LAW OFFICE OF RICHARD A. ALTMAN
Attorneys for Plaintiff
285 West Fourth Street
New York, New York 10014
212.633.0123
altmanlaw@earthlink.net
artesq@earthlink.net

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

PETER PAUL BIRO,

        Plaintiff,                          <u>COMPLAINT</u>

   -against-

CONDÉ NAST, a division of
ADVANCE MAGAZINE PUBLISHERS INC.,    Plaintiff demands trial by jury
DAVID GRANN,                                of all issues so triable.
DAN'S PAPERS, LLC,
MANHATTAN MEDIA LLC,
and DAN RATTINER,

        Defendants.

------------------------------------------------------------x

      Plaintiff PETER PAUL BIRO, by his attorneys, Law Office of Richard A. Altman, for

his complaint against the defendants, alleges as follows:


<u>INTRODUCTION</u>

      1.  This is an action for libel caused by the publication of a reckless, defamatory and

utterly false article of, about and concerning the plaintiff Peter Paul Biro, written by defendant

David Grann.  The article was published in the New Yorker Magazine, published by defendant

Condé Nast, a division of defendant Advance Magazine Publishers Inc. ("Advance"), in its issue dated July 12 and 19, 2010 ("the Article").

2.  Plaintiff also brings a claims against defendants Dan's Papers, LLC, Manhattan Media LLC and Dan Rattiner, who wrote and published an article in response to the Article, repeated many of the same defamatory statements as are contained therein, and also added some of their own.

3.  The articles and publications complained of herein are false and defamatory.  They have been widely circulated and commented on in the art world and elsewhere, and have caused, and continue to cause, enormous damage to plaintiff's reputation, to his business and to his health.

4.  In addition, plaintiff has incurred special damages as a result of defendants' false statements.

THE PARTIES, JURISDICTION AND VENUE

5. Plaintiff Peter Paul Biro is a resident and citizen of Montreal, Canada.

6.  He is by profession a forensic scientist, specializing in the use of fingerprint technology to assist in the resolution of issues of authenticity in works of art.  He trained and practiced as a conservator, but some years ago began to study artists' fingerprints, and in particular on a painting which was possibly by J.M.W. Turner.

7.  Plaintiff discovered a fingerprint on the painting, and this led him to question whether traditional methods for attribution of works of art could be supplemented by more scientific means. By comparing the fingerprint found in the painting to another he found in a known

Turner work, he provided strong evidence that the painting was an authentic Turner. The finding was corroborated by established fingerprint experts at the time.

8.  Since then plaintiff has continued to evolve his methodology and documented fingerprints from the works of other noted artists. As a leading authority in this emerging field, plaintiff's services have been retained in a number of challenging authentication studies for collections and private clients worldwide.

9.  Plaintiff has lectured at Harvard University, the Yale Club in New York, the National Portrait Gallery in London, and the University of Glasgow in Scotland, among others. He has also published articles in scientific journals, including one entitled "Forensics and Microscopy in Authenticating Works of Art" in the journal of the Royal Microscopical Society, Oxford, England.  He has been interviewed for a feature-length documentary "Who the #$&% is Jackson Pollock?," two BBC documentaries, CBS's 60 Minutes, CNN, and a forthcoming documentary produced by the National Geographic Society.

10. Defendant Advance is on information and belief, a New York corporation with a principal place of business at Four Times Square, New York, New York 10036, and the publisher of the New Yorker Magazine, which is issued 47 times a year.

11.  Defendant David Grann is, on information and belief, a citizen of the City and State of New York, and is a staff writer for the New Yorker Magazine, and is employed by the defendant Advance.

12. Defendant Dan's Papers Inc. is, on information and belief, a New York corporation with a principal place of business at 79 Madison Avenue, 16th Floor, New York, New York, and which publishes a weekly magazine called Dan's Papers.

13. Defendant Dan Rattiner is, on information and belief, an individual who resides in Bridgehampton, New York.

14. Defendant Manhattan Media LLC ("Manhattan Media") is, on information and belief, a New York Limited Liability Corporation with a principal place of business at 79 Madison Avenue, 16th Floor, New York, New York.

15. On information and belief, Manhattan Media is the owner of defendant Dan's Papers, or otherwise holds a controlling interest therein.

16. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(2), in that it is between a citizen or subject of a foreign state and citizens of this State, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

17. Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district in that the defendants reside or may be found in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and the defendants are subject to personal jurisdiction in this district.

FIRST CLAIM FOR DEFAMATION
AGAINST DEFENDANTS ADVANCE AND GRANN

18. Plaintiff re-alleges paragraphs 1 through 17.

19. On or about July 5, 2010, defendant Grann and Advance published in the New Yorker Magazine, and distributed throughout the world and on the internet, an article containing

-4-

more than 16,000 words, of, about and concerning the plaintiff ("the Article").  It is entitled "The Mark of a Masterpiece:  The man who keeps finding famous fingerprints on uncelebrated works of art."  A true and complete copy of the Article is annexed as Exhibit A.

20.   On information and belief, the weekly circulation of the New Yorker Magazine exceeds one million copies.

21.   The Article contains a byline of, and was written by, defendant David Grann.

22.   The Article purports to be an in-depth study of the science of forensic examination of art works, and of the use of fingerprint technology to advance that science.

23.   It is nothing of the sort, but is rather a false and defamatory screed against plaintiff, written and published with malice and an indifference to the standards of responsible journalism.

24.   The Article relies to a significant extent on anonymous sources, many of whom are no longer alive, and repeats defamatory statements made by those sources.

25.   Through selective omission, innuendo and malicious sarcasm, the Article paints a portrait of plaintiff which has no basis in reality, and which has been highly damaging to his reputation.

26.   The intent of the Article is apparent from the very subtitle, which implies that plaintiff finds fingerprints where they do not exist, and which represents an editorial attempt to prejudice the reader in advance of the narrative which follows.

27.   Defendant Grann obtained plaintiff's consent to a series of interviews by misleading him about defendant Grann's true intentions in writing the Article, and he distorted the substance of those interviews to serve a predetermined  agenda.

28.  The Article ignores the many highly celebrated and iconic masterpieces of art which plaintiff has been privileged to work with, including Edvard Münch's *Scream*, works by Leonardo da Vinci, Claude Monet's *Impression, soleil levant*, and many works by J.M.W. Turner.

29.  These artworks have been written about in books ranging from academic studies to coffee table books and have garnered widespread acclaim.

30.  The Article also ignores the many other works of art which plaintiff has worked with over the years, as well as his many satisfied clients.

31.  Furthermore, the Article ignores the many works of art which plaintiff was asked to study and evaluate, but which he rejected because in his professional opinion the forensic information on them was insufficient or illegible.

32.  It is thus, in the context of the entire Article, false and defamatory to say that plaintiff "keeps finding famous fingerprints on uncelebrated works of art," because such an accusation may reasonably be deemed tantamount to accusing plaintiff of fraudulent conduct and incompetence in his profession, by finding fingerprints where they do not exist.

33.  Taken as a whole, the Article is constructed on the basis of selective omission rather than inclusion of information that would lead the story in a balanced direction.

34.  Many of the sources quoted or otherwise used in the Article have died, and thus cannot comment or refute what they are alleged to have said.

35.  Many statements are edited so as to give a sinister and suspicious connotation to what would otherwise be objective facts.

36. In the end and in its entirety, the Article demonstrates a shocking indifference to the truth, and a violation of the basic principles of professional journalism.

37. Defendant Grann, writing much of the Article in the first person, says that "[r]eporters work, in many ways, like authenticators. We encounter people, form intuitions about them, and then attempt to verify these impressions…A woman who had once known him well told me, 'Look deeper into his past. Look at his family business.' As I probed further, I discovered an underpainting that I had never imagined." Exhibit A at 11-12.

38. Leaving aside the fatuity of defendant Grann, a journalist and writer, comparing himself to an art authenticator, and referring to underpaintings as if he had studied art works under ultraviolet light or X-rays instead of writing a magazine article, such a statement–from an anonymous source–demonstrates an unprofessional refusal to look at actual facts.

39. Such an attitude of "attempt[ing] to verify these impressions," strongly suggests "confirmation bias," defined as "a tendency for people to favor information that confirms their preconceptions or hypotheses regardless of whether the information is true." http://en.wikipedia.org/wiki/Confirmation_bias.

40. The attitude may be harmless in the case of the public generally, but when a journalist in a national magazine succumbs to it, the effect is profound and destructive, as it is here.

41. Defendants Advance and Grann did not act from intuitions, but from preconceived prejudices and over-reliance on anonymous sources, some of whom are demonstrated liars.

42.  Plaintiff is not a public figure, and has not willfully thrust himself into a matter of public importance or controversy.  He is a highly skilled professional whose career of many years has been destroyed by defendants' actions, and who has suffered both general and special damages as a direct result.

43.  Defendants Advance and Grann acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties, and should be held responsible for their libels.

THE D.C. CIRCUIT COURT FOUND THAT DEFENDANT GRANN
WROTE AND PUBLISHED MATERIAL "REASONABLY
CAPABLE OF A DEFAMATORY MEANING."

44.  The defendant Advance had substantial reason to question the accuracy of many of the statements in the Article, and the bona fides of defendant Grann.

45.  Defendant Grann has been judicially determined to have written and published statements capable of a defamatory meaning.

46.  In *Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C.Cir.2001), defendant Grann was a defendant in a defamation suit arising from an article he had written about a political figure named Paul Weyrich.  The D.C. Circuit said:

> The article is flowered with anecdotes that reveal Weyrich to be both emotionally volatile and short-tempered, and it depicts him as both a zealoted political extremist and an easily-enraged tyrant of the first order....Accepting the facts as alleged in the complaint, as we must, it appears that some of the anecdotes reported in the article are reasonably capable of defamatory meaning and arguably place Weyrich in a false light that would be highly offensive to a reasonable person.  Thus, because we find that some of the article's contested statements are both verifiable and reasonably capable of defamatory meaning, at least a portion of the complaint is sufficient to survive a Rule 12(b)(6) motion to dismiss. We are

> therefore constrained to reverse and remand the case for further proceedings....There is no doubt that a reasonable person, reading the article's repeated tale of appellant's volatile temper and apparent emotional instability, could very well conclude that appellant is an emotionally unstable individual unfit for his trade or profession.  One or more of the anecdotes arguably make appellant appear personally odious, infamous, or ridiculous.
> 235 F.3d at 620, 628.

47.  The case was widely publicized at the time, and thus defendant Advance either knew or should have known of the defendant Grann's defamatory propensities when it hired him as a staff writer.

48.  The defendant Advance had more than ample time to investigate and determine the validity of the statements made by defendant Grann in the Article before publishing it, but failed to do so.

49.  Defendant Advance, and the New Yorker Magazine, have an unwarranted reputation for being assiduous and thorough fact-checkers, but failed to comport themselves as such here.

50.  Under the facts and circumstances, in failing to question the accuracy of defendant Grann's reporting, defendant Advance acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

## THE SPECIFIC LANGUAGE IN THE ARTICLE, AND PLAINTIFF'S RESPONSES THERETO.

51.  The Article contains numerous statements of fact which are false and defamatory. Some, but not all, of those statements follow, and the Article is incorporated herein in its entirety by reference.

52.  The Article introduces plaintiff with the following: "in January, 2009, [Leonardo scholar Martin] Kemp turned to a Canadian forensic art expert named Peter Paul Biro, who, during the past several years, has pioneered a radical new approach to authenticating pictures." *Id.* at 5.

53.  This statement is false and misleading.  There is nothing radical about fingerprints, not even on artworks, and plaintiff is not the first person who has looked for fingerprints to provide evidence to assist in the attribution of works of art.

54.  For example, a purported fingerprint played a role in the celebrated 1929 case of *Hahn v. Duveen*, 133 Misc. 871, 234 N.Y.S. 185 (Sup.Ct.N.Y.Co.1929), a defamation suit about the authenticity of a painting attributed to Leonardo da Vinci.

55.  The Article describes plaintiff physically in terms which are intended to demean his appearance:

> "Come in, come in," Biro said, opening the door to his elegant three-story brick house, in Montreal.  Biro, who is in his mid-fifties, has a fleshy pink face and a gourmand's stomach, and he wore black slacks, a black turtleneck, and black shoes—his habitual raven-like outfit. A pair of glasses dangled from a string around his neck, and he had thick sideburns and whitening black hair that stood on end, as if he had been working late. ("For me, this is not a nine-to-five job," he later said. "I wake up in the middle of the night because something occurred to me. It's basically every waking hour.") In his arms, he cradled a miniature schnauzer. "This is Coco," he said, petting the dog to keep it from barking.

*Id.* at 5.

56.  In fact, plaintiff often wears black while working, in order to avoid back-reflections during photography sessions.  Using ultraviolet techniques, white or bright colors interfere with the process, which requires total darkness.

57.  The choice of language makes plaintiff appear to be sinister, and the physical description is pointlessly but intentionally demeaning.

58.  The Article continues, "[t]hough it was still early in the day, Biro reached into a long wooden rack filled with wine bottles and removed one. After examining the label, he poured himself some and offered me a glass. 'Every drop is precious,' he said, before finishing his glass and refilling it."  *Id.* at 5.

59.  In fact, there is no "long wooden rack" and it was lunchtime, not "early in the day."

60.  The choice of language falsely suggests that plaintiff drinks to excess.

61.  On page 11 of Exhibit A, the following appears:

And so, with this final flourish, the glittering portrait of Peter Paul Biro was complete:  he was the triumphant scientist who had transformed the art world. Like "La Bella Principessa," the image was most appealing to the eye.  But, somewhere along the way, I began to notice small, and then more glaring, imperfections in this picture.

One of the first cracks appeared when I examined the case of Alex Matter, a filmmaker whose parents had been close to Jackson Pollock. In 2005, Matter announced that he had discovered a cache of art works in his late father's storage space, on Long Island. Ellen Landau, the art historian, said that she was "absolutely convinced" that the paintings were by Pollock.

Biro was sent a photograph of a fingerprint impressed on the front of one picture. He identified six characteristics that corresponded with the fingerprint on the paint can in Pollock's studio—strong evidence that the work was by Pollock. But, as more and more connoisseurs weighed in, they noticed patterns that seemed at odds with Pollock's style. Meanwhile, in sixteen of twenty art works submitted for analysis, forensic scientists discovered pigments that were not patented until after Pollock's death, in 1956. At a symposium three years ago, Pollock experts all but ruled out the pictures. Ronald D. Spencer, a lawyer who represents the Pollock-Krasner Foundation, told me, "Biro can find all the fingerprints he wants. But, in terms of the marketplace, the Matter paintings are done. They are finished."

When I first talked to Biro about Matter's cache, he had noted that no anachronistic pigments were found on the picture that he had authenticated, and he said that it was possible that Pollock had created only a few of the pictures, or

that he had simply touched one of them. After all, Pollock was a friend of Matter's parents.

His explanation seemed plausible, but I kept being troubled by other details relating to Biro's Pollock investigations. For instance, it was peculiar that even though there were no documented cases of acrylic being used in Pollock's pour paintings, Biro had easily found some on the floor of the Long Island studio—indeed, in the very first sample he tested. I contacted a leading forensic scientist in the art world who teaches at the F.B.I. Academy, in Quantico, Virginia, and who has done research in the Pollock studio. The scientist told me that he had spent hours combing the floor and had not found any acrylic. He added that a microchemistry test was not even considered suitable for identifying acrylic. As for the gold paint particles that Biro said he had uncovered on the studio floor and matched to the pigment in Teri Horton's painting, Helen Harrison, an art historian who is the director of the Pollock-Krasner House & Study Center, which oversees Pollock's old studio, told me that she did not know of Pollock's having used gold in any of his pour paintings.

62.  The foregoing, taken as a whole, is false and defamatory, in that it implies that Biro planted or fabricated evidence to support his contention that the pictures were by Jackson Pollock.

63.  In fact, plaintiff never stated that any of the Matter paintings were authentic Pollocks, and has never implied at any point in time that Pollock used gold-colored paint in his paintings.

64.  The Article continues:

I contacted a leading forensic scientist in the art world who teaches at the F.B.I. Academy, in Quantico, Virginia, and who has done research in the Pollock studio. The scientist told me that he had spent hours combing the floor and had not found any acrylic. He added that a microchemistry test was not even considered suitable for identifying acrylic.

*Id.* at 11.

65.  In fact, the studio floor measures approximately 400 square feet and is heavily covered in paint in a myriad of patterns and colors. A major research project would be required to conclusively make such a statement, and a project of this magnitude would be published.

Moreover, the actual detection of acrylate was made by Dr. Nicholas Eastaugh using FTIR spectroscopy.

66. The Article continues:

One day, I visited the records office at the Palais de Justice, the provincial courthouse in downtown Montreal... During the eighties and early nineties, more than a dozen civil lawsuits had been filed against Peter Paul Biro, his brother, his father, or their art businesses. Many of them stemmed from unpaid creditors. An owner of a picture-frame company alleged that the Biros had issued checks that bounced and had operated "under the cover" of defunct companies "with the clear aim of confusing their creditors." (The matter was settled out of court.).

*Id.* at 12.

67. These statements are false and defamatory.  There were no "defunct companies" and plaintiff did not operate "under the cover" of such companies "with the clear aim of confusing their creditors."

68. The Article continues:

On February 12, 1981, Sam and Syd Wise, brothers who were art collectors in Montreal, stopped by the Biros' gallery. Peter Paul Biro was present, along with his father, Geza. The restoration business was in the back of the gallery, and the Biros often wore white laboratory coats. ...Though the gallery was filled mostly with Geza's landscape paintings, Peter Paul told the Wises that they had for sale an exemplary oil painting by Goodridge Roberts, the Canadian artist. The picture was signed and showed what appeared to be Georgian Bay, in Ontario, which Roberts had often rendered in his paintings. The Wises bought the picture for ninety-five hundred dollars. Soon afterward, Peter Paul informed the Wises that he had another landscape painting by Roberts, and the Wises, who had already sold the first picture to a local gallery, agreed to buy the second one, for seventy-five hundred dollars.
In 1983, Goodridge Roberts's widow, Joan, happened to visit the gallery where the Wises had sold the Georgian Bay painting. She had been intimately involved in her husband's work, keeping a catalogue of his paintings, and she was immediately drawn to the picture. As she subsequently testified, it mimicked her husband's paintings, but the trees were "feeble imitations," the play of the colors

was jarring, and the signature appeared oddly slanted. Moreover, she had never
catalogued the work. She went up to the dealer and cried, "That's a fake."
...
Peter Paul Biro insisted that the works were genuine—and that, in any case, the
Wises had had an opportunity to investigate the paintings before buying them. He
refused to reimburse the Wises, who ultimately sued..
...
Throughout the trial, the Biros and their attorneys maintained that the two
paintings sold to the Wises were authentic, but to make their case they presented
an art expert who was not a specialist on Roberts, or even on Canadian art.
On September 3, 1986, the court found in favor of the Wises, and ordered Peter
Paul and Geza Biro to pay them the seventeen thousand dollars they had spent
on the pictures, as well as interest.

*Id.* at 12-13.

69.  This excerpt, taken as a whole, is false and defamatory in that it implies that plaintiff

knowingly sold fake art, and concealed that fact until the trial court ruled against them.

70.  In fact, the trial court ruled only that the contract should be cancelled, and made no

finding regarding the authenticity of the paintings.

71.  In fact, the testimony was that the original owner had purchased the painting directly

from the artist when, by chance he encountered Goodridge Roberts painting in the countryside,

and bought the painting directly off the easel.  That owner, however, had died by the time of the

trial.

72.    Moreover, plaintiff's expert witness, a Professor Warren Sanderson, only

recommended technical and scientific examinations on the paintings, which were never carried

out.

73.  The Article continues:

Sand was contacted by another former client of the Biros, an art-and-antique
collector named Saul Hendler, who has since died.  According to court records

-14-

and interviews with Sand and Hendler's wife, Marion, the Biros approached
Hendler in 1983, saying that they had found a suspected Renoir, signed by the
artist, which, if authenticated, was worth millions of dollars.  The Biros asked
Hendler to front them nine thousand dollars to buy the painting, a portrait of a
nude woman; the Biros would then authenticate the work and sell it, sharing the
profits. Hendler gave them the money.  Not long afterward, Peter Paul Biro
consulted a leading Renoir expert, who determined that the painting was a fake
and that the signature was forged.  The Biros refunded Hendler half his money,
and eventually agreed to give him the painting, which still had some value as a
decorative piece.
*Id.* at 13.

74. This excerpt, taken as a whole, is false and defamatory in that it implies that plaintiff

knowingly sold fake art, a criminal offense.

75.     In fact, Hendler was a dealer/collector who expressed interest in acquiring

undervalued and undiscovered pieces.  He was a repeat client for restoration of artwork prior

to this episode.

76.  The agreement between them was to jointly acquire a painting of a seated nude

signed "Renoir" and explore its potential.

77.  Plaintiff was not then in the business of authentication, and consulted a Renoir

expert, who returned a negative opinion.

78.  Confronted with this news, Hendler became belligerent and demanded all of his

money back.

79.  The court awarded him half of the purchase price (his part of the investment), the

other half representing effort and cost of restoration and research carried out by plaintiff.

80.  The Article continues:

When Hendler picked up the picture, he thought that the composition looked
vaguely different. He had previously made a photo transparency of the painting,

and at home he compared it with the canvas he had just been handed. "My late husband was furious," Marion Hendler told me. "Then I saw it, and I was horrified. It was clearly not the same painting." Had the Biros sold the original painting without telling Hendler?

*Id.* at 13.

81.  This excerpt, taken as a whole, is false and defamatory in that it implies that plaintiff switched one painting for another, or fraudulently sold a painting determined by experts as not by Renoir as if it were authentic, for a substantial sum of money.

82.  In fact, the painting had undergone the removal of large amounts of aged darkened varnish, and the undoing of prior alterations done to it in a previous restoration. As a result, understandably the painting in that state no longer perfectly matched the appearance of its un-restored state.

83.  The Article continues:

Hendler, unable to get back what he considered the original painting, sued the Biros for the rest of the money he had paid. In a written response, the Biros called the allegations "false and untrue and defamatory," adding that "the sole difference in the painting was the work which had been performed on the painting by the Defendants in lifting the paint in order to discover the original painting which had appeared on the canvas." During the trial, which took place in 1992, Sand called to the stand an art expert who testified that the painting was not the same as the one Hendler had bought. The court agreed, awarding Hendler several thousand dollars. But Marion asked me, "What did we win?" She went on, "Where's that piece of art? We never got it back. He probably sold it for a lot of money and we got this piece of junk in return."

*Id.* at 13.

84.  This excerpt, taken as a whole, is false and defamatory in that it implies that plaintiff defrauded the Hendlers.

85.  In fact, the Hendlers' claim was fully paid. What the Article fails to say is that, after plaintiff purchased the painting back, Marion Hendler also demanded a signed Renoir for free, thrown in as part of the deal.

86.  Furthermore, the court consigned the painting back to plaintiff in return for the full refund, thus showing that Hendler had no ownership interest.

87. The Article continues:

Lawsuits had piled up against Peter Paul Biro and his family business.  In two instances, there were allegations that art works had vanished under mysterious circumstances while in the care of Peter Paul. In one of the cases, Serge Joyal, who is now a senator in Canada, told me that he left a nineteenth-century drawing with the Biros to be restored. Before he could pick it up, Peter Paul notified him that it had been stolen from his car and that there was no insurance. Biro, however, never filed a police report, and Joyal says that Biro pleaded with him to wait before going to the authorities. During their conversations, Joyal says, Peter Paul acted evasive and suspicious, and Joyal became convinced that Biro was lying about the theft. As Joyal put it, "There was something fishy." Though Peter Paul said that there was nothing "suspect" about his behavior, and that he should not be held liable, the court awarded Joyal seven thousand dollars, plus interest.

*Id.* at 13.

88.  This excerpt, taken as a whole, is false and defamatory in that it implies that plaintiff concealed a theft, or was a thief himself, and describes him as a liar.

89.  It is also false and defamatory in that it mentions "two instances" but describes only one.

90.  In fact, the vehicle was apparently taken for a joyride and returned unharmed. Since the car was returned intact, plaintiff did not file a police report.

91.  However,  after the incident plaintiff realized that the drawing was missing, and so informed Joyal, saying that he (Joyal) could file a police report if he (Joyal) deemed it necessary.

-17-

92.  Instead of filing a police report and making an insurance claim, Joyal sued, alleging that the drawing was more valuable than it actually was worth.  On information and belief, the court awarded the lesser value.

93.  No wrongdoing was ever attributed to plaintiff in the matter.

94.  The excerpt is also false and defamatory in that it says "art works had vanished under mysterious circumstances while in the care of Peter Paul."  *Id.* at 13.

95.  In fact, this was the one and only instance of the loss of an art work while in plaintiff's care and custody, and it was the result of a theft, not of any lack of due care or wrongdoing on the plaintiff's part.

96.  The Article continues:

Elizabeth Lipsz, a Montreal businesswoman who had once been close to Biro, and who won a lawsuit against him for unpaid loans, described him to me as a "classic con man." Her lawyer  told me that Biro "was so convincing. He was very suave, soft-spoken, but after a while you catch him in different lies and you realize that the guy is a phony."

*Id.* at 13-14.

97.  The excerpt is false and defamatory.

98.  In fact, plaintiff has asked Lipsz to confirm or deny the statement she allegedly made to defendant Grann, and to provide the name of her unnamed attorney.  She has refused to respond.

99.  The Article continues:

Within Montreal's small art world, there were whispers about Peter Paul Biro and his father.  But the lawsuits appear to have attracted virtually no public attention. In 1993, Peter Paul Biro filed for bankruptcy, and he never paid many of the judgments against him, including what he owed the Wises and Joyal. Lipsz's

lawyer said of Biro, "He oiled his way out of that whole thing....He got away scot-free."

*Id.* at 14.

100.  The excerpt is false and defamatory and scurrilous in its use of the words, "he oiled his way out of that whole thing...He got away scot-free."

101.  It is accurate to state that plaintiff filed for bankruptcy in 1993 and was discharged. However, in the early 1990s the art market in Montreal suffered a serious recession, major art galleries closed, and some moved away because of it.  Plaintiff was among the victims of that recession.

102.  Plaintiff's financial difficulties under such circumstances some two decades ago is utterly irrelevant to the work he does today, and was brought up for no reason other than to smear plaintiff in that work, to undermine his credibility and to damage his reputation.

103.  The Article continues:

Biro was part of an effort to launch a venture named Provenance, which would provide, as he put it, the "clever strategy" necessary to sell "orphaned" paintings for tens of millions of dollars. According to a business prospectus, marked confidential, Provenance would acquire art works that had been forensically validated by Biro and several colleagues, and sell them in a gallery in New York City. The company chose a thumbprint for a logo...Once Provenance was established, Biro told the Parkers, "there really is nothing we can no[t] do."

The plan called for raising sixty-five million dollars from investors, part of which would go toward buying J. P. Morgan's old headquarters, on Wall Street, and turning it into a palatial arts complex anchored by a gallery. Surprisingly, at least five million dollars of investors' money would also go to purchasing Teri Horton's painting—even though Biro had authenticated the work and Volpe had tried to sell it. By capitalizing on the media interest surrounding the painting, the plan said, the work could be resold for between forty and sixty million dollars, maybe even a hundred million. Although Biro has always publicly maintained that he had no financial stake in Horton's painting, Horton sent an e-mail to the

-19-

Parkers saying that after the sale of her painting Biro would "collect" and that it would "set him for life."

The business plan noted that Biro had access to "more than 20" other valuable orphaned paintings, all of which could be sold at Provenance. Among them were paintings by artists with whom Biro and his family had long been closely associated, including three by Turner and a landscape by Constable. The plan estimated that each year Provenance would accept anywhere from twenty to thirty new possible masterpieces for scientific evaluation, of which nearly half would be authenticated, creating staggering profits. (The forensic expert who works with the F.B.I. expressed surprise at this prediction, telling me that, in the overwhelming majority of cases involving disputed art, the work fails to be authenticated.)

Provenance was cleverly tapping into the public's desire to crack open the art world, offering the tantalizing dream that anyone could find a Pollock or a Leonardo or a Turner languishing in a basement or a thrift shop. The company combined the forensic triumphalism of "C.S.I." with the lottery ethos of "Antiques Roadshow." (An associate producer at "Roadshow" had already sent Biro an e-mail about possibly doing a segment on the Parkers' "unbelievable discovery.")

*Id.* at 15.

104.   The foregoing excerpt, taken as a whole, is false and defamatory, in that it implies that plaintiff was the initiator of a fraudulent investment scheme, and that he planned as part of the scheme to falsely authenticate art works so as to create "staggering profits," and that plaintiff "was cleverly trapping into the public's desire to crack open the art world."

105.   The Article continues, "Biro previously had been suspected of creating an investment scheme around a seemingly precious object, with the promise that it would eventually reap huge profits...Lafferty's longtime business partner, Allan Aitken, told me that he believed that 'Biro was either a shyster or a con man, and had found in Lafferty an easy mark.'" *Id.* at 15-16.

106.  The statement is false and defamatory.

107.  In fact, plaintiff has never taken an interest in any of the works of art he is asked to analyze, but only charges a daily fee plus expenses. He does not work on contingency or for a percentage if a work is sold, so as to maintain disinterest in the outcome of his investigations.

108.  Plaintiff has never asked for or received a bonus from any client because of an attribution or opinion regarding authenticity.

109.  The Article continues, "[w]hen I asked Biro about the allegedly forged fingerprints on the Parkers' painting, he peered intently at his glass of wine. I suddenly noticed how blue his eyes were. Calm again, he denied that he had ever forged a fingerprint." *Id.* at 19.

110.  The statement is false and defamatory, in that it implies that plaintiff had in fact forged fingerprints, and that his denial was a lie.

111.  The Article continues, "I asked whether their father had forged the fake Goodridge Roberts landscape, or the painting given to Saul Hendler, or any other works of art. Laszlo stood up, circling the table, and for the first time Peter Paul became agitated." *Id.* at 19.

112.  The statement is false and defamatory, in that it implies that plaintiff's and his brother's understandable emotional reaction to having their father accused of forgery and insulted in plaintiff's own home was somehow an admission of guilt.

113. The Article continues, "[w]e discussed "Landscape with a Rainbow," the purported Turner painting that was Peter Paul Biro's first fingerprint-authentication case." *Id.* at 19.

114.  The statement is false and defamatory, in that it implies that the painting is only purportedly authentic,  that plaintiff was the only person who claimed it to be authentic, and that it is not considered a genuine Turner.

115.  In fact, the fingerprints were not matched by plaintiff, but confirmed by a top British fingerprint expert named John Manners. The painting was authenticated by David Hill, a well-known Turner scholar, who to this day stands by his opinion.  The scientific work was done by Dr. Nicholas Eastaugh and a specialist from the Tate Gallery in London.

116.  The Article continues, "Biro later noted that he had spent only a 'few hours' in Pollock's studio, in the 'presence of staff,' making it impossible for him to have made a rubber stamp. But when I asked Helen Harrison, who oversees the studio, about this, she said, 'That's not true.' Her records show that he visited four times, once with Tod Volpe, and that he was 'there for hours.'  She said that she did not watch over him all that time; indeed, in her absence he had removed, 'without authorization,' a match from the floor, which he took to Montreal to analyze for possible paint particles." *Id.* at 20.

117.  The statements are false and defamatory, in that they imply that plaintiff committed a fraud and that he was a thief.

118.  The Article continues:

By the time that Biro took on "La Bella Principessa,"  his reputation had become so solid, and the public appetite for forensic solutions had become so strong, that he no longer seems to have worried about watermarking his evidence or presenting a perfect match. Many people, not just experts, can look at a painting and argue over what they see, but few individuals, inside or outside the art world, can evaluate fingerprints.  In that sense, Biro's authentications were far less demo-cratic than traditional connoisseurship. Though he told me that he did not want to be "judge and jury,"  he had positioned himself as a singular authority.

*Id.* at 21.

119.   The statements are false and defamatory, in that they imply that plaintiff's reputation was unwarranted, and that he was in fact a fraud.

120.   In fact, any individual who serves on a jury in a case involving fingerprint evidence can decide whether there is a match, and plaintiff has never claimed to be a singular authority.

121.   The Article continues, "I followed Biro into his basement laboratory, where his father's landscape paintings hung. I wondered what had consigned them to this fate—hidden from the public, seen only by an adoring son.  They had, I thought, a certain anguished beauty, but they also seemed derivative.  Perhaps Biro's father had lacked that divine spark of originality, or perhaps he had sacrificed it while inhabiting the skin of immortal artists."  *Id.* at 21.

122.   The statements are false and defamatory, in that they imply that plaintiff is concealing his own private property because he has something to hide, and that he is protecting his father as well by concealing the latter's wrongdoing.

123.   The statements scurrilously defame plaintiff by defaming his dead father, who cannot sue.

### DEFENDANTS RELIED UPON A SOURCE WHO A COURT FOUND "ENGAGED IN PERSISTENT MISCONDUCT."

124.  One of defendants Advance and Grann's principal sources was one Theresa Franks. She is described as the Founder of a company called Global Fine Art Registry, based in Phoenix.

125.   In her website, Franks says:

Teri is grateful to the author David Grann for his fine work and for including some material and videos that were a result of the investigation that Fine Art

Registry® conducted in reference to Peter Paul Biro and his amazing ability to discover fingerprints of the Masters on everything he examines. If a fingerprint is needed, he will find it. FAR® began its probe into Biro and his dealings back in 2007 with some amazing results. There are more questions raised here than answered, however there will be more revelations to come!

See http://www.fineartregistry.com/articles/2010-07/ fine-art-registry-featured-in-the-new-yorker-magazine.php.

126.    The Article says:

[A]lthough not well known in the art world, [she] has cast herself as a crusader against fraud in a realm that she describes as the "last wild frontier."  Operating out of her home, she pursues her own investigations, hiring independent experts and posting reports on her Web site. (One of her recent campaigns was against a company named Park West Gallery, which, she alleged, was selling fake prints by Salvador Dali. The gallery's founder, who called her attacks "cyber-terrorism," sued for defamation. In April, a jury ruled unanimously in Franks's favor, and awarded her half a million dollars in a counterclaim.).

127.  By noting that a jury had determined in her favor on a counterclaim which she had brought in a defamation action against her, the Article thereby suggests that Franks was vindicated after a trial, that her reputation for truthfulness and veracity had been unfairly maligned, and that her accusations should be deemed credible.

128.  However, on August 16, 2010, the District Court in the case vacated the jury verdict on Franks's counterclaim and ordered a new trial:

[T]he Court finds that Franks and counsel for the FAR Defendants engaged in persistent misconduct in front of the jury throughout the trial, and it would be fair to characterize the misconduct as contumacious conduct.  As explained below, the Court also concludes that their misconduct permeated the trial and justifies ordering a new trial against the FAR Defendants.
...
[T]he Court finds that Franks and counsel for the FAR Defendants engaged in a deliberate course of conduct aimed at preventing a fair and impartial jury and that such misconduct: (1) deflected the jury's attention from the issues involved, (2) caused unfair prejudice to Plaintiff, and (3) had a controlling influence on the

-24-

jury.  In addition, the Court finds that Plaintiff has made a concrete showing that
the misconduct of counsel [and Franks and Szostak] consistently permeated the
entire trial from beginning to end.  The Court thus concludes that there was a
reasonable probability that a fair and impartial jury no longer existed by the time
it commenced deliberations and, accordingly, that a fair verdict was not rendered
in this case.
*Park West Galleries, Inc. v. Global Fine Art Registry, LLC*, 2010 U.S. Dist. LEXIS 84525 at
*13 and *65 (E.D.Mich.Aug.16, 2010)(citations and quotation marks omitted; brackets
in original).

129.  On information and belief, the defendants Grann and Advance have never printed

a clarification or correction of the statement in the Article regarding the award on the

counterclaim, and the fact that it was vacated because of the "contumacious conduct" of Franks

and her counsel.

130.  The defendant Advance knew or should have known that one of the Article's

principal sources had a reputation for misleading and fraudulent conduct.

131.  Thus, both defendant Advance's writer, and one of his principal sources, had been

defendants in court cases which held against them, which harshly criticized their professionalism,

and found that they had respectively engaged in potentially defamatory conduct, and actual

"contumacious conduct" in front of a jury.

132.  Under the circumstances, defendant Advance had substantial reason to question

the reporting abilities of defendant Grann, the accuracy of the Article and the bona fides of

defendant Grann and his sources.

133.  However, defendant Advance failed to exercise that degree of responsibility which

was appropriate under the circumstances and which is normally observed by a large media

defendants.

134.  Both Advance and Grann acted in a grossly irresponsible manner, without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible reporters and media organizations.

### TAKEN AS A WHOLE, THE ARTICLE IS A DEVASTATING AND UTTERLY FALSE ATTACK ON PLAINTIFF'S REPUTATION.

135.  The complained of language in the Article has exposed plaintiff to public contempt, ridicule, aversion or disgrace, has induced an evil opinion of him in the minds of right-thinking persons and has deprived him of their friendly intercourse in society.

136.  The words complained of are libelous per se in that they have injured the plaintiff in his good name and profession as a forensic scientist.

137.  The words complained of are libelous per se in that they falsely imply that plaintiff was guilty of crimes, of fraudulent conduct and of deceit.

138.  Plaintiff has never been convicted of any crime.

139.  The words complained of imply that plaintiff is dishonest and incompetent in his profession and are thus libelous per se.

140.  Several persons have refused to deal with plaintiff as a direct result of the Article, causing him special damages, as set forth in the Third Claim.

141.  Plaintiff has suffered severe emotional and physical distress as a direct result of the Article.

142.  The conduct of defendants Advance and Grann was malicious and done with intent to harm plaintiff in his person and profession, and to destroy his formerly excellent reputation.

143.  Defendants Advance and Grann are liable to plaintiff for defamation, and for such amounts in compensatory and punitive damages as the Court and a jury may deem appropriate, but not less than $1 million.

## SECOND CLAIM FOR DEFAMATION
## AGAINST DEFENDANTS DAN'S PAPERS AND DAN RATTINER

144.  Plaintiff re-alleges paragraphs 1 through 17.

145.  On or about August 13, 2010, defendants Dan's Papers, LLC and Manhattan Media LLC printed and published an article which contained language of, about and concerning the plaintiff ("Dan's Article").  A copy is annexed as Exhibit B.

146.  The Dan's Article was written by defendant Rattiner.  It contains the following language:

147.  "As for Biro, *New Yorker* reporter Grann reveals that Biro and his late father, in the art studio and gallery in Montreal, engaged in all sorts of art forgery, fraud and bogus fingerprint identification.  They'd even served jail time."  Exhibit B at 2-3.

148.  These statements are false and defamatory per se in that they accuse plaintiff of having committed crimes and of being imprisoned for those crimes.

149.  Plaintiff has never been convicted of, or imprisoned for, any crimes.

150.  The Dan's Article further says:

One such bogus fingerprint appeared in an article in *Art News.*  On one side was the fingerprint found on a famous Leonardo painting in Italy.  On the other side is the fingerprint found on a previously unidentified painting that Biro has learned through fingerprint matchup is a Leonardo da Vinci.  Arrows point to where the swirls and turns in the fingerprint coincide.  But experts who, during Grann's time researching his story, looked closely at these side by side fingerprints in *Art*

*News*, found the arrows just point to random locations. And none of them match up. Apparently, everybody just took Biro's word for it. Nobody ever looked very closely before.

*Id.* at 3.

151.  The factual statements that the "arrows just point to random locations. And none of them match up," that "everybody just took Biro's word for it," and that "[n]obody ever looked very closely before" are false, and, in their implications and application to the plaintiff, are defamatory in that they imply that plaintiff is incompetent to practice his profession.

152.  In fact, the fingerprints are indeed comparable, and many persons had examined, and agreed with, plaintiff's conclusions.

153.  Plaintiff Biro through his counsel immediately demanded a retraction of the Dan's Article.

154.  On or about August 27, 2010, defendant Dan's Papers printed and published the following : "CORRECTION/ In an article about Jackson Pollock in this newspaper two weeks ago, it was indicated that Art Expert Peter Paul Biro or members of his family had committed fraud or other crimes and had spent time in jail. This is not the case, and we regret the error." A copy of the correction is annexed as Exhibit C.

155.  This correction was far less prominent than the original article, being placed at the bottom of page 46, whereas the original Dan's Article began on the upper half of page 27, under a large headline which read "Jackson Pollock Matters: Story of Paintings Found at Home Sweet Home Moving Co."

156.   Moreover, the "error" was nothing of the kind, but was rather a fabrication of defendants Dan's Papers, LLC, Manhattan Media LLC and Rattiner.

157.   The allegation in paragraphs 147 and 150  are false and defamatory per se.

158.   Defendants Dan's Papers, Manhattan Media, Inc. and Rattiner are liable to plaintiff for defamation, and for such amounts in compensatory and punitive damages as the Court and a jury may deem appropriate,  but not less than $1 million.

### THIRD CLAIM AGAINST ALL DEFENDANTS
(Injurious Falsehood; Special Damages)

159.   Plaintiff re-alleges paragraphs 1 through 158.

160.   The statements in the Article and the Dan's Article, as set forth above, are false and have caused plaintiff special damages.

161.   Professor Martin Kemp, who initially consulted with plaintiff in connection with the authentication of a drawing which is almost certainly by Leonardo da Vinci, has stated that he is no longer able to deal with plaintiff as a direct result of the publication of the Article.

162.   Plaintiff was a partner in, and a director of, a company called Art Access and Research UK Ltd., and had an ownership interest in it as well.

163.   In August 2010, plaintiff was terminated as a partner in that company, as a direct result of the Article.

164.   Plaintiff was told that he was being terminated because he had brought the company into "ill repute."

165.  Plaintiff thus lost his salary and was deprived of his ownership interest as well.  He is still owed salary and severance pay from that company, as well as the value of his ownership interest, and has been seeking to negotiate a settlement of the damages caused by his unfair ouster.

166.  In addition, around August 2010, the Munch Museum in Oslo Norway informed plaintiff that they had decided to drop an important project which plaintiff had been hired to work on, because of the Article and the Dan's Article.

167.  Paragraph 9 above notes that plaintiff was interviewed for two BBC documentaries. The second one was aired a few weeks ago, and the portion of it which featured plaintiff was taken out, as a direct result of the Article and Dan's Article.

168.  Since August 2010, plaintiff has been working alone, and has lost other potential clients who would otherwise have hired him but for the Article and the Dan's Article.

WHEREFORE, plaintiff demands relief as follows:

1.  On his First Claim, a judgment for compensatory and punitive damages in such amount as may be deemed appropriate by the Court, but not less than $1 million;

2.  On his Second Claim, a judgment for compensatory in such amount as may be deemed appropriate by the Court, but not less than $1 million;

3.  On his Third Claim, a judgment for special damages, in an amount to be determined, but not less than $1 million.

Together with the costs and disbursements of this action, and such further relief as may be just.

Dated: New York, New York
        June 29, 2011

                              LAW OFFICE OF RICHARD A. ALTMAN
                              Attorneys for Plaintiff
                              285 West Fourth Street
                              New York, New York 10014
                              212.633.0123
                              altmanlaw@earthlink.net
                              artesq@earthlink.net