UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

PETER PAUL BIRO,                              :    Index No. 11-CV-04442 (JPO)

                                              :

                      Plaintiff,              :    ECF Case

              -against-                       :

CONDÉ NAST, a division of ADVANCE             :
MAGAZINE PUBLISHERS INC. and DAVID            :
GRANN,                                        :

                                              :

                      Defendants.             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x


**MEMORANDUM IN SUPPORT OF MOTION TO
DISMISS PLAINTIFF'S AMENDED COMPLAINT**


*Of counsel*:                          LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
                                          David A. Schulz
Lynn Oberlander                           Amanda M. Leith
The New Yorker                         321 West 44th Street, Suite 510
4 Times Square                         New York, NY 10036
New York, NY 10036                     (212) 850-6100

                                       *Attorneys for Defendants Advance Magazine
                                       Publishers Inc. and David Grann*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................ 3

     A.    The Parties ...................................................................................................... 3
     B.    *The New Yorker* Article ................................................................................ 3
     C.    The Amended Complaint ................................................................................ 6

ARGUMENT ..................................................................................................................... 8

I.     THE AMENDED COMPLAINT FAILS TO STATE ANY CLAIM FOR
     REPORTING ALLEGATIONS MADE AGAINST BIRO IN PRIOR
     LAWSUITS ................................................................................................................ 8

II.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR
     LIBEL BASED ON ANY ALLEGEDLY FALSE STATEMENT IN THE
     ARTICLE ................................................................................................................. 14

     A.    Plaintiff Has No Claim For Libel Based On Publication Of Non-
          Defamatory Facts ......................................................................................... 14
     B.    Plaintiff Has No Claim For Libel Based On Publication Of
          Opinion and Conjecture ............................................................................... 16

III.   THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR
     LIBEL BASED ON ANY UNSTATED IMPLICATION ALLEGEDLY
     CONVEYED ............................................................................................................ 19

     A.    None of the Challenged Statements Reasonably Conveys the
          Implication Alleged ...................................................................................... 21
          1.   Implied accusations alleged in the Complaint are not found in
              the Article ........................................................................................ 22
          2.   Omissions alleged in the Complaint would not change the gist
              of the Article .................................................................................... 27
          3.   The implication allegedly flowing from the Article "as a
              whole" is the same as the alleged implications of the non-
              actionable statements ...................................................................... 30
     B.    The Article Does Not Adopt or Endorse the Alleged Implications ..................... 31
     C.    Any Implication Actually Conveyed Would Be Fully Protected As
          Opinion ......................................................................................................... 33

IV.   BIRO HAS NO CLAIM FOR INJURIOUS FALSEHOOD ............................................. 34

CONCLUSION ................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abadian v. Lee*,
    117 F. Supp. 2d 481 (D. Md. 2000) ........................................................................30

*Armstrong v. Simon & Schuster, Inc.*,
    85 N.Y.2d 373 (1995) ...........................................................................8, 20, 21, 22

*Aronson v. Wiersma*,
    65 N.Y.2d 592 (1985) ..............................................................................14, 15, 22

*Beary v. West Publishing Co.*,
    763 F.2d 66 (2d. Cir. 1985) ...................................................................................9

*Becher v. Troy Publishing Co.*,
    183 A.D.2d 230 (3d Dep't 1992) ...........................................................................9

*Beverly Hills Foodland, Inc. v. UFCW Local 655*,
    39 F.3d 191 (8th Cir. 1994) .................................................................................27

*Bloom v. Fox News of Los Angeles*,
    528 F. Supp. 2d 69 (E.D.N.Y. 2007) ................................................................16, 17

*Chaiken v. VV Publishing Corp.*,
    907 F.Supp. 689 (S.D.N.Y. 1995), *aff'd*, 119 F.3d 1018 (2d Cir. 1997) ..............................21

*Chandok v. Klessig*,
    648 F. Supp. 2d 449 (N.D.N.Y. 2009), *aff'd*, 632 F.3d 803 (2d Cir. 2011) ...........................7

*Chapin v. Knight-Ridder, Inc.*,
    993 F.2d 1087 (4th Cir. 1993) ..................................................................... passim

*Church of Scientology International v. Behar*,
    238 F.3d 168 (2d Cir. 2001) ...............................................................................14

*Daniel Goldreyer, Ltd v. Van de Wetering*,
    217 A.D.2d 434 (1st Dep't 1995) ...........................................................................9

*DiFolco v. MSNBC Cable L.L.C.*,
    622 F.3d 104 (2d Cir. 2010) ..................................................................................4

*Foley v. CBS Broadcasting, Inc.*,
    2006 WL 6619947 (N.Y. Sup. Sept. 13, 2006) .......................................................18

*Freeze Right Refrigeration & Air Conditioning Services, Inc. v. City of New York*,
    101 A.D.2d 175 (1st Dep't 1984) ..........................................................................10

*Fuji Photo Film U.S.A., Inc. v. McNulty*,
  669 F. Supp. 2d 405 (S.D.N.Y. 2009)................................................................12

*Galasso v. Saltzman*,
  42 A.D.3d 310 (1st Dep't 2007) .....................................................................33

*Glendora v. Gannett Suburban Newspapers*,
  201 A.D.2d 620 (2d Dep't 1994) ....................................................................10

*Gotbetter v. Dow Jones & Co.*,
  259 A.D.2d 335 (1st Dep't 1999) ....................................................................10

*Green v. CBS, Inc.*,
  286 F.3d 281 (5th Cir. 2002) .....................................................................26, 27

*Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation*,
  2009 WL 4547792 (E.D.N.Y. Dec. 1, 2009) ................................................18, 19

*Gross v. New York Times Co.*,
  82 N.Y.2d 146 (1993) ............................................................................17, 33

*Gurda v. Orange County Publications Division of Ottaway Newspapers, Inc.*,
  81 A.D.2d 120 (2d Dep't 1981), *rev'd*, 56 N.Y.2d 705 (1982) ...............................9

*Gurda v. Orange County Publications Division of Ottaway Newspapers, Inc.*,
  56 N.Y.2d 705 (1982) .................................................................................9

*H&R Industries, Inc. v. Kirshner*,
  899 F. Supp. 995 (E.D.N.Y. 1995) ..................................................................17

*Haynes v. Alfred A. Knopf, Inc.*,
  8 F.3d 1222 (7th Cir. 1993) ..........................................................................34

*Henneberry v. Sumitomo Corp. of America*,
  415 F. Supp. 2d 423 (S.D.N.Y. 2006)..............................................................34

*Herbert v. Lando*,
  781 F.2d 298 (2d. Cir. 1986)......................................................................20, 30

*Holy Spirit Association for Unification of World Christianity v. New York Times Co.*,
  49 N.Y.2d 63 (1979) ..............................................................................9, 10

*Huggins v. NBC*,
  1996 WL 763337 (N.Y. Sup. Feb. 7, 1996)........................................................18

*Hustler Magazine v. Falwell*,
  485 U.S. 46 (1988)....................................................................................30

*Idema v. Wager,*
    120 F. Supp. 2d 361 (S.D.N.Y. 2000), *aff'd*, 29 F. App'x 676 (2d. Cir. 2002)................17, 22

*Immuno AG. v. Moor-Jankowski,*
    145 A.D.2d 114 (1st Dep't 1989), *aff'd*, 77 N.Y.2d 235 (1991) ................................................8

*Immuno AG. v. Moor-Jankowski,*
    77 N.Y.2d 235 (1991) ........................................................................................................17

*James v. DeGrandis,*
    138 F. Supp. 2d 402 (W.D.N.Y. 2001) ..............................................................................29

*James v. Gannett Co.,*
    40 N.Y.2d 415 (1976), *aff'd*, 119 F.3d 189 (2d Cir. 1997) ..................................................14

*Janklow v Newsweek,*
    759 F.2d 644 (8th Cir 1985) ........................................................................................29, 30

*Janklow v. Newsweek,*
    788 F.2d 1300 (8th Cir 1986) ......................................................................................23, 30

*Jewell v. NYP Holdings, Inc.,*
    23 F. Supp. 2d 348 (S.D.N.Y. 1998)....................................................................16, 19, 29

*Kamalian v. Reader's Digest Association, Inc.,*
    29 A.D.3d 527 (2d Dep't 2006) .........................................................................................33

*Karedes v. Ackerly Group, Inc.,*
    423 F.3d 107 (2d Cir. 2005)...............................................................................................14

*Kelly v. Schmidberger,*
    806 F.2d 44 (2d Cir. 1986) ................................................................................................14

*Klepetko v. Reisman,*
    41 A.D.3d 551 (2d Dep't 2007) ....................................................................................14, 15

*Krepps v. Reiner,*
    588 F. Supp. 2d 471 (S.D.N.Y. 2008)..............................................................................28, 29

*Kuan Sing Enterprises, Inc. v. T. W. Wang, Inc.,*
    86 A.D.2d 549, *aff'd*, 58 N.Y.2d 708 (1982) ......................................................................35

*Levin v. McPhee,*
    917 F. Supp. 230 (1996), *aff'd*, 119 F.3d 189 (2d Cir. 1997)..............................................14

*Levin v. McPhee,*
    119 F.3d 189 (2d Cir. 1997)....................................................................................17, 21, 33

*Locricchio v. Evening News Association*,
  476 N.W.2d 112 (Mich. 1991) (Cavanaugh, C.J., concurring)........................................19, 20

*Loeb v. New Times Communications Corp.*,
  497 F. Supp. 85 (S.D.N.Y. 1980) ..............................................................................21, 22, 25

*Love v. William Morrow & Co.*,
  193 A.D.2d 586 (2d Dep't 1993) ...........................................................................................16

*Masson v. New Yorker Magazine, Inc.*,
  501 U.S. 496 (1991)...............................................................................................................16

*McDonald v. E. Hampton Star*,
  10 A.D.3d 639 (2d Dep't 2004) .............................................................................................10

*In re Merrill Lynch & Co. Inc Research Reports Securities Litigation*,
  218 F.R.D. 76 (S.D.N.Y. 2003) ...............................................................................................6

*Newport Service & Leasing, Inc. v. Meadowbrook Distribution Corp.*,
  18 A.D.3d 454 (2d Dep't 2005) .............................................................................................35

*Newton v. NBC*,
  930 F.2d 662 (9th Cir.1991) ..................................................................................................30

*P. Kaufman Inc. v. Americraft Fabrics, Inc.*,
  198 F. Supp. 2d 466 (S.D.N.Y. 2002)....................................................................................35

*Partington v. Bugliosi*,
  56 F.3d 1147 (9th Cir. 1995) ...........................................................................................27, 34

*Pelayo v. Celle*,
  270 A.D.2d 469 (2d Dep't 2000) ...........................................................................................11

*Qureshi v. St. Barnabas Hospital Center*,
  430 F. Supp. 2d 279 (S.D.N.Y. 2006)...............................................................................14, 15

*Rappaport v. VV Publishing Corp.*,
  618 N.Y.S.2d 746 (N.Y. Sup. 1994), *aff'd*, 223 A.D.2d 515 (1st Dep't 1996) ...........20, 21, 23

*Rashada v. New York Post*,
  39 Med. L. Rptr. 2310 (N.Y. Sup. Aug. 11, 2011) ...........................................................33, 34

*Riddell Sports Inc. v. Brooks*,
  872 F. Supp. 73 (S.D.N.Y. 1995) .....................................................................................34, 35

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000)....................................................................................................11

*Ruder & Finn, Inc. v. Seaboard Surety Co.*,
   52 N.Y.2d 663 (1981) ........................................................................34

*Sabratek Corp. v. Keyser*,
   2000 WL 423529 (S.D.N.Y. Apr. 19, 2000).......................................17

*Schaefer v. Lynch*,
   406 So. 2d 185 (La. 1981) .............................................................19, 20

*Scherer v. Equitable Life Assurance Society of United States*,
   347 F.3d 394 (2d Cir. 2003)............................................................10, 11

*Smith v. Santa Rosa Press Democrat*,
   2011 U.S. Dist. LEXIS 121449 (N.D. Cal. 2011) ...............................12

*Sprecher v. Dow Jones & Co.*,
   450 N.Y.S.2d 330 (1st Dep't 1982), *aff'd*, 58 N.Y.2d 862 (1983) ...................................23, 28

*Steinhilber v. Alphonse*,
   68 N.Y.2d 283 (1986) .....................................................................16, 17

*Strada v. Connecticut Newspapers Inc.*,
   477 A.2d 1005 (Conn. 1984) ..........................................................19, 20

*Thomas v. Los Angeles Times Communications*,
   189 F. Supp. 2d 1005 (C.D. Cal.), *aff'd*, 45 F. App'x 801 (9th Cir. 2002) .....................31, 32

*Tracy v. Newsday, Inc.*,
   160 N.Y.S.2d 152 (N.Y. Sup. 1957), *aff'd*, 5 N.Y.2d 134 (1959)........................................21

*Tracy v. Newsday, Inc.*,
   5 N.Y.2d 134 (1959) ...............................................................21, 22, 24, 25

*Van Buskirk v. New York Times Co.*,
   325 F.3d 87 (2d Cir. 2003) ...............................................................3

*Vinas v. Chubb Corp.*,
   499 F. Supp. 2d 427 (S.D.N.Y. 2007)...............................................21

*White v. Fraternal Order of Police*,
   707 F. Supp. 579 (D.D.C. 1989), *aff'd*, 909 F.2d 512 (D.C. Cir. 1990)....................25, 26, 31

*Woods v. Evansville Press Co.*,
   791 F.2d 480 (7th Cir. 1986) ...........................................................20

**STATUTES AND RULES**

New York Civil Rights Law Section 74 ............................................................ passim

Fed. R. Civ. P. 12(f)..................................................................................................................6

**OTHER AUTHORITIES**

1 SACK ON DEFAMATION § 7.3.5(4th ed. 2011) ...................................................................9, 11

BLACK'S LAW DICTIONARY 670 (7th ed.1999) .........................................................................13

## PRELIMINARY STATEMENT

Plaintiff Peter Paul Biro ("Biro") professes to be a self-trained expert in fingerprint analysis.  He has captured worldwide attention by claiming to find similarities between fingerprints on unknown artwork and fingerprints on masterpieces by such famous artists as Leonardo da Vinci, JMW Turner and Jackson Pollock.  In this defamation action, Biro seeks to punish a journalist for publishing in *The New Yorker* a factually accurate report exploring his role at the center of an ongoing rivalry between connoisseurship and science in art authentication.  The article reviewed Biro's techniques, explored his key role in the purported authentication of several disputed paintings, and surveyed accusations of misconduct that have trailed him for decades.  The article was extensively researched and thoroughly vetted—including with Mr. Biro himself.

Because the article is entirely accurate, the Amended Complaint ("Complaint" or "Compl.") advances primarily a claim for libel by implication—alleging that the presentation of true facts nonetheless falsely *implies* Biro is guilty of fraud and incompetence.  The Complaint alleges that 16 different statements, and the article as a whole, implicitly level these accusations through their tone and manner of editing otherwise "objective facts," and through the supposed omission of various facts.  The effort is entirely unavailing.

The alleged accusations of fraud and incompetence by the author are not reasonably read into the article.  Its tone is inquisitive, not accusatory, and the article takes no position on the validity of Biro's purported authentications.  It explores, in context, a number of questions raised by Biro's critics and provides his responses *in every instance*.  Nothing in the article conveys a direct accusation of wrongdoing, and nothing indicates an intent by the author to endorse or adopt such an accusation implicitly.  Any defamatory inference a reader might draw from the true facts presented is therefore not actionable, regardless of the tone or structure of the article.

Moreover, many of the false implications the article is alleged to convey arise from its description of claims made against Biro in various lawsuits.  But fair reports of judicial proceedings are absolutely privileged against claims of libel, and the article's reports are indisputably fair and true.  Likewise, most of the "omitted" facts that allegedly give rise to false implications are actually *not* omitted, and none would change the meaning of the true facts presented.  Under both the First Amendment and Article I, Section 8 of the New York Constitution, no claim for libel can be based upon substantially true statements in an article on a matter of public concern.  Absent an allegation of a non-privileged false fact or a material omitted fact, Biro has no claim for libel by implication.

Desperate to assert some claim, the Complaint thus strains to identify statements it can allege to be false, but each challenged statement is either non-defamatory on its face, non-actionable opinion, or fully protected as a fair report of a judicial proceeding.  A straight-forward application of well-settled legal principles readily demonstrates that none of the allegations in Biro's blunderbuss Complaint is capable of sustaining a libel claim.

Unlike the carefully fact-checked article, the Complaint is riddled with error and misstatement, including allegations of falsity that contradict Biro's own published statements, allegations of omitted facts that are fully disclosed in the article, and carefully parsed allegations that malign the article publicly without stating *any* cause of action.  Plaintiff should not be permitted to inflict the burdens, distractions and costs of litigating a claim advanced on such deceptive and patently insufficient allegations.  Even accepting as true the terribly misleading allegations advanced by Mr. Biro, his amended pleading fails to state any claim as a matter of law, and his Complaint should promptly be dismissed, in its entirety, with prejudice.

# BACKGROUND[1]

## A.    The Parties

Plaintiff Peter Paul Biro is a self-described "leading authority" in "the use of fingerprint technology" to authenticate works of art.  (Compl. ¶¶ 5, 9.)  He has long placed himself at the center of the debate on the value of fingerprint analysis in art authentication.  According to the Complaint, Biro "has lectured at Harvard University, the Yale Club in New York, the National Portrait Gallery in London, and the University of Glasgow in Scotland," among others and "has . . . published articles in scientific journals, including one entitled 'Forensics and Microscopy in Authenticating Works of Art' in the journal of the Royal Microscopical Society, Oxford, England." *Id.* ¶ 10.  Biro also "has been interviewed for a feature-length documentary "Who the #$&% is Jackson Pollock?," two BBC documentaries, CBS's 60 Minutes, CNN, and a forthcoming documentary produced by the National Geographic Society." *Id.*

Defendant Advance Magazine Publishers Inc. publishes a number of magazines, including *The New Yorker*, a weekly magazine that includes reporting on politics and culture, humor and cartoons, fiction and poetry, and reviews and criticism.  Defendant David Grann ("Grann") is an award-winning journalist who has written many articles for *The New Yorker*.  He is the recipient of a George Polk Award and the Society of Professional Journalists' award for outstanding investigative reporting in the magazine category, among other awards.  Grann has been a finalist for two National Magazine Awards, including one for the article at issue here.

## B.    *The New Yorker* Article

The Complaint challenges an article written by Grann and published in *The New Yorker* in the July 12 & 19, 2010 issue, entitled "The Mark of a Masterpiece: The man who keeps

---

[1] Defendants accept the Complaint's allegations as true, as they must, solely for purposes of this motion. *E.g.*, *Van Buskirk v. New York Times Co.*, 325 F.3d 87, 89 (2d Cir. 2003).

finding famous fingerprints on uncelebrated works of art" (the "Article").[2]  A thoroughly researched piece of investigative journalism, the Article explores the ongoing controversy over the role of fingerprint analysis in the authentication of artworks.  It features Biro as a leading advocate for the use of fingerprints in authenticating art, with an intense desire "to transform the authentication process through science."  (Article at 9-10.)

The first half of the Article explores the debate between "connoisseurship" and "science" through the history of several famous authentication controversies in which Biro played a role.  It begins with a debate that has raged over "La Bella Principessa," a drawing believed by some to be the work of Leonardo da Vinci.  In the midst of this raging debate, Biro claimed to find seven different characteristics of a fingerprint on the drawing that overlapped those of a fingerprint he found on Leonardo's "St. Jerome" in the Vatican—similarities that suggested the drawing is a genuine Leonardo.

The Article presents the details surrounding a number of other apparent authentications achieved through Biro's fingerprint analysis.  One case involved a painting in the style of Jackson Pollock, which was bought by truck driver Teri Horton for $5 at a thrift shop.  Biro says he discovered a fingerprint on that painting that matches one he found on a paint can in Pollock's studio, an apparent authentication that was trumpeted in the international press and documented in a feature-length motion picture, "Who the #$&% is Jackson Pollock?"  (*Id.* at 12.)

Another case involved Biro's apparent authentication of a painting owned by his family as the work of JMW Turner—an authentication accomplished by matching a fingerprint on the painting to one Biro found on a work by Turner hanging in the Tate Gallery in London.  Biro's

---

[2] The Article is annexed as Exhibit A to the Complaint (*see* Dkt. No. 17-1), and its content may properly be considered by the Court on this motion to dismiss.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (on motion to dismiss court may consider "facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint").

painting then sold at auction for more than $150,000 and became known as "the first art work officially authenticated based on fingerprint identification." (*Id.* at 11.)

After reviewing Biro's many apparent successes, the Article catalogs a number of questions that have been raised about Biro and his purported authentications. Among these are persistent claims of fraud and deceit advanced in lawsuits, such as:

- Allegations by a creditor that Biro operated through defunct companies to evade his debts. (*Id.* at 16.)

- Allegations by two clients (the Wise Brothers) that Biro had sold them two purported paintings by Goodridge Roberts that were actually fakes. (*Id.* at 16-18.)

- Allegations by another client (Saul Hendler) that Biro had induced him to invest in a painting apparently by Renoir, and refused to refund his money when the painting was determined to be a fake. (*Id.* at 18-19.)

- Allegations by a client (Canadian Sen. Serge Joyal) that Biro refused to return art left in his care, offered an implausible explanation of a purported theft, and then refused to provide reimbursement. (*Id.* at 19.)

In each instance, the Article reviews the allegations made in the lawsuits and accurately depicts their outcomes. The Article also laid out the circumstances surrounding Biro's claimed discovery at Jackson Pollock's studio of gold paint particles and acrylic paint that he said was consistent with paint on the Horton painting. And it describes Biro's involvement with an art dealer who had previously been convicted of art fraud in a proposed investment vehicle known as Provenance. Among other things, Provenance planned to purchase the Horton painting for $4-5 million and resell it for at least $40 million, and to open an art gallery in Manhattan that would specialize in the sale of art works that were to be authenticated by Biro. (*Id.* at 20.)

The exhaustively researched Article includes comments from more than thirty named sources and two unnamed, confidential sources. In the course of more than six months of research, Mr. Grann spoke with Mr. Biro, his family members, professional colleagues and clients, reviewed vast amounts of information obtained from court records, and conducted

interviews with art historians, artists, scholars, fingerprint experts, chemists and law enforcement personnel.  Some of those interviewed leveled pointed criticisms at Biro.  Before publication, Grann presented each of those directly to Biro, and the Article contains Biro's explanations and counter-charges.

The Article presents a detailed and truthful portrait of Biro, without agenda or bias.  It does not claim to reach any conclusion about the value of Biro's work.  It does not take sides in the debate over the use of fingerprint analysis in art authentication.  And it does not accuse Biro of fraud or criminal conduct.  It simply lays out the known facts in a thought-provoking manner.

## C.   **The Amended Complaint**

Biro's amended pleading attacks virtually every aspect of the Article, including the author's motive and good faith.[3]  It purports to assert two causes of action.  Count I asserts a claim for libel, contending that the Article, "[t]hrough selective omission, innuendo and malicious sarcasm . . . implies that plaintiff finds fingerprints where they do not exist," that Biro is "dishonest and incompetent in his profession," and that he "was guilty of crimes, of fraudulent conduct and of deceit."  (Compl. ¶¶ 22-23, 162-166.)  This claim rests on Biro's contentions that omissions and editing choices caused many parts of the Article to convey a false implication, and the claim that a handful of statements are actually false.  (*Id.* ¶¶ 47-134.)  Count II purports to assert a claim for injurious falsehood, based on the very same factual allegations.  (*Id.* ¶ 172.)

---

[3] The Complaint misuses the forum provided by this Court to take a scurrilous swipe at Grann, accusing him of "defamatory propensities" because he was once sued for libel and the Complaint survived a motion to dismiss.  (Compl. ¶ 138.)  The Second Circuit has repeatedly held that such preliminary rulings are immaterial, not to be cited in complaints, and properly stricken from pleadings under Fed. R. Civ. P. 12(f).  *See In re Merrill Lynch & Co. Inc Research Reports Sec. Litigation*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003).  The allegation about Grann is all the more improper because it brazenly misrepresents the prior litigation—the court did *not* find the article at issue to be defamatory and made *no* findings about Grann.  Indeed, the plaintiff walked away from that meritless action before proceeding to discovery.  *See Weyrich v. New Republic, Inc.*, Case No. 99-1213 (TPJ), Dkt. No. 45 (Order anticipating dismissal with prejudice because plaintiff "indicated an intention to abandon the case" and failed to proceed with discovery).

Through a lengthy and inconsistent list of criticisms about the tone and content of the Article, the Complaint purports to identify 16 separate statements that allegedly convey the false implications that Biro is a fraud, has knowingly sold fake art, and is incompetent at art authentication.  (*E.g.*, Compl. ¶¶ 57, 68, 74, 82, 85, 92, 108, 119, 121, 126, 128, 133.)  The Complaint alleges that another 8 statements contain false facts, pointing to such statements as the terms "con man" and a "shyster" used by litigation adversaries and others to refer to Biro.[4]

In advancing these claims, the Complaint avers that Biro is "not a public figure" for purposes of libel law (*Id.* ¶ 38), but its own allegations confirm that he is:  The allegations establish that Biro has voluntarily injected himself into the controversy over the use of fingerprints in art authentication and gained international notoriety for his role in advocating greater use of science to authenticate art.  *See, e.g.*, *id.* ¶¶ 9-10 (describing Biro's role, among other things, as a lecturer and author on the subject, a central figure in a feature-length documentary and a sought-out figure by news organizations).  Although the issue need not yet be decided, Biro is plainly a public figure for purposes of this libel claim and to succeed will need to establish constitutional malice.[5]

---

[4] While the Complaint is wordy and not entirely consistent, the 24 discrete allegations of defamation we have been able to discern in the Complaint, together with defendants' grounds for moving to dismiss each, are summarized in the annexed Addenda for the Court's convenience:  Addendum A identifies the challenged statements that are privileged under New York law; Addendum B identifies the non-privileged allegedly false facts, and Addendum C identifies non-privileged allegedly false implications.

[5] A plaintiff may be found to be a public figure within a limited community. *See*, *e.g.*, *Chandok v. Klessig*, 648 F. Supp. 2d 449, 459 (N.D.N.Y. 2009) (scientific researcher "well known within the plant biology community" a public figure for purposes of criticism of her work), *aff'd*, 632 F.3d 803 (2d Cir. 2011).

Regardless of Biro's status as a public figure, none of the myriad allegations advanced in the Complaint is remotely sufficient to state a claim for libel, and the Complaint should be dismissed with prejudice,[6] as will now be demonstrated.

## ARGUMENT

To protect public debate and safeguard freedom of the press, New York courts have long-favored dismissal of libel claims at the earliest possible stage of the proceedings. Dispositive motions are recognized to hold "particular value, where appropriate, in libel cases, so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms." *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 379 (1995). To delay the disposition of a libel action unnecessarily "is not only to countenance waste and inefficiency but to enhance the value of such actions as instruments of harassment and coercion inimical to the exercise of First Amendment rights." *Immuno AG. v. Moor-Jankowski*, 145 A.D.2d 114, 128 (1st Dep't 1989), *aff'd*, 77 N.Y.2d 235 (1991).

On the facts alleged, such prompt relief is plainly appropriate in this case.

## I.
## THE AMENDED COMPLAINT FAILS TO STATE ANY CLAIM FOR REPORTING ALLEGATIONS MADE AGAINST BIRO IN PRIOR LAWSUITS

As a threshold matter, many of Biro's claims of both libel by implication and direct falsity arise out of the Article's discussion of charges of fraud and deceit that have been leveled against him in myriad lawsuits. (*See* Addendum A.) Biro's claims of libel arising from the Article's discussion of these lawsuits are unambiguously barred by the fair report privilege provided by New York Civil Rights Law Section 74 ("Section 74").

---

[6] At a pre-motion conference on September 6, 2011, Judge Berman directed Biro to amend his complaint to address deficiencies raised by defendants' pre-motion request for a conference, and further directed that the ruling on a subsequent motion to dismiss the amended complaint would be decided "with prejudice" and without further leave to amend.

Section 74 provides that a "civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding." N.Y. Civ. Rights Law § 74.[7]  This privilege exists to enable journalists to report on official proceedings without fear that they will be held liable for repeating allegations and statements relating to those proceedings, regardless of whether the allegations are true or false. *See, e.g.*, *Gurda v. Orange Cnty. Publ'ns Div. of Ottaway Newspapers, Inc.*, 81 A.D.2d 120, 130-33 (2d Dep't 1981) (Mollen and Titone, JJ., dissenting), *rev'd*, 56 N.Y.2d 705 (1982);[8] *see also* 1 SACK ON DEFAMATION § 7.3.5 (4th ed. 2011) (underlying "truth" is "irrelevant" under fair report privilege).  Once the privilege attaches, it can be defeated only by a showing that the statements at issue so mischaracterize the allegations made in the context of an official proceeding that they cannot be considered "fair and true" within the meaning of the statute. *Beary v. West Publ'g Co.*, 763 F.2d 66, 68 (2d. Cir. 1985).

Whether challenged statements are privileged under Section 74 is a question of law for the court. *See, e.g.*, *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 67-68 (1979) (hereinafter "*Holy Spirit*").  In making this determination, the privilege is to be liberally applied because a published account "is, by its very nature, a condensed report of events which must, of necessity, reflect to some degree the subjective viewpoint of its author." *Id.* at 68; *see Becher v. Troy Publ'g Co.*, 183 A.D.2d 230, 233 (3d Dep't 1992) (privilege applied "to provide broad protection to news accounts").

---

[7] Section 74 fully applies to reports of official proceedings in foreign fora, such as the Canadian litigation discussed in the Article. *See, e.g.*, *Daniel Goldreyer, Ltd v. Van de Wetering*, 217 A.D.2d 434, 435 (1st Dep't 1995) (statements from Dutch Ministry of Justice subject to Section 74 privilege).

[8] The Second Department's holding in *Gurda* was reversed by the Court of Appeals for the reasons stated by Justices Mollen and Titone in their dissent. *See Gurda v. Orange Cnty. Publ'ns Div. of Ottaway Newspapers, Inc.*, 56 N.Y.2d 705 (1982).

A publication therefore "need not be a verbatim account or even a precisely accurate report of an official proceeding to be a 'fair and true report.'" *Freeze Right Refrig. & Air Cond. Servs., Inc. v. City of New York*, 101 A.D.2d 175, 183 (1st Dep't 1984). Nor do allegations that editorial choices have made a report "unbalanced" defeat the privilege. *Gotbetter v. Dow Jones & Co.*, 259 A.D.2d 335, 335-36 (1st Dep't 1999); *see also Glendora v. Gannett Suburban Newspapers*, 201 A.D.2d 620, 620-21 (2d Dep't 1994) (privilege applies to report that does not present plaintiff's "side"); *McDonald v. E. Hampton Star*, 10 A.D.3d 639, 639-40 (2d Dep't 2004) (omission of information favorable to plaintiff does not defeat privilege). A report remains privileged so long as "the substance of the article" is "substantially accurate." *Holy Spirit*, 49 N.Y.2d at 67.

Applying these standards, Section 74 undeniably bars all of Biro's claims based upon the Article's explanations of the various lawsuits against him. The Complaint makes no claim that any description is substantially untrue and identifies no material omitted fact that would change the gist of the report, as a review of the pleading makes abundantly clear.

In two instances, Biro contends that allegations made in the underlying lawsuits were false, not that there was any error in reporting them. These include his claims that:

- Stating "[a]n owner of a picture-frame company alleged that the Biros had issued checks that bounced and had operated 'under the cover' of defunct companies 'with the clear aim of confusing their creditors" is "false and defamatory." (Compl. ¶¶ 64-66.)

- Stating that there are "'two instances'" of art work that Biro failed to return to their owners "under mysterious circumstances" is false and defamatory because there was only one such incident. (*Id.* ¶¶ 93, 98-99.)

The first statement simply repeats—almost verbatim—an allegation made against Biro in a creditor suit. *See* Grann Declaration, Ex. E, Affidavit of Bernard Desroches ¶ 11, filed in *Encadrements Marcel Inc. v. 112321 Canada Inc. et Peter Paul Biro* (stating that Biro "either

personally or under cover of the corporate names dissolved" acted "in an obvious effort to confuse their creditors and escape their obligations to those creditors").[9]  The second statement adverts to two separate lawsuits arising out of Biro's failure to return artwork entrusted to his care.  *See* Grann Decl., Ex. A, Declaration filed in *Joyal v. 112320 Canada Inc. et Biro*, ¶¶ 5-6 (alleging that Biro claimed plaintiff's artwork had been stolen from his car, but suggested they delay making report to the police, "which seemed very suspect in the circumstances"); and Grann Decl. Ex. B, Affidavit of Charles Desmarteau ¶¶ 1-30, filed in *Desmarteau v. Biro* (alleging that Biro claimed to have sold a painting of plaintiff's (without permission), then claimed to recover it but refused to return it, and positing that Biro was attempting to steal the painting).  That Biro disputes the truth of the allegations made in these cases does not defeat defendants' privilege to report them.  *E.g.*, *Pelayo v. Celle*, 270 A.D.2d 469, 469 (2d Dep't 2000); 1 SACK ON DEFAMATION § 7.3.5.

Other allegations concerning the Article's discussion of lawsuits are phrased in an effort to avoid directly disputing the actual claim in the underlying litigation, but the effort is entirely unavailing.  In each instance, the Complaint restates as an alleged "implication" from the Article an allegation made *explicitly* in the lawsuit described, or one that flows directly from the allegations in the underlying litigation.  In each instance, the Section 74 privilege applies:

- Claim that description of lawsuit by Sam and Syd Wise falsely "*implies* that plaintiff knowingly sold fake art, and concealed that fact until the court ruled against them [sic]." (Compl. ¶¶ 67-68 (emphasis added).)

The Wise lawsuit alleged that Biro had sold them two paintings that he represented to be by the Canadian painter, Goodridge Roberts, and after the Wises determined the paintings were

---

[9] When ruling on a motion to dismiss, the Court may take judicial notice of judicial records.  S*ee Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000); *Scherer v. Equitable Life Assur. Soc'y of U.S.*, 347 F.3d 394, 402 (2d Cir. 2003) (same).

not authentic, Biro refused to refund their money.  Grann Decl., Ex. F Judgment in *Studio des Artistes du Chateau Inc. v. Biro* at 2-3.  Biro does not deny that these allegations were made, but contends the Article's description conveys a false implication because the court "made no finding regarding the authenticity of the paintings one way or the other," and "ruled only that the contract should be cancelled."  (Compl. ¶¶ 69, 72.)  Putting aside that the Article states only— and accurately—that the court found in favor of the Wises, the Complaint misrepresents the court's judgment:  The court *did* hold expressly that the Wises had carried their burden of proving that the painting "was not an authentic work."  Grann Decl., Ex. F, Judgment at 24-25.

- Claim that description of litigation over Biro's joint purchase with Saul Hendler of a possible Renoir falsely implies "that plaintiff knowingly sold fake art, a criminal offense." (Compl. ¶ 73-74.)

The Article accurately states that Biro consulted with an expert *after* the purchase and, when it was determined not to be an authentic Renoir, refunded a portion of the Hendlers' money.  Compl. ¶ 73 & Ex. A, Article at 18.  The Complaint does not dispute that the Hendlers made the allegations reported in the Article—and could not.  *See* Grann Decl., Ex. C, Declaration filed in *Hendler v. Biro*, ¶¶ 1-6.  Any implication that flows from the accurate report of those allegations is itself privileged.  *See, e.g.*, *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 415 (S.D.N.Y. 2009) (implications flowing from a fair summary of claims made in litigation not actionable unless the summary implies conduct beyond that at issue in the lawsuit); *Smith v. Santa Rosa Press Democrat,* 2011 U.S. Dist. LEXIS 121449 (N.D. Cal. 2011) (privilege extends to implications conveyed by a fair report of an official proceeding).

- Claim that description of allegations in Hendler litigation falsely "implies that plaintiff switched one painting for another." (Compl. ¶ 82.)

In this instance, the false "implication" alleged to arise from the Article was actually an express allegation of wrong-doing advanced in the underlying lawsuit—the Hendlers accused

Biro of switching the paintings.  *See* Grann Decl., Ex. C, Declaration ¶¶ 9-10 (alleging that

painting Biro returned was "not that which [Hendler] had originally purchased").

- Claim that description of the Hendler litigation, falsely "implies that plaintiff defrauded the Hendlers." (Compl. ¶ 85.)

Again, even if the asserted implication can reasonably be said to be conveyed by the

Article, it is because the Hendlers' allegations themselves create that implication.  Indeed, their

allegations squarely fit the common definition of fraud.  *Compare* BLACK'S LAW DICTIONARY

670 (7th ed.1999) (defining "fraud" as "[a] knowing misrepresentation of the truth ... to induce

another to act to his or her detriment") *with* Grann Decl., Ex. C, Declaration ¶¶ 9-13 (had

Hendler "known that the painting he saw and received on September 17, 1998, was not the same

painting which he originally purchased from Defendants on December 29, 1983, he never would

have signed the agreement").  Biro objects that "the Hendlers' claim was fully paid" (Compl.

¶ 86), but that does not negate the underlying allegations or the accuracy of the Article.

- Claim that description of Biro's dispute with Senator Joyal, falsely "implies that plaintiff concealed a theft, or was a thief himself, and describes him as a liar." (Compl. ¶¶ 91-92.)

Like all of his claims of false implications allegedly flowing from the descriptions of

lawsuits, Biro does not dispute the Article's accuracy in describing the case brought by Senator

Joyal, but argues that "[n]o wrongdoing was ever attributed to plaintiff in the [Joyal] matter."

(*Id*. ¶ 97.)  Once again, the Article does not attribute any such "wrongdoing" to Biro, but simply

reports the allegations made by Joyal and the true fact that "the court awarded Joyal seven

thousand dollars, plus interest."  *See id*. ¶ 91 & Ex. A., Article at 19; Grann Decl., Ex. D,

Judgment in *Joyal v. 112320 Canada Inc. et Biro*.

In sum, all of the allegations arising from descriptions of litigation accusing Biro of fraud and misconduct are barred by Section 74.  The Article accurately describes the allegations and the outcomes—it is only the Complaint that distorts the records of those lawsuits.

## II.
## THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR LIBEL BASED ON ANY ALLEGEDLY FALSE STATEMENT IN THE ARTICLE

The Complaint wistfully asserts that a handful of statements in the Article are directly false.  (*See* Addendum B.)  None of these statements is actionable, even if they were otherwise false.

### A.    Plaintiff Has No Claim For Libel Based On Publication Of Non-Defamatory Facts

Three of the allegedly false facts in the Article are non-defamatory on their face.  Under New York law, "it is for the court to decide . . . whether the offending words pleaded in a libel action are susceptible of a libelous meaning."[10]  *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986).  In so doing, the challenged statements are to be read in the context of the publication as a whole and without straining to give the publication either an innocent or a defamatory construction.  *Levin v. McPhee*, 917 F. Supp. 230, 236 (1996) (citing *James v. Gannett Co.*, 40 N.Y.2d 415, 419-20 (1976)), *aff'd*, 119 F.3d 189 (2d Cir. 1997).

A statement is defamatory "if it tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society."  *Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F. Supp. 2d 279, 287 (S.D.N.Y. 2006).  If a statement is "not reasonably susceptible" of such a defamatory meaning, it is not actionable as a matter of law, and "cannot be made so by a strained

---

[10] The Second Circuit has stressed that this determination "'should ordinarily be resolved at the pleading stage.'"  *Karedes v. Ackerly Group, Inc.*, 423 F.3d 107, 113 (2d Cir. 2005) (quoting *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001)).

or artificial construction." *Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985); *Klepetko v. Reisman*, 41 A.D.3d 551, 551 (2d Dep't 2007) (same).

Desperately seeking to discredit the Article, the Complaint stretches to challenge statements that are plainly not defamatory as a matter of law, specifically:

- The statement that Biro "pioneered a radical new approach to authenticating pictures" is alleged to be false and defamatory because "there is nothing radical about fingerprints" (Compl. ¶¶ 47-48);

- The statement "though it was still early in the day, Biro reached into a long wooden rack filled with wine bottles and removed one," is false and defamatory because there was no "long wooden rack" and it was not "early in the day," it was lunchtime (*Id.* ¶¶ 53-55); and

- The statement '[s]urprisingly, at least five million dollars of investor's money would also go to purchasing Teri Horton's painting – even though Biro had authenticated the work," is false and defamatory because "plaintiff never authenticated Horton's painting." (*Id.* ¶¶ 107, 116.)

None of these allegations can provide the basis for a libel claim because none, even if false, is reasonably capable of a defamatory meaning in the context of the Article.

Biro quibbles that his approach to authentication is not "radical," but the Complaint itself describes his work as a newly "emerging field." (*Id.* ¶ 9.)  Whether it is accurate to describe the use of fingerprints to authenticate art as "radical" or not, the description does not expose Biro "to public contempt, ridicule, aversion or disgrace." *Qureshi*, 430 F. Supp. 2d at 287.  Likewise, Biro's objection to his depiction pouring a glass of wine fails to establish any defamatory meaning—a nit-pick over the description of a wine rack or whether lunchtime is "early" does not give rise to a libel claim.

It is equally non-defamatory to state that Biro authenticated Ms. Horton's painting.  Biro apparently seeks to quibble that he did not "authenticate" the Horton painting but rather concluded only that a fingerprint on the painting and a fingerprint he found at Jackson Pollock's

studio came from the same hand.[11]   This distinction does not render the Article's statement substantially untrue given the undisputed facts in the Article.  *See, e.g., Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (statement not actionable if "the substance, the gist [or] the sting, of the libelous charge" is substantially true).   Where, as here, a libel plaintiff has admitted the truth of facts that would have the same effect on the mind of the reader as the allegedly defamatory statement, no claim for libel exists.  *Love v. William Morrow & Co.*, 193 A.D.2d 586, 588 (2d Dep't 1993); *see also, e.g, Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348 (S.D.N.Y. 1998) (dismissing libel claim challenging report that plaintiff was "a prime suspect" in Atlanta bombing where plaintiff admitted he was "a suspect" and had been investigated by FBI).   Here, Biro's Complaint acknowledges that he was featured in a documentary whose central point makes this very claim—that Horton's painting was shown to be an authentic Pollock through Biro's work.  *See* Compl. ¶ 10 & Ex. A, Article at 12.

**B.      Plaintiff Has No Claim For Libel Based
         On Publication Of Opinion and Conjecture**

The other allegedly false facts in the Article constitute non-actionable opinion.  To state a claim for libel, a challenged statement, in context, must reasonably be understood to assert a fact that is provably false and defamatory—a libel plaintiff may not recover against defendants who are expressing an opinion.  *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 286 (1986).  "[F]alse or not, libelous or not," expressions of opinion "are constitutionally protected and may not be the subject of private damage actions."  *Id.*; *see also Bloom v. Fox News of Los Angeles*,  528 F.

---

[11] Like many of its claims, the Complaint's allegation that Biro never "authenticated" the Horton painting is intentionally deceptive.  Biro has claimed loudly and publicly to have "matched" a fingerprint and authenticated Horton's painting as a Pollock—indeed, that is the point of the documentary, "Who the #$&% is Jackson Pollock?," in which Biro states: "I believe it's a Pollock."  In a report published on his own website in 2009, Biro similarly stated his personal conclusion that Teri Horton's painting "is exactly what it appears to be: a poured painting by Jackson Pollock c. 1947-49."  *See* http://web.archive.org/web/20090221031410/http://www.birofineartrestoration.com/ Pollock/Pollock.htm ("Archived Site") (last visited, October 28, 2011).

Supp. 2d 69, 76 (E.D.N.Y. 2007).  Indeed, the New York constitution is even more protective of

opinion than the First Amendment—under New York law, an expression of opinion is not an

actionable defamation, "no matter how vituperative or unreasonable" that opinion might be.

*Steinhilber*, 68 N.Y.2d at 289; *see also Gross v. New York Times Co.*, 82 N.Y.2d 146, 152-53

(1993); *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991).

Whether a particular statement constitutes fact or opinion is a threshold question of law

for the court.  *H&R Indus., Inc. v. Kirshner*, 899 F. Supp. 995, 1009 (E.D.N.Y. 1995).  To make

this determination:

> New York courts look to the immediate context and the broader
> social context of the statement.  . . . When the defendant's
> statements, read in context, are readily understood as conjecture,
> hypothesis, or speculation, this signals the reader that what is said
> is opinion, and not fact.

*Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) (statement that it was "a possibility" plaintiff

killed someone held to be non-actionable opinion); *see also Sabratek Corp. v. Keyser*, 2000 WL

423529, at *6 (S.D.N.Y. Apr. 19, 2000) (calling plaintiff a "pathological liar" labeled opinion in

context); *Idema v. Wager*, 120 F. Supp. 2d 361, 366 (S.D.N.Y. 2000) (describing plaintiff as a

"militant" is non-actionable opinion because term has "many meanings and shades of

meanings"), *aff'd*, 29 F. App'x 676 (2d. Cir. 2002).

Applying these standards, three allegations from the Complaint are readily revealed to

challenge statements of pure opinion by individuals who felt Biro's bankruptcy filing and

business practices had cheated them or their friends out of money:

- "Elizabeth Lipsz, a Montreal businesswoman who had once been close to Biro, and
  who won a lawsuit against him for unpaid loans, described him to me as a 'classic
  con man.' Her lawyer told me that Biro 'was so convincing. He was very suave, soft-
  spoken, but after a while you catch him in different lies and you realize that the guy is
  a phony.'"  (Compl. ¶ 100);

17

- Lipsz's lawyer said of Biro, "'He oiled his way out of that whole thing . . . . He got away scot-free.'"  (*Id.* ¶¶ 103-04); and

- "Lafferty's longtime business partner, Allan Aitken, told me that he believed 'Biro was either a shyster or a con man, and had found in Lafferty an easy mark.'" (*Id.* ¶¶ 109-110).

The descriptions of Biro as a "con man," a "phony" and a "shyster" who "oiled" his way out of paying his debts, in the context of the Article, are all non-actionable under well-settled precedent.  The reasoning of *Foley v. CBS Broadcasting, Inc.*, 2006 WL 6619947 (N.Y. Sup. Sept. 13, 2006), applies directly here.  There, plaintiff operated a business selling high-end cabinets, and sued based on a television broadcast reporting many customers complaints that had been made against her.  The broadcast described plaintiff as a "con artist" and asserted that she had been "scamming customers for years."  *Id.* at *1.  The trial court granted defendants' motion to dismiss, finding that the description of the plaintiff as a "con artist" in the context of customer complaints would be understood as opinion and voicing allegations, not facts.  *Id.* at *4.

Similarly in *Huggins v. NBC*, 1996 WL 763337 (N.Y. Sup. Feb. 7, 1996), a trial court held that statements made by entertainer Melba Moore describing her ex-husband as a "con artist" were non-actionable opinion.  Among the facts supporting this conclusion, the court found it "significant" that Ms. Moore was discussing her former husband-manager in the context of a "broken marriage" and "bankruptcy," so that a reasonable listener would understand that she was speaking "from a subjective rather obvious point of view."  *Id.* at *3.  *See also*, *e.g.*, *Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation*, 2009 WL 4547792, at *18-19 (E.D.N.Y. Dec. 1, 2009) (allegation that Indian tribe operated "under a veil of secrecy" was protected opinion when made by an attorney adverse to the tribe who readers would recognize as a partisan).

The challenged statements referring to Biro as a "con man," "phony" and a "shyster" who "oiled" his way out of debts likewise appear in the context of claims made by people whose bias

18

against Biro would plainly signal to a reasonable reader that they were speaking from a

subjective point of view:

- Ms. Lipsz is described as someone who once had a personal relationship with Biro and later had to sue him to recover unpaid loans. (Article at 19.)

- Mr. Aitken is described as the "longtime business partner" of a Biro client who felt his partner had been taken advantage of in a series of dealings that are fully disclosed in the Article.  (*Id.* at 22.)

- Ms. Lipsz's attorney would equally be recognized as a partisan, and his comment about Biro's escape from his debts is presented in the context of an accurate portrayal of Biro's bankruptcy proceeding in 1993.  (*Id.* at 19.)

In each case, the Complaint makes no allegation of any misstated fact, and attacks only the

statement of personal opinion based on those facts.  Such claims are barred as a matter of law.

*See*, *e.g.*, *Jewell*, 23 F. Supp. 2d at 377 (no claim for voicing opinion where plaintiff "does not

challenge the veracity of the underlying facts"); *Gristede's Foods, Inc.*, 2009 WL 4547792, at

*18 (no claim for statement uttered by an attorney who readers would understand to be partisan).

### III.
### THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR LIBEL BASED ON ANY UNSTATED IMPLICATION ALLEGEDLY CONVEYED

Unable to point to any material false fact in the Article, the Amended Complaint strains

mightily to assert a claim based on some unstated implication allegedly conveyed by the true

facts presented.  (*See* Addendum C.)  According to the Complaint, "selective omission,

innuendo, and malicious sarcasm," give rise to the implication that plaintiff is "guilty of crimes,

of fraudulent conduct and of deceit...[and] is dishonest and incompetent in his profession."

(Compl. ¶¶ 22, 29-30, 164, 166.)  Once again, the allegations fail to state any claim for libel.

Given the central concern of the First Amendment to protect the dissemination of true,

newsworthy information, some courts have concluded that such claims based upon "the overall

implications that may flow from true factual statements" can never sustain a libel claim because

any other conclusion "would unacceptably inhibit" reporting on information of public concern. *Locricchio v. Evening News Ass'n*, 476 N.W.2d 112, 144 (Mich. 1991) (Cavanaugh, C.J., concurring).  *See also Strada v. Connecticut Newspapers Inc.*, 477 A.2d 1005, 1010 (Conn. 1984) (in absence of undisclosed facts, "first amendment considerations dictate that an article concerning a public figure composed of true or substantially true statements is not defamatory regardless of the tone or innuendo evident"); *Schaefer v. Lynch*, 406 So. 2d 185, 188 (La. 1981) ("Where public officers and public affairs are concerned, there can be no libel by innuendo.").

Courts of New York have not gone so far, and have accepted that a claim for libel by implication can potentially arise from a combination of statements that are not individually defamatory, or from the omission of vital information, if the reader is led to draw an inference that is both damaging to the plaintiff and provably false.  *See Armstrong*, 85 N.Y. 2d at 381; *Herbert v. Lando*, 781 F.2d 298, 307 (2d. Cir. 1986).  But given the substantial First Amendment interest in protecting true speech, libel claims premised on unstated implications must be carefully constrained.  *Rappaport v. VV Publ'g Corp.*, 618 N.Y.S.2d 746, 748 (N.Y. Sup. 1994) (referring to the "significant obstacles" in establishing a claim for libel by implication), *aff'd*, 223 A.D.2d 515 (1st Dep't 1996).  As the Seventh Circuit cautioned in *Woods v. Evansville Press Co.*, 791 F.2d 480, 487 (7th Cir. 1986), "requiring a publisher to guarantee the truth of all the inferences a reader might reasonably draw from a publication would undermine the uninhibited, open discussion of matters of public concern."

At the pleadings stage, implication claims must therefore be subjected to close scrutiny to avoid the chilling impact on admittedly true speech caused by burdensome litigation and intrusive inquiry into the editorial process.  *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092-93 (4th Cir. 1993) ("because the constitution provides a sanctuary for truth, a libel-by implication

plaintiff must make an especially rigorous showing"); *Rappaport*, 618 N.Y.S.2d at 748 (same).

Although neither the New York Court of Appeals nor the Second Circuit has fully defined the

proper standard to be applied, *Armstrong*, 85 N.Y. 2d at 381; *Levin*, 119 F.3d at 196 n.5, it is

widely accepted that a plaintiff alleging a false and defamatory implication must establish at the

outset two fundamental prerequisites to survive a motion to dismiss—specifically, that the

challenged statements (1) can reasonably be read to convey the alleged implication, and (2) on

their face demonstrate that the alleged implication is one the author adopted and intended to

convey. *See Chapin*, 993 F.2d at 1093 ("language must not only be reasonably read to impart the

false innuendo, but it must also affirmatively suggest that the author intends or endorses the

inference"); *Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427, 437 (S.D.N.Y. 2007) (plaintiffs alleging

libel by implication "typically have to show that Defendants affirmatively intended such

implication"); *Chaiken v. VV Publ'g Corp.*, 907 F. Supp. 689, 698 (S.D.N.Y. 1995) ("publisher

is not liable for a defamatory innuendo unless it intended or endorsed that inference"), *aff'd*, 119

F.3d 1018 (2d Cir. 1997).

Each determination raises a question of law properly decided on a motion to dismiss.

*Tracy v. Newsday, Inc.*, 5 N.Y.2d 134, 136 (1959) (court decides whether publication is capable

of implication ascribed to it); *Rappaport*, 618 N.Y.S.2d at 748.  Biro cannot meet either burden.

**A.     None of the Challenged Statements**
**        <u>Reasonably Conveys the Implication Alleged</u>**

In assessing the meaning of statements alleged to convey a libelous implication, it is

long-settled as a matter of New York law that words are to be construed as persons generally

understand them and according to their ordinary meaning. *Tracy v. Newsday, Inc.*, 160 N.Y.S.2d

152, 154 (N.Y. Sup. 1957), *aff'd*, 5 N.Y.2d 134 (1959).  Courts "must give the disputed language

a fair reading in the context of the publication as a whole," *Armstrong*, 85 N.Y.2d at 380, and

may not allow a claim of innuendo or implication to "enlarge upon the meaning of the words so as to convey a meaning that is not expressed."  *Loeb v. New Times Commc'ns Corp.*, 497 F. Supp. 85, 90 (S.D.N.Y. 1980).

In this case, the Complaint alleges implied accusations that are not reasonably read into the Article, objects to omissions that are generally not omitted and would not change the meaning of the Article in any event, and improperly resorts to challenging the Article "as a whole" even though it allegedly conveys nothing different than the individual non-actionable statements.  None of the allegations of implied libel advanced by Biro states a proper claim.

### 1.   Implied accusations alleged in the Complaint are not found in the Article.

A few of the "implications" plaintiff would read into the Article are not remotely actionable and warrant no serious consideration:

- Describing Biro's "habitual raven-like outfit" is alleged to falsely make him appear "sinister."  (Compl. ¶¶ 50, 52.)

- Depicting Biro finishing a glass of wine and refilling it while being interviewed falsely implies that he "drinks to excess."  (*Id*. ¶ 55.)

Neither of these allegations denies the truth of anything said or identifies any omission.  The alleged implications that Biro is "sinister" and "drinks to excess" are entirely "strained, unreasonable and unjustified," and therefore fail to state a claim.  *Tracy*, 5 N.Y.2d at 137.  *See also Aronson*, 65 N.Y.2d at 594 (courts should not strain to interpret statements as defamatory); *Idema*, 120 F. Supp. 2d at 367 (same).

Other allegations—objecting that false implications arise from the tone and structure of the Article—are similarly far-fetched and equally insufficient:

- A true description of Biro's reaction when asked about allegations that Jackson Pollock fingerprints found on the Parkers' painting were forged, "implies that plaintiff had in fact forged fingerprints, and that his denial was a lie."  (Compl. ¶¶ 118-19.)

- A true description of the response of Biro and his brother when asked whether their father had forged any works of art implies that their "understandable emotional reaction to having their father accused of forgery and insulted... was somehow an admission of guilt." (*Id.* ¶¶ 120-21.)

- A true description of painting's by Biro's father "consigned" to his basement laboratory and "seen only by an adoring son," allegedly implies "that plaintiff is concealing his own property because he has something to hide, and that he is protecting his father's wrongdoing out of filial loyalty." (*Id.* ¶¶ 132-33.)

These allegations are particularly misdirected because they seek to punish the means of expressing facts, without denying the truth of the facts presented. "Courts must be slow to intrude" in such cases because how to express a situation "must always be left to writers and editors. It is not the business of government." *Rappaport*, 618 N.Y.S.2d at 749-50 (quoting *Janklow v. Newsweek*, 788 F.2d 1300, 1306 (8th Cir 1986)). *See also Sprecher v. Dow Jones & Co.*, 450 N.Y.S.2d 330, 332 (1st Dep't 1982) (challenging a report as unbalanced "is essentially a matter involving editorial judgment and is not actionable"), *aff'd*, 58 N.Y.2d 862 (1983).

Not only are the allegations inadequate as a matter of law, they are based on significant distortions of the Article. The Complaint ignores the Article's lengthy presentation of Biro's response to allegations he had forged fingerprints (Article at 27-28), and its description of *both* Biro's reaction to allegations of forgery by his father ("'It is upsetting,' he said. It's pure fantasy.'") *and* his denial of forgery ("Because somebody's a painter, therefore he can forge. It's like saying that if somebody is a surgeon he can kill, because he's got a sharp instrument in his hand"). (*Id.* at 27.) Similarly, the claim that the Article's references to some paintings by Biro's father as "consigned to his laboratory" implies he is "concealing" the paintings, ignores the explicit disclosure that his father's paintings are "displayed throughout Biro's house." (*Id.* at 7.) In the context of the full Article, the alleged implications are indefensible.

Plaintiff's more fundamental complaint is with statements he reads to convey *implicit* accusations of wrongdoing, even though the Article makes no such accusations *explicitly*. Biro

finds the implications of "fraud and incompetence" to be supported by false implications allegedly conveyed by a number of statements in the Article:

- That Biro "keeps finding famous fingerprints on uncelebrated works of art" allegedly conveys that he finds them "where they do not exist."  (Compl. ¶ 29.)

- An accurate 4-paragraph summary of plaintiff's examination of a fingerprint on a painting owned by Alex Matter and his discovery of acrylic paint and gold paint particles in Pollock's studio, allegedly implies "that Biro planted or fabricated evidence to support his contention that the pictures were by Jackson Pollock." (*Id.* ¶¶ 56-7.)

- Several paragraphs truthfully reporting Biro's role "in an effort to launch a venture named Provenance" allegedly imply "that plaintiff was the initiator of a fraudulent investment scheme, and that he planned as part of the scheme to falsely authenticate art works." (*Id.* ¶¶ 107-08.)

- A full presentation of the inconsistency between Biro's statement "that he had spent only a 'few hours' in Pollock's studio, in the 'presence of staff,'" and the statement of the studio manager who flatly stated "[t]hat's not true," and explained that her records show Biro "visited four times," was "there for hours," was not "watched over.. all that time," and in the absence of staff "had removed, 'without authorization,' a match from the floor," allegedly implies that Biro "committed a fraud and that he was a thief." (*Id.* ¶¶ 125-26.)

- The statements that "few individuals, inside or outside the art world, can evaluate fingerprints" so "[i]n that sense, Biro's authentications were far less democratic than traditional connoisseurship," allegedly imply that "plaintiff's reputation was unwarranted, and that he was in fact a fraud." (*Id.* ¶¶ 127-28.)

Courts applying New York law have repeatedly rejected such libel claims for an unstated accusation that is allegedly implied from true facts.  Even before *New York Times v. Sullivan* injected First Amendment constraints on the common law of libel, the New York Court of Appeals rejected an accusation by implication claim, finding that an allegation that the presentation of true facts amounted to an accusation of wrongdoing, added "an entirely new and independent thought that [found] no support in the article."  *Tracy*, 5 N.Y.2d at 137.  In *Tracy*, a newspaper reported that plaintiff had (a) been hired as an investigator to aid in the defense of an alleged sex offender's case, (b) helped the alleged offender carry his luggage out of a hotel, and

24

(c) was the last man to hear from the offender who called him to cancel an appointment to go to court together.  The Court of Appeals held that the presentation of these true facts could not support a libel claim for the implication that plaintiff aided the alleged offender to jump bail.  The reported facts were true, no such accusation was adopted or endorsed in the article, and the implication claim was thus rejected on a motion to dismiss.

In *Loeb v. New Times Communications Corp.*, recovery was denied by this court on summary judgment based upon a similar analysis.  Loeb claimed the statements referring to a "mysterious fire" that destroyed the printing plant of a competitor implied he was responsible for the fire and was an arsonist.  Although the court found that "[t]he authors' clear intent was to portray an overwhelmingly negative picture of Loeb by presenting purported examples of his ridiculous idiosyncrasies and prejudices, shady political maneuverings, and dishonest reporting practices" 497 F. Supp. at 88-89, plaintiff had no claim for libel by implication because "defendants have reported the facts accurately and carefully," and the article did not expressly convey "the defamatory conclusion which Loeb claims they intended the reader to draw," leaving the reader "free to draw his own conclusion" *id.* at 91.

Unlike *Loeb*, the tone of the Article in this case does not demonstrate an intent to convey "an overwhelmingly negative picture" of Biro and, to the contrary, presents plaintiff's side of each dispute.  But as in *Loeb*, the Article here accurately reports the true facts and omits no materials facts, and is therefore not actionable.

It bears emphasis that the threshold question presented is whether the challenged statements *reasonably* convey the defamatory accusation that plaintiff is a criminal and a fraud, not whether such an interpretation of the Article is possible, or even plausible.  In the law of defamation, "what meaning a communication is *capable* of bearing" is a very different inquiry

25

from identifying "the inferences that can *reasonably* be drawn from it." *White v. Fraternal Order of Police*, 707 F. Supp. 579, 589 n.12 (D.D.C. 1989) (emphasis added), *aff'd*, 909 F.2d 512 (D.C. Cir. 1990). The court in *White* illustrated this "important, but subtle," point:

> If a newspaper accurately reported that an individual was arrested and charged with a crime, a reader could reasonably infer, *i.e.*, guess, surmise, or derive as a probability, that the individual actually committed the crime. However, unless the newspaper article, considered as a whole, in context, could be reasonably understood to express that the individual in fact committed the crime, the newspaper report would not be actionable, questions of privilege aside. (*Id.*)

In similar situations, courts across the country have repeatedly rebuffed efforts to transform reports raising questions about matters of public concern into defamatory assertions of guilt. In *Chapin*, for example, the Fourth Circuit dismissed a libel action based on a newspaper article that "pointedly questioned" the finances of a non-profit organization sponsoring "a program to send 'Gift Pacs' to American soldiers in Saudi Arabia," and the "apparent 'hefty mark-up' between the wholesale cost of the items in the Gift Pac and the price charged the public." 993 F.2d at 1091. Rejecting plaintiff's contention that the article implied he had defrauded the public, the Court of Appeals concluded:

> Fundamentally, the . . . article raises questions about the Gift Pac project. In the Court's view, it is a story constructed around questions, not conclusions. But the mere raising of questions is, without more, insufficient to sustain a defamation suit in these circumstances. Questions are not necessarily accusations or affronts. Nor do they necessarily insinuate derogatory answers.

*Id.* at 1098. Put differently, the Court of Appeals recognized in *Chapin* that journalism which "invite[s] the public to ask" questions about matters of public concern is the "paradigm of a properly functioning press." *Id.* at 1096. The court acknowledged that the conclusion "Chapin is a dishonest man . . . was certainly within the wide range of possibilities" flowing from defendant's article, but that is "precisely why we need and must permit a free press to ask the

question." *Id. See also Green v. CBS, Inc.*, 286 F.3d 281, 284 (5th Cir. 2002) (reporting allegations on a matter of public concern does not give rise to a claim for libel by implication).

As in *Chapin,* the Article in this case accurately reports questions being raised on a matter of public interest.  Even if the conclusions that Biro is a fraud could be found within the "range of possibilities" raised by the Article, the Article is not reasonably read to make an implied accusation of fraud itself.  Questioning the validity of Biro's techniques and accurately pointing out inconsistencies in his statements does not subject defendants to a claim for libel by implication.  *E.g.*, *Partington v. Bugliosi*, 56 F.3d 1147, 1157 (9th Cir. 1995) ("inquiry itself, however embarrassing or unpleasant to its subject, is not an accusation"); *Beverly Hills Foodland, Inc. v. UFCW Local 655*, 39 F.3d 191, 195 (8th Cir. 1994) (raising question whether plaintiff engaged in discriminatory hiring practices not an actionable false statement of fact).

## 2.  Omissions alleged in the Complaint would not change the gist of the Article.

Plaintiff is equally misdirected in alleging that an implication of fraud and incompetence is created by "selective omission" of facts from the Article.  (Compl. ¶ 22.)  The primary omissions he alleges include:

- The discussion of Biro's work on the Alex Matter paintings allegedly failed to disclose that (a) Biro allegedly "never stated" that Pollock used gold paint or that gold paint on the Horton painting "matched" the gold paint he found on Pollack's studio floor, (b) the "actual detection of acrylate" at the Pollock studio was allegedly made by Dr. Eastaugh using FTIR spectroscopy, and (c) others allegedly have reported that Pollock used acrylic paints.  (*Id.* ¶¶ 58-62.)

- The discussion of Biro's involvement with the Provenance investment scheme allegedly omits that Biro: (a) "has never taken an interest in any of the works of art he is asked to analyze" and (b) "does not work on contingency for a percentage if a work is sold." (*Id.* ¶ 112.)

- The discussion of Biro's authentication of "Landscape with a Rainbow" allegedly omits that (a) his fingerprint match was confirmed by a British fingerprint expert, (b) the painting was also authenticated by a well-known of Turner scholar, and (c) scientific work was done on the painting by Dr. Eastaugh.  (Compl. ¶ 124.)

In two of these cases, Biro's claim of libel by omission fundamentally fails because the omitted facts are *not* omitted. The allegation of omission from the Provenance discussion simply ignores the Article's explicit explanation that Biro says he:

> maintains a firewall between his research and the sale of a painting, and that he receives the same fee – two thousand dollars a day – regardless of the outcome of his investigation. "If I stopped being disinterested, my credibility will be gone," he said.

Article at 12. *See also id.* at 27 (noting Biro's assurance "that he had no financial stake in Horton's painting" and Horton's statement "that she could not 'let that get out in the media that he has a percentage, *when he does not.*'" (emphasis added)).

Again, the alleged omissions concerning Biro's purported authentication of "Landscape with a Rainbow" are largely not omitted. The Article *does* report that Prof. David Hill, a Turner scholar at the University of Leeds thought "the composition and coloring strongly pointed to the hand of Turner," and that John Manners, a fingerprint examiner with the West Yorkshire Police, said "the fingerprints definitely matched: 'It is a Turner.'" (*Id.* at 11.) Moreover, the contention that a simple reference to Biro's authentication of a "purported Turner" would cause readers to infer that (a) Biro is the *only* person to consider the painting genuine and (b) it is not genuine is patently unreasonable, particularly in the face of the Article's express disclosures that two experts supported Biro's authentication, the painting sold at auction for more than $150,000 after his authentication, and the painting is considered "the first artwork officially authenticated" through fingerprints. (*Id.*)

The allegations concerning omissions from the discussion of the Matter painting are equally insufficient. To state a libel claim based on the omission of information, the *omitted* facts must be material and significant enough to change the defamatory sting of the *disclosed* facts in the mind of a reasonable reader. *See, e.g.*, *Krepps v. Reiner*, 588 F. Supp. 2d 471, 484

(S.D.N.Y. 2008) (rejecting implication based on reference to two lawsuits an opposing party had

won that omitted discussion of one where opposing party had lost); *Sprecher*, 450 N.Y.S.2d at

332 (rejecting implication claim based on failure to note that restrictions placed by SEC on

others in investigation were not placed on plaintiff).[12]   Biro alleges no such material omission.

The quibbles about Biro's alleged failure to state affirmatively that there was a chemical

"match" between gold paint and acrylate found at the Pollock studio with paint used on the

Matter painting, and an alleged failure to disclose confirmation of Biro's discovery of acrylate by

Dr. Eastaugh, does not change the gist of the description of Biro's role in investigating the

Matter paintings.[13]   The Article presents many facts concerning his claims to discovery of gold

paint and acrylate at the Pollock studio, conflicting reports between Biro and the studio director

about his activities at the studio, and the nature of the work done by Biro in connection with the

Matter paintings, *none of which is alleged to be untrue.*   The allegedly omitted facts would not

change the truth of the facts reported or the understanding of a reasonable reader.

As in *Janklow v Newsweek*, 759 F.2d 644, 648 (8th Cir 1985), the omissions alleged by

Biro do "not make what was published untrue."   In *Janklow,* defendants published an account of

a 14-year-old rape allegation against the plaintiff, but omitted to include that plaintiff had passed

a lie detector test while the victim had been declared "untestable," there was no medical evidence

---

[12] This conclusion is also compelled by the doctrine of "incremental harm," which bars a defamation plaintiff from recovery even when a publication contains inaccurate facts, so long as those false facts do no more damage to plaintiff's reputation than a recitation of the "true facts" would have done.  *Jewell*, 23 F. Supp. 3d at 388; *James v. DeGrandis*, 138 F. Supp. 2d 402, 419 (W.D.N.Y. 2001) (even maliciously false statement may be "'nonactionable on the grounds that it causes no harm beyond the harm caused by the remainder of the [nonactionable] publication.'").

[13] Once again, the allegations that Biro has never claimed that gold paint he found in Pollock's studio "matched" paint on the Horton painting, and that "the actual detection of acrylate [paint] was made by a Dr. Nicholas Eastaugh" (Compl. ¶¶ 59, 61) are pure sophistry.  Biro has publicly proclaimed in both the Pollock documentary and his own 2009 report that the two samples of gold paint taken from Pollock's studio and the Horton painting "optically appear identical" and Biro's 2009 report also expressly takes credit for having personally "performed microchemistry on each sample" taken at the Pollock studio "to test what the medium was." *See* n.11, *supra*, Archived Report.

of any rape, and law enforcement authorities had previously called the rape allegations "unfounded." *Id.* An Eighth Circuit panel recognized that the inclusion of these facts would undoubtedly have cast doubt on the validity of the rape charge, but rejected the claim for libel by implication in any event, because the published information was entirely true. Sitting *en banc*, the Court affirmed the panel's holding, stressing that:

> Accounts of past events are always selective, and under the First Amendment the decision of what to select must always be left to writers and editors. It is not the business of government.

788 F.2d at 1306. *See also Abadian v. Lee*, 117 F. Supp. 2d 481, 488 (D. Md. 2000) (libel by omission claims disfavored because "'editorial decisions [to omit material] are best left to editors'") (quoting *Newton v. NBC*, 930 F.2d 662, 686 (9th Cir.1991)).

In short, Biro's claimed omissions are both factually and legally insufficient to sustain a claim for libel by implication.

**3. The implication allegedly flowing from the Article "as a whole" is the same as the alleged implications of the non-actionable statements**.

Finally, Biro's attempt to assert an independent claim based on the "article as a whole" is fatally flawed because it simply contends that the Article overall conveys the same implications allegedly created by the separately challenged statements, statements that are non-actionable. This, too, is inadequate as a matter of law. *See Herbert v. Lando*, 781 F.2d at 311-312 ("overall impact" not a separate claim unless distinct from impact of non-actionable statements). An implication claim based on the "overall" impact of an article cannot be used to end-run common law and constitutional limits to a libel claim. *Cf. Hustler Magazine v. Falwell*, 485 U.S. 46, 56-57 (1988) (rejecting claim for intentional infliction of emotional distress arising solely out of published statements that were insufficient to state a claim for libel).

**B.** **The Article Does Not Adopt or**
 **Endorse the Alleged Implications**

Plaintiff's claims of libel by implication are fatally defective for a second independent

and equally dispositive reason:  The Article does not convey to a reasonable reader that it adopts

or endorses the accusation that Biro is a fraud and incompetent.  To state an implication claim,

the challenged language "must not only be reasonably read to impart the false innuendo, but it

must also affirmatively suggest that the author intends or endorses the inference."  *Chapin*, 993

F.2d at 1110.  *See also White*, 909 F.2d at 519 (publication must be "'reasonably understood by

the recipient of the communication *to have been intended* in the defamatory sense'" alleged)

(emphasis in original).  Thus, for example, in *White*, even though the defendant "reported true

facts from which a reader might infer that [plaintiff] used drugs," no claim for libel existed

because the court could not find that "it would be reasonable for a reader to conclude that

[defendant] intended the defamatory inference."  909 F.2d at 526.  *See also Thomas v. Los*

*Angeles Times Commc'ns*, 189 F. Supp. 2d 1005, 1013 (C.D. Cal.) (even where reasonable

reader might conclude that plaintiff had lied about his past, no claim for libel where "no

reasonable juror could find that Defendants intended to convey that impression"), *aff'd*, 45 F.

App'x 801 (9th Cir. 2002).

This same conclusion is compelled by a reasonable reading of the Article here.  Its

extensive review of Biro's past is entirely accurate, omits no material facts, and draws no

conclusions.  Nor is it one-sided.  The Article presents Biro as a "forensic art expert" with an

intense desire "to transform the authentication process through science."  (*Id.* at 6, 9.)  It

describes how Biro will scour a canvas for fingerprints, treating it as part of "a crime scene, in

which an artist has left behind traces of evidence."  (*Id.* at 6.)  It portrays the intensity with which

Biro tackles his work ("every waking hour"), his healthy skepticism of claims made about art

works by his clients (a "human lie detector"), and the sophisticated equipment he says he has designed and built to assist in analyzing art—including a "one of its kind in the world" multi-spectral camera. (*Id.* at 7.)

Indeed, it would be particularly inappropriate to allow an implication claim to proceed on the basis of the allegations against Biro discussed in the Article, when the Article goes out of its way to present fully Biro's responses to each of the allegations against him, and nowhere endorses or adopts an accusation of fraud. For example, the Article:

- Presents Biro's stated policy of only working on a flat fee per day for his authentication work to avoid any undue influence (Article at 12);

- Lays out Biro's explanation that claims in old lawsuits "involved relatively small amounts, and . . . often stemmed from disgruntled 'treasure seekers' who 'hoped to turn a thousand into ten or even into millions and then turned on us and still make nasty comments because their greed did not turn to gold.'" (*id.* at 26-27);

- Provides Biro's explanation for the roughly one million dollars Richard Lafferty paid for Biro to investigate a painting possibly by a disciple of Raphael (*id.* at 27);

- Sets out Biro's explanation of why he had claimed to find acrylic at Pollock's studio on basis of a "microchemistry test" that others had said was insufficient to detect acrylic (*id.*); and

- Describes Biro's response to allegations that fingerprints on the Parker paintings were forged and including Biro's lengthy defense of the equipment and techniques he uses to detect and analyze fingerprints (*id.* at 27-28).

Throughout the Article, Biro's explanations and versions of events are fully presented. *See also id.* at 14, 27-28, 30.

In short, the Article on its face cannot reasonably be read to convey that an accusation of fraud was adopted and endorsed by defendants in reporting on the controversy surrounding Peter Paul Biro. For this reason, too, plaintiff has no claim for libel by implication.

C.    **Any Implication Actually Conveyed**
      **Would Be Fully Protected As Opinion**

While defendants do not believe the Article can reasonably be read to convey the

accusations of fraud and incompetence alleged, the Complaint should still be dismissed even if

the Court were to conclude otherwise.  If the alleged implications *were* conveyed, they would

constitute non-actionable opinion based on the fully disclose facts.  "[I]f a statement of opinion

either discloses the facts on which it is based or does not imply the existence of undisclosed

facts, the opinion is not actionable." *Levin*, 119 F.3d at 197.  In New York, even an accusation of

criminal conduct is protected as opinion, when the facts on which the accusation is based are set

forth and reasonable reader would understand the accusation to be "a personal surmise built upon

those facts."  *Gross*, 82 N.Y.2d at 155; *see also Galasso v. Saltzman*, 42 A.D.3d 310, 311 (1st

Dep't 2007) (statements referring to plaintiff as "a criminal" who had "'committed crimes'

against property" referred to "arguable criminal trespasses" disclosed in publication and

therefore protected as opinion); *Kamalian v. Reader's Digest Ass'n, Inc.*, 29 A.D.3d 527, 527-28

(2d Dep't 2006) (statement that surgeon was guilty of "deadly mistakes" protected as opinion

where "adequately supported by a recitation of the facts upon which [it was] based").

The proper application of this rule is illustrated by the recent dismissal of a libel

complaint in *Rashada v. New York Post*, 39 Med. L. Rptr. 2310 (N.Y. Sup. Aug. 11, 2011),

where an imam who also worked for the Department of Corrections challenged a newspaper

article, entitled "Converts to Terror."  That article described four individuals accused of bombing

synagogues in the Bronx as "radicalized," noted that all four were former inmates who had

attended plaintiff's mosque, and advocated an investigation of the connection between the prison

system, radicalization of inmates, and the mosque.  The trial court rejected plaintiff's implication

claim that the facts as presented would lead readers to believe she had radicalized prison inmates,

noting that "the article is plainly intended to raise issues" and "[did] not make any definitive accusation" against plaintiff.  To the extent the article could be read to implicate plaintiff in wrongdoing, such a conclusion was held to be the protected opinion of the author:  "[T]he tone of the article is inquiring, not conclusory and shows that [the author] is presenting a plausible theory and not a proven fact."  39 Med. L. Rptr. at 2312.  *See also Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) ("[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable."); *Partington*, 56 F.3d at 1156-57 ("when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment").

* * * * *

In sum, Biro's various allegations of libel by implication are flawed in multiple respects and none states a claim.  The Article accurately lays out the facts on a matter of public concern without omitting any crucial information, and it is therefore fully protected under the State and Federal constitutions.

IV.

**BIRO HAS NO CLAIM FOR INJURIOUS FALSEHOOD**

In New York, the tort of injurious falsehood is akin to trade libel or product disparagement, and differs from defamation primarily in the nature of the damage at issue.  *See Ruder & Finn, Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670-71 (1981); *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 470 & n.24 (S.D.N.Y. 2006).  Because the tort of injurious falsehood challenges speech, a plaintiff advancing such claim is subject to the same basic burdens and defenses as in an defamation.  *Riddell Sports Inc. v. Brooks*, 872 F. Supp. 73,

34

76 (S.D.N.Y. 1995) (injurious falsehood claim that was in reality a defamation claim dismissed, since the essence of claimed injury was one to reputation).

Biro's claim for injurious falsehood thus fails for all the reasons discussed above that render his claims for defamation insufficient as a matter of law. *See supra* pp. ___.  To assert a claim for injurious falsehood, the challenged statement must still communicate the defamatory meaning Biro ascribes to it, Biro must still prove falsity; statements of opinion are still protected. *See, e.g.*, *Newport Serv. & Leasing, Inc. v. Meadowbrook Distrib. Corp.*, 18 A.D.3d 454, 455 (2d Dep't 2005); *Kuan Sing Enters., Inc. v. T. W. Wang, Inc.*, 86 A.D.2d 549, 549-50 (1st Dep't), *aff'd*, 58 N.Y.2d 708 (1982); *P. Kaufman Inc. v. Americraft Fabrics, Inc.*, 198 F. Supp. 2d 466, 471 (S.D.N.Y. 2002).  The injurious falsehood claim is fatally defective and should be dismissed.

## CONCLUSION

For each and all the foregoing reasons, defendants respectfully request this Court to enter an order dismissing the Complaint against them, with prejudice, and for such other and further relief as the Court deems just and proper.

Dated:  October 31, 2011
      New York, New York

                    LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

                    By:  /s/ David A. Schulz
                       David A. Schulz
                       Amanda M. Leith
*Of counsel*:
                    321 West 44th Street, Suite 510
Lynn Oberlander               New York, NY 10036
The New Yorker                (212) 850-6100
4 Times Square
New York, NY 10036

                    *Attorneys for Defendants Advance Magazine*
                    *Publishers Inc. and David Grann*

**ADDENDUM A**

**STATEMENTS PRIVILEGED UNDER SECTION 74**

| | Challenged Statement | False Implication Alleged | Failure to State Claim |
|---|---|---|---|
| 1. | "One day, I visited the records office of the Palais de Justice, the provincial courthouse in downtown Montreal . . . . During the eighties and early nineties, more than a dozen civil lawsuits had been filed against Peter Paul Biro, his brother, his father, or their art businesses. Many of them stemmed from unpaid creditors. An owner of a picture-frame company alleged that the Biros had issued checks that bounced and had operated 'under the cover' of defunct companies 'with the clear aim of confusing their creditors.'" (¶ 64, citing Article at 12 [sic] (pp. 15-16 of Dkt. No. 17-1, Exhibit A)) | "[T]here were no 'defunct companies' and plaintiff did not operate 'under the cover' of such companies 'with the clear aim of confusing in their creditors.'" (¶ 66) | Fair report of judicial proceeding (Mem., pp. 8-14) |

| | | | |
|---|---|---|---|
| 2. | Description of lawsuit filed by Wise brothers over paintings sold to them by Biro as the work of Goodridge Roberts. His widow, who had kept a catalogue of all Roberts' paintings, declared one of the paintings sold by Biro to be "a fake."  Among the challenged statements is the paragraph: "Throughout the trial, the Biros and their attorneys maintained that the two paintings sold to the Wises were authentic, but to make their case they presented an art expert who was not a specialist on Roberts, or even on Canadian art.  On September 3, 1986, the court found in favor of the Wises, and ordered Peter Paul and Geza Biro to pay them the seventeen thousand dollars they had spent on the pictures, as well as interest." (¶ 67, citing Article at 12 [sic], (p. 18 of Dkt. No. 17-1, Exhibit A).) | "[T]aken as a whole" falsely "implies that plaintiff knowingly sold fake art, and concealed that fact until the trial court ruled against them." (¶ 68)<br><br>Allegedly omitted:<br>• "[T]he trial court ruled only that the contract should be canceled, and made no finding regarding the authenticity of the paintings."  (¶ 69)<br><br>• The original owner testified that he "had purchased the painting directly from the artist when, by chance he encountered Goodrich Roberts painting in the countryside, and bought the painting directly off the easel.  That owner, however, had died by the time of the trial."  (¶ 70)<br><br>• Plaintiff's expert witness testified that his opinion "was tentative and conditional," and "recommended technical and scientific examinations of the paintings, which were not done."  (¶ 71)<br><br>• "Because of this conditional opinion, the trial court said that it could not reach a conclusion regarding authenticity."  (¶ 72) | Fair report judicial proceeding. (Mem., pp. 8-14)<br><br>Omitted facts not material/do not change defamatory sting. (Mem., pp. 27-30)<br><br>Article does not adopt implication alleged. (Mem., pp. 31-32) |

| 3. | "[Attorney] Sand was contacted by another former client of the Biros, an art-and-antique collector named Saul Hendler, who has since died.  According to court records and interviews with Sand and Hendler's wife, Marion, the Biros approached Hendler in 1983, saying that they had found a suspected Renoir, signed by the artist, which, if authenticated, was worth millions of dollars.  The Biros asked Hendler to front them nine thousand dollars to buy the painting, a portrait of a nude woman; the Biros would then authenticate the work and sell it, sharing the profits.  Hendler gave them the money.  Not long afterward, Peter Paul Biro consulted a leading Renoir expert, who determined that the painting was a fake and that the signature was forged.  The Biros refunded Hendler half his money, and eventually agreed to give him the painting, which still had some value as a decorative piece."  (¶ 73, citing Article at 13 [sic] (p. 18 of Dkt. No. 17-1, Exhibit A).) | "[T]aken as a whole," falsely "implies that plaintiff knowingly sold fake art" (¶ 74)<br><br>Allegedly omitted:<br>• "Hendler was a dealer/collector who expressed interest in acquiring undervalued and undiscovered pieces.  He was a repeat client for restoration of artwork prior to this episode."  (¶ 75)<br><br>• "[P]laintiff did not approach Hendler; it was the other way around."  (¶ 76)<br><br>• "The agreement between them was to jointly acquire a painting of a seated nude signed 'Renoir' and explore its potential."  (¶ 77)<br><br>• Confronted with the negative opinion of a Renoir expert, "Hendler became belligerent and demand that all of his money back."  (¶ 79)<br><br>• "The court awarded [Hendler] half of the purchase price... the other half representing effort and cost of restoration and research carried out by plaintiff."  (¶ 80) | Fair report of judicial proceeding.  (Mem., pp. 8-14)<br><br>Omitted facts not material/do not change defamatory sting. (Mem., pp. 27-30)<br><br>Article does not adopt implication alleged. (Mem., pp. 31-32) |

| 4. | "When Hendler picked up the picture, he thought that the composition looked vaguely different. He had previously made a photo transparency of the painting, and at home he compared it to the canvas he had just been handed. 'My late husband was furious,' Marion Hendler told me. 'Then I saw it, and I was horrified. It was clearly not the same painting.' Had the Biros sold the original painting without telling Hendler?" (¶ 81, citing Article at 13 [sic] (p. 18 of Dkt. No. 17-1, Exhibit A).) | "Taken as a whole," falsely "implies that plaintiff switched one painting for another, or fraudulently sold the painting determined by experts as not by Renoir as if it were authentic." (¶ 82)<br><br>Allegedly omitted:<br>• "[T]he painting had undergone the removal of large amounts of aged darkened varnish, and the undoing of prior alterations done to it in a previous restoration.  As a result, the restored painting no longer perfectly matched the appearance of its unrestored state." (¶ 83) | Fair report of judicial proceeding. (Mem., pp. 8-14)<br><br>Omitted facts not material/do not change defamatory sting, (Mem., pp. 27-30) and, moreover, were not in fact omitted (*See* Dkt No. 17-1, Article at 19 (reporting the Biros' written response, that the allegations were "'false and untrue and defamatory,' [and] adding that 'the sole difference in the painting was the work which had been performed on the painting by the Defendants in lifting the paint in order to discover the original painting which had appeared on the canvas.'"))<br><br>Article does not adopt implication alleged. (Mem., pp. 31-32) |

| 5. | "Hendler, unable to get back what he considered the original painting, sued the Biros for the rest of the money he had paid.  In a written response, the Biros called the allegations 'false and untrue and defamatory,' adding that 'the sole difference in the painting was the work which had been performed on the painting by the Defendants in lifting the paint in order to discover the original painting which had appeared on the canvas.'  During the trial, which took place in 1992, Sand called to the stand an art expert who testified that the painting was not the same as the one Hendler had bought.  The court agreed, awarding Hendler several thousand dollars.  But Marion asked me, 'What did we win?'  She went on, 'Where's that piece of art?  We never got it back. He probably sold it for a lot of money and we got this piece of junk in return.'" (¶ 84, citing Article at 13 [sic] (pp. 18-19 of Dkt. No. 17-1, Exhibit A).) | "[T]aken as a whole" falsely "implies that plaintiff defrauded the Hendlers." (¶ 85)<br><br>Allegedly omitted:<br>• "[T]he Hendler's claim was fully paid" and "Hendler executed a satisfaction of judgment." (¶¶ 86, 88)<br><br>• "[A]fter plaintiff purchased the painting back, Marion Hendler also demanded a signed Renoir for free, thrown in as part of the deal." (¶ 86)<br><br>• "[T]he Court had consigned the painting back to plaintiff in return for the full refund, thus showing that Hendler had no ownership interest in the first place." (¶ 87)<br><br>• Marion Hendler defaulted in a defamation action commenced by plaintiff in June 2011, "thereby admitting the allegations therein that the statements which she made to defend Grann were false." (¶¶ 88, 89) | Fair report of judicial proceeding. (Mem., pp. 8-14)<br><br>Omitted facts not material/do not change defamatory sting. (Mem., pp. 27-30)<br><br>Article does not adopt implication alleged. (Mem., pp. 31-32) |

| 6. | "Lawsuits had piled up against Peter Paul Biro and his family business.  In two instances, there were allegations that art works had vanished under mysterious circumstances while in the care of Peter Paul.  (¶ 91, citing Article at 13 [sic] (p. 19 of Dkt. No. 17-1, Exhibit A).) | Falsely "implies that plaintiff concealed a theft, or was a thief himself, and describes him as a liar."  (¶ 92) | Fair report of judicial proceeding. (Mem., pp. 8-14)  Article does not adopt implication alleged. (Mem., pp. 31-32) |
| --- | --- | --- | --- |
| 7. | "Lawsuits had piled up against Peter Paul Biro and his family business.  In two instances, there were allegations that art works had vanished under mysterious circumstances while in the care of Peter Paul.  (¶ 91, citing Article at 13 [sic] (p. 19 of Dkt. No. 17-1, Exhibit A).) | Mentions 2 instances of artwork not returned when there was only one (¶ 93) | Fair report of judicial proceeding (Mem., pp. 8-14) |

# ADDENDUM B

**NON-PRIVILEGED STATEMENTS CHALLENGED AS FALSE**

| | Challenged Statement | Alleged Falsity | Failure to State Claim |
|---|---|---|---|
| 8. | Plaintiff "has pioneered a radical new approach to authenticating pictures." (¶ 47, citing Article at 5 [sic] (p. 6 of Dkt. No. 17-1, Exhibit A).) | "There is nothing radical about fingerprints." (¶ 48) | Non-defamatory (Mem., pp. 14-16) |
| 9. | "[T]hough it was still early in the day, Biro reached into a long wooden racks filled with wine bottles and removed one... he poured himself some and offered me a glass." (¶ 53, citing Article at 5 [sic] (p. 6 of Dkt. No. 17-1, Exhibit A).) | "[T]here is no 'long wooden rack' and it was lunchtime, not 'early in the day'." (¶ 54) | Non-defamatory (Mem., pp. 14-16) |
| 10. | "Elizabeth Lipsz, a Montreal businesswoman who had once been close to Biro, and who won a lawsuit against him for unpaid loans, described him to me as a 'classic con man.' Her lawyer told me that Biro 'was so convincing. He was very suave, soft-spoken, but after a while you catch him in different lies and you realize that the guy is a phony.'" (¶ 100, citing Article at 13-14 [sic] (p. 19 of Dkt. No. 17-1, Exhibit A).) | "The excerpt is false and defamatory." (¶ 101) | Protected opinion (Mem., pp. 33-34) |

| | Challenged Statement | Alleged Falsity | Failure to State Claim |
|---|---|---|---|
| 11. | Within Montreal's small art world, there were whispers about Peter Paul Biro and his father. But the lawsuits appear to have attracted virtually no public attention.  In 1993, Peter Paul Biro filed for bankruptcy, and he never paid many of the judgments against him, including what he owed the Wises and Joyal. Lipsz's lawyer said of Biro, 'He oiled his way out of that whole thing . . . . He got away scot-free.'" (¶ 103, citing Article at 14 [sic] (p. 19 of Dkt. No. 17-1, Exhibit A).) | "The excerpt is false and defamatory...in its use over the words, 'he oiled his way out of that whole thing... He got away scot-free.'"  (¶ 104) | Protected opinion (Mem., pp. 33-34) |
| 12. | "Surprisingly, at least five million dollars of investors' money would also go to purchasing Teri Horton's painting – even though Biro had authenticated the work..." (¶ 107, citing Article at 15 [sic] (p. 20 of Dkt. No. 17-1, Exhibit A).) | "[P]laintiff never authenticated Horton's painting."  (¶ 116) | Non-defamatory (Mem., pp. 14-16) |
| 13. | "Biro previously had been suspected of creating an investment scheme around a seemingly precious object, with the promise that it would eventually reap huge profits . . . . Lafferty's longtime business partner, Allan Aitken, told me that he believed that 'Biro was either a shyster or a con man, and had found in Lafferty an easy mark.'" (¶ 109, citing Article at 15-16 [sic] (p. 22 of Dkt. No. 17-1, Exhibit A).) | "The statement is false and defamatory." (¶ 110) | Protected opinion (Mem., pp. 33-34) |

# ADDENDUM C

**TRUE STATEMENTS ALLEGEDLY CONVEYING A NON-PRIVILEGED FALSE IMPLICATION**

|  | Challenged Statement | False Implication Alleged | Failure to State Claim |
|---|---|---|---|
| 14. | Plaintiff "keeps finding famous fingerprints on uncelebrated works of art." (¶ 29) | "[M]ay reasonably be construed as accusing plaintiff of fraudulent conduct and incompetence in his profession, by finding fingerprints where they do not exist." (¶ 29) | Not capable of defamatory meaning. (Mem., pp. 21-30)<br><br>No omitted material true facts. (Mem., pp. 22-30)<br><br>Article does not adopt implication alleged. (Mem., pp. 31-32) |
| 15. | "Biro, who is in his mid-fifties, has a fleshy pink face and a gourmand's stomach, and he wore black slacks, a black turtleneck, and black shoes – his habitual raven-like outfit.  A pair of glasses dangled from a string around his neck, and he had thick sideburns and whitening black hair that stood on end, as if he had been working late." (¶ 50, citing Article at 5 [sic] (p. 6 of Dkt. No. 17-1, Exhibit A).)) | "[M]akes plaintiff appear to be sinister" (¶ 52) | Not capable of defamatory meaning. (Mem., pp. 21-30)<br><br>No omitted material true facts. (Mem., pp. 22-30)<br><br>Article does not adopt implication alleged. (Mem., pp. 31-32) |
| 16. | "[T]hough it was still early in the day, Biro reached into a long wooden rack filled with wine bottles and removed one... he poured himself some and offered me a glass.  'Every drop is precious,' he said before finishing his glass and refilling it." (¶ 53, citing Article at 5 [sic] (p. 6 of Dkt. No. 17-1, Exhibit A).)) | Falsely implies that "plaintiff drinks to excess." (¶ 55) | Not capable of defamatory meaning. (Mem., pp. 21-30)<br><br>No omitted material true facts. (Mem., pp. 22-30)<br><br>Article does not adopt implication alleged. (Mem., pp. 31-32) |

| | Challenged Statement | False Implication Alleged | Failure to State Claim |
|---|---|---|---|
| 17. | Article's 4-paragraph summary of plaintiff's authentication of a Pollock fingerprint on a painting owned by Alex Matter and his discovery of acrylic paint and gold paint particles in Pollock's studio. (¶ 56, citing Article at 11 [sic] (p. 15 of Dkt. No. 17-1, Exhibit A).)) | "[T]aken as a whole" falsely "implies that Biro planted or fabricated evidence to support his contention that the pictures were by Jackson Pollock." (¶ 57)<br><br>Allegedly omitted:<br>• "[P]laintiff never stated that any of the Matter paintings were authentic Pollocks and has never stated directly that Pollock used gold-colored paint." (¶ 58)<br><br>• Plaintiff has never stated that the gold paint on the Horton painting "matched" the specks of gold paint he found on Pollock's studio floor.  (¶ 59)<br><br>• "The actual detection of acrylate was made by Dr. Nicholas Eastaugh, who analyzed the paint samples using FTIR spectroscopy."  (¶ 61)<br><br>• "Acrylic paints were not only available to Pollock, but he actually did use them."  (¶ 62) | Not capable of defamatory meaning. (Mem., pp. 21-30)<br><br>Omitted facts not material/do not change defamatory sting. (Mem., pp. 27-30)<br><br>Article does not adopt implication alleged. (Mem., pp. 31-32) |

2

|  | Challenged Statement | False Implication Alleged | Failure to State Claim |
|---|---|---|---|
| 18. | Several paragraphs, beginning with "Biro was part of an effort to launch a venture named Provenance" and ending with "(An associate producer at 'Roadshow' had already sent Biro an email about possibly doing a segment on the Parkers' 'unbelievable discovery.')." (¶ 107, citing Article at 15 [sic] (p. 20-21 of Dkt. No. 17-1, Exhibit A).)) | "[T]aken as a whole" falsely "implies that plaintiff was the initiator of a fraudulent investment scheme, and that he planned as part of the scheme to falsely authenticate art works." (¶ 108)<br><br>Allegedly omitted:<br>• "[P]laintiff has never taken an interest in any of the works of art he is asked to analyze, but only charges a daily fee plus expenses.  He does not work on contingency work for a percentage if a work is sold..." (¶ 112)<br><br>• "Plaintiff has never asked for or received a bonus from any client because of an attribution or opinion regarding authenticity."  (¶ 114)<br><br>• "Since plaintiff's bankruptcy filing, he not received any money from the sale of an art work wherein he was involved in issues of authenticity.  He is from time to time asked to take on cases on contingency, but he refuses..." (¶ 115) | Not capable of defamatory meaning. (Mem., pp. 21-30)<br><br>Omitted facts not material/do not change defamatory sting (Mem., pp. 27-30) and, moreover, were not in fact omitted (see Dkt No. 17-1, Article at 12 ("Biro told me that he maintains a firewall between his research and the sale of a painting, and that he receives the same fee—two thousand dollars a day—regardless of the outcome of his investigation"); Article at 20 (reporting "Biro has always publicly maintained that he had no financial stake in Horton's painting"); and Article at 27 (again reporting Biro's assurance "that he had no financial stake in Horton's painting" and Horton's statement "that she could not 'let that get out in the media that he has a percentage, when he does not.'"))<br><br>Article does not adopt implication alleged. (Mem., pp. 31-32), and in fact, reports that "[t]he driving force behind the venture was Tod Volpe." (Article at 20.) |

3

| | Challenged Statement | False Implication Alleged | Failure to State Claim |
|---|---|---|---|
| 19. | "When I asked Biro about the allegedly forged fingerprints on the Parkers' painting, he peered intently at his glass of wine.  I suddenly noticed how blue his eyes were.  Calm again, he denied that he had ever forged a fingerprint."  (¶ 118, citing Article at 19 [sic] (p. 27-28 of Dkt. No. 17-1, Exhibit A).) | Statement falsely "implies that plaintiff had in fact forged fingerprints, and that his denial was a lie." (¶ 119) | Not capable of defamatory meaning. (Mem., pp. 21-30)<br><br>No omitted material facts. (Mem., pp. 22-30)<br><br>Article does not adopt implication alleged. (Mem., pp. 31-32) |
| 20. | "[When] I asked whether their father had forged the fake Goodridge Roberts landscape, or the painting given to Saul Hendler, or any other works of art, Laszlo stood up, circling the table, and for the first time Peter Paul became agitated." (¶ 120, citing Article at 19 [sic] (p. 27 of Dkt. No. 17-1, Exhibit A).) | Statement falsely "implies that plaintiff's and his brother's understandable emotional reaction to having their father accused of forgery and insulted in plaintiff's own home was somehow an admission of guilt." (¶ 121) | Not capable of defamatory meaning. (Mem., pp. 21-30)<br><br>No omitted material true facts. (Mem., pp. 22-30)<br><br>Article does not adopt implication alleged. (Mem., pp. 31-32)<br><br>The Article presents Biro's reaction ("'It is upsetting,' he said. 'It's pure fantasy.'") and his denial that his father ever engaged in forgery ("It's so easy to make this kind of an accusation.  Because somebody's a painter, therefore he can forge. It's like saying that if somebody is a surgeon he can kill, because he's got a sharp instrument in his hand.")  (Article at 27.) |

4

| | Challenged Statement | False Implication Alleged | Failure to State Claim |
|---|---|---|---|
| 21. | "We discussed 'Landscape with a Rainbow,' the purported Turner painting that was Peter Paul Biro's first fingerprint-authentication case." (¶ 122, citing Article at 19, [sic] (p. 27 of Dkt. No. 17-1, Exhibit A).) | Statement falsely "implies that the painting is only purportedly authentic, that plaintiff was the only person who claimed it to be authentic, and that it is not considered a genuine Turner." (¶ 123).<br><br>Allegedly omitted:<br>• "[T]he fingerprints were not matched by plaintiff, but confirmed by a top British fingerprint expert named John Manners. The painting was authenticated by David Hill, a well-known Turner scholar, who to this day stands by his opinion. The scientific work was done by Dr. Nicholas Eastaugh and a specialist from the Tate Gallery in London." (¶ 124) | Not capable of defamatory meaning. (Mem., pp. 21-30)<br><br>Omitted facts not material/do not change defamatory sting (Mem., pp. 27-30) and, moreover, in most cases were not in fact omitted (*see* Dkt. No. 17-1, Article at 11 (reporting on Hill and Manner's work on "Landscape with a Rainbow.": "the Biros took the painting to a Turner scholar, David Hill, at the University of Leeds. He thought that the composition and coloring strongly pointed to the hand of Turner, and he enlisted John Manners, a fingerprint examiner with the West Yorkshire Police, to verify Biro's conclusions…he said, the fingerprints definitely matched: 'It is a Turner.' Hill called the fingerprints the 'clinching piece of evidence.'")<br><br>Article does not adopt implication alleged. (Mem., pp. 31-32) |

| | Challenged Statement | False Implication Alleged | Failure to State Claim |
|---|---|---|---|
| 22. | "Biro later noted that he had spent only a 'few hours' in Pollock's studio, in the 'presence of staff,' making it impossible for him to have made a rubber stamp.  But when I asked Helen Harrison, who oversees the studio, about this, she said, 'That's not true.' Her records show that he visited four times, once with Tod Volpe, and that he was 'there for hours.' She said that she did not watch over him all that time; indeed, in her absence he had removed, 'without authorization,' a match from the floor, which he took to Montreal to analyze for possible paint particles." (¶ 125, citing Article at 20 [sic] (p. 28 of Dkt. No. 17-1, Exhibit A).) | Statements falsely "imply plaintiff committed a fraud and that he was a thief."  (¶ 126) | Not capable of defamatory meaning. (Mem., pp. 21-30)<br><br>No omitted material facts. (Mem., pp. 22-30)<br><br>Article does not adopt implication alleged. (Mem., pp. 31-32) |

| | Challenged Statement | False Implication Alleged | Failure to State Claim |
|---|---|---|---|
| 23. | "By the time that Biro took on 'La Bella Principessa,' his reputation had become so solid, and the public appetite for forensic solutions had become so strong, that he no longer seems to have worried about watermarking his evidence or presenting a perfect match. Many people, not just experts, can look at a painting and argue over what they see, but few individuals, inside or outside the art world, can evaluate fingerprints. In that sense, Biro's authentications were far less democratic than traditional connoisseurship. Though he told me he did not want to be 'judge and jury,' he had positioned himself as a singular authority." (¶ 127, citing Article at 21 [sic] (p. 30 of Dkt. No. 17-1, Exhibit A).) | Statements falsely "imply that plaintiff's reputation was unwarranted, and that he was in fact a fraud." (¶ 128)<br><br>Allegedly omitted:<br>• "[T]he more attention which plaintiff's work received, the more careful and meticulous he became." (¶ 129)<br><br>• "Plaintiff has never claimed to be a singular authority" on fingerprint identification, and "did not 'position[] himself'" as such. (¶¶ 130-31) | Not capable of defamatory meaning. (Mem., pp. 21-30)<br><br>Omitted facts not material/do not change defamatory sting. (Mem., pp. 27-30)<br><br>Article does not adopt implication alleged. (Mem., pp. 31-32) |
| 24. | "I followed Biro into his basement laboratory, where his father's landscape paintings hung. I wonder what had consigned them to this fate—hidden from the public, seen only by an adoring son. They had, I thought a certain anguished beauty, but they also seemed derivative. Perhaps Biro's father had lacked that divine spark of originality, or perhaps he had sacrificed it while inhabiting the skin of immortal artists." (¶ 132, citing Article at 21 [sic] (p. 30 of Dkt. No. 17-1, Exhibit A).) | Statements "imply that plaintiff is concealing his own property because he has something to hide, and that he is protecting his father's wrongdoing out of filial loyalty." (¶ 133) | Not capable of defamatory meaning. (Mem., pp. 21-30)<br><br>No omitted material true facts. (Mem., pp. 22-30)<br><br>Article does not adopt implication alleged. (Mem., pp. 31-32) The Article reports that the father's paintings are "displayed throughout Biro's house." (Article at 7.) |

7