LAW OFFICE OF RICHARD A. ALTMAN
Attorneys for Plaintiff
285 West Fourth Street
New York, New York 10014
212.633.0123
altmanlaw@earthlink.net
artesq@earthlink.net

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

PETER PAUL BIRO,

          Plaintiff,                           SECOND AMENDED AND
                                         SUPPLEMENTAL COMPLAINT
      -against-                          11-cv-4442 (JPO)

CONDÉ NAST, a division of
ADVANCE MAGAZINE PUBLISHERS INC.,     Plaintiff demands trial by jury
DAVID GRANN,                             of all issues so triable.
LOUISE BLOUIN MEDIA INC.,
GLOBAL FINE ART REGISTRY LLC,
THERESA FRANKS,
BUSINESS INSIDER, INC.,
GAWKER MEDIA LLC,
INTERNATIONAL COUNCIL OF MUSEUMS,
GEORGIA MUSEUM OF ART and
PADDY JOHNSON,

          Defendants.

----------------------------------------------------------x

       Plaintiff PETER PAUL BIRO, by his attorneys, Law Office of Richard A. Altman, for

his second amended and supplemental complaint against the defendants, alleges as follows:

-1-

## INTRODUCTION

1.  This is an action for libel arising from the publication of an article of, about and concerning the plaintiff Peter Paul Biro, written by defendant David Grann.  The article was published in the New Yorker Magazine, published by defendant Condé Nast, a division of defendant Advance Magazine Publishers Inc. ("Advance"), in its issue dated July 12 and 19, 2010 ("the Article").

2. Taken as a whole, the Article is false and defamatory.  It has been widely circulated and commented upon in the art world and elsewhere, and has caused, and continues to cause, enormous damage to plaintiff's reputation, to his business and to his health.

3.  In addition, plaintiff has incurred special damages as a direct result of the false statements of defendants Advance and Grann.

4.  Because of the prominence of the New Yorker Magazine, many of the false statements contained in the Article have been republished by the other defendants both before and after the commencement of this action.

5.  Those republications have exacerbated the damage to plaintiff's reputation caused by the original publication, and plaintiff is asserting claims against some of the entities and individuals who have both republished the original defamatory statements and uttered additional defamatory statements of their own, based upon the false statements in the Article.

## THE PARTIES, JURISDICTION AND VENUE

6. Plaintiff Peter Paul Biro is a resident and citizen of Montreal, Canada.

7.   He is by profession a forensic scientist, specializing in the use of fingerprint technology to assist in the resolution of issues of authenticity in works of art.  He trained and practiced as a conservator, but some years ago began to study artists' fingerprints, and in particular on a painting which was possibly by J.M.W. Turner.

8.  Plaintiff discovered a fingerprint on the painting, and this led him to question whether traditional methods for attribution of works of art could be supplemented by more scientific means.

9.  By comparing the fingerprint found in the painting to another he found in a known Turner work, he provided strong evidence that the painting was indeed an authentic Turner. The finding was corroborated by established fingerprint experts at the time.

10.   The authentication process leading up to its sale was conducted by the auction house Phillips in London, and the attribution is now generally accepted.

11.   Since then plaintiff has continued to evolve his methodology and has documented fingerprints from the works of other noted artists. As a leading authority in this emerging field, plaintiff's services have been retained in a number of challenging authentication studies for collections and private clients worldwide.

12.  Plaintiff has lectured at Harvard University, the Yale Club in New York, the National Portrait Gallery in London, and the University of Glasgow in Scotland.. He has also published articles in scientific journals, including one entitled "Forensics and Microscopy in Authenticating Works of Art" in the journal of the Royal Microscopical Society, Oxford, England.  He has been interviewed for a feature-length documentary "Who the #$&% is Jackson Pollock?," two BBC

documentaries, CBS's 60 Minutes, CNN, and a forthcoming documentary produced by the National Geographic Society.

13.  Defendant Advance is on information and belief, a New York corporation with a principal place of business at Four Times Square, New York, New York 10036, and the publisher of the New Yorker Magazine, which is issued 47 times a year.

14.  Defendant David Grann is, on information and belief, a citizen of the City and State of New York, and is a staff writer for the New Yorker Magazine, and is employed by the defendant Advance.

15.  Defendant Louise Blouin Media Inc. is, on information and belief, a Delaware corporation authorized to do business in New York, with a principal place of business at 601 West 26th Street, Suite 410, New York, New York 10001.

16.  Defendant Global Fine Art Registry LLC is, on information and belief, an Arizona limited liability company with an address at 4146 West Banff Lane, Phoenix, Arizona 85053.

17.  Defendant Theresa Franks is, on information and belief, a citizen of the State of Arizona with an address at  4146 West Banff Lane, Phoenix, Arizona 85053.

18.  Defendant Business Insider Inc. is, on information and belief, a Delaware corporation authorized to do business in New York, with a principal place of business at 257 Park Avenue South, 13th Floor, New York, New York 10010.

19.  Defendant Gawker Media LLC is, on information and belief, a Delaware limited liability company authorized to do business in New York, with a principal place of business at 210 Elizabeth Street, 4th Floor, New York, New York 10012.

-4-

20.  Defendant International Council of Museums is, on information and belief, a not-for-profit non-governmental organization based in Paris, France.

21.  Defendant Georgia Museum of Art is, on information and belief, an art museum located at 90 Carlton Street,. Athens, Georgia 30602 and is the official museum of the State of Georgia.

22.  Defendant Paddy Johnson is, on information and belief, a resident of the City of New York, whose present address is unknown to plaintiff.

23.  This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(2), in that it is between a citizen or subject of a foreign state and citizens of this and other States, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

24.  Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district in that the defendants reside or may be found in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and the defendants are subject to personal jurisdiction in this district.

FIRST CLAIM
Against Defendants Advance and Grann

25.  Plaintiff re-alleges paragraphs 1 through 14, 23 and 24.

26.  On or about July 5, 2010, defendant Grann and Advance published in the New Yorker Magazine, and distributed throughout the world and on the internet, an article of more than 16,000 words, of, about and concerning the plaintiff ("the Article").  It is entitled "The

Mark of a Masterpiece: The man who keeps finding famous fingerprints on uncelebrated works of art."  A true and complete copy of the Article is annexed as Exhibit A.

27.   On information and belief, the weekly circulation of the New Yorker Magazine exceeds one million copies, and the Article is still available on the internet to this day.

28.   The Article contains a byline of, and was written by, defendant David Grann.

29.   The Article purports to be an in-depth study of the science of forensic examination of art works, and of the use of fingerprint technology to advance that science.

30.   It is nothing of the sort, but is rather a largely false and defamatory screed against plaintiff, written and published with malice and an indifference to the standards of responsible journalism.

31.   The Article relies to a significant extent on anonymous sources and repeats defamatory statements made by those sources.

32.   Through selective omission, innuendo and malicious sarcasm, the Article paints a portrait of plaintiff which has no basis in reality, and which has been highly damaging to his reputation.

33.   The intent of the Article is apparent from the very subtitle, which implies that plaintiff finds fingerprints where they do not exist.

34.  Defendant Grann obtained plaintiff's consent to a series of interviews by misleading him about his (Grann's) true intentions in writing the Article, and he distorted the substance of those interviews to serve a predetermined  agenda.

35.  The Article ignores the many highly celebrated and iconic masterpieces of art which plaintiff has been privileged to work with, including Edvard Münch's *Scream*, works by Leonardo da Vinci, Claude Monet's *Impression, soleil levant*, and many works by J.M.W. Turner.

36.  These artworks have been written about in books ranging from academic studies to coffee table books and have garnered widespread acclaim.

37.  The Article also ignores the many other works of art which plaintiff has worked with over the years, as well as his many satisfied clients.

38.  Furthermore, the Article ignores the many works of art which plaintiff was asked to study and evaluate, but which he rejected because in his professional opinion the forensic information on them was insufficient or illegible.

39.  It is thus, in the context of the entire Article, false and defamatory to say that plaintiff "keeps finding famous fingerprints on uncelebrated works of art," because such an accusation may reasonably be construed as accusing plaintiff of fraudulent conduct and incompetence in his profession, by finding fingerprints where they do not exist.

40.  Many statements in the Article are edited so as to give a sinister and suspicious connotation to what would otherwise be objective facts.

41.  In the end and in its entirety, the Article demonstrates a shocking indifference to the truth, and a violation of the basic principles of professional journalism.

42.  Defendant Grann, writing much of the Article in the first person, says that "[r]eporters work, in many ways, like authenticators. We encounter people, form intuitions about them, and then attempt to verify these impressions...A woman who had once known him well

told me, 'Look deeper into his past. Look at his family business.' As I probed further, I discovered an underpainting that I had never imagined." Exhibit A at 11-12.

43. Leaving aside the fatuity of defendant Grann, a journalist and writer, comparing himself to an art authenticator, and referring to underpaintings as if he had studied art works under ultraviolet light or X-rays instead of writing a magazine article, such a statement–from an anonymous source, "a woman who had once known him well"–demonstrates an unprofessional refusal to look at actual facts.

44. Such an attitude of "attempt[ing] to verify these impressions," strongly suggests "confirmation bias," defined as "a tendency for people to favor information that confirms their preconceptions or hypotheses regardless of whether the information is true." http://en.wikipedia.org/wiki/Confirmation_bias.

45. The attitude may be harmless in the case of the public generally, but when a journalist in a national magazine succumbs to it, the effect is profound and destructive, as it is here.

46. Defendants Advance and Grann did not act from intuitions or from facts, but from preconceived prejudices and over-reliance on anonymous and untrustworthy or biased sources.

47. In fact, defendant Grann's main source for the Article is of dubious reliability, and has been judicially sanctioned for giving improper and prejudicial testimony in a court proceeding

48. Plaintiff is not a public figure, and has not willfully thrust himself into a matter of public importance or controversy.

-8-

49.   He is a highly skilled professional whose career of many years has been nearly destroyed by defendants' actions, and who has suffered both general and special damages as a direct result.

50.   Defendants acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties, and should be held responsible for their libels.

51.   Defendants acted with actual malice, in that they knew or should have known that many of the statements of fact in the Article were false, and they published the Article notwithstanding that knowledge.

52.   The defendant Advance had more than ample time to investigate and determine the validity of the statements made by defendant Grann in the Article before publishing it, but failed to do so.

53.   Defendant Advance, and the New Yorker Magazine, have a reputation for being assiduous and thorough fact-checkers, but failed to comport themselves as such here.

54.   As a result of that unwarranted reputation, the Article has been widely circulated and commented upon, thereby repeating and giving wider circulation to some of the defamatory falsehoods it contains, essentially assuming that "it must be true because it's in the New Yorker." In doing so, the damage caused plaintiff by the Article has been compounded.

55.   Given the facts and circumstances, in failing to question the accuracy of defendant Grann's reporting, defendant Advance acted in a grossly irresponsible manner without due

consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

### THE SPECIFIC LANGUAGE IN THE ARTICLE, AND PLAINTIFF'S RESPONSES THERETO.

56. The Article contains numerous statements of fact which are false and defamatory. Some, but not all, of those statements follow, and the Article is incorporated herein in its entirety by reference.

57. The Article introduces plaintiff with the following: "in January, 2009, [Leonardo scholar Martin] Kemp turned to a Canadian forensic art expert named Peter Paul Biro, who, during the past several years, has pioneered a radical new approach to authenticating pictures." *Id.* at 5.

58. This statement is false and misleading. There is nothing radical about fingerprints, not even on artworks, and plaintiff is not the first person who has looked for fingerprints to provide evidence to assist in the attribution of works of art.

59. For example, a purported fingerprint played a role in the celebrated 1929 case of *Hahn v. Duveen*, 133 Misc. 871, 234 N.Y.S. 185 (Sup.Ct.N.Y.Co.1929), a defamation suit about the authenticity of a painting attributed to Leonardo da Vinci.

60. The Article describes plaintiff physically in terms which are intended to demean his appearance:

> "Come in, come in," Biro said, opening the door to his elegant three-story brick house, in Montreal. Biro, who is in his mid-fifties, has a fleshy pink face and a gourmand's stomach, and he wore black slacks, a black turtleneck, and black shoes—his habitual raven-like outfit. A pair of glasses dangled from a string

around his neck, and he had thick sideburns and whitening black hair that stood on end, as if he had been working late. ("For me, this is not a nine-to-five job," he later said. "I wake up in the middle of the night because something occurred to me. It's basically every waking hour.") In his arms, he cradled a miniature schnauzer. "This is Coco," he said, petting the dog to keep it from barking.

*Id.* at 5.

61.  In fact, plaintiff often wears black while working, in order to avoid back-reflections during photography sessions.  When using ultraviolet techniques, white or bright colors interfere with the process, which requires total darkness.

62.  The choice of language makes plaintiff appear to be sinister, and the physical description is pointlessly but intentionally demeaning.

63.  The Article continues, "[t]hough it was still early in the day, Biro reached into a long wooden rack filled with wine bottles and removed one. After examining the label, he poured himself some and offered me a glass. 'Every drop is precious,' he said, before finishing his glass and refilling it."  *Id.* at 5.

64.  In fact, there is no "long wooden rack" and it was lunchtime, not "early in the day."

65.  The choice of language falsely suggests that plaintiff drinks to excess.

66.  On page 11 of Exhibit A, the following appears:

And so, with this final flourish, the glittering portrait of Peter Paul Biro was complete:  he was the triumphant scientist who had transformed the art world. Like "La Bella Principessa," the image was romantic, almost idealized–the version of Biro that was most appealing to the eye.  But, somewhere along the way, I began to notice small, and then more glaring, imperfections in this picture.
One of the first cracks appeared when I examined the case of Alex Matter, a filmmaker whose parents had been close to Jackson Pollock. In 2005, Matter announced that he had discovered a cache of art works in his late father's storage space, on Long Island. Ellen Landau, the art historian, said that she was "absolutely convinced" that the paintings were by Pollock.

Biro was sent a photograph of a fingerprint impressed on the front of one picture. He identified six characteristics that corresponded with the fingerprint on the paint can in Pollock's studio—strong evidence that the work was by Pollock. But, as more and more connoisseurs weighed in, they noticed patterns that seemed at odds with Pollock's style. Meanwhile, in sixteen of twenty art works submitted for analysis, forensic scientists discovered pigments that were not patented until after Pollock's death, in 1956. At a symposium three years ago, Pollock experts all but ruled out the pictures. Ronald D. Spencer, a lawyer who represents the Pollock-Krasner Foundation, told me, "Biro can find all the fingerprints he wants. But, in terms of the marketplace, the Matter paintings are done. They are finished."

When I first talked to Biro about Matter's cache, he had noted that no anachronistic pigments were found on the picture that he had authenticated, and he said that it was possible that Pollock had created only a few of the pictures, or that he had simply touched one of them. After all, Pollock was a friend of Matter's parents.

His explanation seemed plausible, but I kept being troubled by other details relating to Biro's Pollock investigations. For instance, it was peculiar that even though there were no documented cases of acrylic being used in Pollock's pour paintings, Biro had easily found some on the floor of the Long Island studio— indeed, in the very first sample he tested. I contacted a leading forensic scientist in the art world who teaches at the F.B.I. Academy, in Quantico, Virginia, and who has done research in the Pollock studio. The scientist told me that he had spent hours combing the floor and had not found any acrylic. He added that a microchemistry test was not even considered suitable for identifying acrylic. As for the gold paint particles that Biro said he had uncovered on the studio floor and matched to the pigment in Teri Horton's painting, Helen Harrison, an art historian who is the director of the Pollock-Krasner House & Study Center, which oversees Pollock's old studio, told me that she did not know of Pollock's having used gold in any of his pour paintings.

67.  The foregoing, taken as a whole, is false and defamatory, in that it implies that Biro planted or fabricated evidence to support his contention that the pictures were by Jackson Pollock.

68.  In fact, plaintiff never stated that any of the Matter paintings were authentic Pollocks, and has never stated directly that Pollock used gold-colored paint.

69.  In fact, all that plaintiff said was that he had found specks of gold paint on the matchstick on the studio floor, and that he also found specks of gold paint on the painting. Inasmuch as no testing of these specks was performed to plaintiff's knowledge, it is incorrect to claim that they matched., and plaintiff has never so stated.

70.  In fact, the studio floor measures approximately 400 square feet and is heavily covered in paint in a myriad of patterns and colors. A major research project would be required to conclusively make such a statement, and the results of a project of this magnitude would presumably be published.

71.  Moreover, the actual detection of acrylate was made by a Dr. Nicholas Eastaugh, who analyzed the paint samples using FTIR spectroscopy.

72.  In fact, acrylic paints were not only available to Pollock, but he actually did use them, according to the Smithsonian Archives on American Art.

73.  In fact, Helen Harrison said only that she did not know if Pollock used gold paint, but did not deny it.  Thus the question remains open.

74.  The Article continues:

One day, I visited the records office at the Palais de Justice, the provincial courthouse in downtown Montreal... During the eighties and early nineties, more than a dozen civil lawsuits had been filed against Peter Paul Biro, his brother, his father, or their art businesses. Many of them stemmed from unpaid creditors. An owner of a picture-frame company alleged that the Biros had issued checks that bounced and had operated "under the cover" of defunct companies "with the clear aim of confusing their creditors." (The matter was settled out of court.).

*Id.* at 12.

75.  These statements are false and defamatory.

76.  In fact, there were no "defunct companies" and plaintiff did not operate "under the cover" of such companies "with the clear aim of confusing their creditors."

77.  The Article continues:

On February 12, 1981, Sam and Syd Wise, brothers who were art collectors in Montreal, stopped by the Biros' gallery. Peter Paul Biro was present, along with his father, Geza. The restoration business was in the back of the gallery, and the Biros often wore white laboratory coats. ...Though the gallery was filled mostly with Geza's landscape paintings, Peter Paul told the Wises that they had for sale an exemplary oil painting by Goodridge Roberts, the Canadian artist. The picture was signed and showed what appeared to be Georgian Bay, in Ontario, which Roberts had often rendered in his paintings. The Wises bought the picture for ninety-five hundred dollars. Soon afterward, Peter Paul informed the Wises that he had another landscape painting by Roberts, and the Wises, who had already sold the first picture to a local gallery, agreed to buy the second one, for seventy-five hundred dollars.
In 1983, Goodridge Roberts's widow, Joan, happened to visit the gallery where the Wises had sold the Georgian Bay painting. She had been intimately involved in her husband's work, keeping a catalogue of his paintings, and she was immediately drawn to the picture. As she subsequently testified, it mimicked her husband's paintings, but the trees were "feeble imitations," the play of the colors was jarring, and the signature appeared oddly slanted. Moreover, she had never catalogued the work. She went up to the dealer and cried, "That's a fake."
...
Peter Paul Biro insisted that the works were genuine—and that, in any case, the Wises had had an opportunity to investigate the paintings before buying them. He refused to reimburse the Wises, who ultimately sued..
...
Throughout the trial, the Biros and their attorneys maintained that the two paintings sold to the Wises were authentic, but to make their case they presented an art expert who was not a specialist on Roberts, or even on Canadian art.
On September 3, 1986, the court found in favor of the Wises, and ordered Peter Paul and Geza Biro to pay them the seventeen thousand dollars they had spent on the pictures, as well as interest.

*Id.* at 12-13.

78.  This excerpt, taken as a whole, is false and defamatory in that it implies that plaintiff knowingly sold fake art, and concealed that fact until the trial court ruled against them.

-14-

79.  In fact, the trial court ruled only that the contract should be cancelled, and made no finding regarding the authenticity of the paintings one way or the other.

80.  In fact, the testimony was that the original owner had purchased the painting directly from the artist when, by chance he encountered Goodridge Roberts painting in the countryside, and bought the painting directly off the easel.  That owner, however, had died by the time of the trial.

81.  In fact, plaintiff's expert witness, a Professor Warren Sanderson, testified that although he believed the paintings to be authentic, his opinion was tentative and conditional.. He recommended technical and scientific examinations of the paintings, which were not done.

82.  Because of this conditional opinion, the trial court said that it could not reach a conclusion regarding authenticity.

83.  The Article continues:

> Sand was contacted by another former client of the Biros, an art-and-antique collector named Saul Hendler, who has since died.  According to court records and interviews with Sand and Hendler's wife, Marion, the Biros approached Hendler in 1983, saying that they had found a suspected Renoir, signed by the artist, which, if authenticated, was worth millions of dollars.  The Biros asked Hendler to front them nine thousand dollars to buy the painting, a portrait of a nude woman; the Biros would then authenticate the work and sell it, sharing the profits. Hendler gave them the money.  Not long afterward, Peter Paul Biro consulted a leading Renoir expert, who determined that the painting was a fake and that the signature was forged.  The Biros refunded Hendler half his money, and eventually agreed to give him the painting, which still had some value as a decorative piece.
> *Id.* at 13.

84.  This excerpt, taken as a whole, is false and defamatory in that it implies that plaintiff knowingly sold fake art, a criminal offense.

85.     In fact, Hendler was a dealer/collector who expressed interest in acquiring undervalued and undiscovered pieces.  He was a repeat client for restoration of artwork prior to this episode.

86.  In fact, plaintiff did not approach Hendler; it was the other way around.

87.  The agreement between them was to jointly acquire a painting of a seated nude signed "Renoir" and explore its potential.

88.  Plaintiff was not then in the business of authentication, and consulted a Renoir expert, who returned a negative opinion.

89.  Confronted with this opinion, Hendler became belligerent and demanded all of his money back.

90.  The court awarded him half of the purchase price (his part of the investment), the other half representing effort and cost of restoration and research carried out by plaintiff.

91.  The Article continues:

When Hendler picked up the picture, he thought that the composition looked vaguely different. He had previously made a photo transparency of the painting, and at home he compared it with the canvas he had just been handed. "My late husband was furious," Marion Hendler told me. "Then I saw it, and I was horrified. It was clearly not the same painting." Had the Biros sold the original painting without telling Hendler?

*Id.* at 13.

92.  This excerpt, taken as a whole, is false and defamatory in that it implies that plaintiff switched one painting for another, or fraudulently sold a painting determined by experts as not by Renoir as if it were authentic, for a substantial sum of money.

-16-

93.  In fact, the painting had undergone the removal of large amounts of aged darkened varnish, and the undoing of prior alterations done to it in a previous restoration. As a result, the restored painting no longer perfectly matched the appearance of its un-restored state.

94.  The Article continues:

> Hendler, unable to get back what he considered the original painting, sued the Biros for the rest of the money he had paid. In a written response, the Biros called the allegations "false and untrue and defamatory," adding that "the sole difference in the painting was the work which had been performed on the painting by the Defendants in lifting the paint in order to discover the original painting which had appeared on the canvas." During the trial, which took place in 1992, Sand called to the stand an art expert who testified that the painting was not the same as the one Hendler had bought. The court agreed, awarding Hendler several thousand dollars. But Marion asked me, "What did we win?" She went on, "Where's that piece of art? We never got it back. He probably sold it for a lot of money and we got this piece of junk in return."

> *Id.* at 13.

95.  This excerpt, taken as a whole, is false and defamatory in that it implies that plaintiff defrauded the Hendlers.

96.  In fact, the Hendlers' claim was fully paid. What the Article fails to say is that, after plaintiff purchased the painting back, Marion Hendler also demanded a signed Renoir for free, thrown in as part of the deal.

97.  In fact, the court had consigned the painting back to plaintiff in return for the full refund, thus showing that Hendler had no ownership interest in the first place.

98.  Furthermore, Hendler executed a satisfaction of judgment, indicating that he was fully paid, with interest.

99.  In June 2011, plaintiff commenced a civil action for defamation in Montreal Superior Court against Marion Hendler based upon the statements attributed to her in the Article, and she was duly served in that action.

100.  Marion Hendler has subsequently defaulted in the action, thereby admitting the allegations therein that the statements which she made to defendant Grann were false.

101. The Article continues:

Lawsuits had piled up against Peter Paul Biro and his family business.  In two instances, there were allegations that art works had vanished under mysterious circumstances while in the care of Peter Paul. In one of the cases, Serge Joyal, who is now a senator in Canada, told me that he left a nineteenth-century drawing with the Biros to be restored. Before he could pick it up, Peter Paul notified him that it had been stolen from his car and that there was no insurance. Biro, however, never filed a police report, and Joyal says that Biro pleaded with him to wait before going to the authorities. During their conversations, Joyal says, Peter Paul acted evasive and suspicious, and Joyal became convinced that Biro was lying about the theft. As Joyal put it, "There was something fishy." Though Peter Paul said that there was nothing "suspect" about his behavior, and that he should not be held liable, the court awarded Joyal seven thousand dollars, plus interest.

*Id.* at 13.

102.  This excerpt, taken as a whole, is false and defamatory in that it implies that plaintiff concealed a theft, or was a thief himself, and describes him as a liar.

103.  It is also false in that it mentions "two instances" but describes only one.

104.  In fact, the vehicle was apparently taken for a joyride and returned unharmed. Since the car was returned intact, plaintiff did not file a police report.

105.  However,  after the incident plaintiff realized that the drawing was missing, and so informed Joyal, saying that he (Joyal) could file a police report if he (Joyal) deemed it necessary.

106.   Instead of filing a police report and making an insurance claim, Joyal sued, alleging that the drawing was more valuable than it actually was worth.   On information and belief, the court awarded the lesser value.

107.   No wrongdoing was ever attributed to plaintiff in the matter.

108.   The excerpt is also false and defamatory in that it says "art works had vanished under mysterious circumstances while in the care of Peter Paul."   *Id.* at 13.

109.   In fact, this was the one and only instance of the loss of an art work while in plaintiff's care and custody, and it was the result of a theft, not of any lack of due care or wrongdoing on the plaintiff's part.

110.   The Article continues:

Elizabeth Lipsz, a Montreal businesswoman who had once been close to Biro, and who won a lawsuit against him for unpaid loans, described him to me as a "classic con man." Her lawyer  told me that Biro "was so convincing. He was very suave, soft-spoken, but after a while you catch him in different lies and you realize that the guy is a phony."

*Id.* at 13-14.

111.   The excerpt is false and defamatory, and relies upon an unnamed source.

112.   In fact, Lipsz never obtained a judgment against plaintiff for unpaid loans; the action was suspended.

113.   In fact, plaintiff has asked Lipsz to confirm or deny the statement she allegedly made to defendant Grann, and to provide the name of her unnamed attorney.  She has refused to respond.

114.   The Article continues:

Within Montreal's small art world, there were whispers about Peter Paul Biro and his father. But the lawsuits appear to have attracted virtually no public attention. In 1993, Peter Paul Biro filed for bankruptcy, and he never paid many of the judgments against him, including what he owed the Wises and Joyal. Lipsz's lawyer said of Biro, "He oiled his way out of that whole thing....He got away scot-free."

*Id.* at 14.

115. The excerpt is false and defamatory and scurrilous in its use of the words, "he oiled his way out of that whole thing...He got away scot-free."

116. It is accurate to state that plaintiff filed for bankruptcy in 1993 and was discharged. However, in the early 1990s the art market in Montreal suffered a serious recession, major art galleries closed, and some moved away because of it. Plaintiff was among the victims of that recession.

117. Plaintiff's financial difficulties under such circumstances some two decades ago is utterly irrelevant to the work he does today, and was brought up for no reason other than to smear plaintiff in that work, to undermine his credibility and to damage his reputation.

118. The Article continues:

Biro was part of an effort to launch a venture named Provenance, which would provide, as he put it, the "clever strategy" necessary to sell "orphaned" paintings for tens of millions of dollars. According to a business prospectus, marked confidential, Provenance would acquire art works that had been forensically validated by Biro and several colleagues, and sell them in a gallery in New York City. The company chose a thumbprint for a logo...Once Provenance was established, Biro told the Parkers, "there really is nothing we can no[t] do."

The plan called for raising sixty-five million dollars from investors, part of which would go toward buying J. P. Morgan's old headquarters, on Wall Street, and turning it into a palatial arts complex anchored by a gallery. Surprisingly, at least five million dollars of investors' money would also go to purchasing Teri Horton's painting—even though Biro had authenticated the work and Volpe had

tried to sell it. By capitalizing on the media interest surrounding the painting, the plan said, the work could be resold for between forty and sixty million dollars, maybe even a hundred million. Although Biro has always publicly maintained that he had no financial stake in Horton's painting, Horton sent an e-mail to the Parkers saying that after the sale of her painting Biro would "collect" and that it would "set him for life."

The business plan noted that Biro had access to "more than 20" other valuable orphaned paintings, all of which could be sold at Provenance. Among them were paintings by artists with whom Biro and his family had long been closely associated, including three by Turner and a landscape by Constable. The plan estimated that each year Provenance would accept anywhere from twenty to thirty new possible masterpieces for scientific evaluation, of which nearly half would be authenticated, creating staggering profits. (The forensic expert who works with the F.B.I. expressed surprise at this prediction, telling me that, in the overwhelming majority of cases involving disputed art, the work fails to be authenticated.)

Provenance was cleverly tapping into the public's desire to crack open the art world, offering the tantalizing dream that anyone could find a Pollock or a Leonardo or a Turner languishing in a basement or a thrift shop. The company combined the forensic triumphalism of "C.S.I." with the lottery ethos of "Antiques Roadshow." (An associate producer at "Roadshow" had already sent Biro an e-mail about possibly doing a segment on the Parkers' "unbelievable discovery.")

*Id.* at 15.

119.   The foregoing excerpt, taken as a whole, is false and defamatory, in that it implies that plaintiff was the initiator of a fraudulent investment scheme, and that he planned as part of the scheme to falsely authenticate art works so as to create "staggering profits," and that plaintiff "was cleverly tapping into the public's desire to crack open the art world."

120.   The Article continues, "Biro previously had been suspected of creating an investment scheme around a seemingly precious object, with the promise that it would eventually reap huge profits...Lafferty's longtime business partner, Allan Aitken, told me that he

believed that 'Biro was either a shyster or a con man, and had found in Lafferty an easy mark.'"
*Id.* at 15-16.

121.  The statement is false and defamatory.

122.  In fact, it was Lafferty who proposed the venture, not plaintiff, and it was Lafferty who prepared and submitted a business plan, not plaintiff.

123.  In fact, plaintiff has never taken an interest in any of the works of art he is asked to analyze, but only charges a daily fee plus expenses. He does not work on contingency or for a percentage if a work is sold, so as to maintain disinterest in the outcome of his investigations.

124.  Some of plaintiff's clients may have made statements to the effect that they will take care of him or make him rich and famous. Plaintiff has no control over what others may say.

125.  Plaintiff has never asked for or received a bonus from any client because of an attribution or opinion regarding authenticity.

126.  Since plaintiff's bankruptcy filing, he not received any money from the sale of an artwork wherein he was involved in issues of authenticity.  He is from time to time asked to take on cases on contingency, but he refuses, asking for no more than his regular professional fee.

127.  There is another factual error in the above excerpt.  In fact, plaintiff never authenticated Horton's painting.

128.  Authentication is by its very nature a complex and multidisciplinary process, and seldom provides definitive answers.  Plaintiff presented the evidence in favor of the attribution to Jackson Pollock, but did not draw a firm conclusion.

129.   The Article continues, "[w]hen I asked Biro about the allegedly forged fingerprints on the Parkers' painting, he peered intently at his glass of wine. I suddenly noticed how blue his eyes were. Calm again, he denied that he had ever forged a fingerprint." *Id.* at 19.

130.   The statement is false and defamatory, in that it implies that plaintiff had in fact forged fingerprints, and that his denial was a lie.

131.   The Article continues, "I asked whether their father had forged the fake Goodridge Roberts landscape, or the painting given to Saul Hendler, or any other works of art. Laszlo stood up, circling the table, and for the first time Peter Paul became agitated." *Id.* at 19.

132.   The statement is false and defamatory, in that it implies that plaintiff's and his brother's understandable emotional reaction to having their father accused of forgery and insulted in plaintiff's own home was somehow an admission of guilt, and that the accusation was true.

133.   The Article continues, "[w]e discussed 'Landscape with a Rainbow,' the purported Turner painting that was Peter Paul Biro's first fingerprint-authentication case." *Id.* at 19.

134.   The statement is false and defamatory, in that it implies that the painting is only purportedly authentic,  that plaintiff was the only person who claimed it to be authentic, and that it is not considered a genuine Turner.

135.   In fact, the fingerprints were not matched by plaintiff, but confirmed by a top British fingerprint expert named John Manners. The painting was authenticated by David Hill, a well-known Turner scholar, who to this day stands by his opinion.  The scientific work was done by Dr. Nicholas Eastaugh and a specialist from the Tate Gallery in London.

136.   The Article continues, "Biro later noted that he had spent only a 'few hours' in Pollock's studio, in the 'presence of staff,' making it impossible for him to have made a rubber stamp. But when I asked Helen Harrison, who oversees the studio, about this, she said, 'That's not true.' Her records show that he visited four times, once with Tod Volpe, and that he was 'there for hours.' She said that she did not watch over him all that time; indeed, in her absence he had removed, 'without authorization,' a match from the floor, which he took to Montreal to analyze for possible paint particles." *Id.* at 20.

137.   The statements are false and defamatory, in that they imply that plaintiff committed a fraud and that he was a thief.

138.   The Article continues:

By the time that Biro took on "La Bella Principessa," his reputation had become so solid, and the public appetite for forensic solutions had become so strong, that he no longer seems to have worried about watermarking his evidence or presenting a perfect match. Many people, not just experts, can look at a painting and argue over what they see, but few individuals, inside or outside the art world, can evaluate fingerprints. In that sense, Biro's authentications were far less democratic than traditional connoisseurship. Though he told me that he did not want to be "judge and jury," he had positioned himself as a singular authority.

*Id.* at 21.

139.   The statements are false and defamatory, in that they imply that plaintiff's reputation was unwarranted, and that he was a fraud.

140.   In fact, the more attention which plaintiff's work received, the more careful and meticulous he became.

141.   In fact, any individual who serves on a jury in a case involving fingerprint evidence can decide whether there is a match, and plaintiff has never claimed to be a singular authority.

142.   In fact, plaintiff did not "position[ ] himself."  The art market is far more complex than defendants would have it.  No dealer or auction house would accept plaintiff's (or anyone else's) conclusions as definitive before selling a contested work of art, without other evidence and thorough investigation.

143.   The Article continues, "I followed Biro into his basement laboratory, where his father's landscape paintings hung. I wondered what had consigned them to this fate—hidden from the public, seen only by an adoring son.  They had, I thought, a certain anguished beauty, but they also seemed derivative.  Perhaps Biro's father had lacked that divine spark of originality, or perhaps he had sacrificed it while inhabiting the skin of immortal artists."  *Id.* at 21.

144.   The statements are false and defamatory, in that they imply that plaintiff is concealing his own property because he has something to hide, and that he is protecting his father's wrongdoing out of filial loyalty.

145.   The statements scurrilously injure plaintiff by defaming his dead father, who cannot sue.

## THE D.C. CIRCUIT COURT FOUND THAT DEFENDANT GRANN WROTE AND PUBLISHED MATERIAL "REASONABLY CAPABLE OF A DEFAMATORY MEANING."

146.   The defendant Advance had substantial reason to question the accuracy of many of the statements in the Article, and the journalistic *bona fides* and professionalism of defendant Grann.

147.   Defendant Grann has been judicially determined to have written and published statements capable of a defamatory meaning.

148.  In *Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C.Cir.2001), defendant Grann was a defendant in a defamation suit arising from an article he had written about a political figure named Paul Weyrich.  The D.C. Circuit said:

> The article is flowered with anecdotes that reveal Weyrich to be both emotionally volatile and short-tempered, and it depicts him as both a zealoted political extremist and an easily-enraged tyrant of the first order....Accepting the facts as alleged in the complaint, as we must, it appears that some of the anecdotes reported in the article are reasonably capable of defamatory meaning and arguably place Weyrich in a false light that would be highly offensive to a reasonable person.  Thus, because we find that some of the article's contested statements are both verifiable and reasonably capable of defamatory meaning, at least a portion of the complaint is sufficient to survive a Rule 12(b)(6) motion to dismiss. We are therefore constrained to reverse and remand the case for further proceedings....There is no doubt that a reasonable person, reading the article's repeated tale of appellant's volatile temper and apparent emotional instability, could very well conclude that appellant is an emotionally unstable individual unfit for his trade or profession.  One or more of the anecdotes arguably make appellant appear personally odious, infamous, or ridiculous.

235 F.3d at 620, 628.

149.  The case was widely publicized at the time, and thus defendant Advance either knew or should have known of defendant Grann's defamatory propensities when it hired him.

## DEFENDANTS RELIED UPON A SOURCE WHO A COURT FOUND "ENGAGED IN PERSISTENT MISCONDUCT."

150.  One of the defendants' principal sources for the Article was one Theresa Franks.  She is described as the Founder of a company called Global Fine Art Registry, based in Phoenix, Arizona.

151.  On information and belief, defendant Grann and Franks worked closely together on the Article for nearly one year.

152.  On her website, Franks says:

Teri is grateful to the author David Grann for his fine work and for including some material and videos that were a result of the investigation that Fine Art Registry® conducted in reference to Peter Paul Biro and his amazing ability to discover fingerprints of the Masters on everything he examines. If a fingerprint is needed, he will find it. FAR® began its probe into Biro and his dealings back in 2007 with some amazing results. There are more questions raised here than answered, however there will be more revelations to come!

See http://www.fineartregistry.com/articles/2010-07/ fine-art-registry-featured-in-the-new-yorker-magazine.php.

153.   The Article says:

[A]lthough not well known in the art world, [she] has cast herself as a crusader against fraud in a realm that she describes as the "last wild frontier."  Operating out of her home, she pursues her own investigations, hiring independent experts and posting reports on her Web site. (One of her recent campaigns was against a company named Park West Gallery, which, she alleged, was selling fake prints by Salvador Dali. The gallery's founder, who called her attacks "cyber-terrorism," sued for defamation. In April, a jury ruled unanimously in Franks's favor, and awarded her half a million dollars in a counterclaim.).

Exhibit A at 23.

154.  By noting that a jury had determined in her favor on a counterclaim which she had brought in a defamation action against her, the Article thereby implies that Franks was vindicated after a trial, that her reputation for truthfulness and veracity had been unfairly maligned by Park West Gallery, and that her accusations against the plaintiff should be deemed credible.

155.  However, on August 16, 2010, the District Court for the Eastern District of Michigan, where the case had been tried, vacated the jury verdict on Franks's counterclaim and ordered a new trial:

[T]he Court finds that Franks and counsel for the FAR Defendants engaged in persistent misconduct in front of the jury throughout the trial, and it would be fair to characterize the misconduct as contumacious conduct. As explained below, the Court also concludes that their misconduct permeated the trial and justifies ordering a new trial against the FAR Defendants.

...

[T]he Court finds that Franks and counsel for the FAR Defendants engaged in a deliberate course of conduct aimed at preventing a fair and impartial jury and that such misconduct: (1) deflected the jury's attention from the issues involved, (2) caused unfair prejudice to Plaintiff, and (3) had a controlling influence on the jury. In addition, the Court finds that Plaintiff has made a concrete showing that the misconduct of counsel [and Franks and Szostak] consistently permeated the entire trial from beginning to end. The Court thus concludes that there was a reasonable probability that a fair and impartial jury no longer existed by the time it commenced deliberations and, accordingly, that a fair verdict was not rendered in this case.

*Park West Galleries, Inc. v. Global Fine Art Registry, LLC*, 2010 U.S. Dist. LEXIS 84525 at *13 and *65 (E.D.Mich.Aug.16, 2010)(citations and quotation marks omitted; brackets in original).

156.  On information and belief, in response to the District Court's decision, Franks created a video and posted it on the internet, in which she accuses the District Judge of being "biased from the beginning," states that she intends to investigate him, and suggests that a "special relationship" exists between the District Judge Park West Gallery's counsel.

157.  On information and belief, Franks has violated court orders requiring her either to refrain from posting comments about her litigation with Part West, or to remove such postings.

158.  On information and belief, the defendants Grann and Advance have never printed a clarification or correction of the statement in the Article regarding the counterclaim, or the fact that it was vacated because of the "contumacious conduct" of Franks and her counsel.

159.  The defendant Advance knew or should have known that one of the Article's principal sources had a reputation for misleading and fraudulent conduct.

160.  Further evidence of Franks's personal animus against plaintiff may be seen at her website, wherein she engages in vituperative personal attacks upon him.

161.  In several posts since the commencement of this action, Franks has written about this action, Biro and his counsel in intemperate, defamatory and actionable language.

162.  For example, just a few days after this action was commenced on June 29, 2011, Franks published on her website the following, under the headline "Pinhead Peter Paul Biro Awakens Sleeping Giants-Sues New Yorker Magazine and Award-Winning Writer David Grann and Takes Swipe at Fine Art Registry®:"

> The self-proclaimed "art authenticator" (cough-cough) Peter Paul Biro, has foolishly thrown down the gauntlet, accusing award-winning writer, David Grann and Condé Nast (the New Yorker magazine) of defamation. A lawsuit filed by Biro (a Canadian art restorer) against David Grann, Conde Nast, and others is amateur hour at best. The Complaint contains outrageous and fallacious allegations against David Grann and the New Yorker, and other parties, with no basis whatsoever in fact.
>
> Further, the lawsuit (published here in its entirety with exhibits) is amusing, in that it is written and crafted by Biro's lawyer in such a way to make Biro appear frightfully shady and quite guilty of wrongdoing. Knowingly or unknowingly, it paints Biro in a light much worse than anything that David Grann or anyone else could have written and the joke is on Biro because he is presumably paying his lawyer to essentially resurrect, refresh, and raise public awareness anew about everything Biro ostensibly would want to bury and forget. And the fact that he waited a year to file this drivel is amazing. It's PR suicide. The lawsuit as it reads could very well be submitted as a script for a Saturday Night Live episode. Seriously!
> http://www.fineartregistry.com/articles/2011-07/peter-paul-biro-sues-new-yorker-magazine.php (accessed September 26, 2011).

163.  A few weeks later, Franks posted the following:

Oh, yes, it's going to get very messy as Fine Art Registry begins to fully expose Biro's participation in what appears to be a cleverly orchestrated sucker game valued at around $360,000,000, give or take a few million here or a few million

there. Fine Art Registry believes that to an enormous degree of reasonable
probability (according to the overwhelming evidence we have on file), Biro is
hoping to deflect possible lawsuits against him for fraud and maybe even eventual
criminal implications, by accusing David Grann and the New Yorker magazine
of defamation. In other words, Biro doesn't want you to pay any attention to
what's going on behind the curtain. Look over here everyone! Perhaps Biro
thought no one would notice his sleight of hand, his abracadabra, his hocus
pocus. Heck, if he could dodge a bullet or two and quell the fears of a few
pissed-off investors and at the same time ring the bell on a nice fat settlement
from the New Yorker--well, what could be better? If he can just keep all the balls
in the air--he just might be able to pull it off and then he would be set for life and
wouldn't have to worry about all those pesky little Jackson Pollock fingerprints,
hairs, and DNA he can't help but to discover on all those canvases and stretcher
bars that magically materialize with frequency, using his specially designed super
duper fingerprint detection formula that no other latent fingerprint examiner in
the world has ever heard of.
http://www.fineartregistry.com/articles/2011-07/peter-paul-biro-and-his-wild-tale-of
-conspiracy.php (accessed September 26, 2011).

164. Such intemperate, insulting and abusive (not to mention defamatory and actionable)

language demonstrates an obvious animus toward plaintiff on the part of Franks, and casts

doubt upon her reliability and veracity as a source for the Article.

165.  Defendant Grann knew, or should have known, of Franks's personal animus and

hostility toward the plaintiff, and therefore had reason to question the truth of what she told

him.

166.  A source with such animus toward the subject of a news story should not be the

principal source for a writer and publisher who are concerned about factual accuracy.

167.  Thus, both defendant Advance's writer, and that writer's principal source, have

been defendants in court cases which ruled against them, and found that they had respectively

engaged in arguably defamatory conduct, and repeated "contumacious conduct" in front of a

jury, deemed sufficiently egregious to overturn a verdict.

168.   Under the circumstances, defendant Advance had substantial reason to question the reporting abilities of defendant Grann, the accuracy of the Article and the *bona fides* of defendant Grann and his sources.

169.   Defendant Advance failed to exercise that degree of responsibility which was appropriate under the circumstances and which is normally observed by media defendants.

170.   Defendants Advance and Grann acted in a grossly irresponsible manner, without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible reporters and media organizations.

171.   Defendants Advance and Grann either knew or believed or had reason to believe that many of the statements of fact in the Article were false or inaccurate, and nonetheless published them anyway.

172.   Defendants Advance and Grann acted with actual malice, or in reckless disregard of the truth, or both.

### TAKEN AS A WHOLE, THE ARTICLE IS A DEVASTATING AND UTTERLY FALSE ATTACK ON PLAINTIFF'S REPUTATION.

173.   The complained-of language in the Article has exposed plaintiff to public contempt, ridicule, aversion or disgrace, has induced an evil opinion of him in the minds of right-thinking persons and has deprived him of their friendly intercourse in society.

174.   The words complained of are libelous *per se* in that they have injured the plaintiff in his good name and profession as a forensic scientist.

175.  The words complained of are libelous *per se* in that they falsely imply that plaintiff was guilty of crimes, of fraudulent conduct and of deceit.

176.  Plaintiff has never been convicted of any crime.

177.  The words complained of imply that plaintiff is dishonest and incompetent in his profession and are thus libelous *per se*.

178.  Several persons have refused to deal with plaintiff as a direct result of the Article, causing him special damages, as set forth in the Second Claim.

179.  Plaintiff has suffered severe emotional and physical distress as a direct result of the Article.

180.  The conduct of defendants Advance and Grann was malicious and done with intent to harm plaintiff in his person and profession, and to destroy his formerly excellent reputation.

181.  Defendants Advance and Grann are liable to plaintiff for defamation, and for such amounts in compensatory and punitive damages as the Court and a jury may deem appropriate, but not less than $10 million.

## SECOND CLAIM AGAINST
### Defendants Advance and Grann
### (Injurious Falsehood; Special Damages)

182.  Plaintiff re-alleges paragraphs 1 through 14 and 26 through 180.

183.  The statements in the Article, as set forth above, are false and have caused plaintiff special damages.

184.  Professor Martin Kemp, who initially consulted with plaintiff in connection with the authentication of a drawing which is almost certainly by Leonardo da Vinci, has stated that he is no longer able to deal with plaintiff, as a direct result of the publication of the Article.

185.  Plaintiff was a partner in, and a director of, a company called Art Access and Research UK Ltd., and had an ownership interest in it as well.

186.  In August 2010, plaintiff was terminated as a partner in that company, as a direct result of the Article.

187.  Plaintiff was told that he was being terminated because he had brought the company into "ill repute."

188.  Plaintiff thus lost his salary and was deprived of his ownership interest as well.  He is still owed salary and severance pay from that company, as well as the value of his ownership interest, and has been seeking to negotiate a settlement of the damages caused by his unfair ouster.

189.  In addition, around August 2010, the Munch Museum in Oslo Norway informed plaintiff that they had decided to drop an important project which plaintiff had been hired to work on, because of the Article.

190.  Paragraph 9 above notes that plaintiff was interviewed for two BBC documentaries.  The second one was aired a few months ago, and the portion of it which featured plaintiff was taken out, as a direct result of the Article.

191.  Since August 2010, plaintiff has been working alone, and has lost other potential clients who would otherwise have hired him but for the Article.

192.  Plaintiff has incurred special damages directly attributable to the false statements in the Article.

## THIRD CLAIM
### Against Defendant Louise Blouin Media LLC

193.  Plaintiff re-alleges paragraphs 1 through 12 and 15.

194.  On or about September 16, 2011, defendant Louise Blouin Media published on its internet website the following exchange with one Noah Charney:

> What do you think about DNA Security where a DNA Security Marker links art object with provenance documentation to provide authentication?

> This sounds great in principle, but the dangers of such technological authentication systems were brilliantly exposed in a recent New Yorker article called "Mark of a Masterpiece" by David Grann.  It was the story of Peter Paul Biro, who began as a forensic science hero, discovering DNA and fingerprints of famous artists in questionable works (most famously a purported Jackson Pollock bought at a tag sale).  But it was later shown that Biro was part of a family of art forgers, and that he had been planting the forensic evidence into the questionable works himself.

195.  The last sentence is false and defamatory.

196.  By letter dated September 21, 2011, plaintiff's counsel demanded that defendant ArtInfo remove this exchange from its website.

197.  Defendant ArtInfo has not responded to plaintiff's counsel's letter.

198.  The defamatory exchange remained on ArtInfo's website for approximately one month after plaintiff's demand.

199.  Defendant ArtInfo acted with actual malice, in that it knew or should have known that many of the statements of fact in the interview were false, and they published the interview notwithstanding that knowledge.

200.  Defendant ArtInfo also acted with actual malice by failing to respond to plaintiff's counsel's letter and failing to remove the interview for one month.

201.  Defendant ArtInfo is liable for damages for defamation in an amount to be determined.

FOURTH CLAIM
Against Defendants Fine Art Registry LLC and Theresa Franks

202.  Plaintiff re-alleges paragraphs 1 through 12, 16 and 17, 162 and 163.

203.  Defendants Fine Art Registry LLC and Theresa Franks own and operate an internet website entitled www.fineartregistry.com

204.  On or about July 1, 2011, defendants Fine Art Registry LLC and Theresa Franks published on their website the statement quoted above at paragraph 162.

205.  On or about July 15, 2011, defendants Fine Art Registry LLC and Theresa Franks published on their website the statement quoted above at paragraph 163.

206.  The statements quoted are false and defamatory.

207.  The defendants Fine Art Registry LLC and Theresa Franks acted with actual malice in publishing these statements, in that they knew or should have known that the statements of fact were false, and they published the statements notwithstanding that knowledge.

208.  The statements are further published with ill will and malicious and evil intent to harm plaintiff.

209.  Defendants Fine Art Registry LLC and Theresa Franks are liable for compensatory and punitive damages in amounts to be determined.

## FIFTH CLAIM
## Against Defendant Business Insider Inc.

210.  Plaintiff re-alleges paragraphs 1 through 12 and 18.

211.  On or about July 5, 2011, defendant Business Insider Inc. published on its website an article entitled "Nine of the Biggest Art Forgeries of All Time."  The article contained the following language about and concerning the plaintiff:

"But soon after, New Yorker reporter David Grann wrote a profile of Biro revealing him as a forger and long-term fraud who created phony fingerprints on paintings to market them as genuine."

212.  The quoted language is false and defamatory.

213.  Plaintiff demanded a retraction of this language, and defendant Business Insider Inc. has removed the posting.

214.  The remainder of the article remains on the website tot he present time, except that it is now entitled "Eight Of The Biggest Art Forgeries Of All Time."  See http://www. businessinsider.com/art-forgeries-2011-6#an-art-inspector-who-authenticated-a-da-vinci-portrait-was-later-accused-of-being-a-forger-5.

-36-

215.  Defendant Business Insider Inc. acted with actual malice, in that it knew or should have known that the statement of fact was false, and they published it notwithstanding that knowledge.

216.  Defendant Business Insider Inc. is liable for damages for defamation in an amount to be determined.

SIXTH CLAIM
Against Defendant Gawker Media LLC

217. Plaintiff re-alleges paragraphs 1 through 12 and 19.

218.  Defendant Gawker Media LLC operates and publishes an internet website known as gizmodo.com.

219.  On or about July 7, 2010, defendant Gawker Media LLC published on its website an article about and concerning plaintiff with the headline "Is This Man the Art World's High-Tech Hero or Villain?"

220.  The article contains the following language:

This is Peter Paul Biro. Depending on who you ask, he's either using fingerprinting, forensic science, and state of the art spectral cameras to uncover lost art masterpieces, or using that same technology to manufacture them.

221.  The article then includes an excerpt from the Article written by defendant Grann and published by defendant Advance, and says:

But Grann quickly began to find cracks in Biro's story, tracing a long history of purported fraud and manipulation of artworks he was employed to restore (his family worked in restoring art before Peter Paul eventually moved into the field of authenticating it).  At the end of this tangled yarn comes a striking accusation: Biro had actually planted many of the fingerprints that supposedly verified the authenticity of the paintings he was charged with evaluating.

> Just like the art he works with, it's hard to pin down the true story behind Peter Paul Biro. But as shown in the New Yorker piece (which you should really read in full), Biro's complicated cameras and forensic techniques have only introduced a new layer of uncertainty to the hazier corners of art history.

222.  The above-quoted language is false and defamatory.

223.  The above-quoted language is available on the website to this day, at http://gizmodo.com/5580991/is-this-man-the-art-worlds-high+tech-hero-or-villain.

224.  Defendant Gawker Media LLC acted with actual malice, in that it knew or should have known that many of the statements of fact in the article were false, and they published the article notwithstanding that knowledge.

225.  Defendant Gawker Media LLC also acted with actual malice by failing to remove the article despite plaintiff's demand.

226.  Defendant is liable for damages for defamation in an amount to be determined.

### SEVENTH CLAIM
### Against Defendant International Council of Museums

227.  Plaintiff re-alleges paragraphs 1 through 12 and 20.

228.  On or about July 30, 2010, defendant International Council of Museums published the following on its website:

> The article focuses on the activities of the man who has become the fingerprint specialist of the art world – Peter Paul Biro. Digging into records several decades old, Grann traces the ethically questionable activities of the Biros (father and son), who worked as painting conservators, mostly in Montreal.  During their practice as painting conservators the Biros were involved in numerous lawsuits (for example, they lost the case in which their client accused them of selling the painting and returning a copy in place of the original).  Building on this foundation of dubious honesty, Grann makes a good case for the intimation that the partial fingerprint of Jackson Pollock identified by Biro on a drip painting

-38-

bought for five dollars in a thrift shop in California was placed there by Biro. More Pollock fingerprints were discovered by Biro on a cache of his paintings found in a storage space. Meanwhile, in 16 of the 20 artworks pigments were identified that were not even used until after Pollock's death in 1956. Grann interviews specialists in fingerprint analysis, who examining Biro's conclusions found many inconsistencies and errors.

229.  The above-quoted language, taken as a whole, is false and defamatory.

230.   The above-quoted language is on the website of the defendant International Council of Museums at http://www.icom-cc.org/forums/viewtopic.php?f=24&t=161

231.  Defendant International Council of Museums acted with actual malice, in that it knew or should have known that many of the statements of fact in the article were false, and they published the article notwithstanding that knowledge.

232.  Defendant International Council of Museums is liable for damages for defamation in an amount to be determined.

EIGHTH CLAIM
Against Defendant Georgia Museum of Art.

233.  Plaintiff re-alleges paragraphs 1 through 12 and 21.

234.  On or about July 14, 2010, defendant Georgia Museum of Art published on its website, in a weblog called Curator's Corner, a posting by one Dylan Whitlow.

235.  The posting contains following language about and concerning the plaintiff:

Based on his record, Biro is nothing short of amazing. Besides authenticating the Pollock painting for which he is now most famous, he has made several other shocking finds. Among these were another painting by Pollock, one by J. M. W. Turner, and one by Rafael's disciple Perino del Vaga. Biro's research, which seems to disprove many of the world's most reputable connoisseurs, suggests that the system of authenticating art works can be arbitrary or even fraudulent.

However, reporter David Grann and others dug into Biro's past and the more fraudulent Biro himself appeared.

...

Then there was Biro, who could brilliantly place false fingerprints on paintings and then authenticate the paintings using fingerprints he placed there himself. Of course Biro will never confess to any of these accusations and there is little that can be done about him. He continues his work in Canada and is even planning a brand new method utilizing DNA evidence to authenticate paintings. It is possible that Biro is innocent, that all of his claims were true, and that he simply has an extremely suspicious past and strangely shaped fingerprints, but there is something to take away from this. It's that everything should be questioned, even (and perhaps especially) if it is scientific.

Biro's entire process appeared to be a triumph of objective science over the usual subjective speculation. Unfortunately, therein lies the problem. This scientific approach is far more convincing to most people outside—and many within—the art community. Sadly, the fact that it seemed scientific made people far less likely to question it and far too quick to accept it.

236.  The above-quoted language, taken as a whole, is false and defamatory.

237.  Defendant Georgia Museum of Art and Whitlow acted with actual malice, in that they knew or should have known that many of the statements of fact in the article were false, and they published the article notwithstanding that knowledge.

238.  Defendant Georgia Museum of Art is liable for damages for defamation in an amount to be determined.

NINTH CLAIM
Against Defendant Paddy Johnson

239.  Plaintiff re-alleges paragraphs 1 through 12 and 22.

240.  On information and belief, defendant Paddy Johnson is the founding editor of a weblog entitled artfagcity.com.

241.  On or about May 18, 2011, defendant Paddy Johnson wrote and published on the

website artfagcity.com an article entitled "Making the Mark of a Masterpiece."

242.  The article contained the following language about and concerning the plaintiff:

The New Yorker's Mark of a Masterpiece tells me its time to re-evaluate a couple
opinions I expressed about that so-called Jackson Pollock I wrote about back in
2006. Thanks to a documentary called Who the #$&% is Jackson Pollock?, I
wasted a fair bit of ink on why I thought the International Foundation for Art
Research should take another look at a garish painting that didn't look much like
a Pollock. Forensic scientist Peter Paul Biro had produced fingerprinting
identification and matched paint samples though, and that evidence seemed rather
compelling. So I pushed aside a few pesky details, namely that it followed the
basic rule of forgery: The less plausible the fake, the more involved the narrative
and documentation becomes. This one reached absurd levels, with truck driver
Teri Horton's big thrift store find and Peter Paul Biro's research even spinning
its own documentary.

Now however, David Grann sheds considerable light on some of the forensic
scientist's more questionable authentication techniques. From the article:

> [Theresa] Franks [of Global Fine Art Registry, a company
> crusading against fraud] became particularly interested in Biro's
> methods after Frankie Brown, an artist in California, told her that
> he had seen a photograph of the Teri Horton painting, in People,
> and wondered if it might be his own work. Franks hired as an
> expert Tom Hanley, the chief of police in Middlebury, Vermont,
> who had more than two decades of experience as a fingerprint
> examiner. Hanley told me that he approached Biro, who had
> previously stated about Horton's painting, "My work is (and has
> been) available for evaluation to qualified experts." Yet Biro
> declined to share his evidence, saying that Horton had objected to
> the idea.
>
> Hanley was thus forced to rely on bits of information that Biro had
> posted on his Web site, several years earlier. The online report
> contains a photograph of the partial fingerprint that Biro said he
> had found on the back of Horton's painting. In Hanley's
> judgment, the impression lacked the kind of detail—the clear
> ridges and furrows—that is necessary to make a proper
> comparison.

After Hanley revealed his findings to Franks, she raised questions on her Web site about the reliability of Biro's fingerprint methodology. Biro then inserted a clarification to his online report. It said:

For security reasons, several images in this report are watermarked in a way that is not apparent to the observer. The fingerprint images have also been reduced in resolution so as to render them unusable except for illustration. I advise against evaluating the fingerprint images illustrated in this report as if they were the actual source material. Any attempt to do so is pointless.

Biro told me that such secrecy protected the privacy of his clients and prevented anyone from misusing the fingerprint. To Hanley, this was baffling: what forensic scientist avoids peer review and even admits to doctoring evidence in order to prevent others from evaluating it? "If what he found are truly fingerprints, why isn't he sharing?" Franks asked me. In any case, Hanley, unable to examine Biro's evidence firsthand, had reached a dead end.

Then Ken Parker [a man Biro also produced a controversial Pollock authentication for] told Hanley and Franks about his drama with Biro. Parker said that Hanley was welcome to examine his painting. For the first time, Hanley was able directly to observe Biro's fingerprint evidence. He noted several fingerprints on the back of the picture, including two on the wooden stretcher frame, which were black, as if they had been made with ink. Looking through a magnifying glass, Hanley focussed on the most legible fingerprint, which appeared to be covered with a clear finishing coat, like a varnish. Parker said that before giving the painting to Biro he hadn't noticed a fingerprint on it. "I don't know where it came from," he said. He said that Biro had told him he had used some sort of "resin process" to make it more visible. Hanley had never seen a print developed in this fashion. Based on the clarity of the impression, Hanley thought that the fingerprint had to be relatively new—certainly not from half a century ago, when Pollock was alive.

Those are pretty damning words. I spoke with Peter Paul Biro on more than one occasion during the promotion of the movie, and while he didn't offer a lot of insight on the movie itself he did go to great lengths to explain that his reputation

was his livelihood. "This is not a risk I would take if I were not certain," he told me. Foolishly, I believed him.

243.  The above-quoted language is false and defamatory.

244.  The above-quoted language republishes a portion of the Article in the New Yorker, thereby further circulating more widely the false and defamatory language contained therein.

245.  The above-quoted language is on the website of artfagcity.com to the present day, at http://www.artfagcity.com/2011/05/18/making-the-mark-of-a-masterpiece.

246.  On October 4, 2011, plaintiff demanded that defendant Paddy Johnson retract the above-quoted language.

247.  His demand has been ignored and the above-quoted language remains on the website of artfagcity.com at the above link.

248.  Defendant Paddy Johnson acted with actual malice, in that she knew or should have known that many of the statements of fact in the article were false, and she published the article notwithstanding that knowledge.

249.  Defendant Paddy Johnson is liable for damages for defamation in an amount to be determined.

WHEREFORE, plaintiff demands relief as follows:

1.   On his First Claim, a judgment for compensatory and punitive damages in such amount as may be found by the jury and deemed appropriate by the Court, but not less than $10 million;

2.   On his Second Claim, a judgment for special damages, in such amount as may be found by the jury and deemed appropriate by the Court, but not less than $10 million.

3.   On his Third Claim, a judgment for compensatory damages in such amount as may be  found by the jury and deemed appropriate by the Court.

4.   On his Fourth Claim, a judgment for compensatory and punitive damages in such amounts as may be found by the jury and deemed appropriate by the Court.

4.   On his Fifth, Sixth, Seventh, Eighth and Ninth Claims, judgments for compensatory damages in such amounts  as may be found by the jury and deemed appropriate by the Court.

Together with the costs and disbursements of this action, and such further relief as may be just, including a reasonable attorney's fee.

Dated: New York, New York
          December 5, 2011

                              LAW OFFICE OF RICHARD A. ALTMAN
                              Attorneys for Plaintiff
                              285 West Fourth Street
                              New York, New York 10014
                              212.633.0123
                              altmanlaw@earthlink.net
                              artesq@earthlink.net