UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

PETER PAUL BIRO,

        Plaintiff,

    -against-                                  11-cv-4442 (JPO)

CONDÉ NAST, a division of
ADVANCE MAGAZINE PUBLISHERS INC.,
DAVID GRANN,
LOUISE BLOUIN MEDIA INC.,
GLOBAL FINE ART REGISTRY LLC,
THERESA FRANKS,
BUSINESS INSIDER, INC.,
GAWKER MEDIA LLC,
INTERNATIONAL COUNCIL OF MUSEUMS,
GEORGIA MUSEUM OF ART and
PADDY JOHNSON,

        Defendants.

-----------------------------------------------------------x

MEMORANDUM OF LAW IN OPPOSITION
TO MOTION TO DISMISS COMPLAINT

LAW OFFICE OF RICHARD A. ALTMAN
Attorneys for Plaintiff
285 West Fourth Street
New York, New York 10014
212.633.0123
altmanlaw@earthlink.net
artesq@earthlink.net

TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STANDARD OF REVIEW AND ELEMENTS OF THE CLAIMS. . . . . . . . . . . . . . . . . 4

ARGUMENT:.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

POINT I:
THE STATEMENTS IN THE ARTICLE ARE REASONABLY SUSCEPTIBLE OF
A DEFAMATORY CONNOTATION.  THE QUESTION IS ONE OF FACT FOR
THE JURY, NOT ONE OF LAW FOR THE COURT ON A MOTION TO DISMISS..  5
    1.  The Headline of the Article is Itself Susceptible of a Defamatory Connotation..  10
    2.  The "Glittering Portrait," the Alex Matter Paintings and the Acrylic Paint.. . . . . 12
    3.  The Provenance Venture... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    4.  The Glass of Wine Discussion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    5.  The Turner Painting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    6.  The Pollock Studio Visit and the Match. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    7.  The Accusation of Plaintiff's Unwarranted Reputation.. . . . . . . . . . . . . . . . . . . . 17
    8.  Mr. Biro's Father's Paintings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

POINT II:
THE DECLARATION OF DEFENDANT GRANN SHOULD BE STRICKEN.. . . . . 19

POINT III:
CIVIL RIGHTS LAW § 74 IS NOT A DEFENSE AS A MATTER OF LAW.
WHETHER A REPORT IS FAIR AND TRUE IS USUALLY A  JURY QUESTION.. . 21
    1.  Defendant Grann's Visit to the Montreal Courthouse... . . . . . . . . . . . . . . . . . . . . 26
    2.  The Goodridge Roberts Painting... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    3.  The Hendlers.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    4.  Serge Joyal and the "Stolen" Drawing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

POINT IV:
THE AMENDED COMPLAINT STATES
A CLAIM FOR INJURIOUS FALSEHOOD.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

TABLE OF AUTHORITIES

PAGE(S)

FEDERAL CASES

*Albin v. Cosmetics Plus, Ltd.*, 1997 U.S. Dist. LEXIS 15217 (S.D.N.Y. Oct. 6, 1997). . . . . . . 27

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). . . . . . . . . . . . . . . . . 4

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed. 2d 929 (2007). . . . . . . 4

*Calvin Klein Trademark Trust v. Wachner*, 129 F.Supp.2d 248 (E.D.N.Y.2001). . . . . . . . . . . . 22

*Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163 (2d Cir.2000). . . . . . . . . . . . . . . . . 10, 11

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir.2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Cianci v. New Times Publishing Co.*,639, F.2d 54 (2d Cir.1980). . . . . . . . . . . . . . . . . . . . . . . 11, 25

*Davis v. Ross*, 754 F.2d 80 (2d Cir.1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 10

*DiFolco v. MSNBC Cable L.L.C.*, 2011 U.S. Dist. LEXIS 131506 (S.D.N.Y. Nov. 9, 2011).  24

*Egiazaryan v. Zalmayev*, 2011 U.S. Dist. LEXIS 140851 (S.D.N.Y.Dec. 7, 2011). . . . . . . . . . . 5

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir.1995). . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Elevator Antitrust Litigation*, 502 F.3d 47 (2d Cir.2007). . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Karedes v. Ackerley Group, Inc.*, 423 F.3d 107 (2d Cir.2005). . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384 (2d Cir.1992). . . . . . . . . . . . 19

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir.1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Rudin v. Dow Jones & Co.*, 510 F. Supp. 210 (S.D.N.Y.1981). . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Weldy v. Piedmont Airlines*, 985 F.2d 5 (2d Cir.1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Wenz v. Becker*, 948 F. Supp. 319 (S.D.N.Y.1995)26. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>STATE CASES</u>

*Al Raschid v. News Syndicate Co., Inc.*, 265 N.Y. 1, 191 N.E. 713 (1934) . . . . . . . . . . . . . . . . . . 32

*Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 649 N.E.2d 825,
　　625 N.Y.S.2d 477 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Clemente v. Impastato*, 274 A.D.2d 771, 711 N.Y.S.2d 71 (3d Dept 2000) . . . . . . . . . . . . . . . . 6

*DeLuca v. N.Y. News, Inc.*, 4 Media L. Rep. (BNA) 2312 (Sup.Ct.N.Y.Co.1978) . . . . . . . . . 12

*Dillon v. City of New York*, 261 A.D.2d 34, 704 N.Y.S.2d 1 (1st Dept.1999) . . . . . . . . . . . . . . 5

*Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.,* 49 N.Y.2d 63,
　　399 N.E.2d 1185, 424 N.Y.S.2d 165 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Four Star Stage Lighting, Inc. v. Merrick*, 56 A.D.2d 767, 392 N.Y.S.2d 297 (1st Dept.1977) . . . 6

*George v. Time, Inc.*, 259 A.D. 324, 19 N.Y.S.2d 385 (1st Dept.1940) . . . . . . . . . . . . . . . . . . . . 23

*Golub v. Enquirer/Star Group, Inc.*, 89 N.Y.2d 107, 681 N.E.2d 128,
　　659 N.Y.S.2d 836 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*James v. Gannett Co., Inc.*, 40 N.Y.2d 415, 386 N.Y.S.2d 871, 353 N.E.2d 834 (1976) . . . . . . . 6

*Kimmerle v. New York Evening Journal*, 262 N.Y. 99, 186 N.E. 217 (1933) . . . . . . . . . . . . . . . . 5

*Liberman v. Gelstein*, 80 N.Y.2d 429, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992) . . . . . . . 5, 25

*Morsette v. Final Call*, 278 A.D.2d 81, 718 N.Y.S.2d 29 (1st Dept.2000) . . . . . . . . . . . . . . . . . 6

*Nichols v. Item Publishers*, 309 N.Y. 596, 132 N.E.2d 860 (1956) . . . . . . . . . . . . . . . . . . . . . . 5, 6

*November v. Time Inc.*, 13 N.Y.2d 175, 194 N.E.2d 126, 244 N.Y.S.2d 309 (1963) . . . . . . . . . 7

*Ocean State Seafood, Inc. v. Capital Newspaper*, 12 A.D.2d 662, 492 N.Y.S.2d 175
　　(3rd Dept.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co.*, 7 A.D.2d 441, 184 N.Y.S.2d 58
　　(1st Dept.1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 422 N.E.2d 518, 439 N.Y.S.2d 858 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Schermerhorn v. Rosenberg,* 73 A.D.2d 276, 426 N.Y.S.2d 274 (2d Dept. 1980). . . . . . . . . . . . . 12

*Shubert v. Variety, Inc.*, 128 Misc. 428 (Sup.Ct.N.Y.Co.1926), *aff'd* 221 App.Div. 856 (1st Dept. 1927). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Waste Distillation Tech., Inc. v. Blasland & Bouck Engineers, P.C.*, 136 A.D.2d 633, 523 N.Y.S.2d 875 (2d Dept.1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Weiner v Doubleday & Co.*, 74 N.Y.2d 586, 549 N.E.2d 453, 550 N.Y.S.2d 251 (1989). . . . . . 6

## FEDERAL RULES

F.R.Civ.P 44.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

F.R.Evid. 201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Rule 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 19

Rule 12(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Rule 41(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## STATE STATUTES

New York Civil Rights Law § 74. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

## OTHER AUTHORITIES:

http://www.artnet.com/magazineus/features/hoving/hoving11-6-08.asp. . . . . . . . . . . . . 17

http://www.artnet.com/magazineus/news/moses/moses11-18-08.asp. . . . . . . . . . . . . . . 17

http://fineartinvestigations.blogspot.com. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Restatement (Second) of Torts § 623A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

<u>PRELIMINARY STATEMENT</u>

Plaintiff's attorneys, Law Office of Richard A. Altman, submit this memorandum of law in opposition to the Rule 12(b)(6) motion by defendants Condé Nast and David Grann to dismiss the complaint (referred to herein as the defendants, although there are others who have not yet appeared).  The motion should be denied, the defendants directed to serve an answer, and discovery should proceed.

This is a diversity action for libel, brought against the publisher and writer of an article published in the New Yorker Magazine in its issue dated July 12 and 19, 2010 ("the Article"). The complaint alleges that the Article contains numerous false and defamatory assertions of fact of and concerning the plaintiff, Peter Paul Biro, sets them out *in haec verba* in the text of the complaint, and attaches the entire 16,000 word article as an exhibit.

Mr. Biro is a forensic scientist who uses fingerprint technology to assist in the resolution of issues of authenticity in works of art, and the Article essentially asserts that he has committed fraud by finding fingerprints where they do not exist.  Quoting from a large variety of sources (two of whom are now defendants themselves), some known and some anonymous, some objective and some with an ax to grind, some truthful and some liars, the defendants created by the Article, taken in its entirety, an unseemly and sordid picture of Mr. Biro as a fraud and a criminal.

There is no need to characterize the Article in detail; it is before the Court in its entirety, and the individual statements in it will be addressed one at a time.  But in its entirety, the Article is reasonably susceptible of a defamatory connotation, and that is sufficient at the pleading stage

to deny the motion. Defendants do not have any privileges which apply here, or at the least, whether there are such privileges is a question of fact for the jury. Moreover, they have failed to support their claims for the applicability of any privileges. Mr. Biro has stated a claim for defamation based upon numerous statements of fact, and has also stated a claim for injurious falsehood. The motion should be denied.

Defendants' arguments for dismissal are essentially four:

1. The privilege for the fair reporting of judicial proceedings contained in New York Civil Rights Law § 74 bars the action to the extent that the Article sets out allegations made in those proceedings, and bars them as a matter of law.

2. Mr. Biro fails to state a claim based upon false statements in the Article, because the facts are either not defamatory as a matter of law, or they are matters of opinion and conjecture, not factual assertions.

3. He fails to state a claim based upon any defamatory implications of the stated facts.

4. He has no claim for injurious falsehood and special damages arising therefrom.

Defendants submit a memorandum of law and a declaration by defendant Grann, annexing copies of some (but not all) of the Canadian court decisions mentioned in the Article.

We will show that the complaint is legally sufficient to state a claim for defamation, that the fair reporting privilege is either not applicable or that its application is a question of fact for the jury, that the complained-of statements are factual assertions capable of being proven true or false, that they are thus susceptible of a defamatory connotation, and that the statements, even

if not defamatory, carry a defamatory implication.  The separate statements set forth in the complaint and alleged to be defamatory are  addressed below in Point II.

## PROCEDURAL HISTORY

This action was commenced on June 29, 2011 by the filing of a complaint against the moving defendants, and three additional defendants, Dan's Papers, LLC, Manhattan Media LLC, and Dan Rattiner.  Those three defendants were made parties because they had published an article based upon the New Yorker Article, and had made additional defamatory statements in their article.  Defendants Manhattan Media LLC and Dan's Papers were voluntarily dismissed pursuant to Rule 41(a) on July 25, 2011.  A confidential settlement was then reached with defendant Dan Rattiner before his time to respond to the complaint had expired, and the claim against him was dismissed on September 23, 2011.  Thereafter, plaintiff filed an amended complaint deleting those dismissed defendants, and making some modifications to the claims against the New Yorker and Mr. Grann.  This complaint is the one challenged by this motion.

The commencement of this action attracted considerable media attention, almost as much as the publication of the original Article, and there ensued a flurry of articles based upon the Article, and arising from the widespread publicity of the allegations of the original complaint. Because this action is against a prominent writer and publisher, the commencement of the case resulted in the further circulation of many of the original defamatory statements contained in the Article, and the making of additional false statements of fact based on it, causing further damage to Mr. Biro's reputation.  Mr. Biro therefore sought, and was granted, permission to file a supplementary complaint containing allegations against eight more defendants based upon

additional defamatory statements published by them on the internet, and widely circulated.  That Second Amended and Supplemental Complaint was filed on December 5, 2011, and copies of the papers have been mailed to the additional defendants, with requests for waivers of service. The additional claims in this latest complaint support the conclusion that the damage caused by the original New Yorker Article has been greatly magnified, thereby significantly increasing the ultimate damages to which Mr. Biro is entitled.

<u>STANDARD OF REVIEW AND ELEMENTS OF THE CLAIMS</u>

As in any motion pursuant to Rule 12(b)(6), the legal standard is whether, assuming all factual statements set out in the complaint are taken as true, plaintiff states a legally cognizable theory of liability.  The complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed. 2d 929 (2007).  A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).   In assessing plausibility, the court is to draw all reasonable inferences in favor of the non-movant. *In re Elevator Antitrust Litigation*, 502 F.3d 47, 50 (2d Cir.2007).

In the particular context of a defamation claim, the pleading requirement is based upon state law, and in this diversity case, New York law provides the basis for analysis of the allegedly defamatory statements in the complaint.  "Under New York law, the elements of defamation are (1) a defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party, (4) that is false, (5) made with the applicable level of fault, (6) causing injury, and (7) not protected

by privilege." *Egiazaryan v. Zalmayev*, 2011 U.S. Dist. LEXIS 140851 at * 10-11 (S.D.N.Y.Dec.

7, 2011)(*citing Dillon v. City of New York*, 261 A.D.2d 34, 704 N.Y.S.2d 1, 5 (1st Dept.1999)).

Statements that tend to disparage or injure a plaintiff in his or her trade or profession are

defamatory *per se*. *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir.1985); *Liberman v. Gelstein*, 80 N.Y.2d

429, 435, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992); *Nichols v. Item Publishers*, 309 N.Y. 596, 600,

132 N.E.2d 860 (1956). Where statements are defamatory *per se*, the law presumes that damages

have resulted and they need not be alleged. *Weldy v. Piedmont Airlines*, 985 F.2d 5, 61-62 (2d

Cir.1993).

All of the elements of a defamation claim are presented in the amended complaint. It

is thus legally sufficient and the motion to dismiss should be denied.


POINT I

THE STATEMENTS IN THE ARTICLE ARE REASONABLY SUSCEPTIBLE OF
A DEFAMATORY CONNOTATION. THE QUESTION IS ONE OF FACT FOR
<u>THE JURY, NOT ONE OF LAW FOR THE COURT ON A MOTION TO DISMISS.</u>

The gravamen of a defamation action is injury to reputation. The New York Court of

Appeals has defined a defamatory statement as one that exposes an individual "to public hatred,

shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or

disgrace, or...induces an evil opinion of one in the minds of right-thinking persons, and...

deprives one of...confidence and friendly intercourse in society." *Kimmerle v. New York Evening*

*Journal*, 262 N.Y. 99, 102, 186 N.E. 217, 218 (1933).

When the individual is a professional, statements which impute dishonesty or

incompetence in the practice of that profession are defamatory *per se*, *i.e.*, damages are presumed

without the need for proof of them.  *Davis v. Ross, supra*, 754 F.2d at 83;  *Nichols v. Item Publishers, supra*;  *Four Star Stage Lighting, Inc. v. Merrick*, 56 A.D.2d 767, 768, 392 N.Y.S.2d 297, 298 (1st Dept.1977)("words are libelous if they affect a person in his profession, trade, or business by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof").  "Even on a professional level, a defamatory meaning may attach to derogatory statements that would cause apprehension about a person's ability to conduct business."  *Golub v. Enquirer/Star Group, Inc*, 89 N.Y.2d 1074, 681 N.E.2d 1282, 1283, 659 N.Y.S.2d 836 (1997).  Moreover, some of the statements in the Article are tantamount to accusations of crimes, and such accusations are also defamatory *per se.  Morsette v. Final Call*, 278 A.D.2d 81, 718 N.Y.S.2d 29 (1st Dept.2000);  *Clemente v. Impastato*, 274 A.D.2d 771, 711 N.Y.S.2d 71 (3d Dept 2000).

In any defamation case, the question for the court on a motion to dismiss is whether the complained-of language is "reasonably susceptible of a defamatory connotation," *Weiner v Doubleday & Co.*, 74 N.Y.2d 586, 592, 549 N.E.2d 453, 455, 550 N.Y.S.2d 251, 253 (1989);  *James v. Gannett Co., Inc.*, 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834, 837 (1976).  If so, the complained-of words must be submitted to a to a jury to determine if that connotation was actually conveyed.  The truth or falsity of the words is not in issue on the motion; it must be presumed at the pleading stage that the words are false, because the complaint so states.

The standards to be followed in examining the language are of long standing in New York.  The Court of Appeals has said:

> If every paragraph had to be read separately and off by itself plaintiff would fare pretty well. But such utterances are not so closely parsed by their readers or by

-6-

the courts and their meaning depends not on isolated or detached statements but on the whole apparent scope and intent. Plaintiff is a professional man. If, on their face, they are susceptible in their ordinary meaning of such a construction as would tend to injure him in that capacity, they are libelous per se and the complaint, even in the absence of allegation of special damage, states a cause of action. The courts will not strain to interpret such writings in their mildest and most inoffensive sense to hold them nonlibelous. The words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed. *The casual reader might not stop to analyze, but could readily conclude that plaintiff is a crook and let it go at that.*

*November v. Time Inc.*, 13 N.Y.2d 175, 178-79, 194 N.E.2d 126, 128, 244 N.Y.S.2d 309, 311-12 (1963)(citations and quotation marks omitted; emphasis added).

The Court of Appeals has repeatedly held that courts "must give the disputed language a fair reading in the context of the publication as a whole." *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 380, 649 N.E.2d 825, 829, 625 N.Y.S.2d 477, 481. The challenged statements are not to be considered in isolation, but must be read as the average reader would, against the "whole apparent scope and intent" of the writing. *November, supra*, 13 N.Y.2d at 177, 194 N.E.2d 126 at 128.

Based upon these principles, the amended complaint states a claim for defamation and the motion to dismiss should be denied. Preliminarily, the "whole apparent scope and intent" of the Article is to undermine and attack the credibility and expertise of Mr. Biro, to leave the clear impression that he has committed fraud and serious crimes, that his expertise is based on deception and that he is incompetent, untrustworthy and dishonest in his profession. Much of the Article is constitutionally protected opinion, but much is not. Some statements are factual assertions, capable of being proven true or false, some are couched as opinions based upon undisclosed facts, some are republications of defamatory statements made by others, and some

statements deliberately omit facts which could lessen their defamatory impact.   All such statements are actionable.

We acknowledge that many allegations in the amended complaint do not set out defamatory language, but instead quote passages from the Article, for the purpose of demonstrating "the context of the publication as a whole."   Many of those allegations are about relatively trivial things which are erroneous, or which are unnecessarily negative, or contain "malicious sarcasm"   (amended complaint, ¶ 22 at 5).   We nowhere claim that every false, erroneous, critical or maliciously sarcastic statement in the Article is defamatory, as defendants argue (memo at 15, calling some allegations   "a nit-pick," or a "quibble").   The amended complaint is quite clear about what is claimed to be defamatory, what is claimed to be stated maliciously (but not defamatory), and what is merely claimed to be erroneous or misleading or an unfair characterization of the facts.

Defendants object to the  inclusion of these passages, but their objection misses the point. We are not suing about or attempting to interfere with editorial judgments, or defendants' "means of expressing facts."   (*id.* at 23).   A false statement of fact about an innocuous detail which a reporter gets wrong may not be defamatory, but it can certainly be revealing, and can fairly lead to an inference of carelessness with regard to the facts which do matter.  And it can also tend to prove that an article was "written and published with malice and an indifference to the standards of responsible journalism."  (amended complaint, ¶ 20 at 4).  That is precisely why the amended complaint makes those allegations, and why Mr. Biro is entitled to such an inference on this motion.

It is also significant that this was not a newspaper article written under the pressure of a deadline, but the product of six months of work, as defendants note (memo at 5). It may even be a year.[1] Every word in the Article is there deliberately. There can be no excuses based upon time pressures, as might be claimed by a daily newspaper. That is why all mistakes matter: because they can suggest an agenda, a biased attitude toward the material, a carelessness with the facts, and an intent to do harm. After all, the Article openly admits to an agenda: "Reporters work, in many ways, like authenticators. We encounter people, form intuitions about them, and then attempt to verify these impressions" (Exh. A at 11-12). Such opinions and biases are surely constitutionally protected as a general principle. But when they are used to justify the omission of facts which go the other way, and lead to deliberately misleading and false accusations of fact, they become actionable.

Defendants object that the amended complaint is a "blunderbuss" (*id.* at 2), that it is "terribly misleading," (*id.*), "wordy and not entirely consistent" (*id.* at 7 n. 4) and even "wistful" (*id.* at 14), and that it "strains mightily to assert a claim" (*id.* at 19). But if even one statement of fact in the Article is capable of a defamatory connotation, this motion must be denied. And there are many statements which are.

---

[1] According to http://fineartinvestigations.blogspot.com, (accessed December 12, 2011), "[t]hen, in a July 12, 2010 article in the New Yorker, reporter David Grann painted Biro as a forger and a criminal. Theresa Franks, one of defendant Grann's primary sources, and recently joined as a defendant, has stated that 'We worked together for about a year on that story,' she said.. 'I supplied him with a good number of documents. So, he took that and ran with it.' She continues, 'It was our (Fine Art Registry's) investigation that really was the catalyst for that article.'"

Some of the statements arose in the context of statements about litigation involving Mr. Biro, and defendants have asserted that those statements are subject to the fair reporting privilege contained in New York Civil Rights Law § 74.  Those statements are examined below, at Point III.  We address here initially the other statements, the ones which were made outside the context of that other litigation.

The threshold question whether the assertions complained of are potentially defamatory is always for the court to determine.  However, if the issue is arguable, that is, if the assertions are susceptible of more than one interpretation, the question is properly for the jury to decide, and a motion to dismiss will be denied.  *See Davis v. Ross, supra*, 754 F.2d at 83;  *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163 (2d Cir.2000).  In all of the following excerpts, the defamatory implications are clear, thus requiring denial of the motion.  Even if the implications are not clear, the ultimate question of the existence of those implications is for the jury.

1.  The Headline of the Article is Itself Susceptible of a Defamatory Connotation.

We begin with the very title of the Article: "THE MARK OF A MASTERPIECE/The man who keeps finding famous fingerprints on uncelebrated works of art."  The title is directly under a photograph of Mr. Biro on the upper half of the page, shown examining a painting with a magnifying glass (Exh. A at 2).  In the magazine, the photograph and headline are on the right-hand page, across from another photograph of a painting on the left-hand page, on which the image of a fragment of a fingerprint can be seen (Exh. A at 1).

It is a reasonable implication from these words and the two photographs that Mr. Biro has a knack for finding fingerprints where they are unlikely to exist, and that his finding them

has the potential to increase the value of unimportant artworks, by falsely attributing them to famous artists.  After all, fingerprints of famous artists do not show up on works of art very often, even on their own works, let alone on uncelebrated ones.  When they do, the story is usually the subject of news articles.  The headline thus plausibly suggests fraudulent conduct by Mr. Biro in his profession, defamatory *per se*. A reasonable reader of the headline might certainly so conclude, and that is enough to defeat the motion.

It is well-established in New York that headlines can be defamatory.  Compare this one with the headline in *Cianci v. New Times Publishing Co.*, 639 F.2d 54 (2d Cir.1980).  In that case, the headline was "BUDDY WE HARDLY KNEW YA," an innocuous phrase on the face of it. The cover of the magazine bore a photograph of the plaintiff, who had been the mayor of Providence, Rhode Island.  The article contained a legend reading "Was this man accused of raping a woman at gunpoint 12 years ago?"  Under the headline were five lines reading "Twelve years ago, in a suburb of Milwaukee a law student was accused of raping a woman at gunpoint. After receiving a $3,000 settlement, she dropped the charges and the incident was nearly forgotten. That student, Vincent 'Buddy' Cianci, Jr., is now the mayor of Providence, Rhode Island."

In reviewing the article, the Second Circuit said that *the headline itself* could be considered defamatory: "A jury, considering this in light of the article as a whole, could surely conclude that New Times was saying that Mayor Cianci, instead of being the man of character he represented himself to be, was in fact a rapist and an obstructor of justice not simply a person who had been accused of being such."  639 F.2d at 60 (footnote omitted).

In *Celle, supra*, 209 F.3d at 185, the Second Circuit found a sub-headline defamatory as well, and affirmed a jury verdict of libel:

> The sub-headline stating that "US judge finds Celle negligent" has only one meaning, namely that plaintiff has been found to have libeled Ms. Ty. As a news commentator in a tightly-knit ethnic community, plaintiff Celle's professional reputation would turn in large measure on the community's faith in the accuracy and fairness of his reporting. The statement that a United States judge has found plaintiff negligent for spreading false information would leave readers with the conclusion that he abused his position as a news commentator.

Other cases have found headlines alone to be capable of defamatory connotations, and have denied motions to dismiss claims based on them. *See, e.g., Rudin v. Dow Jones & Co.*, 510 F. Supp. 210 (S.D.N.Y.1981)("Sinatra's Mouthpiece" with respect to Frank Sinatra's lawyer); *Shubert v. Variety, Inc.*, 128 Misc. 428 (Sup.Ct.N.Y.Co.1926), *aff'd* 221 App.Div. 856 (1st Dept.1927)("Shuberts Gouge $1,000 from Klein Brothers"). Moreover, the headline can be actionable even if the article is not, if it is not "a fair index of an accurate article." *Schermerhorn v. Rosenberg*, 73 A.D.2d 276, 426 N.Y.S.2d 274, 283 (2d Dept.1980)("A headline is often all that is read by the casual reader and therefore separately carries a potential for injury"); *DeLuca v. N.Y. News, Inc.*, 4 Media L. Rep. (BNA) 2312 (Sup.Ct.N.Y.Co.1978).

## 2. The "Glittering Portrait," the Alex Matter Paintings and the Acrylic Paint

The Article describes how, in 2000, a woman named Teri Horton asked Mr. Biro to examine a painting which she bought in a thrift shop for $5 (Exh. A at 11). He said that he found a partial fingerprint on the back of the canvas, and that he had matched it to a fingerprint on a paint can in Pollock's old studio, in East Hampton. The story attracted wide media

attention, and became the subject of a 2006 documentary by Harry Moses, entitled "Who the %$#! is Jackson Pollock?"

In that documentary, Mr. Biro and other experts are interviewed, including Thomas Hoving, the former director of the Metropolitan Museum of Art. The Article notes that he had described the Horton painting as "dead on arrival," based primarily on the presence of acrylic paint, which he said Pollock never used (*id.*).

Paragraph 56 of the amended complaint then sets out a portion of the Article (*id.* at 60), about a group of paintings found in a warehouse in 2005 by Alex Matter, a film maker whose parents were friends of Pollock's. According to the Article, Mr. Matter thought that these paintings might be by Pollock, and sent Mr. Biro a photograph of a fingerprint on the front of one picture. Mr. Biro then is said to have identified six characteristics that corresponded with the fingerprint on a paint can in Pollock's studio, which Mr. Biro had visited in connection with his analysis of the Teri Horton painting. In that painting, Mr. Biro had said that acrylic paint was present.

The excerpt begins, "And so, with this final flourish, the glittering portrait of Peter Paul Biro was complete: he was the triumphant scientist who had transformed the art world. Like 'La Bella Principessa,' the image was romantic, almost idealized–the version of Biro that was most appealing to the eye. But, somewhere along the way, I began to notice small, and then more glaring, imperfections in this picture." (*id.*).

The Article then says:

His explanation seemed plausible, but I kept being troubled by other details relating to Biro's Pollock investigations. For instance, it was peculiar that even

-13-

though there were no documented cases of acrylic being used in Pollock's pour paintings, Biro had easily found some on the floor of the Long Island studio—indeed, in the very first sample he tested. I contacted a leading forensic scientist in the art world who teaches at the F.B.I. Academy, in Quantico, Virginia, and who has done research in the Pollock studio. The scientist told me that he had spent hours combing the floor and had not found any acrylic. He added that a microchemistry test was not even considered suitable for identifying acrylic. As for the gold paint particles that Biro said he had uncovered on the studio floor and matched to the pigment in Teri Horton's painting, Helen Harrison, an art historian who is the director of the Pollock-Krasner House & Study Center, which oversees Pollock's old studio, told me that she did not know of Pollock's having used gold in any of his pour paintings.

This excerpt, taken as a whole, reasonably leads the reader to the conclusion that Mr. Biro either planted evidence in Pollock's studio, or that he lied about finding acrylic and gold paint there.  Paragraphs 58 to 63 of the amended complaint set out Mr. Biro's version of the facts, stating that indeed there was an analysis of some scrapings from the studio floor by another scientist, who confirmed the presence of acrylic paint.  That scientist, Dr. Nicholas Eastaugh, was not interviewed for the Article, although he was available to defendant Grann.

The Article also does not mention an exchange between Hoving and Moses, in which the former admits to numerous mistakes in connection with an article he wrote.  *See* http://www.artnet.com/magazineus/features/hoving/hoving11-6-08.asp; and http://www.artnet.com/magazineus/news/moses/moses11-18-08.asp (both accessed December 12, 2011).  So it is entirely reasonable to conclude that had Eastaugh and Moses been interviewed for the Article, they would have provided a different perspective on the issue and created a more balanced picture.  The Article creates the distinct impression that Mr. Biro committed fraud, and therefore it is susceptible to a defamatory connotation.  That is sufficient to survive a motion to dismiss.

-14-

3.  The Provenance Venture

The Article then describes a business venture which Mr. Biro entered into, called Provenance (amended complaint, ¶ 108 at 19).  It says that Mr. Biro put forth a confidential business plan which proposed to examine and authenticate works of art, and describes the plan as follows:

> Provenance was cleverly tapping into the public's desire to crack open the art world, offering the tantalizing dream that anyone could find a Pollock or a Leonardo or a Turner languishing in a basement or a thrift shop. The company combined the forensic triumphalism of "C.S.I." with the lottery ethos of "Antiques Roadshow." (An associate producer at "Roadshow" had already sent Biro an e-mail about possibly doing a segment on the Parkers' "unbelievable discovery.")
> Exh. A at 15.

The description of this business venture in the Article, taken as a whole, is susceptible of a defamatory connotation, in that it reasonably implies that Mr. Biro created a fraudulent investment scheme, and that he planned to falsely authenticate art works so as to create "staggering profits," and that he "was cleverly tapping into the public's desire to crack open the art world." *Id.*

The amended complaint denies (¶¶ 112-18 at 20) that Mr. Biro created this business plan, and further denies that Mr. Biro has ever entered into any arrangements in which his compensation is contingent on the results of an authentication.  The Article quotes from an interview with one Allan Aitken, said to be Lafferty's long-time business partner, who "told me that he believed that 'Biro was either a shyster or a con man, and had found in Lafferty an easy mark.'" Amended complaint, ¶ 110 at 20, Exh. A at 15-16. This is sufficient to state a claim for defamation.  See Point III, *infra*, at 24.

4.  The Glass of Wine Discussion

The amended complaint then includes an excerpt from the Article, as follows:

When I asked Biro about the allegedly forged fingerprints on the Parkers'
painting, he peered intently at his glass of wine. I suddenly noticed how blue his
eyes were. Calm again, he denied that he had ever forged a fingerprint...I asked
whether their father had forged the fake Goodridge Roberts landscape, or the
painting given to Saul Hendler, or any other works of art. Laszlo stood up,
circling the table, and for the first time Peter Paul became agitated.
*Id.* at 19.

The foregoing is susceptible of a defamatory connotation.  The plain inference is that Mr.
Biro and his brother Lazlo were lying, and that their actions and understandable emotional
reaction to defendant Grann's accusing their father of forgery while he was a guest sitting in
their home was somehow evidence or an admission of guilt.

5.  The Turner Painting

The amended complaint then alleges: "The Article continues, '[w]e discussed "Landscape
with a Rainbow," the purported Turner painting that was Peter Paul Biro's first fingerprint-
authentication case.'" (amended complaint, ¶ 123 at 22).

The statement is false and defamatory, in that the word "purported" implies that the
painting may not be authentic,  that Mr. Biro was the only person who claimed it to be such, and
that it is not generally considered a genuine Turner.  In fact, as the amended complaint alleges,
the authentication of the painting as a Turner was also done by the auction house which sold it,
the attribution was accepted by a scholar, and is now widely accepted.  The use of the word
implies that his work was flawed, if not fraudulent.

6.  The Pollock Studio Visit and the Match

The amended complaint then includes an excerpt from the Article, as follows:

Biro later noted that he had spent only a "few hours" in Pollock's studio, in the "presence of staff," making it impossible for him to have made a rubber stamp. But when I asked Helen Harrison, who oversees the studio, about this, she said, "That's not true." Her records show that he visited four times, once with Tod Volpe, and that he was "there for hours." She said that she did not watch over him all that time; indeed, in her absence he had removed, "without authorization," a match from the floor, which he took to Montreal to analyze for possible paint particles.
Amended complaint, ¶ 126 at 22.

The last sentence is a clear statement of fact, namely that Mr. Biro had taken a match from the floor without authorization.  It is an accusation of theft, and it surely defamatory on its face as an accusation of a crime.

7.  The Accusation of Plaintiff's Unwarranted Reputation.

The amended complaint (¶ 128 at 23) then alleges another excerpt from the Article:

By the time that Biro took on "La Bella Principessa," his reputation had become so solid, and the public appetite for forensic solutions had become so strong, that he no longer seems to have worried about watermarking his evidence or presenting a perfect match. Many people, not just experts, can look at a painting and argue over what they see, but few individuals, inside or outside the art world, can evaluate fingerprints. In that sense, Biro's authentications were far less democratic than traditional connoisseurship. Though he told me that he did not want to be "judge and jury," he had positioned himself as a singular authority.

This excerpt reasonably implies that Mr. Biro's reputation was unwarranted, and that he had essentially defrauded the public.  As the amended complaint says, no one can "position [ ] himself as a singular authority" in the art market (¶ 131 at 23).  It is a direct attack on his reputation, and a suggestion that it is undeserved.

-17-

8.  Mr. Biro's Father's Paintings

The amended complaint (¶ 133 at 23) then alleges another excerpt from the Article:

I followed Biro into his basement laboratory, where his father's landscape paintings hung. I wondered what had consigned them to this fate—hidden from the public, seen only by an adoring son.  They had, I thought, a certain anguished beauty, but they also seemed derivative.  Perhaps Biro's father had lacked that divine spark of originality, or perhaps he had sacrificed it while inhabiting the skin of immortal artists.

The reasonable implication of this overripe passage, which appears near the end of Article, is that there was an ulterior motive in Mr. Biro's concealment of his own property, as if it were in a secret place, inaccessible to visitors to his home. It is a fair reading, supported by the context of all that preceded it, that defendant Grann had by then made up his mind that Mr. Biro was a complete fraud, that he (Grann) was indulging in some amateur psychologizing to understand Biro's motivations, and was trying to suggest, by expressing sympathy for the paintings and their "anguished beauty" (!), that Biro was hiding the paintings because he was laden with guilt..  While it may be seen as mere opinion, the gratuitous swipe at Mr. Biro's dead father is equally plausibly seen as evidence of malice towards him, *i.e.*, malice in the sense of ill will, not in the constitutional sense.   It is thus reasonably susceptible of a defamatory connotation, since it implies that Mr. Biro has something to hide.

****

All in all, these excerpts from the Article are either susceptible of a defamatory connotation, or else the existence or absence of that connotation cannot be decided as a matter of law, and should be left for the jury's determination.  Both the *Davis* and *Celle* cases support this conclusion., and for that reason, the motion to dismiss should be denied.

POINT II

THE DECLARATION OF DEFENDANT GRANN SHOULD BE STRICKEN.

Defendants attach to their motion a declaration from defendant David Grann, describing his visit to the courthouse in Montreal during his research for the Article, and attaching uncertified copies of court documents which he says he collected there.  There are five such documents, although the Article claims that there "were more than a dozen." (Amended Complaint, ¶ 64 at 12).  The exact number is unspecified.  All but one are in French, and translations are attached.  The declaration is improper and it should be stricken.

First, a Rule 12(b)(6) motion is addressed solely to the face of the complaint, any documents attached to it, and matters of which the court may take judicial notice.  *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir.1995).  It is improper for the movant (or the non-movant, for that matter) to submit additional materials on such a motion and ask that the Court consider them.  Rule 12(d) requires that the Court either exclude these materials or treat this motion as one for summary judgment, and give the parties the opportunity to submit any evidence which could properly be submitted on one.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir.2002).

Thus the question is whether the materials attached to Mr. Grann's declaration, which consist of translated copies of Canadian court decisions, can be subjects of judicial notice.  They can not.  The scope of judicial notice is controlled by F.R.Evid. 201, and, with respect to foreign law, F.R.Civ.P 44.1.  Those rules provide that a court may take judicial notice of its own records, but not those of other courts.  "A court may take judicial notice of a document filed in another

court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir.1992), *quoting Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991).

Furthermore, they are not in admissible form, not being certified as true copies of court records, and they are not even all court records in the first place.  As for the affidavit of Desroches (Exh. E) and the judgment (Exh. F), neither is a public document even arguably subject to judicial notice.  Defendant Grann says that "George Sand...represented Sam and Syd Wise...Mr. Sand provided me with copies of the following records that he indicated were true and correct copies of records filed with the court."  Grann decl., ¶ 4 at 2.  This is pure hearsay, and does not make the affidavit admissible or a proper subject for judicial notice, because the foundation for the reliability and authenticity of court records is absent.

Defendant Grann also does not explain why he managed to obtain the records of other cases in the courthouse, but not this one.  And he does not explain why he did not obtain copies of *all* of the court records which are discussed in the Article.  Thus he has not properly supported defendants' § 74 defense and the declaration must be stricken.  It would seem an unreasonable burden at this stage for the court to examine and analyze whether the privilege is available with respect to those cases whose records are produced, but not with respect to the others.  If there is only one factual assertion which is outside of the privilege, then the motion based upon § 74 should be denied in its entirety.

In any event, even if the court does not strike the declaration, and decides to take judicial notice of these cases (it is not required to do so, F.R.Evid. 201), all that they can possibly establish on this motion is that there were court cases involving Mr. Biro, a fact which he acknowledges.  However, being involved in litigation does not give another a license to defame. Rather, he alleges that the facts in the Article are not a fair and accurate report of the judicial proceedings reflected in the cases.  That is enough.  Thus, on this motion, all that can be determined is that the cases were brought, and what they actually say is not properly before the court.

## POINT III

### CIVIL RIGHTS LAW § 74 IS NOT A DEFENSE AS A MATTER OF LAW. WHETHER A REPORT IS FAIR AND TRUE IS USUALLY A  JURY QUESTION.

Even if the exhibits are considered on this motion, the privilege in § 74 does not apply, or at the least, its application is a question of fact for the jury, and cannot be determined on this motion to dismiss.

New York Civil Rights Law § 74 provides that:

> A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

Defendants argue that the applicability of § 74 is always a question of law to be decided on a motion to dismiss, and cite *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 399 N.E.2d 1185, 424 N.Y.S.2d 165 (1979) for that proposition. However, defendants' position is incorrect.  The New York Court of Appeals did apply § 74 as

a matter of law to defeat the claim in that case, but that is not always how it is applied.  In *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107 (2d Cir.2005), the Court said:

> A publication is deemed "fair and true" if it is substantially accurate.  A report is substantially accurate if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth.  A report cannot be said to be substantially accurate, however, if it would have a different effect on the mind of the recipient than the actual truth. In other words, Section 74 does not afford protection if the specific statements at issue, considered in their context, suggest more serious conduct than that actually suggested in the official proceeding...Just as a reasonable jury could conclude that the February 25, 2001 article falsely reported the content of the audit, a reasonable jury could conclude that the article suggested more serious conduct than that actually suggested in the official proceeding.

423 F.3d at 119 (citations and quotation marks omitted)

Thus, whether the privilege in § 74 applies, that is, whether the article suggests more serious conduct than was alleged in the judicial proceeding, is often a jury question, and many cases have so held.  For example, in *Ocean State Seafood, Inc. v. Capital Newspaper*, 12 A.D.2d 662, 492 N.Y.S.2d 175 (3rd Dept.1985), the defendant newspaper had published a story about illnesses suffered because of contaminated seafood, and had accused the plaintiffs, who were seafood merchants, of being responsible.  The story noted that the plaintiffs had been fined $25 in a court, leaving the implication that the fine was connected to the contaminated seafood.  However, the fine was only for violation of labeling requirements, not for selling contaminated seafood.  The Appellate Division said:

> [A] jury question is also presented with respect to defendants' defense that the article's account of the imposition of a fine against plaintiffs in Justice Court was statutorily privileged as a "fair and true report of any judicial proceeding" (Civil Rights Law § 74).  The "neutral reportage" privilege does not apply when the news account of the judicial proceeding is combined with other facts or opinions to imply wrongdoing.  Since, as previously discussed, the account of plaintiffs'

-22-

fine omitted disclosure that it related only to a violation of labeling requirements and can be read with other portions of the article to suggest more serious misconduct, resolution of this defense must also await a plenary trial.

12 A.D.2d at 665, 492 N.Y.S.2d at  (citation omitted).

To the same effect is *Calvin Klein Trademark Trust v. Wachner*, 129 F.Supp.2d 248, 253 (E.D.N.Y.2001)("a reasonable juror could find that Mr. Klein's comments...suggested a form of fraud and counterfeiting on the part of defendants going well beyond anything reasonably suggested by the allegations of the Complaint...the letter and press release...likewise contain statements that a reasonable juror could find go well beyond the allegations of the Complaint. The Court therefore finds that Section 74 immunity is, at best, a jury question and cannot support summary judgment in plaintiffs' favor.")(quotation marks omitted).

*See also Wenz v. Becker*, 948 F. Supp. 319, 324 (S.D.N.Y.1995)(whether statement sued on was a fair and true report of a lawsuit was a question of fact, despite "an undisputable similarity between the two allegations.");   *George v. Time, Inc.*, 259 A.D. 324, 19 N.Y.S.2d 385 (1st Dept.1940)(any question as to the fairness of the report is for the jury)..

On the other hand, the court can readily decide that the privilege does not apply at all, and can remove it from the jury's province altogether:

> The article does not quote the Ministry of Justice report in detail and the portions of the article cited by plaintiffs, when read in context, suggest that there has been an investigation and that the reporters are in possession of undisclosed details from the report that support the assertions they make against plaintiffs...The Wall Street Journal article does not qualify for the Civil Rights Law § 74 privilege...The published account suggests more serious conduct than that suggested in the official proceeding; thus the privilege may not be asserted as a matter of law.

*Daniel Goldreyer, Ltd. v. Van De Wetering,* 217 A.D.2d 434, 436-37, 630 N.Y.S.2d 18, 23 (1st Dept.1995), *dism. on other grds.* 259 A.D.2d 353; 687 N.Y.S.2d 64 (1st Dept.1999).

In each and every one of the reports about litigation in which Mr. Biro was involved, the Article adds facts which distort and go beyond the facts of the litigations and the allegations contained therein.  The Article interviews some of the participants in those litigations, who make additional comments which are then quoted in the Article.  *See, e.g.,* Amended Complaint, ¶¶ 103-04 at 18-20:

> Elizabeth Lipsz, a Montreal businesswoman who had once been close to Biro, and who won a lawsuit against him for unpaid loans, described him to me as a "classic con man." Her lawyer  told me that Biro "was so convincing. He was very suave, soft-spoken, but after a while you catch him in different lies and you realize that the guy is a phony."...Lipsz's lawyer said of Biro, "He oiled his way out of that whole thing....He got away scot-free....Lafferty's longtime business partner, Allan Aitken, told me that he believed that "Biro was either a shyster or a con man, and had found in Lafferty an easy mark."

Those comments suggest more serious conduct than that described in the cases, and thus the privilege is either not applicable, or its application is a jury question.  Moreover, the defamatory remark by Aitken was not made in the course of any litigation, but was elicited by defendant Grann in an interview, and republished in the Article.  Thus there is no § 74 defense with respect to it.

There is no question that words and expressions like "shyster," "classic con man," "phony," "oiled his way out of the whole thing," "got away scot-free," or that someone saw another to be "an easy mark.," when used in connection to a man's profession or business, are defamatory *per se.  See, e.g., DiFolco v. MSNBC Cable L.L.C.*, 2011 U.S. Dist. LEXIS 131506 at *35 n. 14 (S.D.N.Y. Nov. 9, 2011)(shyster defamatory *per se* when referring to a lawyer).  To call

someone "oily" suggests that they are slippery and untrustworthy, able to talk someone into (or out of) something dishonestly, and to say that someone "oiled his way out of the whole thing" surely suggests dishonesty and untrustworthiness at a minimum.  Any words of similar import, which tend to disparage a person in her office, profession or trade, are defamatory *per se* so long as they are "of a kind incompatible with the proper conduct of the business, trade, profession or office" that "must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities." *Liberman v. Gelstein*, supra, 80 N.Y.2d 429, 605 N.E.2d 344, 348, 590 N.Y.S.2d 857 (N.Y. 1992). The quoted remarks fit within this definition.

Defendants argue that these statements "appear in the context of claims made by people whose bias against Biro would plainly signal to a reasonable reader that they were speaking from a subjective point of view," and are thus protected opinion.  Memo at 18-19.  But there is no basis to think that the speakers were doing so, and in any event someone who republishes defamatory statements made by another, as the defendants did here, cannot defend by claiming to only be repeating opinions made by others, when those opinions are actually mingled with factual assertions.  "[T]he common law privilege of fair comment does not here apply because the disclosed facts and any implied opinion are inextricably intertwined in the accused article. The reader is not presented with facts and a separate inference therefrom; rather the opinion is conveyed as part and parcel of the factual disclosures.  In such a case it is meaningless to say that the opinion is protected, when the facts are not."  *Cianci*, *supra*, 639 F.2d at 67 (citation omitted).

Moreover, they are republications in the Article of defamatory utterances by others, are not subject to any privileges whatever, and are separate grounds for defamation:

> The law affords no protection to those who couch their libel in the form of reports or repetition and...the repeater cannot defend on the ground of truth simply by proving that the source named did, in fact, utter the statement....Any different rule would permit the expansion of a defamatory private statement, actionable but without serious consequences, into an article reaching thousands of readers, without liability on the part of the republisher....If a man has not the right to go around (and) tell of charges made by one against another, much less should a newspaper have the right to spread it broadcast and in enduring form.

> *Cianci, supra,* 639 F.2d at 61 (citations and quotation marks omitted).

There are clear differences between the language in the court decisions and how they are reported in the Article. Those differences show that the Article "suggested more serious conduct than that actually suggested in the official proceeding" and therefore are sufficient to defeat the fair reporting defense of § 74 as a matter of law. Even if they are considered substantially similar, any question as to the fairness of the report, or whether the Article suggests more serious conduct, is for the jury, not the court on a motion to dismiss.

We now examine each of the remaining defamatory statements, the ones which are connected to the litigations.

## 1. Defendant Grann's Visit to the Montreal Courthouse

The amended complaint, ¶ 64 at 12; Exh. A at 12 reads as follows:

> One day, I visited the records office at the Palais de Justice, the provincial courthouse in downtown Montreal... During the eighties and early nineties, more than a dozen civil lawsuits had been filed against Peter Paul Biro, his brother, his father, or their art businesses. Many of them stemmed from unpaid creditors. An owner of a picture-frame company alleged that the Biros had issued checks that bounced and had operated "under the cover" of defunct companies "with the clear aim of confusing their creditors." (The matter was settled out of court.).

Plaintiff asserts that this is false and defamatory, and defendants claim that this is subject to the fair reporting defense. Accepting the allegation that it is false and defamatory, it states a claim for defamation and defendants' submission does not defeat it.  First, defendants attach to their motion copies of court papers from five lawsuits, not "more than a dozen."  Thus, to the extent that the Article misstates the number of lawsuits, it is plainly false.  If defendants intended to support their § 74 defense (and assuming the court can take judicial notice of them at all) they were obliged to present *all* of the court documents, not just the selected few.  There is no explanation for the omissions, if indeed there were "more than a dozen."  Thus, to the extent it says that "[m]any of them stemmed from unpaid creditors of his art business," it is defamatory.

Second, the cases which defendants do attach do not support the inference.  The first is about a drawing which went missing from Mr. Biro's car (Exh. A), the second and third are about withheld paintings (Exhs. B and C), the fourth is a copy of a judgment entered on consent, with no basis for concluding that the plaintiff therein was an unpaid creditor (Exh. D), the fifth is an affidavit by one Bernard Desroches claiming that moneys were owed (Exh. E), unaccompanied by any pleadings or judgment or proof that was ever filed in  a court, and the sixth is a copy of a judgment in a case which "concerns an action for revocation of a sales contract and for reimbursement of the purchase price."  (Exh. F).  Only one of these cases arguably concerns a claim by an unpaid creditor (Exh. E), and that is only in the form of an affidavit, which, not being a public record, cannot in any event be the subject of judicial notice. Defendant Grann admits that the last two were not even copies from the court file. They must therefore be stricken, even if the other documents are not.

-27-

Third, a false accusation that one has unpaid creditors in connection with his business is arguably defamatory, *see Albin v. Cosmetics Plus, Ltd.*, 1997 U.S. Dist. LEXIS 15217 (S.D.N.Y. Oct. 6, 1997)("crook" and "dishonest").  However, an accusation that a plaintiff was involved in litigation over the authenticity of a painting, or that someone was sued because of a drawing stolen from his car, even negligently, are not defamatory, because neither is necessarily an accusation of criminality, dishonesty or unethical behavior in connection with one's business or profession.  Thus, the cases cited do not support the clear inference of dishonesty stated in the Article.  Not one of the cases attached speaks of unpaid creditors.

## 2.  The Goodridge Roberts Painting

Paragraph 67 at 12 reads in part as follows:

In 1983, Goodridge Roberts's widow, Joan, happened to visit the gallery where the Wises had sold the Georgian Bay painting. She had been intimately involved in her husband's work, keeping a catalogue of his paintings, and she was immediately drawn to the picture. As she subsequently testified, it mimicked her husband's paintings, but the trees were "feeble imitations," the play of the colors was jarring, and the signature appeared oddly slanted. Moreover, she had never catalogued the work. She went up to the dealer and cried, "That's a fake."
...
Peter Paul Biro insisted that the works were genuine—and that, in any case, the Wises had had an opportunity to investigate the paintings before buying them. He refused to reimburse the Wises, who ultimately sued..
...
Throughout the trial, the Biros and their attorneys maintained that the two paintings sold to the Wises were authentic, but to make their case they presented an art expert who was not a specialist on Roberts, or even on Canadian art.
On September 3, 1986, the court found in favor of the Wises, and ordered Peter Paul and Geza Biro to pay them the seventeen thousand dollars they had spent on the pictures, as well as interest.

The amended complaint responds to this as follows (¶¶ 68-72 at 13-14):

This excerpt, taken as a whole, is false and defamatory in that it implies that plaintiff knowingly sold fake art, and concealed that fact until the trial court ruled against them.  In fact, the trial court ruled only that the contract should be cancelled, and made no finding regarding the authenticity of the paintings one way or the other.  In fact, the testimony was that the original owner had purchased the painting directly from the artist when, by chance he encountered Goodridge Roberts painting in the countryside, and bought the painting directly off the easel.  That owner, however, had died by the time of the trial.  In fact, plaintiff's expert witness, a Professor Warren Sanderson, testified that although he believed the paintings to be authentic, his opinion was tentative and conditional.  He recommended technical and scientific examinations of the paintings, which were not done.  Because of this conditional opinion, the trial court said that it could not reach a conclusion regarding authenticity.

The amended complaint alleges in detail that the excerpt in ¶ 67 is not a fair and accurate reporting of the court proceeding, and in exactly what respects it is not.  Thus the § 74 defense is not available as a matter of law.  Furthermore, the absence of any filed court documents to support the defense, including the testimony of Roberts and Sanderson, makes it impossible to determine on this motion if the description of the court proceeding is fair and accurate.  The language in the Article is susceptible of a defamatory connotation, there is no basis to conclude as a matter of law that it is a fair and accurate report, and thus the defense is not available.

### 3.  The Hendlers

Paragraph 73 of the amended complaint sets forth another excerpt from the Article, concerning Saul and Marion Hendler, and the accusation that Mr. Biro attempted to sell a fake Renoir.  Defendant Grann submits a declaration allegedly from the case brought by Saul Hendler.  However, the declaration is not a document sworn to by either of the Hendlers, but is signed by Sand, Sher and Associates (Grann decl., Exh. C at 3).  Thus it is equivalent to a

complaint.  Yet the Article then sets out allegations from the declaration as if they were positive assertions and statements of fact, not merely allegations taken from it.

This interpretation is supported by Mr. Grann's interview with Marion Hendler (amended complaint, ¶¶ 81 and 84 at 15).  His inclusion of additional statements from the wife of the plaintiff in this portion of the Article renders it something more than a "fair and true report" and thus forfeits the privilege of § 74.  She is quoted as saying "What did we win?  Where's that piece of art?  We never got it back.  He probably sold it for a lot of money and we got this piece of junk in return."  This is a defamatory remark, republished in the Article.  It is not a "fair and true report" of anything which happened in a court.  Therefore, § 74 does not apply.[2]

### 4.  Serge Joyal and the "Stolen" Drawing

Paragraph 91 of the amended complaint (at 16) says that "there were allegations that art works had vanished under mysterious circumstances while in the care of Peter Paul."

Defendants support their § 74 defense on this claim by an unsworn declaration, signed by counsel, and thus again equivalent to a complaint, and a copy of a judgment (Grann decl., Exhs. A and D).  But the Article does not rely upon or merely quote from these documents.  Instead, it relies almost entirely upon an interview with the plaintiff in that case.  The excerpt continues:

> In one of the cases, Serge Joyal, who is now a senator in Canada, told me that he left a nineteenth-century drawing with the Biros to be restored. Before he could pick it up, Peter Paul notified him that it had been stolen from his car and that there was no insurance. Biro, however, never filed a police report, and Joyal says

---

[2]  It is also worth noting that the amended complaint alleges that Mr. Biro sued her for defamation and that she defaulted, thereby admitting that she had defamed him (¶ ¶ 89 and 90 at 16).

that Biro pleaded with him to wait before going to the authorities. During their conversations, Joyal says, Peter Paul acted evasive and suspicious, and Joyal became convinced that Biro was lying about the theft. As Joyal put it, "There was something fishy." Though Peter Paul said that there was nothing "suspect" about his behavior, and that he should not be held liable, the court awarded Joyal seven thousand dollars, plus interest.

The only portion of this excerpt arguably taken from the court papers is that Joyal was awarded seven thousand dollars, and even that is incorrect, because the judgment does not say that it is a court award, but a "partial consent decree," saying that "[t]he 2 defendants confess judgment" (Grann decl., Exh. D). Everything else in this excerpt is the republication of defamatory remarks uttered by Joyal himself in the interview, calling Biro "evasive," "suspicious," and "fishy." Thus the § 74 privilege does not apply, because the excerpt is not a "fair and true report" of anything which happened in a court.

Thus, all in all, defendants cannot avail themselves of the "fair and true report" privilege provided by Civil Rights L. § 74. The Article does not merely describe court proceedings, but adds assertions contributed by some of the participants, and by the defendants themselves, and republishes defamatory statements by those participants. At the very least, whether the privilege is applicable cannot be decided as a matter of law on this motion, but is ultimately a jury question.

POINT IV

THE AMENDED COMPLAINT STATES
A CLAIM FOR INJURIOUS FALSEHOOD.

The difference between a defamation claim and a claim for injurious falsehood is that the former is intended to protect reputation, while the latter is intended to protect economic

-31-

interests.   Restatement (Second) of Torts § 623A cmt. g (1977).   The New York Court of Appeals has addressed the historical development of claims for injurious falsehood  and the distinction between such claims and defamation:

> Now, although defamation and disparagement in the commercial context are allied in that the gravamen of both are falsehoods published to third parties, there is a distinction.   Where a statement impugns the basic integrity or credit-worthiness of a business, an action for defamation lies and injury is conclusively presumed. Where, however, the statement is confined to denigrating the quality of the business' goods or services, it could support an action for  disparagement, but will do so only if malice and special damages are proven

> *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670-71, 422 N.E.2d 518, 521-22, 439 N.Y.S.2d 858, 862 (1981).

Thus, in order to state a claim, a plaintiff must allege that the defendant made false statements regarding the former's business interests, did so with malice, and that the plaintiff suffered special damages thereby.  The false statements do not even need to be defamatory for the claim to be stated:

> That an action will lie for written or oral falsehoods, *not actionable per se nor even defamatory*, where they are maliciously published, where they are calculated in the ordinary course of things to produce, and where they do produce, actual damage, is established law.  Such an action is not one of libel or of slander, but an action on the case for damage willfully and intentionally done without just occasion or excuse, analogous to an action for slander of title.

> *Al Raschid v. News Syndicate Co., Inc.*, 265 N.Y. 1, 191 N.E. 713 (1934)(citation and quotation marks omitted, emphasis supplied).

The elements of the tort are set out in *Waste Distillation Tech., Inc. v. Blasland & Bouck Engineers, P.C.*, 136 A.D.2d 633, 523 N.Y.S.2d 875, 877 (2d Dept.1988)(citations omitted).

> The tort of trade libel or injurious falsehood consists of the knowing publication of false matter derogatory to the plaintiff's business of kind calculated to prevent others from dealing with the business or otherwise interfering with its relations

-32-

with others, to its detriment.  The communication must play a material and substantial part in inducing others not to deal with the plaintiff, with the result that special damages, in the form of lost dealings, are incurred.  In pleading special damages, actual losses must be identified and causally related to the alleged tortious act.

The tort requires only the intentional utterance of falsehoods and actual damages arising from them,  *Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co.*, 7 A.D.2d 441, 184 N.Y.S.2d 58 (1st Dept.1959)(citation omitted):

> By its very nature a false statement intentionally made is wrongful. If it inflicts material harm upon another, which was or should have been in the contemplation of the actor, and it results in actual damage to the plaintiff's economic or legal relationships, an action may lie. It logically follows that to sustain a complaint, it is not necessary that the pleading must allege that the defendant was solely motivated to injure the plaintiff. It is enough if the falsehoods charged were intentionally uttered and did in fact cause the plaintiff to suffer actual damage in his economic or legal relationships.

Defendants argue that this claim "is subject to the same burdens and defenses as in an [sic] defamation." memo at 34.  This is incorrect.  If the statements do not even need to be defamatory to be actionable, according to *Al Raschid* and *Penn-Ohio*, then *a fortiori*, the defamation burdens and defenses are not applicable.

The Second Claim in the amended complaint incorporates by reference all of the falsehoods set out in the Article and claimed to have caused damages, and sets forth as well specific examples of persons who refused to deal with Mr. Biro as a direct result of the publication of the Article, and of actual monetary losses caused thereby.  The Second Claim is therefore legally sufficient and the motion to dismiss it should be denied.

## CONCLUSION

Based upon the foregoing, the motion to dismiss should be denied in all respects.  The declaration of defendant Grann and its exhibits should be stricken, or in the alternative, the court should determine that the privilege of § 74 of the Civil Rights Law does not apply, or that it is a question for the jury.  The defendants should be directed to serve an answer, and the Court should schedule a conference to establish a discovery plan.

Dated: New York, New York
        December 12, 2011

LAW OFFICE OF RICHARD A. ALTMAN
Attorneys for Plaintiff
285 West Fourth Street
New York, New York 10014
212.633.0123
altmanlaw@earthlink.net
artesq@earthlink.net

-34-