UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                       :

PETER PAUL BIRO,                    :
                            Plaintiff,    :
                                           :

                  -v-               :
                                       :

CONDÉ NAST, a division of ADVANCE    :
MAGAZINE PUBLISHERS INC., DAVID    :        11 Civ. 4442 (JPO)
GRANN, LOUISE BLOUIN MEDIA INC.,   :
GLOBAL FINE ART REGISTRY LLC,    :        MEMORANDUM
THERESA FRANKS, BUSINESS INSIDER,  :     OPINION AND ORDER
INC., GAWKER MEDIA LLC,           :
INTERNATIONAL COUNCIL OF MUSEUMS, :
GEORGIA MUSEUM OF ART and PADDY   :
JOHNSON,                      :
                                       :
                       Defendants.  :
                                       :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

      This is a diversity action for defamation and injurious falsehood.  Plaintiff Peter Paul

Biro was the subject of an article written by Defendant David Grann that appeared in the July 12-

19, 2010 issue of the *New Yorker* magazine (the "Article"), published by Defendant Condé Nast,

a division of Advance Magazine Publishers Inc.  Biro alleges that the Article was false and

defamatory in a variety of respects.  Defendants Grann and Advance Magazine Publishers Inc.

("Advance") (collectively, "Defendants") have moved to dismiss the Complaint against them in

its entirety.  For the reasons that follow, Defendants' motion is granted in part and denied in part.

# I.     Background

## A.     The Parties

Biro is a Canadian citizen in the business of art restoration and authentication.  He is well known in the art world for having developed scientific approaches to art authentication through the analysis of fingerprints.

Defendant David Grann is a citizen of New York and a journalist who has written numerous books and feature stories for publications including the *New Yorker*, where the Article appeared.

Defendant Advance is a corporation with its principal place of business in New York and is the publisher of the *New Yorker*.

The other defendants in the case are individuals and publications that reported on the Article (and on Biro) after the Article was published.  The claims against these defendants are not at issue on this Motion.

## B.     The Article

Because the Article is lengthy and the allegations in the Complaint concern many passages from it, a copy of the Article is attached as an appendix to this Opinion.[1]  A general summary of the Article follows.

The Article can be roughly divided, for purposes of this lawsuit, into five sections.  In the first section, Grann discusses the practice of art authentication—which he describes as "a rare, mysterious, and often bitterly contested skill"—and the people who perform it, who are called

---

[1] Citations to the Article are to the printout from the version of the Article that appears on the website of the *New Yorker*.  This is the version that was attached to the Second Amended and Supplemental Complaint, which is the operative complaint in the case.  (Dkt. No. 27, Ex. A.)  Some earlier submissions in the case referred to the version of the Article as it appeared in the printed issue of *New Yorker* (which was attached to the original complaint).  That version had different pagination than the one the Court refers to in this Opinion.

2

"connoisseurs."  (Article at 1.)  The Article describes how traditional connoisseurs are scholars of a particular artist or period.  To authenticate a work, connoisseurs rely on objective analysis of particular characteristics of an artist's style, consideration of the materials available and in use at the time the artist worked, and scientific analysis to attempt to date the work.  But they also rely on a more subjective "immediate reaction," "ineffable sense," or "sixth sense" about a work. (Article at 2.)

This first section of the Article focuses on one connoisseur in particular, Martin Kemp, and his investigation to determine whether a portrait of a girl, called "La Bella Principessa" was, in fact, drawn by Leonardo Da Vinci.  If authenticated, the drawing would have been the first newly discovered work by Leonardo to be authenticated in over a century.[2]  Connoisseurs were sharply divided as to whether the work was an authentic Leonardo.  The Article then introduces Biro as someone to whom Kemp turned when traditional connoisseurs could not resolve the dispute.

The second section of the Article properly introduces Biro, first detailing Grann's visit to Biro's home and laboratory and describing the advanced technical equipment and techniques that Biro uses to analyze works of art.  The Article explains how Biro "has tried to render objective what has historically been subjective.  In the process, he has shaken the priesthood of connoisseurship, raising questions about the nature of art, about the commodification of aesthetic beauty, and about the very legitimacy of the art world."  (Article at 6.)

---

[2] This work was the subject of litigation in this Court between the Christie's auction house and the woman who sold the work to Christie's before it had been associated with Leonardo for a fraction of what a true Leonardo would be worth.  *See generally Marchig v. Christie's Inc.*, 430 F. App'x 22, 24 (2d Cir. 2011), *aff'g in part* 762 F. Supp. 2d 667 (S.D.N.Y. 2011).

The Article then provides Biro's biographical background, starting with his father, Geza Biro, an immigrant from Hungary who was a painter and art restorer.  Biro and his brother, Laszlo, first served as apprentices in his father's art restoration business and Biro eventually worked in the business full time.

The Article proceeds to explain the genesis of Biro's fingerprint analysis approach.  In 1985, after beginning to clean and restore a dirty, damaged landscape painting that he and his brother had purchased, Biro discovered that the painting shared characteristics with the works of the English painter J. M. W. Turner.  Connoisseurs to whom Biro and his brother showed the work dismissed it as a "tattered imitation."  (Article at 9.)  But Biro soon discovered that undisputed works by Turner contained fingerprints that could potentially be matched to fingerprints on the work he was restoring.  After studying fingerprint analysis techniques, Biro compared high resolution images of verified Turner works and discovered that the fingerprints in those works matched those on his painting.  A Turner scholar verified that the composition and coloring pointed to the hand of Turner, and a fingerprint examiner for the West Yorkshire police confirmed that the prints matched.

The Article also describes the case of a dispute over whether a particular work, purchased for five dollars by a retired truck driver named Teri Horton at a thrift shop in California, was painted by Jackson Pollock.[3]  Traditional connoisseurs rejected the notion that the work was a genuine Pollock, but Biro found a fingerprint on the back of the canvas that matched a fingerprint on a paint can that is displayed in Pollock's old studio.  Some scholars noted that Horton's picture featured acrylic paint, which, the Article notes, "had not previously been

---

[3] The dispute over the authenticity of this work was eventually the subject of a 2006 documentary film, "Who the #$&% Is Jackson Pollock?"  Biro is prominently featured in the documentary.

documented in Pollock's drip paintings." (Article at 12.) However, Biro performed a "microchemistry test" on pigment samples from the floor and found that the first sample he tested was acrylic. (*Id.*) He also revealed that gold paint from a matchstick embedded in the studio floor matched gold paint found in the Horton painting.

The Article describes how over the course of the past ten years, Biro's work has become increasingly accepted and respected in the art world. In 2009, Biro helped form a company, Art Access and Research, which analyzes and authenticates paintings. Biro serves as its director of forensic studies. His clients included museums, galleries, dealers, and major auction houses, and his work has been published extensively.

This second section concludes with a description of how Biro discovered a fingerprint on "La Bella Principesa" that matched a fingerprint from another Leonardo work. As a result, Biro "was lauded around the world." (Article at 14.)

In the third section of the Article, Grann explains how he began noticing "small, and then more glaring, imperfections in [the] picture" of Biro. (Article at 14-15.) He first identifies certain inconsistencies and suspicious details with regard to Biro's investigation of the Horton painting and another set of purported Pollock paintings. He then describes how he started to dig deeper into Biro's past and "discovered an underpainting that [he] had never imagined." (Article at 15.)

Grann describes how he traveled to the courthouse in Montreal to search for records from past lawsuits against Biro. The Article then provides details of several of those lawsuits:

(1) A lawsuit from 1981 by brothers Sam and Syd Wise, who alleged that Biro had sold them forged paintings falsely attributed to the Canadian artist Goodridge Roberts. The Article details Biro's evasiveness at a deposition when asked about the provenance of the paintings. The

Wises obtained a court order to seize various items at Biro's gallery, including a painting whose frame had a plaque engraved with the name John Constable.  At trial, Biro explained that he was restoring that painting for a client, but did not notify that client that the painting had been seized, because the painting was not, in fact, by John Constable.  The court found in favor of the Wises.

(2)  A lawsuit from two years later by an art collector named Saul Hendler.  The Article explains that Biro and his brother approached Hendler asserting that they had found a painting that they suspected was by Renoir (and was signed by Renoir), which, if authenticated, would be worth millions of dollars.  The Hendlers fronted them $9,000 to purchase the work, which would then be authenticated by the Biros, and the Hendlers and Biros would split the profits when the painting was sold.  However, a Renoir expert determined that the painting was fake and the signature forged.  The Biros refunded Hendler half his money and agreed to give him the painting.  When Hendler brought the painting home, he realized that it looked different and concluded that it was not the same painting that he had purchased.  (Hendler's wife tells Grann that she believes that Biro's father, who was a skilled art restorer, had created the ersatz copy of her husband's painting.)  He eventually sued the Biros for the rest of the money.  The Court, based on expert testimony, determined that the paintings were different and awarded Hendler several thousand dollars.

(3)  A lawsuit by Serge Joyal, now a senator in Canada, alleging that after Joyal left a nineteenth century drawing with the Biros to be restored, Biro notified Joyal that it was stolen from his car and that there was no insurance.  Biro did not file a police report and pleaded with Joyal to wait before going to the authorities.  The court awarded Joyal seven thousand dollars, plus interest.

The Article also describes how Biro was repeatedly sued for unpaid debts, ultimately declared bankruptcy, and never paid many of the judgments against him.

In the fourth section, Grann digs more deeply into suspicious aspects of Biro's background. The Article describes how Biro was part of an effort to launch a business venture called "Provenance," which would purchase paintings that could then be authenticated as masterpieces by Biro and sold for millions of dollars. The business plan estimated that each year the company would accept twenty to thirty possible masterpieces for evaluation, of which nearly half would be authenticated. One of the key figures behind the Provenance venture was an art dealer named Tod Volpe, who the Article later reveals had been convicted of defrauding his clients of nearly two million dollars and had served two years in prison.

The Article also details another instance of Biro's having been "suspected of creating an investment scheme around a seemingly precious object, with the promise that it would eventually reap huge profits." (Article at 21.) In that incident, Biro and his brother worked with a Canadian financial adviser, Richard Lafferty, to authenticate a painting the Biros claimed to have found in an antique store. The work was purportedly by a disciple of Raphael, Perino del Vaga. Biro claimed to have found a fingerprint that could be matched to one on an undisputed work by Perino, and also claimed to have invented a unique ultrasound instrument (which he called a "Perinoscope") which he used to detect a note, signed by Raphael and dated April 5, 1520, hidden inside a secret compartment in the picture's frame. Lafferty, who was elderly and nearing the end of his life, spoke of the painting as the "holy grail," and, all told, invested up to a million dollars in the process of authenticating the painting. (Article at 22.) A research team at Harvard analyzed the message and concluded that "it had never seen 'sixteenth-century ink act as

it does on that particular document.'"  (*Id.*)  The Article quotes a leading scholar on the

Renaissance as suggesting that the work was "a very skilled, elaborate and expert hoax."  (*Id.*)

Tod Volpe asked at least one of Biro's clients, Ken Parker, for a contribution of five

million dollars toward launching the venture.  Around that time, Biro was in the process of

evaluating fingerprints he had found on possible Jackson Pollock paintings that Parker had

received from his father.  Biro stated that he had matched a print to the same print on the paint

can found in Pollock's studio and on Teri Horton's painting.  After Parker discovered Volpe's

criminal background and confronted Biro, Biro stated that he had severed all ties with Volpe.

Parker also learned that his father had obtained the work from a couple named Thelma

and Norman Grossman, who told Parker that she had obtained the painting "for a few hundred

dollars from a young artist in Brooklyn who was skilled at imitating famous artists.  As she put

it, it is certain that the painting 'is *not* a Jackson Pollock.'"  (Article at 23.)

In the course of his investigation, Parker worked with Theresa Franks and her company,

Global Fine Art Registry, both defendants in this case.  Franks hired Tom Hanley, the chief of

police in Middlebury, Vermont, who had more than two decades' experience as a fingerprint

examiner.  Hanley attempted to study Biro's methods, and asked to see the evidence that Biro

had used to authenticate the Teri Horton painting, but Biro declined the request.

Hanley later examined Parker's painting, which Biro had worked on.  Hanley examined

the fingerprints on the back of the painting's frame (which Parker had claimed not to have

noticed before giving the painting to Biro).  Hanley noted that two of the prints "were black, as if

they had been made with ink."  (Article at 24.)  Hanley concluded, "[b]ased on the clarity of the

impression, . . . that the fingerprint had to be relatively new—certainly not from half a century

ago when Pollock was alive."  (*Id.*)  Hanley also observed a liquid varnish over the fingerprints,

which Biro had told Parker was a "resin process" to make the print more visible.  Grann states

that Hanley "began to wonder if he was seeing something virtually unheard of:  forged

fingerprints."  (*Id*.)

A different examiner, Lawrence Rooney, a retired detective sergeant and latent-print

examiner with two decades of experience as a fingerprint analyst, "agreed that the fingerprint

appeared too recent to have come from Pollock."  (*Id*.)  Rooney also stated that the use of the

"liquid seal" coating  was "beyond all acceptable professional methods of latent print

preservation and opens the door to many valid questions relating to the latent prints' origin of

placement and development."  (*Id*.)  A third expert, Pat A. Wertheim, who works in the Arizona

Department of Public Safety and teaches fingerprint analysis to law enforcement agencies, noted

that someone could forge a fingerprint with a rubber stamp or an engraving made from a

photograph of a fingerprint.  Grann describes Wertheim's analysis of the prints, and his

observation that, "[i]n his more than three decades as an examiner, he had never seen a set of

fingerprints like this."  (Article at 25.)  In particular, the fingerprints were too similar to each

other, and did not show the inconsistencies that would naturally appear from multiple prints from

a real finger.  Wertheim concluded that the prints "screamed forgery," and were likely created by

a rubber stamp.  (*Id.*)

Grann concludes this section by stating that

> [i]f a forgery's success were to depend on fake fingerprints, rather
> than on the sly imitation of a painter's style, it would represent a
> radical departure from the methods employed by art forgers over
> thousands of years. And yet such a forgery would perfectly reflect
> the contemporary faith in science to conquer every realm, even one
> where beauty is supposed to be in the eye of the beholder.

(Article at 26.)

In the last section of the Article, Grann again visits Biro's home and confronts him with what he had learned about the old lawsuits, the various allegations against Biro, and the evidence that the fingerprints were not authentic.  The Article details how Biro denied or attempted to explain away each of the inconsistencies and accusations again him.  When Grann "continued to question Biro about whether any fingerprint on the Parker's painting was a forgery, he suddenly asked 'What if maybe it is?'  Though he disagreed with Wertheim's analysis, his conclusion 'could be right.'  Still, Biro had said, this didn't mean that he was the culprit: 'Why is everybody after me?'"  (Article at 28.)

The Article then returns to the possible Leonardo drawing, "La Bella Principesa."  Plaintiff did not actually handle the drawing itself, but was sent multispectral images from another laboratory.  Martin Kemp, who discovered the work, expressed his confidence in Biro's work, but other scholars continued to dispute whether the work was a genuine Leonardo.  In a book that Kemp authored about the work, Biro wrote a chapter called "Fingerprint Examination," in which he included images of the fingerprints side by side with arrows showing eight overlapping characteristics between them.  Grann speaks with another fingerprint examiner who reviewed the chapter and stated that "most of the arrows don't point to actual overlapping characteristics, just random details," and that there is not sufficient detail for a true match to be made:  "No other examiner I know would sign off on it  . . . . I couldn't even get it past the door."  (Article at 29.)  Grann asked Biro if "he might have been wrong in suggesting that Leonardo had ever touched 'La Bella Principesa.'  He looked up at the sky and said, 'It's possible.  Yes.'"  (Article at 30.)

Throughout the Article, Grann discusses the inherently controversial nature of art authentication, as well as the public's distrust of an elite subset of people who claim to have the

10

sole authority to determine whether a work is worth millions of dollars or next to nothing.  He also discusses the tension between the potential democratizing element of using objective science to authenticate art works, and the fact that such work is highly technical and may depend on specialized techniques and equipment (and even then may not lead to consensus).  Toward the end of the Article, Grann muses that

> [c]onnoisseurship is rife with flaws.  It is susceptible to error, arrogance, even corruption.  And yet there is something about that "strange breed of cat," as [art scholar Thomas] Hoving referred to the best connoisseurs, who could truly see with greater depth— who, after decades of training and study and immersion in an artist's work, could experience a picture in a way that most of us can't.  Connoisseurship is not merely the ability to discern whether an art work is authentic or fake; it is also the ability to recognize whether a work is a masterpiece.  Perhaps the most uncomfortable truth about art is that such knowledge can never be truly democratic.

(Article at 30-31.)

The Article concludes by describing how Biro informed Grann that he was in the process of "pioneering a forensic method that would further revolutionize the process of authenticating art:  DNA analysis."  He had found several hairs on Teri Horton's painting and had also removed several hairs trapped in the dried paint on Pollock's studio floor.  "Matching an artist's DNA on a painting," Biro told Grann, "would finally remove doubt from the authentication process.  It would be, he said, a 'holy grail.'"  (Article at 31.)

### C.   Procedural History

Biro brought these claims against Grann, Advance, and other defendants no longer in the case on June 29, 2011.  On September 27, 2011, Biro filed the First Amended Complaint against Grann and Advance.

A briefing schedule for Defendants' motion to dismiss the Complaint was set forth in a
Case Management Plan issued September 6, 2011.  (Dkt. No. 11.)

On October 31, 2011, the Court granted Biro leave to file a supplemental complaint to
add additional claims against additional parties who republished allegedly false and defamatory
facts from the Article.  (Dkt. No. 19.)  Biro represented to the Court that the new Complaint
would not change any of the allegations against the Defendants, and would only add allegations
and claims against the new defendants.  Accordingly, the Court held that the briefing schedule
for Defendants' motion to dismiss would remain in place, and that Defendants' motion would be
applied to the operative complaint, once it was filed.  (*Id.*)

The same day, Defendants filed the instant motion.  (Dkt. No. 20.)

On December 5, 2011, Biro filed the Second Amended and Supplemental Complaint
("SASC"), adding claims against Louise Blouin Media Inc., Global Fine Art Registry LLC,
Theresa Franks, Business Insider, Inc., Gawker Media LLC, International Council of Museums,
Georgia Museum of Art, and Paddy Johnson.  (Dkt. No. 27.)  The Court now applies
Defendants' motion to dismiss to the claims against them in the SASC.[4]

After this motion was fully briefed, there was additional motion practice between Biro
and some of the newly added defendants.  Biro also seeks leave to file a Third Amended
Supplemental Complaint.  These issues will be addressed in separate orders.

On April 23, 2012, the Court held oral argument on this motion.  (Dkt. No. 68.)

---

[4] Because the motion was filed before the SASC was filed, the memoranda of law refer to paragraph numbers from
the previous version of the complaint.  In this Opinion, the Court refers to the paragraph numbers in the SASC.
Citations to the SASC will be styled as follows:  "Comp. ¶ __."

## II.      Legal Standards

### A.      Motions to Dismiss Generally

In order to survive a motion to dismiss pursuant to Federal Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw [ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (internal quotations omitted).  On the other hand, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S.Ct. at 1949; *see also Twombly*, 550 U.S. at 555 (noting that a court is "not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986))).

When determining the sufficiency of a claim under Rule 12(b)(6), the court is normally required to consider only the allegations on the face of the pleading.  "Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).  In defamation actions, this typically includes the documents containing the allegedly defamatory statements. *See Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 414 n.52 (S.D.N.Y. 2009) (citing *Gargiulo v. Forster & Garbus Esqs.*, 651 F. Supp. 2d 188, 190 (S.D.N.Y. 2009) and *Riel v. Morgan Stanley*, No. 06 Civ. 524, 2007 WL 541955, at *4, *8 (S.D.N.Y. Feb. 16, 2007)).

13

The Court may also consider documents subject to judicial notice.  *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991).  The Second Circuit has explained that, on a motion to dismiss, "[a] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."  *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)); *cf. Roth*, 489 F.3d at 509 (noting that "where public records that are integral to a fraud complaint are not attached to it, the court, in considering a Rule 12(b)(6) motion, is permitted to take judicial notice of those records . . . in order to determine *what* statements they contained but . . . *not for the truth of the matters asserted.*" (internal citations, quotation marks and brackets omitted)).  Such documents may be authenticated with evidence "sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  This can include an affidavit or declaration by a witness with knowledge of what the item is, as well as from the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."  Fed. R. Evid. 901(b).

   **B.      Defamation Claims**

   "Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander."  *Idema v. Wager,* 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000).  "Under New York law, a plaintiff must establish five elements to recover in libel: (1) a written defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault (either negligence or actual malice depending on the status of the libeled party); (4) falsity of the defamatory statement; and (5) special damages or per se actionability (defamatory on its

face)." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).  A defamatory

statement is one that exposes the plaintiff "to public hatred, shame, obloquy, contumely, odium,

contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induces an evil opinion

of one in the minds of right-thinking persons, and . . . deprives one of . . . confidence and

friendly intercourse in society.'"  *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 113 (2d Cir.

2005) (quoting *Celle*, 209 F.3d at 177).   "A statement that tends to injure another in his or her

trade, business or profession is defamatory per se."  *Fuji Photo Film U.S.A.*, 669 F. Supp. 2d at

411 (internal quotation marks omitted).

    New York state courts require a plaintiff to state defamation claims with particularity,

setting forth "the particular words complained of," though "their application to the plaintiff may

be stated generally."  N.Y. C.P.L.R. § 3016(a).  In federal court, however, the complaint is

subject to the usual standards set forth by the Federal Rules of Civil Procedure and *Twombly* and

*Iqbal*.  "While the federal rules do not require the particularized pleading requirements set forth

in New York's C.P.L.R. section 3016, Rule 8 [of the Federal Rules of Civil Procedure] still

requires that each pleading be specific enough to afford defendant sufficient notice of the

communications complained of to enable him to defend himself."  *Gristede's Foods, Inc. v.

Poospatuck (Unkechauge) Nation*, No. 06 Civ. 1260, 2009 WL 4547792, at *8-9 (E.D.N.Y. Dec.

1, 2009) (citations omitted); *see also Thai v. Cayre Group, Ltd.*, 726 F. Supp. 2d 323, 329

(S.D.N.Y. 2010) ("A defamation claim is only sufficient if it adequately identifies the purported

communication, and an indication of who made the communication, when it was made, and to

whom it was communicated." (quoting *Gargiulo*, 651 F. Supp. 2d at 192 (quotation marks

omitted))).

"Whether particular words are defamatory presents a legal question to be resolved by the court[s] in the first instance." *Celle*, 209 F.3d at 177 (quoting *Aronson v. Wiersma,* 65 N.Y.2d 592, 493 N.Y.S.2d 1006, 483 N.E.2d 1138, 1139 (1985)).  As the Second Circuit has explained, it is ultimately "the responsibility of the jury to determine whether the plaintiff has actually been defamed; however, a threshold issue for resolution by the court is whether the statement alleged to have caused plaintiff an injury is reasonably susceptible to the defamatory meaning imputed to it." *Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir. 1997) (citing *James v. Gannett Co.*, 40 N.Y.2d 415, 386 N.Y.S.2d 871, 353 N.E.2d 834, 837-38 (1976)) (internal citation omitted).  Words that are not "reasonably susceptible of defamatory meaning" are not actionable.  *Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F. Supp. 2d 279, 287 (S.D.N.Y. 2006) (citation omitted).

Allegedly defamatory statements should be construed "as they would be commonly understood . . . in the context of their publication." *Levin*, 119 F.3d at 195 (citing *Armstrong v. Simon & Schuster, Inc.,* 85 N.Y.2d 373, 625 N.Y.S.2d 477, 649 N.E.2d 825, 829 (1995)).  "Challenged statements are not to be read in isolation, but must be perused as the average reader would against the 'whole apparent scope and intent' of the writing." *Celle*, 209 F.3d at 177 (quoting *November v. Time Inc.,* 13 N.Y.2d 175, 244 N.Y.S.2d 309, 194 N.E.2d 126, 128 (1963)).  "Allegedly defamatory statements should be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed." *Krepps v. Reiner*, 588 F. Supp. 2d 471, 484 (S.D.N.Y. 2008) (citation omitted).  The New York Court of Appeals instructs courts not to "strain to interpret [] writings in their mildest and most inoffensive sense to hold them nonlibelous." *November*, 13 N.Y.2d 175, 244 N.Y.S.2d 309, 194 N.E.2d at 128 (citation and quotation marks omitted).  At the same time, a court should not "render statements actionable by giving them a 'strained or

16

artificial construction.'" *Qureshi*, 430 F. Supp. 2d at 287 (quoting *Dillon v. City of New York*, 261 A.D.2d 34, 704 N.Y.S.2d 1, 5 (1st Dep't 1999)); *see also Krepps*, 588 F. Supp. 2d at 484 ("[I]t is equally clear that courts should not strain to interpret statements as defamatory.").

## III.  Discussion

This case is somewhat more complex than a typical defamation claim.  Rather than a single statement, or a single allegedly defamatory implication from a group of statements, this case concerns approximately two dozen different passages (some of which are several paragraphs long) in a 16,000-word article.  Defendants raise a variety of arguments as to why the claims arising from each of the passages should be dismissed at the pleading stage.

As the parties acknowledged at oral argument, the Complaint does not necessarily rise or fall in its entirety.  If the Court finds that some of the statements are actionable but others are not, then the Court may dismiss the claims based on the nonactionable statements and allow the claims based on the actionable statements to go forward.  The parties agreed that discovery would then proceed for any statements held to be actionable, but not for any statements that fail to support a claim.

The New York Court of Appeals has explained that there is "particular value" in resolving defamation claims at the pleading stage, "so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms." *Armstrong*, 85 N.Y.2d 373, 625 N.Y.S.2d 477, 649 N.E.2d at 828.[5]

---

[5] Judge Wilkinson has aptly summarized the gravity of this concern, dissenting from denial of rehearing *en banc* of a decision (applying Virginia law) allowing a defamation case to proceed beyond the pleadings stage:

> Even if liability is defeated down the road, the damage has been done. The defendant in this case may well possess the resources necessary for protracted litigation, but smaller dailies and weeklies in our circuit most assuredly do not. The prospect of legal bills, court appearances, and settlement conferences means that all but the most fearless will pull their punches even where robust comment might check the worst impulses of

Thus, as courts typically do in such cases, the Court will evaluate each allegedly defamatory statement (or set of statements) and determine whether it is actionable, granting dismissal of claims based on nonactionable statements and denying dismissal with respect to claims based on actionable statements. *See, e.g., Treppel v. Biovail Corp.*, No. 03 Civ. 3002, 2004 WL 2339759 (S.D.N.Y. Oct. 15, 2004) (granting motion to dismiss claims with respect to eight out of eleven allegedly defamatory statements).

Defendants make several overlapping arguments that each of the allegedly defamatory statements is not actionable as a matter of law.  Specifically, they argue that the allegedly defamatory statements (1) are not susceptible of a defamatory connotation or are substantially true; (2) constitute nonactionable statements of opinion; (3) are based on unchallenged statements of fact and are not actionable as a result of any defamatory implication; and/or (4) are protected as fair and true reports of judicial proceedings.  The Court addresses each set of arguments separately.

### A.       Statements That Are Not Susceptible of a Defamatory Implication

Two of the allegedly defamatory statements are conceded to be substantially true based on the allegations of the complaint, and in any event are not "reasonably susceptible of defamatory meaning." *Qureshi*, 430 F. Supp. 2d at 287.  Accordingly, Defendants' motion to dismiss claims based on those statements is granted.

---

government and serve the community well. To allow litigation to impose large costs will dull democracy at the local level, because the monetary impacts of litigation for all but the largest media organizations will prove unacceptably high.

*Hatfill v. New York Times Co.*, 427 F.3d 253, 255 (4th Cir. 2005) (Wilkinson, J., dissenting).

Under New York law, it is "fundamental that truth is an absolute, unqualified defense to a civil defamation action." *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir. 1986) (citation omitted).  If an allegedly defamatory statement is "substantially true," a claim of libel is "legally insufficient and . . . should [be] dismissed." *Id.*  "Substantial truth turns on the understanding of the 'average reader.'" *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 146 (2d Cir. 2001).  New York courts hold that "[a] statement is substantially true if the statement would not 'have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998) (quoting *Fleckenstein v. Friedman*, 266 N.Y. 19, 193 N.E. 537, 538 (1934)); *see also id.* ("Thus, under New York law, 'it is not necessary to demonstrate complete accuracy to defeat a charge of libel. It is only necessary that the gist or substance of the challenged statements be true.'" (quoting *Printers II, Inc. v. Professionals Publishing, Inc.,* 784 F.2d 141, 146 (2d Cir. 1986)); *Guccione*, 800 F.3d at 301 (stating that "the substantial truth defense permits a certain amount of leeway as to accuracy").

Thus, the following statements identified in the Complaint are not actionable:

- The description of Biro as having "pioneered a radical approach to authenticating pictures," which the Complaint alleges is "false and misleading" because "[t]here is nothing radical about fingerprints, not even on artworks, and plaintiff is not the first person who has looked for fingerprints to provide evidence to assist in the attribution of works of art."  (Comp. ¶ 57-58.)

The Complaint itself contrasts the "more scientific means" of fingerprint authentication with "traditional methods for attribution of works of art," and concedes that the use of fingerprint analysis in art authentication is an "emerging field."   (Comp. ¶ 8, 11.)  This alleged truth would not have a "different effect on the mind of the reader," *Jewell*, 23 F. Supp. 2d at 366, than the idea that fingerprint authentication is a "radical approach."  In any event, whether fingerprint

authentication is "radical" or merely "emerging" is subjective, and not capable of being proven

true or false.  Finally, describing the approach as "radical" does not have any tendency to expose

Biro to "public contempt, ridicule, aversion or disgrace."  *Qureshi*, 430 F. Supp. 2d at 287.[6]

- The statement, in the context of the description of the "Provenance" business plan, that "Biro had authenticated" the Teri Horton painting, which the complaint alleges is a "factual error," because "[i]n fact, plaintiff never authenticated Horton's painting." (Comp. ¶ 127.)

The Complaint alleges that "[a]uthentication is by its very nature a complex and

multidisciplinary process, and seldom provides definitive answers.  Biro presented the evidence

in favor of the attribution to Jackson Pollock, but did not draw a firm conclusion."  (Comp. ¶

128.)  Again, in the context of an article that has as its central theme the uncertainty inherent in

art authentication, the statement that Biro "authenticated" the Horton painting, and the alleged

truth, as set forth in the Complaint, would not have a "different effect on the mind" of the

average reader.  And, in any event, a statement that Biro authenticated the painting is not

reasonably susceptible of a defamatory connotation.

## B.       Nonactionable Expressions of Opinion

Defendants argue that many of the alleged defamatory statements are not actionable

because they are expressions of opinion, not statements of fact.

### 1.       Applicable Law

"Under both New York and federal law, statements of pure opinion are not actionable as

defamation."  *Qureshi*, 430 F. Supp. 2d at 288 (citing *Gross v. New York Times Co.,* 82 N.Y.2d

146, 603 N.Y.S.2d 813, 623 N.E.2d 1163, 1166 (1993)); *see also Levin*, 119 F.3d at 196

---

[6] Plaintiff alleges:  "For example, a purported fingerprint played a role in the celebrated 1929 case of *Hahn v. Duven*, a defamation suit about the authenticity of a painting attributed to Leonardo Da Vinci."  (Comp. ¶ 59 (citation omitted).)  Even if the omission of this fact were relevant, the Article, in fact, discusses this case in detail. (*See* Article at 10.)

("[E]xpressions of opinion are not actionable . . . ."); *Mann v. Abel*, 10 N.Y.3d 271, 856

N.Y.S.2d 31, 885 N.E.2d 884, 885-86 (2008) ("Expressions of opinion, as opposed to assertions

of fact, are deemed privileged and no matter how offensive, cannot be the subject of an action for

defamation.").[7]  This is because a statement of opinion is not an assertion of fact that can be

proved false, and "[a]n assertion that cannot be proved false cannot be held libelous."  *Hotchner*

*v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977); *see also Brian*, 87 N.Y.2d 46, 637 N.Y.S.2d

347, 660 N.E.2d at 1129 ("Since falsity is a *sine qua non* of a libel claim and since only

assertions of fact are capable of being proven false, we have consistently held that a libel action

cannot be maintained unless it is premised on public assertions of *fact*."); *Milkovich*, 497 U.S. at

20 ("[A] statement of opinion relating to matters of public concern which does not contain a

provably false factual connotation will receive full constitutional protection.").  Thus, an

expression of pure opinion is protected "however unreasonable the opinion or vituperous the

expressing of it may be."  *Hotchner*, 551 F.2d at 913 (citing *Gertz v. Robert Welch, Inc.*, 418

U.S. 323, 339-40 (1974); *Buckley v. Littel*, 539 F.2d 882, 888 (2d Cir. 1976)).

Whether a statement is one of fact or opinion is a question of law for the court.  *Mann*, 10

N.Y.3d 271, 856 N.Y.S.2d 31, 885 N.E.2d at 885.  As many courts have observed, the

---

[7] Earlier decisions by the New York Court of Appeals were fairly definitive in holding that statements of opinion can never be actionable.  *See Weiner v. Doubleday*, 74 N.Y.2d 586, 550 N.Y.S.2d 251, 549 N.E.2d 453, 455 (1989) ("It is settled that expressions of opinion, in contrast to assertions of fact, are privileged and, however offensive, may not be the subject of an action for defamation."); *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 508 N.Y.S.2d 901, 501 N.E.2d 550, 550 (1986) ("It is a settled rule that expressions of an opinion false or not, libelous or not, are constitutionally protected and may not be the subject of private damage actions.") (citation and quotation marks omitted).  Subsequently, in *Milkovich v. Lorain Journal*, 497 U.S.1 (1990), the Supreme Court held that there was no categorical protection for statements that could be described as expressions of opinion.  However, later decisions of the New York Court of Appeals expressly reaffirmed the broad protection that New York courts offer to expressions of opinion under state law, even after *Milkovich*.  *See Brian v. Richardson*, 87 N.Y.2d 46, 637 N.Y.S.2d 347, 660 N.E.2d 1126, 1129 (1995); *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 566 N.Y.S.2d 906, 567 N.E.2d 1270, 1280-82 (1991).

"seemingly simple" proposition that expressions of opinion are protected "belies an often

complicated task of distinguishing between potentially actionable statements of fact and

nonactionable expressions of opinion."  *Qureshi*, 430 F. Supp. 2d at 288; *see also Brian*, 87

N.Y.2d 46, 637 N.Y.S.2d 347, 660 N.E.2d at 1129 ("Distinguishing between assertions of fact

and nonactionable expressions of opinion has often proved a difficult task.").  New York courts

look principally to three factors to make this determination:

> (1) whether the specific language in issue has a precise meaning which is readily
> understood; (2) whether the statements are capable of being proven true or false;
> and (3) whether either the full context of the communication in which the
> statement appears or the broader social context and surrounding circumstances are
> such as to signal readers or listeners that what is being read or heard is likely to be
> opinion, not fact.

*Id.* (quoting *Gross*, 82 N.Y.2d 146, 603 N.Y.S.2d 813, 623 N.E.2d at 1166).  "When the

defendant's statements, read in context, are readily understood as conjecture, hypothesis, or

speculation, this signals the reader that what is said is opinion, and not fact."  *Levin*, 199 F.3d at

197 (citation omitted).  Often, statements of "rhetorical hyperbole" or "imaginative expression"

are held not actionable, because they "cannot reasonably be interpreted as stating actual facts"

that could be proved false.  *Milkovich*, 497 U.S. at 20, 25; *see also Treppel*, 2004 WL 2339759,

at *12 (stating that "an opinion may be offered with such excessive language that a reasonable

audience may not fairly conclude that the opinion has any basis in fact" and noting that the

Supreme Court has "afforded constitutional protection to the type of speech often characterized

as 'rhetorical hyperbole,' 'parody,' 'loose,' or 'figurative'" (citing *Milkovich*, 497 U.S. at 16-

17)).

        A statement of "pure opinion" is one which is either "accompanied by a recitation of the

facts upon which it is based" or "does not imply that it is based upon undisclosed facts."

*Steinhilber*, 68 N.Y.2d 283, 508 N.Y.S.2d 901, 501 N.E.2d at 552.  However, if a statement

"impl[ies] that the speaker's opinion is based on the speaker's knowledge of facts that are not

disclosed to the reader," then it may be actionable.  *Levin*, 119 F.3d at 197.  Such statements may

be actionable "not because they convey 'false opinions' but rather because a reasonable listener

or reader would infer that the speaker or writer knows certain facts, unknown to the audience,

which support the opinion and are detrimental to the person toward whom the communication is

directed."  *Gross*, 82 N.Y.2d 146, 603 N.Y.S.2d 813, 623 N.E.2d at 1168 (quoting *Steinhilber*,

68 N.Y.2d 283, 508 N.Y.S.2d 901, 501 N.E.2d at 553) (quotation marks and brackets omitted);

*see also Levin*, 119 F.3d at 196 (noting that the Supreme Court has "explained that the United

States Constitution offers no wholesale protection for so-called 'expressions of opinion' if those

expressions imply assertions of objective fact" (citing *Milkovich*, 497 U.S. at 18)).  In other

words, a statement of opinion that is based on undisclosed facts is potentially actionable because

it carries with it an implicit statement of those facts.  On the other hand, "a proffered hypothesis

that is offered after a full recitation of the facts on which it is based is readily understood by the

audience as conjecture."  *Gross*, 82 N.Y.2d 146, 603 N.Y.S.2d 813, 623 N.E.2d at 1168.

### 2.      Application of Law to Facts

Defendants argue that three of the allegedly defamatory passages are privileged as pure

statements of opinion.  The Court agrees with Defendants as to two of them and disagrees as to

one of them.

Each of these passages contains quotations from third parties expressing negative views

of Biro.  It is well settled that Defendants cannot escape liability simply because they are

conveying someone else's defamatory statements without adopting those viewpoints as their

own.  The Second Circuit has expressly embraced the "widely recognized" rule that "one who

republishes a libel is subject to liability just as if he had published it originally, even though he

attributes the libelous statement to the original publisher, and even though he expressly disavows

the truth of the statement." *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 60-61 (2d Cir. 1980)

(citations omitted); *see also Weiner*, 74 N.Y.2d 586, 550 N.Y.S.2d 251, 549 N.E.2d at 456,

(rejecting "privilege to repeat the statements of  third parties so long as no endorsement was

given").

>   Biro alleges that the following passage is false and defamatory:

> Elizabeth Lipsz, a Montreal businesswoman who had once been close to Biro, and
> who won a lawsuit against him for unpaid loans, described him to me as a "classic
> con man." Her lawyer told me that Biro "was so convincing. He was very suave,
> soft-spoken, but after a while you catch him in different lies and you realize that
> the guy is a phony."

(Article at 13-14.)[8]

>   Defendants argue that the fact that the statements were made by "people whose bias

against Biro would plainly signal to a reasonable reader that they were speaking from a

subjective point of view."  (Defs. Mem. at 18 19.)  *See Brian*, 87 N.Y.2d 46, 637 N.Y.S.2d 347,

660 N.E.2d at 1131 (noting that fact that author of article disclosed that he had been the attorney

for the party that had been in conflict with the subject of the article "signal[ed] that he was not a

disinterested observer").  Defendants also cite decisions holding that descriptions of an

---

[8] Plaintiff also alleges that this passage "relies upon an unnamed source" and that "plaintiff has asked Lipsz to
confirm or deny the statement she allegedly made to defendant Grann, and to provide the name of her unnamed
attorney.  She has refused to respond."  (Comp. ¶¶ 111, 113.)  Although reliance on an "unverified, anonymous
source" has bearing on whether a statement was made with actual malice, it has no bearing on whether a statement is
reasonably susceptible of a defamatory meaning or is privileged as opinion.  *Stern v. Cosby*, 645 F. Supp. 2d 258,
278 (S.D.N.Y. 2009).

Plaintiff also alleges that "[i]n fact, Lipsz never obtained a judgment against plaintiff for unpaid loans; the action
was suspended."  (Comp. ¶ 112.)  But this allegation is not necessarily inconsistent with the description contained in
the Article.  In any event, the technical distinction between "winning" a lawsuit and having a lawsuit suspended
before judgment is obtained is not one that is capable of a defamatory connotation.

individual as a "con artist" are not actionable because the term "con artist" is a "vague, indefinite, ambiguous statement . . . incapable of being objectively proven false." *Huggins v. NBC*, 1996 WL 763337, at *3 (N.Y. Sup. Ct. Feb. 7, 1996) (characterizing term as "loose [and] figurative," and did not "refer to verifiable acts of criminal behavior"); *see also Foley v. CBS Broadcasting, Inc.*, 28 Misc. 3d 1227(A), 2006 WL 6619947, at *4 (N.Y. Sup. Ct. Sept. 13, 2006) (holding that description of plaintiff store owner as "con artist" who had been "scamming customers for years" was not actionable when statements were broadcast in context of segments "which featured customers complaining that Foley either failed to deliver goods or delivered defective goods").

Here, although the context and language used suggest that Lipsz and her lawyer were stating their subjective opinions of Biro, the statements imply the existence of undisclosed facts on which those opinions were based. *Cf. Foley*, 2006 WL 6619947, at *4 (noting that there was "no suggestion in the broadcasts that there were additional undisclosed facts on which the assertion that Foley was a 'con artist' was based"). Merely failing to pay a debt does not automatically make someone a "classic con man." Lipsz's statement, along with her lawyer's description of "catch[ing Biro] in different lies" and "realiz[ing] the guy is a phony" suggest that their opinions are based upon additional facts beyond the stated fact that Biro was involved in a lawsuit concerning unpaid loans. It is possible that their opinion is based upon facts that are elsewhere fully disclosed in the Article, but this is not clear from the context of their statements. And even if the term "con man" is not specific enough to constitute an accusation of "verifiable acts of criminal behavior," *Huggins*, 1996 WL 763337, at *3, it cannot be doubted that, in the context of the Article, the statement is reasonably capable of a defamatory meaning. Thus, Biro's claim for defamation based upon this passage is not dismissed.

On the other hand, the statement from Lipsz's lawyer, in regard to the fact that Biro filed

for bankruptcy and never paid many of the judgments against him, that Biro "oiled his way out

of that whole thing . . .  [and] got away scot-free," is protected as an expression of opinion.

(Article at 19.)  Biro alleges that the statement is "false and defamatory and scurrilous" in its use

of those words.  (Comp. ¶ 115.)  Biro further alleges that "[i]t is accurate to state that plaintiff

filed for bankruptcy in 1993 and was discharged.  However, in the early 1990s the art market in

Montreal suffered a serious recession, major art galleries closed, and some moved away because

of it.  Plaintiff was among the victims of that recession." (Comp. ¶ 116.)  Even if Biro's

allegation is true, in the context of the passage, it is clear that the statement reflects Lipsz's

lawyer's opinion of the fairness of Biro's bankruptcy discharge, and there is no suggestion that

the statement was based upon other, undisclosed facts.  Moreover, assertions that Biro "oiled his

way" out of something, or got away "scot-free," do not carry a precise meaning and are not

capable of being proven true or false.  Thus, Biro's claim based on this passage is dismissed.

Similarly, Defendants argue that the following excerpt of the Article is not actionable:

> Biro previously had been suspected of creating an investment
> scheme around a seemingly precious object, with the promise that
> it would eventually reap huge profits. . . . Lafferty's longtime
> business partner, Allan Aitken, told me that he believed that "Biro
> was either a shyster or a con man, and had found in Lafferty an
> easy mark."

(Article at 21-22.)  Biro alleges simply that this statement is "false and defamatory."  (Comp. ¶

121.)  He alleges that, "[i]n fact, it was Lafferty who proposed the venture, not plaintiff, and it

was Lafferty who prepared and submitted a business plan, not plaintiff."  (Comp. ¶ 122.)

This allegation refers to the extensive description in the Article of the "Perinoscope"

incident, where Biro and his brother claimed to have found a note embedded in the frame of a

painting suggesting that the painting was by Raphael's disciple, Perino del Vaga.  A Harvard

research team concluded that the note was not authentic and the Article quotes one scholar who

concluded that the work was likely an elaborate hoax.

First, the use of the terms "shyster," "con man," and finding an "easy mark" is the type of

"rhetorical hyperbole" and "imaginative expression" that is typically understood as a statement

of opinion.  *Milkovich*, 497 U.S. at 20.  But more fundamentally, outside of the single, peripheral

detail regarding who initially proposed the venture and submitted the business plan, Biro does

not allege that any aspect of the description of the underlying events involving Lafferty is false.

"[W]here the plaintiff only asserts that the opinions are false, and does not challenge the veracity

of the underlying facts, the plaintiff may not sustain a libel action."  *Jewell*, 23 F. Supp. 2d at

377.  And in the context of these unchallenged facts, a reasonable reader would understand

Aitken's description of Biro as a statement of his opinion, based upon the incidents fully

described in the Article.  Unlike the Lipsz statements, there is no suggestion that Aitken was

relying on any other undisclosed facts in reaching his opinion.  *Steinhilber*, 68 N.Y.2d 283, 508

N.Y.S.2d 901, 501 N.E.2d at 553 ("The essential task is to decide whether the words complained

of, considered in the context of the entire communication and of the circumstances in which they

are spoken or written, may be reasonably understood as implying the assertion of undisclosed

facts justifying the opinion.").  Thus, the claim based on this statement is dismissed as a

nonactionable expression of opinion.

### C.      Claims for Defamation by Implication

Many of Biro's allegations are based not on a defamatory connotation from statements in

the Article that are alleged to be expressly false, but rather on an alleged defamatory implication

that can be derived from the juxtaposition of certain statements with the omission of other

allegedly material facts.  "'Defamation by implication' is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." *Armstrong*, 85 N.Y.2d 373, 625 N.Y.S.2d 477, 649 N.E.2d at 829.  A defamatory implication may be based on "a combination of individual statements which in themselves may not be defamatory," but which "might lead the reader to draw an inference that is damaging to the plaintiff."  *Herbert v. Lando*, 781 F.2d 298, 307 (2d Cir. 1986).

Although some jurisdictions refuse to recognize a claim for a defamatory implication where the statements giving rise to the implication are all true,[9] New York courts have acknowledged the possibility that there may be a claim based on a defamatory implication.  The Second Circuit, in dicta, has suggested the following example of a set of statements that could be held to be defamatory by implication:

> If, for example, a newspaper account of a rash of neighborhood thefts also reported that a public figure had recently moved into the neighborhood, purchased tools commonly used in burglaries, and had been seen near a number of homes where burglaries had occurred, a reader would be led to believe that the individual described had committed the crimes. Such a deductive inference might well be actionable if there is proof the article was published with actual malice. While each individual statement alone might be literally accurate, in the aggregate they give rise to a false and defamatory inference.

*Id.* at 307 n.4 (citations omitted).

---

[9] These courts are particularly hesitant to recognize such claims where the plaintiff is a public figure and the challenged statement is on a matter of public concern. *See Diesen v. Hessburg*, 455 N.W.2d 446, 450-51 (Minn. 1990) (expressing agreement with the "[o]ther jurisdictions [that] have . . . specifically declined to allow a public official to prove falsity by implication where the challenged statements are true"); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1432 (8th Cir. 1989) ("We do not recognize defamation by implication."); *Strada v. Connecticut Newspapers, Inc.*, 477 A.2d 1005, 1010, 193 Conn. 313 (Conn. 1984) (holding that in absence of undisclosed "additional material facts which, if reported, would have changed the tone of the article," "first amendment considerations dictate that an article concerning a public figure composed of true or substantially true statements is not defamatory regardless of the tone or innuendo evident"); *Schaeffer v. Lynch*, 406 So.2d 185 (La. 1981) (holding that "truthful statements which carry a defamatory implication can be actionable," but "only . . . in the case of private citizens and private affairs"; "Where public officers and public affairs are concerned, there can be no libel by innuendo.").

1.      **Applicable Law**

a.      **Author Must Adopt Implication**

Neither the New York Court of Appeals nor the Second Circuit has established the

standard to be applied on a motion to dismiss a defamatory implication claim.  *See Levin*, 119

F.3d at 196 ("We neither consider nor decide the question of what is the proper standard to be

applied to a motion to dismiss a claim of 'defamation by implication.'"); *Armstrong,* 85 N.Y.2d

at 381-82, 625 N.Y.S.2d at 481-82, 649 N.E.2d at 829-30 ("The choice of an appropriate test for

claims of defamation by implication must therefore await another day.").

Several other courts of appeals have held that in order to state a claim for a defamatory

implication, the "defamatory implication must be present in the plain and natural meaning of the

words used," and "[t]he language must not only be reasonably read to impart the false innuendo,

but it must also affirmatively suggest that the author intends or endorses the inference."  *Chapin*

*v. Knight-Ridder, Inc*., 993 F.2d 1087, 1092-93 (4th Cir. 1993) (citing *White v. Fraternal Order*

*of Police,* 909 F.2d 512, 520 (D.C. Cir. 1990) ("[I]f a communication, viewed in its entire

context, merely conveys materially true facts from which a defamatory inference can reasonably

be drawn, the libel is not established.  But if the communication, by the particular manner or

language in which the true facts are conveyed, supplies additional, affirmative evidence

suggesting that the defendant *intends* or *endorses* the defamatory inference, the communication

will be deemed capable of bearing that [defamatory] meaning.").

These decisions also express skepticism of a claim for defamation based on the omission

of facts that may have cast the plaintiff in a different, more positive light, but would not

otherwise render the expressed statements untrue.   In *Janklow v. Newsweek*, 759 F.2d 644 (8th

Cir. 1985), the Eighth Circuit held that an article about a 14-year old rape allegation against the

plaintiff was not actionable even though the article omitted the facts that (1) the plaintiff had

passed a lie detector test; (2) the alleged victim had been declared "untestable" because of her

emotional display during her polygraph exam; (3) a medical examination showed no signs of

rape; and (4) numerous federal authorities had called the rape allegations unfounded. *Id.* at 647-

48. The court stated:

> We note that the law does not recognize libel by omission as a tort. Libel, by
> definition, consists of the publication of a false and unprivileged fact. Thus,
> liability may be imposed in a libel case only for an assertion or implication of fact
> that is false and unprivileged, and not for mere omission of a relevant fact. For
> this reason, Newsweek could not be liable solely for its omissions, without regard
> to whether a material assertion was thereby made untrue.

*Id.* at 648.

The court also refused to find liability based on the fact that "the article could be read to

imply that [the plaintiff] was actually guilty of the alleged rape." *Id.* at 649. "Because the

publication of a materially true statement is constitutional protected, and because the article in

question cannot be read to imply that Newsweek espoused the validity of the rape allegation,"

there could be no liability for defamation by implication. *Id.* (internal citations omitted). The *en*

*banc* court affirmed the decision, explaining:

> Courts must be slow to intrude into the area of editorial judgment, not only with
> respect to choices of words, but also with respect to inclusions in or omissions
> from news stories. Accounts of past events are always selective, and under the
> First Amendment the decision of what to select must almost always be left to
> writers and editors. It is not the business of government.

*Janklow v. Newsweek*, 788 F.2d 1300, 1306 (8th Cir. 1986).

New York courts have cited this line of cases in requiring that for claims of defamation

"not based on the factual statements expressly contained in the article, but rather based on the

impressions and implications of the concededly accurate facts," a plaintiff must show that the

language "affirmatively suggest[s] that the author intends or endorses" the defamatory

inference. *Rappaport v. VV Pub. Corp.*, 163 Misc. 2d 1, 7-8, 618 N.Y.S.2d 746 (N.Y. Sup. Ct.

1994) (quoting *Chapin*, 993 F.2d at 1092-93, and noting "significant obstacles" to maintaining

defamatory implication claims), *aff'd*, 223 A.D.2d 515, 637 N.Y.S.2d 109 (1st Dep't 1996).

Courts in this District have also held that a plaintiff alleging defamation by implication must

"show that Defendants affirmatively intended such implication." *Vinas v. Chubb Corp.*, 499 F.

Supp. 2d 427, 437 (S.D.N.Y. 2007); *see also Chaiken v. VV Publishing Corp.*, 907 F. Supp. 689,

698 (S.D.N.Y. 1995) (citing *Chapin*, 993 F.2d at 1093).

New York courts have also been hesitant to find defamation based on the omission of

facts, unless the omitted facts would materially change the meaning of the statements that are

expressed. The Appellate Division has held that

> [t]o hold that a possible omission . . . by a reporter may be deemed defamatory
> would place upon the press the onerous and unreasonable burden of having to
> ascertain, whenever a news story is published, if something might conceivably
> have been left out which could be subject to misconception. . . . Whether or not a
> particular article constitutes unbalanced reporting is essentially a matter involving
> editorial judgment and is not actionable.

*Sprecher v. Dow Jones & Co., Inc.*, 450 N.Y.S.2d 330, 88 A.D.2d 550, 551 (1st Dep't 1982),

*aff'd*, 58 N.Y.2d 862, 447 N.E.2d 75 (1983). Thus, the "omission of relatively minor details in

an otherwise basically accurate account is not actionable." *Id.* at 551-52 (quoting *Rinaldi v.*

*Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, 1308

(1977)); *see also Krepps*, 588 F. Supp. 2d at 483-84 ("[W]here a plaintiff fails to identify any

misleading omissions or factual suggestions, dismissal is appropriate.") (citing *Oluwo v. Hallum,*

16 Misc.3d 1139(A), 851 N.Y.S.2d 59 (Table), 2007 WL 2701286, at *3 (N.Y. Sup. Ct. 2007).

*Cf. Church of Scientology Int'l v. Behar*, 238 F.3d 168, 175 (2d Cir. 2001) (holding, in context of

determination of whether plaintiff had shown malice, that "minor omission" in investigative

story would not support "inference of purposeful avoidance of the truth" where omissions were

"insignificant when viewed against the backdrop of [the] investigation as a whole").

In light of these authorities, the Court joins the other courts applying New York law and

adopts the Fourth Circuit's approach to defamatory implication claims in *Chapin*, 993 F.2d at

1092-93. Thus, where a plaintiff asserts a defamation claim based not on any alleged falsity of

the statements themselves, but on an alleged defamatory implication that could be derived from

the unchallenged facts, the Court will require an "especially rigorous showing" that (1) the

language may be reasonably read to impart the false innuendo, and (2) the author intends or

endorses the inference. *Id.* at 1093. The alleged innuendo "may not enlarge upon the meaning

of words so as to convey a meaning that is not expressed." *Tracy v. Newsday*, 5 N.Y.2d 134, 155

N.E.2d 853, 855 (1959). To the extent that Biro alleges that the implication arises due to the

omission of certain facts, the Court will look to whether such omission would materially change

the alleged implication or render untrue what is otherwise unchallenged.

Thus, as applied to the hypothetical in *Herbert v. Lando*, a report that a public figure

recently moved into town and was seen purchasing burglary tools may, in the context of a report

about a rash of neighborhood thefts, be actionable because it conveys a defamatory implication

that the public figure was the culprit. 781 F.2d at 307 n.4. However, the report would be

potentially actionable only if it can be shown that the author of the article intended or endorsed

that implication. This will often require an examination of the statements in the context of the

article as a whole. It is possible that the article reported on several unrelated recent events of

local interest. Perhaps the statement about the public figure moving into town appeared toward

the beginning of the article, in a section about recent arrivals to town, and the statement about the

32

rash of thefts appeared in a different section of the article that recounts recent criminal activity in

town.  Although a reader could conceivably infer from the reporting of the two sets of facts that

the public figure was the thief, the article would likely not be actionable, because there is nothing

to suggest that the author endorsed such an inference.  On the other hand, an article that linked

the key statements together, with the obvious (albeit unstated) insinuation that the public figure

committed the crimes, would potentially be actionable.

> **b.      Implications That May Have Been Adopted by Author May Not Be Actionable If They Are Expressions of Opinion**

This case also presents more difficult questions arising from claims for defamation by

implication where it appears that, broadly speaking, the author may have intended or endorsed an

implication, but where the implication is drawn entirely from unchallenged or nonactionable

statements in the article.

A hypothetical may help to illustrate this concept.  Consider an article that describes in

detail the allegations that a man murdered the members of his family, describes the investigation

that substantiated those allegations, and sets forth all of the evidence suggesting that the man is

guilty.  This description could lead a reader to the natural conclusion that the man is guilty of the

crimes, and that the author shares this view.  The article also contains an interview with the man,

and in describing her conversation with the man, the author notes that the man stared at the floor

for much of the interview.  The accused then brings a libel action against the writer of the article,

but does not challenge as false any of the statements concerning the allegations, the

investigation, or the evidence of his guilt.  He also does not allege that the statement that he

stared at the floor during the interview was false.  However, he alleges that the description of his

demeanor during the interview falsely implied that he was guilty of the murder by suggesting

that he felt shame for his actions.  Is there a cause of action for defamation based only on the unstated implications of that statement?

Simply looking to whether the author "intended or endorsed" the inference is limited in its helpfulness.  Although the statement that the man stared at the floor is benign when viewed in isolation, courts do not read defamatory statements in isolation—courts read the statements in the context of the article as a whole.  *See Levin*, 119 F.3d at 195.  It is likely, based on the article as a whole, that the author may believe the man to be guilty, and included the detail about staring at the floor to subtly convey that the man felt some sense of shame.  Nevertheless, could the man maintain an action based on an implication that could be drawn from concededly true facts (that he stared at the floor) where that implication arises only because of the unchallenged statements in the rest of the article (describing in detail the reasons why he is likely guilty)?  The Court concludes that he could not.

As the Fourth Circuit explained in *Chapin*, "because the Constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true."  *Chapin*, 993 F.2d at 1092-93.  Indeed, the New York Court of Appeals has noted that "falsity is a *sine qua non* of a libel claim."  *Brian*, 87 N.Y.2d 46, 637 N.Y.S.2d 347, 660 N.E.2d at 1129.  A statement may significantly harm a plaintiff's reputation, but if it is not alleged to be a false statement of fact, it is not actionable as defamation.

Courts have consistently held that when an author fully sets forth the factual basis for a particular view (and that factual basis is not challenged as false), then the author's conclusion constitutes nonactionable opinion.  *See Chapin*, 993 F.2d at 1093 ("Because the bases for the . . . conclusion are fully disclosed, no reasonable reader would consider the term anything but the

34

opinion of the author drawn from the circumstances related."); *Partington v. Bugliosi*, 56 F.3d

1147, 1156-57 (9th Cir. 1995) ("[W]hen an author outlines the facts available to him, thus

making it clear that the challenged statements represent his own interpretation of those facts and

leaving the reader free to draw his own conclusions, those statements are generally protected by

the First Amendment."); *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 730 (1st

Cir. 1992) (holding that where "all sides of the issue, as well as the rationale for [the author's]

view, were exposed, the assertion of deceit [contained in the article] could be understood only as

[the author's] personal conclusion about the information presented, not as a statement of fact").

Indeed, the New York Court of Appeals has explained that

> even when uttered or published in a . . . serious tone, accusations
> of criminality could be regarded as mere hypothesis and therefore
> not actionable if the facts on which they are based are fully and
> accurately set forth and it is clear to the reasonable reader or
> listener that the accusation is merely a personal surmise built upon
> those facts.

*Gross*, 82 N.Y.2d 146, 603 N.Y.S.2d 813, 623 N.E.2d at 1169.

  If the Constitution protects an author's right to draw an explicit conclusion from fully

disclosed facts, then an unstated inference that may arise in a reader's mind after reading such

facts is also protected as an implicit expression of the author's opinion.  Thus, even if a plaintiff

can establish that a set of statements meets the *Chapin* test (in that the statements can be

reasonably read to impart a defamatory innuendo, and the author intended or endorsed that

inference), if the plaintiff does not actually challenge the factual bases giving rise to that

inference, and that inference would not reasonably arise from the challenged statements alone,

there can be no action for the defamatory implication.  The implication is simply reflective of the

author's opinion based on the facts set forth.   As noted above, "where the plaintiff only asserts

that the opinions are false, and does not challenge the veracity of the underlying facts, the plaintiff may not sustain a libel action." *Jewell*, 23 F. Supp. 2d at 377.[10]

As applied to our hypothetical, the plaintiff would not have a viable cause of action. He does not allege that the challenged statement (that he stared at the floor) is false; he alleges only that it conveys a defamatory implication. But that defamatory implication arises only because of the facts set forth in the article *that he does not allege to be false*. Thus, even if the inference is a reasonable one, it is simply the implicit opinion of the author based on the unchallenged facts, fully set forth in the rest of the article.

### 2.   Application to Facts

#### a.   Alleged Implications That Defendants Do Not Intend or Endorse

Several of Biro's claims that are based upon an alleged defamatory implication must be dismissed because the language cannot reasonably be read to impart the false implication, let

---

[10] The Court is also guided by the rationales underlying two other doctrines that apply in the defamation context, although neither is directly applicable to this motion: the incremental harm doctrine and the subsidiary meaning doctrine. Under the incremental harm doctrine, "when unchallenged or non-actionable parts of a publication are damaging, an additional statement, even if maliciously false, might be non-actionable because it causes no appreciable additional harm." *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 176 (2d Cir. 2001). Under the subsidiary meaning doctrine, "where a maliciously false statement implies the same ultimate conclusion as that of the remainder of the publication, which has been published without actual malice, a plaintiff cannot 'base his defamation action solely on inaccuracies contained within statements subsidiary to these larger views.'" *Church of Scientology Int'l v. Time Warner, Inc.*, 932 F. Supp. 589, 594 (S.D.N.Y. 1991) (quoting *Herbert*, 781 F.2d at 311). These defenses typically arise on a motion for summary judgment, after there has been evidence to demonstrate the presence or absence of actual malice and the degree of harm caused by the different statements. *See Church of Scientology v. Time Warner*, 932 F. Supp. at 594 (declining to apply incremental harm defense where "the parties ha[d] not yet conducted discovery on the issue of damages"). *But see id.* at 595 (suggesting that the subsidiary meaning defense may be applicable even on a motion to dismiss: "This determination need not be based on statements proven, or conceded, to be true, but may be based on statements that are either unchallenged, or nonactionable." (internal citations omitted)). Because there has been no evidence on malice or the degree of harm caused by the allegedly defamatory statements, these doctrines do not apply here. Nevertheless, they provide some guidance to the Court's approach to defamation claims where the true defamatory sting is caused by statements that are not challenged in the lawsuit.

alone that Defendants intended or endorsed the alleged defamatory inference.  These passages
are not actionable because the "levels of attenuation" within the purported implication "cast
doubt on the 'reasonable' inferences" that Biro argues should be drawn from the statements.
*Vinas*, 499 F. Supp. 2d 427 at 436.

Biro alleges that the initial description of him in the Article "makes [P]laintiff appear to
be sinister," and the "physical description is pointlessly but intentionally demeaning."  (Comp. ¶
62.)  In particular, the Article describes Biro as "in his mid-fifties" with a "fleshy pink face, and
a gourmand's stomach," a description that is not, in and of itself, susceptible of a defamatory
meaning.  The Article also notes that "he wore black slacks, a black turtleneck, and black
shoes—his habitual raven-like outfit."  (Article at 6.)  The Complaint alleges that, "[i]n fact,
[P]laintiff often wears black while working, in order to avoid back-reflections during
photography sessions.  When using ultraviolet techniques, white or bright colors interfere with
the process, which requires total darkness."  (Comp. ¶ 61.)

Nothing in this description reasonably suggests the "sinister" connotation that Biro
ascribes to it.  The term "raven-like," when used to describe an all-black outfit (whatever the
reason that the outfit is worn) is a neutral, descriptive term, and is not reasonably susceptible of a
defamatory connotation.  Use of the term, at most, conveys the author's impression based on the
fully disclosed fact that the Biro was, in fact, wearing all-black.  (Indeed, describing an all-black
outfit as "raven-like" is artistic metaphor, not a statement that can be proven true or false.)  In
any event, there is nothing to suggest that Grann intended or endorsed the "strained" reading that
Biro gives the passage to find the defamatory implication.  *Tracy*, 5 N.Y.2d 134, 155 N.E.2d at
855.  Biro "adds an entirely new and independent thought that finds no support in the article."
*Id.*

Similarly, Biro's allegation that the Article "falsely suggests that [P]laintiff drinks to excess," is not sustainable. (Comp. ¶ 65.) The Article states, "[t]hough it was still early in the day, Biro reached into a long wooden rack filled with wine bottles and removed one. After examining the label, he poured himself some and offered me a glass. 'Every drop is precious,' he said, before finishing his glass and refilling it." (Article at 6.) Biro alleges that "[i]n fact, there is no 'long wooden rack' and it was lunchtime, not 'early in the day.'" (Comp. ¶ 64.) The fully disclosed—and unchallenged—fact that Biro offered and had a glass of wine "early in the day" inoculates these statements from a defamation claim. The assertion that "early in the day" is a meaningfully inaccurate characterization of "lunchtime" is meritless on its face. Moreover, to the extent that Biro is alleging that these are false statements of fact, they are not, in themselves, susceptible of a defamatory meaning. And, again, only with a "strained" reading could an ordinary reader make the leap from the statements in the Article to the allegedly false implication that Biro "drinks to excess."

Finally, Biro cannot sustain a claim based on the reference to the "purported Turner painting that was Peter Paul Biro's first fingerprint authentication case." (Article at 27.) Biro alleges that the statement is "false and defamatory, in that it implies that the painting is only purportedly authentic, that Plaintiff was the only person who claimed it to be authentic, and that it is not considered a genuine Turner." (Comp. ¶ 134.) The Complaint further alleges that, "[i]n fact, the fingerprints were not matched by [P]laintiff, but confirmed by a top British fingerprint expert named John Manners. The painting was authenticated by David Hill, a well-known Turner scholar, who to this day stands by his opinion. The scientific work was done by Dr. Nicholas Eastaugh and a specialist from the Tate Gallery in London." (Comp. ¶ 135.)

Biro's allegations about the authentication process may be true (and on a motion to dismiss, the Court presumes that they are), but that has nothing to do with whether the use of the term "purported" in this context carries the defamatory implication ascribed to it by Biro.  Given Biro's own allegation that "[a]uthentication is by its very nature a complex and multidisciplinary process, and seldom provides definitive answers," (Comp. ¶ 128), describing a painting that was only recently attributed to a painter due to still-controversial techniques as "purported[ly]" by that painter does not carry any defamatory implication at all.  It is not reasonable to infer from the use of the word "purported" that the work is "not . . . genuine" or that Biro was "the only person who claimed it to be authentic."

Even if the inferences that Biro ascribes to each of these passages were reasonable, his claims based on these statements are not actionable because nothing in the language suggests that Defendants intended or endorsed such far-reaching implications.  Thus, these statements are not actionable.

### b.      Statements That Are Implicit Expressions of Opinion

Several of the allegedly defamatory statements present the more difficult issue of an implication that the author arguably did intend or endorse, but which is nonetheless not actionable because it is an implicit expression of the author's opinion.

The clearest examples of this category are the passages that Biro alleges carry the defamatory implication that he forged fingerprints on the works of art that he authenticated on the basis of the presence of those fingerprints.  A central purpose of the Article is undoubtedly to raise questions about the reliability of Biro's work, and about whether the fingerprints he has claimed to find on works of art are genuine.  Toward the end of the Article, Grann quotes several individuals with extensive experience in fingerprint examination who openly state that the

fingerprints on certain works of art that Biro has authenticated are suspect.  He concludes by quoting the assessment of one expert that the fingerprints "screamed forgery."  (Article at 25.)

Biro does not actually allege that *any* of these statements is a false or defamatory statement of fact.  Nor does he allege that any of these particular statements conveys a false or defamatory implication.  In fact, the Complaint does not mention these passages at all, although they are arguably some of the most damning statements in the Article.  However, Biro does highlight certain *other* passages that, he alleges, convey the false implication that Biro has forged fingerprints.  In order to sustain an action based on those defamatory implications, he must be able to show that the statements he does challenge reasonably convey a false and defamatory implication that the author intended or endorsed.  But if the implication arises from unchallenged facts and not from the words complained of, then the inference would be protected as expressive of the author's opinion (based on the disclosed and unchallenged facts).

For example, Biro starts by challenging the headline itself:  "The Mark of a Masterpiece: *The man who keeps finding famous fingerprints on uncelebrated works of art.*"  Biro alleges that, in the context of the entire article, "such an accusation may reasonably be construed as accusing plaintiff of fraudulent conduct and incompetence in his profession, by finding fingerprints where they do not exist."  (Comp. ¶ 39.)  In light of the facts set forth in the Article, it is reasonable to assume that Defendants did intend to subtly suggest at least ambiguity as to the source of the fingerprints that Biro "keeps finding."  Nevertheless, the Court concludes that the headline is not actionable.

Plaintiff is correct that courts have found headlines to be defamatory in the context of an article.  In *Cianci v. New Times Publishing Co.*, 639 F.2d 54, the Second Circuit held that the headline could be actionable in an article about allegations of a rape and subsequent cover-up

40

against the then-mayor of Providence, Rhode Island, Vincent "Buddy" Cianci, Jr.  The headline, "Buddy We Hardly Knew Ya" was held to carry a defamatory connotation.  The court held that "[a] jury, considering this in light of the article as a whole, could surely conclude that New Times was saying that Mayor Cianci, instead of being the man of character he represented himself to be, was in fact a rapist and an obstructor of justice[,] not simply a person who had been accused of being such."  *Id.*

The headline here is not susceptible on its own of the same defamatory connotation as the headline in *Cianci*.  The idiom used in the headline in that case affirmatively suggested at a minimum that Cianci was different (in a negative way) from the man people thought he was, even if the reader did not read the rest of the article.  Here, although a reader could conclude from the Article that not all of the fingerprints that Biro has found on works of art are genuine, nothing in the language of the headline alone reasonably suggests that conclusion.  The mere statement that Biro "keeps finding fingerprints" simply does not suggest anything more than the fact that Biro has repeatedly found fingerprints, which is not itself reasonably susceptible of a defamatory connotation.

Moreover, in *Cianci*, the plaintiff's suit did not challenge only the headline, but also the substantive elements of the article.  *See Cianci*, 639 F.3d at 59 n.7 (noting that Cianci "denied all the pejorative elements of [the accuser's] story[, including descriptions of the] administration of a drugged drink, threats of any kind, taking her to bed, or the conduct of sexual intercourse").  If he had not challenged the central, factual allegations—that he had committed the crimes in question—as false, the court would presumably have been less receptive to an action based only on the headline itself.

41

Here, Biro does not challenge the underlying facts in the article that would even potentially lead a reader to infer that Biro "keeps" finding fingerprints because of "fraudulent conduct or incompetence in his profession." (Comp. ¶ 39.) Since those facts are fully set forth in the Article, and Biro does not allege that those facts are false, any inference that may be drawn from the title in conjunction with those facts is protected as an implicit expression of Defendants' opinion. Thus, the headline is not actionable.

Similarly, Biro cannot maintain an action based on the Article's description of Biro's demeanor when Grann confronted him with the accusations of forgery: "When I asked Biro about the allegedly forged fingerprints on the Parkers' painting, he peered intently at his glass of wine. I suddenly noticed how blue his eyes were. Calm again, he denied that he had ever forged a fingerprint." (Comp. ¶ 129.) Biro alleges that this statement is "false and defamatory, in that it implies that plaintiff had in fact forged fingerprints, and that his denial was a lie." (Comp. ¶ 130.)

Again, nothing in the language of the cited passage reasonably conveys this defamatory implication. Based on the evidence from the fingerprint experts suggesting that the fingerprints were forgeries, it is entirely possible—perhaps even likely—that Grann did not believe Biro's denial. But nothing in the passage reasonably leads to that conclusion, and Biro cannot show that Grann intended or endorsed that "strained" reading of the passage. *Tracy*, 5 N.Y.2d 134, 155 N.E.2d at 855. And again, to whatever extent Grann did intend to convey an implication that he did not believe Biro's denials, that would be protected as an implicit expression of his opinion based upon the fully disclosed, unchallenged facts.

For the same reasons, Biro cannot sustain an action based on the following passage:

> Biro later noted that he had spent only a "few hours" in Pollock's studio, in the "presence of staff," making it impossible for him to have made a rubber stamp. But when I asked Helen Harrison, who oversees the studio, about this, she said, "That's not true." Her records show that he visited four times, once with Tod Volpe, and that he was "there for hours." She said that she did not watch over him all that time; indeed, in her absence he had removed, "without authorization," a match from the floor, which he took to Montreal to analyze for possible paint particles.

(Article at 28.)  Biro alleges that these statements are "false and defamatory, in that they imply that Plaintiff was a fraud and that he was a thief."  (Comp. ¶ 137.)  But Biro does not allege that a single *fact* contained in this passage is false.

To the extent that the defamatory "implication" is that Biro removed the match from Pollock's studio without authorization, that fact is explicitly stated in the Article, and Biro does not challenge it as false.  The passage cannot be read to reasonably convey an implication that Biro is a "thief" more generally, beyond the fact that he removed the match without authorization.  (To the extent that such an inference somehow can be drawn from the passage, there is nothing to suggest that Grann intended or endorsed that inference.)  And again, the "implication" that Biro is a fraud does not come from this passage, which suggests at most that he had the *opportunity* to make a rubber stamp of the fingerprint (something Biro does not allege to be false).  The implication comes from the explicit accusation by several experts that the fingerprints were forged—none of which Biro alleges to be false.

Similar logic applies to passages concerning whether Biro's father created some of the works that Biro has contended were painted by more famous painters.  This idea arises first in a passage discussing the Saul Hendler case.  There, Hendler alleged that Biro switched a painting that Hendler had given to Biro to authenticate as a Renoir with a copy of the same painting.  Hendler's wife later confronted Biro's father, and at that time, "[o]ne of Geza's sons, she said,

inadvertently began to 'spill information,' revealing that Geza liked to 'copy a real artist's work.' She added, 'The whole thing suddenly came together:  *He's* the one who does it.  The father did this to our painting." (Article at 18.)  The Article also contains descriptions of Biro's father's career as an art restorer, and of the fact that art restoration requires mimicking the style of the original painter of the restored work.  From these facts, it would be reasonable for a reader to infer the possibility that Biro's father may have been involved with the forgery of paintings through mimicry of the styles of these painters, and it is reasonable to assume that Defendants intended that inference.  However, although Biro alleges that several passages concerning the Hendler case are false and defamatory, he does not challenge these portions of the Article or allege that the above-stated facts are false.  Indeed, Biro does not ever allege that the suggestion that his father forged the paintings in question is itself false.

Biro does allege that certain other passages which far more tenuously reference the possibility that Geza Biro forged the paintings carry defamatory implications.  Biro challenges the passage stating:  "I asked whether their father had forged the fake Goodridge Roberts landscape, or the painting given to Saul Hendler, or any other works of art. Laszlo stood up, circling the table, and for the first time Peter Paul became agitated."  (Article at 27.)  Biro alleges that the statement "implies that [P]laintiff's and his brother's understandable emotional reaction to having their father accused of forgery and insulted in [P]laintiff's own home was somehow an admission of guilt, and that the accusation was true."  (Comp. ¶ 132.)  Biro also challenges the following passage:

> I followed Biro into his basement laboratory, where his father's landscape paintings hung. I wondered what had consigned them to this fate—hidden from the public, seen only by an adoring son. They had, I thought, a certain anguished beauty, but they also seemed derivative. Perhaps Biro's father had lacked that divine

44

> spark of originality, or perhaps he had sacrificed it while inhabiting
> the skin of immortal artists.

(Article at 30.)  Biro alleges that these statements are "false and defamatory, in that they imply that plaintiff is concealing his own property because he has something to hide, and that he is protecting his father's wrongdoing out of filial loyalty."  (Comp. ¶ 144.)

The passages in question cannot, on their own, reasonably be read to convey the implications that Biro ascribes to them.  And again, to the extent that a reader could draw these inferences from the passages alone—and the Court doubts that such inferences could reasonably be drawn—there is certainly nothing to suggest that Defendants intended or endorsed those inferences.  The passage describing the Biros' response to the accusation that their father forged paintings did convey an "understandable emotional reaction."   But nothing in the language of the passage carries any implication that this reaction was an admission of guilt.

Similarly, the passage describing Biro's father as "inhabiting the skin of immortal artists" suggests that he may have copied more famous artists' work in his capacity as an art restorer or otherwise, but nothing in the passage suggests that Biro is "concealing his own property because he has something to hide."  (Comp. ¶ 144.)  First, the alleged implication of this passage is directly contradicted by several express statements in the Article that his father's landscape paintings "were displayed throughout the [his] house," (Article at 7), and that Biro's "gallery was filled mostly with Geza's landscape paintings."  (Article at 16.)  And even if the Article did not contain those other statements, nothing about the fact that Biro's father's paintings were "consigned" to Biro's laboratory reasonably suggests an inference that Biro "has something to hide" or "is protecting his father's wrongdoing."[11]

---

[11] On the contrary, the use of the phrase "consigned to this fate" more reasonably appears to suggest a sense of pity for an artist who had aspirations to greatness that were never realized.

In any event, to the extent that the reader may draw an inference that Biro's father was responsible for forging the paintings at issue in the case, and Defendants intended that inference, that would merely reflect the author's opinion based on the fully disclosed, unchallenged facts.

Finally, Biro's claim based on the following passage cannot be sustained:

> By the time that Biro took on "La Bella Principessa," his reputation had become so solid, and the public appetite for forensic solutions had become so strong, that he no longer seems to have worried about watermarking his evidence or presenting a perfect match. Many people, not just experts, can look at a painting and argue over what they see, but few individuals, inside or outside the art world, can evaluate fingerprints. In that sense, Biro's authentications were far less democratic than traditional connoisseurship. Though he told me that he did not want to be "judge and jury," he had positioned himself as a singular authority.

(Article at 21.)  Biro alleges that the statements are "false and defamatory, in that they imply that plaintiff's reputation was unwarranted, and that he was a fraud."  (Comp. ¶ 139.)  Biro also alleges that "the more attention which [P]laintiff's work received, the more careful and meticulous he became"; that "any individual who serves on a jury in a case involving fingerprint evidence can decide whether there is a match, and plaintiff has never claimed to be a singular authority"; and that Biro "did not 'position[] himself," because "[t]he art market is far more complex than defendants would have it.  No dealer or auction house would accept [P]laintiff's (or anyone else's) conclusions as definitive before selling a contested work of art, without other evidence and thorough investigation."  (Comp. ¶¶ 140-42.)

Even presuming Biro's allegations as true, the language in the passage at issue does not reasonably give rise to an inference that "plaintiff's reputation was unwarranted" or that "he was a fraud."  Again, a reader may ultimately draw that conclusion from the Article, but such conclusion would be largely based upon portions of the Article that Biro does not challenge.

46

Biro does not show how the language of the challenged passage suggests that Defendants intended or endorsed such inferences, even in the context of the Article as a whole.  And to the extent that the passage does carry an intentional implication that Biro's status as a "singular authority" is undeserved, that implication would be the nonactionable opinion of the author based on unchallenged facts.

c.   **Implication Claims Where Plaintiff Challenges Underlying Facts as False**

Biro may have viable claims based on two sections of the Article that he claims carry defamatory implications as to which he does challenge some of the underlying facts as false.

In the section in which Grann first begins explaining his doubts about Biro's credibility, he details inconsistencies with respect to Biro's investigation of certain Jackson Pollock paintings, including the Teri Horton painting.  Biro had claimed to have matched a fingerprint on a painting owned by Alex Matter.  Matter, whose parents had been friends with Pollock, had found a cache of paintings in his father's storage space and believed that they may be by Pollock. Biro was sent a photograph of a fingerprint found on one of the pictures and identified several characteristics that matched the fingerprint he had found on the paint can in Pollock's studio. However, scholars expressed doubt that the paintings were by Pollock, and forensic analysis later revealed that several of the works contained pigments that were not patented until after Pollock's death.  The Article states that, when asked about the inconsistencies, Biro "noted that no anachronistic pigments were found on the picture that he had authenticated, and he said that it was possible that Pollock had created only a few of the pictures, or that he had simply touched one of them."  (Article at 15.)  The Article continues:

> His explanation seemed plausible, but I kept being troubled by other details relating to Biro's Pollock investigations.   For

47

instance, it was peculiar that even though there were no
documented cases of acrylic being used in Pollock's pour
paintings, Biro had easily found some on the floor of the Long
Island studio—indeed, in the very first sample he tested.   I
contacted a leading forensic scientist in the art world who teaches
at the F.B.I. Academy, in Quantico, Virginia, and who has done
research in the Pollock studio. The scientist told me that he had
spent hours combing the floor and had not found any acrylic.  He
added that a microchemistry test was not even considered suitable
for identifying acrylic.  As for the gold paint particles that Biro
said he had uncovered on the studio floor and matched to the
pigment in Teri Horton's painting, Helen Harrison, an art historian
who is the director of the Pollock-Krasner House & Study Center,
which oversees Pollock's old studio, told me that she did not know
of Pollock's having used gold in any of his pour paintings.

(Article at 15.)

Biro alleges that this section of the Article, "taken as a whole, is false and defamatory, in
that it implies that Biro planted or fabricated evidence to support his contention that the pictures
were by Jackson Pollock."  (Comp. ¶ 67.)  Biro alleges that he "never stated that any of the
Matter paintings were authentic Pollocks, and has never stated directly that Pollock used gold-
colored paint."  (Comp. ¶ 68.)   The Complaint challenges the notion that a scientist could comb
the entire 400-square foot studio floor and definitively rule out the presence of acrylic paints.
(Comp. ¶ 70.)  The Complaint also alleges that it was, in fact, Dr. Nicholas Eastaugh, not Biro,
who analyzed the paint samples using "FTIR spectroscopy" to detect the presence of acrylate in
the samples from the studio floor.  (Comp. ¶ 71.)  Finally, the Complaint alleges that "acrylic
paints were not only available to Pollock, but he actually did use them, according to the
Smithsonian Archives on American Art."  (Comp. ¶ 72.)

This claim presents a close question.  It would not be reasonable for a reader to infer,
from the challenged passage alone, that Biro "planted or fabricated evidence."  But the

48

implications of the passage—that Biro's findings are not trustworthy, and are highly suspect— are certainly susceptible of a defamatory connotation.

If this defamatory implication arose entirely from unchallenged facts, it would be protected as an expression of the author's opinion.  But that is not the case.  Biro challenges several of the underlying facts that give this section its defamatory sting.  Of course, a false statement that Jackson Pollock never used acrylic paint would not, in itself, be defamatory.  But when that false statement is part of a series of statements (some alleged to be false) that convey a distinct implication, then those statements are not, as a matter of law, protected.  Giving Biro all reasonable inferences, the Court cannot dismiss this claim.

Similarly, the Court cannot dismiss the claim based on the portion of the Article that describes the "Provenance" business venture.  Biro alleges that this section of the Article, "taken as a whole, is false and defamatory, in that it implies that plaintiff was the initiator of a fraudulent investment scheme, and that he planned as part of the scheme to falsely authenticate art works so as to create 'staggering profits,' and that plaintiff 'was cleverly tapping into the public's desire to crack open the art world.'"  (Comp. ¶ 119.)  In support of this allegation, Biro further alleges that, in fact, he "has never taken an interest in any of the works of art he is asked to analyze, but only charges a daily fee plus expenses.  He does not work on contingency or for a percentage if a work is sold, so as to maintain disinterest in the outcome of his investigation."  (Comp. ¶ 123.)  The Complaint further alleges that "Plaintiff has never asked for or received a bonus from any client because of an attribution or opinion regarding authenticity.  Since [P]laintiff's bankruptcy filing, he [has] not received any money from the sale of an artwork wherein he was involved in issues of authenticity.  He is from time to time asked to take on cases

on contingency, but he refuses, asking for no more than his regular professional fee." (Comp. ¶¶ 125-26.)

Unlike several of the claims discussed above, the defamatory implication that Biro alleges does not depend entirely on other, unchallenged statements in the Article. Rather, the challenged passage, on its own, potentially suggests that Biro was going to profit from the sale of art works that he authenticated. It is also reasonable to conclude that Defendants intended this inference to be drawn. For example, the Article states that "Biro was part of an effort to launch a venture named Provenance, which would provide, as he put it, the 'clever strategy' necessary to sell 'orphaned' paintings for tens of millions of dollars." (Article at 20.) Part of the strategy involved purchasing the Teri Horton painting. The Article states: "Although Biro has always publicly maintained that he had no financial stake in Horton's painting, Horton sent an e-mail to the Parkers saying that after the sale of her painting Biro would 'collect' and that it would 'set him for life.'" (*Id.*) The Article also suggests that the prediction that Provenance would authenticate half of the twenty to thirty possible new masterpieces that it would evaluate was unrealistic, citing a forensic expert who works with the F.B.I. who explained that "in the overwhelming majority of cases involving disputed art, the work fails to be authenticated." (Article at 21.)

Taken together, these statements imply that, notwithstanding his assertions to the contrary, Biro was going to profit from the sale of the Horton painting and other paintings that he would authenticate. Biro alleges that this implication is false. The inferences that a reader may reasonably draw from the description of the Provenance plan are not protected as expressions of Defendants' opinion based upon unchallenged facts, because Biro challenges one of the key facts

50

underlying the inference:  that he has ever profited from the sale of a work he has authenticated.

Accordingly, the Court denies the motion to dismiss this claim.

### D.      Fair and True Report of Judicial Proceeding

Biro alleges that several statements describing the past lawsuits against him are false and

defamatory.  Defendants argue that these portions of the Article are protected as fair and true

reports of judicial proceedings.

### 1.      Applicable Law

New York's Civil Rights Law provides:

> A civil action cannot be maintained against any person, firm or corporation, for
> the publication of a fair and true report of any judicial proceeding, legislative
> proceeding or other official proceeding, or for any heading of the report which is
> a fair and true headnote of the statement published.

N.Y. Civ. Rights Law § 74.  As the New York Court of Appeals has explained, "[t]he purpose of

Civil Rights Law § 74 is the protection of reports of judicial proceedings which are made in the

public interest."  *Cholowsky v. Civiletti*, 69 A.D.3d 110, 887 N.Y.S.2d 592, 595 (2d Dep't 2009)

(citation and quotation marks omitted).  The "fair and true report" privilege has been described

as an "absolute privilege," *Fishof v. Abady*, 280 A.D.2d 417, 720 N.Y.S.2d 505 (1st Dep't 2001),

that is "not defeated by the presence of malice or bad faith."  *Fuji Photo Film U.S.A.*, 669 F.

Supp. 2d at 411.

A statement is deemed a "fair and true report" if it is "substantially accurate."

*Karedes*, 423 F.3d at 119 (citation omitted).  "A report is 'substantially accurate' if, despite

minor inaccuracies, it does not produce a different effect on a reader than would a report

containing the precise truth."  *Id.* (citation omitted).  As the New York Court of Appeals has

explained, "[a] fair and true report admits of some liberality; the exact words of every proceeding

need not be given if the substance be substantially stated." *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 399 N.E.2d 1185, 1187 (1979). However, "Section 74 does not afford protection if the specific statements at issue, considered in their context, 'suggest[ ] more serious conduct than that actually suggested in the official proceeding.'" *Calvin Klein Trademark Trust v. Wachner*, 129 F. Supp. 2d 248, 253 (S.D.N.Y. 2001) (quoting *Daniel Goldreyer, Ltd. v. Van de Wetering*, 217 A.D.2d 434, 630 N.Y.S.2d 18, 22 (1st Dep't 1995)).

"Comments that essentially summarize or restate the allegations of a pleading filed in an action are the type of statements that fall within section 74's privilege." *Lacher v. Engel*, 33 A.D.3d 10, 817 N.Y.S.2d 37, 43 (1st Dep't 2006) (citing *Ford v. Levinson*, 90 A.D.2d 464, 454 N.Y.S.2d 846 (1st Dep't 1982)); *see also Fuji Photo Film U.S.A.*, 669 F. Supp. 2d at 414-15 (dismissing defamation counterclaim where statement "[did] not imply that [counterclaimant] engaged in any misconduct other than that alleged in the Complaint" in another action). The privilege also "extends to the release of background material with regard to the case, so long as the statement is a substantially accurate description of the allegation," including "where the description of the case is offered by a party's legal counsel." *Fishof*, 280 A.D.2d 417, 720 N.Y.S.2d at 505 (internal citations omitted). Indeed, New York courts have held that "once it is established that the publication is reporting on a judicial proceeding, how a reporter gathers his information concerning a judicial proceeding is immaterial provided his [or her] story is a fair and substantially accurate portrayal of the events in question." *Cholowski*, 69 A.D.3d 110, 887 N.Y.S.2d at 596. Thus, the fact that a defendant "derive[s] information about the judicial proceedings from secondary sources [does] not mean that Civil Rights Law § 74 [is]

52

inapplicable." *Id.*  There is also "no requirement that the publication report the plaintiff's side of the controversy." *Id.*

## 2.    Application of Law to Facts

Several of the allegedly defamatory statements concern past lawsuits involving Biro. Defendants submit court records from these lawsuits—all of which took place in Canada—to demonstrate that the statements are a "fair and true report" of those cases, asking the Court to take judicial notice of these proceedings.  As previously noted, the Court may take judicial notice of these records only "to establish the fact of such litigation and related filings," but not "for the truth of the matter asserted" in the documents.  *Global Network*, 458 F.3d at 157.  Thus, the Court will consider the allegations and statements in the court records in order to determine whether the Article provides a "fair and true" report of those allegations and statements, but will not consider the documents to be evidence of any of the facts stated therein.   *See Fuji Photo Film U.S.A.*, 669 F. Supp. 2d at 414-15 (taking judicial notice of complaint filed in related matter to assess whether the allegedly defamatory statement was substantially truthful in summarizing the allegations of that complaint).[12]

---

[12] Biro argues that the Court may not take judicial notice of these records because they have not been sufficiently authenticated.  The Court disagrees.  Defendants submitted declarations from David Grann attesting to the fact that he obtained the documents submitted from the Palais de Justice in Montreal, directly from an attorney who worked on the cases, and from a database of court records maintained by the Court of Quebec, Civil Division.  (Declaration of David Grann, Dkt. No. 22 ("Grann. Dec.") ¶¶ 2-4; Rebuttal Declaration of David Grann, Dkt. No. 31 ("Grann Rebuttal Dec.")  ¶¶ 2.)  This, combined with the documents' appearance, is "sufficient to support a finding that the item[s are] what the proponent claims [they are]."  Fed. R. Evid. 901(a).  Biro does not raise any argument or point to any evidence casting doubt on the authenticity of these records.

Biro is also incorrect in contending that Grann's declarations may not be considered on a motion to dismiss.  Although a court may not consider substantive affidavits or other extrinsic evidence on a motion to dismiss under Rule 12(b)(6), courts routinely accept declarations submitted solely to authenticate documents that the court may consider on such a motion.  *See, e.g., Amy Axelrod, Inc. v. Simon & Schuster, Inc.*, No. 07 Civ. 891, 2007 WL 2412257, at *3 n.4 (S.D.N.Y. Aug. 27, 2007) (accepting affidavit submitted to authenticate agreements that were integral to the complaint).

Several of Biro's claims amount to little more than an attempt to relitigate the cases that the Article discusses.  In some cases, Biro does not allege that the lawsuits did not exist, or that the Article reports them inaccurately—he argues that the plaintiffs in the original suits were incorrect in their allegations.  This is not sufficient to defeat the fair and true report privilege.

The Article describes how Grann went to the Palais de Justice in downtown Montreal and found records showing that

> [d]uring the eighties and early nineties, more than a dozen civil lawsuits had been filed against Peter Paul Biro, his father, or their art businesses. Many of them stemmed from unpaid creditors. An owner of a picture-frame company alleged that the Biros had issued checks that bounced and had operated "under the cover" of defunct companies "with the clear aim of confusing their creditors." (The matter was settled out of court.)

(Article at 16.)  Biro alleges that the statements are "false and defamatory," because there were no "defunct companies" and "plaintiff did not operate 'under the cover' of such companies 'with the clear aim of confusing their creditors.'"  (Comp. ¶¶ 75-76.)

The statement in the Article is a nearly direct quote from an affidavit filed by Bernard Desroches in *Encadrements Marcel Inc. v. 112321 Canada Inc. et Peter Paul Biro*.  (Grann Dec. Ex. E, ¶ 11 (as translated in the attached certified translation, "[t]he defendants, acting either personally or under cover of the corporate names dissolved in an obvious effort to confuse their creditors and escape their obligations to those creditors").)  Although the quote is not verbatim, it does not produce a different effect on the mind of a reader—and certainly does not suggest more serious conduct—than the exact words of the provided translation.  The fact that Biro disagrees with the allegations contained in the affidavit does not affect whether the statement is a fair and

true report of the allegations it paraphrases. Thus, the Court dismisses the claim for defamation based on this statement.[13]

Similar reasoning applies to Biro's claims based on the Article's descriptions of the case involving Serge Joyal. The Complaint alleges that the description of the Joyal case is false and defamatory "in that it implies that plaintiff concealed a theft, or was a thief himself, and describes him as a liar." (Comp. ¶ 102.) But the Article makes clear that it is describing one of the cases containing "allegations that art works had vanished under mysterious circumstances while in the care of Peter Paul." (Article at 19.) The narrative provided by the Article closely matches the allegations contained in the plaintiff's declaration in the Joyal case. (*See* Grann Dec. Ex. A.) Biro also alleges that "[n]o wrongdoing was ever attributed to plaintiff in the matter." (Comp. ¶ 107.) But the Article does not attribute any "wrongdoing" to Biro; it simply reports that the court awarded Joyal seven thousand dollars, plus interest. This result is confirmed by the judgment issued in the case, which Defendants submitted in support of their motion. (*See* Grann Dec. Ex. D.) Because the description of the Joyal case is a fair and true report of a judicial proceeding, Defendants' statements are privileged under § 74.

Biro also alleges that the Article's characterization of the Joyal case as one of "two instances [where] there were allegations that art works had vanished under mysterious circumstances while in the care of Peter Paul" is false and defamatory. Biro alleges that "[i]n

---

[13] Biro also argues in his Memorandum of Law in Opposition to the Motion to Dismiss (("Ptf. Mem.") Dkt. No. 28) that because Defendants only submitted records from five lawsuits with their initial motion, the statement that there were "[m]ore than a dozen civil lawsuits" is inaccurate. (Ptf. Mem. at 27.) But the Complaint never alleges that the statement that there were more than a dozen civil lawsuits filed is false or defamatory. In any event, Defendants submitted a rebuttal declaration containing the records from an additional dozen lawsuits, as well as a statement of affairs from Biro's bankruptcy showing several unpaid creditors. In light of the "liberality" allowed with the fair and true report defense, the Court holds that the statement in the Article is a fair and true report of the proceedings involving Biro.

fact, [the Joyal case] was the one and only instance of the loss of an art work while in [P]laintiff's care and custody, and it was the result of a theft, not of any lack of due care or wrongdoing on the [P]laintiff's part."  (Comp. ¶ 109.)  Defendants submit an affidavit filed by the plaintiff in the case *Desmarteau v. Biro* in Quebec Superior Court.  (Grann Dec. Ex. B.)  This affidavit describes how the plaintiff in that case, Charles Desmarteau, entrusted a painting to Plaintiff's care, first for restoration, and then to sell the painting for no less than $90,000. Initially, Biro reported to Desmarteau that he had sold the painting for $20,000 (without Desmarteau's authorization), but after extensive back-and-forth communication between the parties, Biro claimed to have recovered the painting.  Subsequently, Desmarteau alleges, Biro refused repeatedly to return the painting to him.

Although the Desmarteau case does not involve a work of art disappearing in precisely the same manner as in the Joyal case, the Court concludes that the Article's characterization of the case as one in which "art works had vanished under mysterious circumstances" while in Biro's care is a fair and true report of the allegations in that case.

In one of his claims, Biro quibbles with the characterization of the judicial proceedings in the Wise brothers case.  That case involved two landscape paintings purportedly by Goodridge Roberts that Biro and his brother sold to the Wises.  Two years after the purchase, Roberts's widow saw one of the paintings in a gallery and declared it to be fake.  After Biro refused to reimburse the Wises, they sued.  As the Article states,

> Throughout the trial, the Biros and their attorneys maintained that the two paintings sold to the Wises were authentic, but to make their case they presented an art expert who was not a specialist on Roberts, or even on Canadian art. On September 3, 1986, the court found in favor of the Wises, and ordered Peter Paul and Geza Biro to pay them the seventeen thousand dollars they had spent on the pictures, as well as interest.

56

(Article at 18.)

Biro alleges that "the trial court ruled only that the contract should be cancelled, and made no finding regarding the authenticity of the paintings one way or the other"; that Biro's expert witness, "a Professor Warren Sanderson, testified that although he believed the paintings to be authentic, his opinion was tentative and conditional.[] He recommended technical and scientific examinations of the paintings, which were not done"; and that "[b]ecause of this conditional opinion, the trial court said that it could not reach a conclusion regarding authenticity." (Comp. ¶¶ 79-82.) These allegations are contradicted by the court's opinion in that case, submitted by Defendants, and of which the Court takes judicial notice. (*See* Grann Dec. Ex. F.) The court in the case, in fact, concluded that because Dr. Sanderson's opinion was "conditional upon other more technical analyses," which were not conducted, "neither Dr. Sanderson's appraisal nor the entirety of his testimony is conclusive." (*Id.* at 24.) The court also did, in fact, conclude that plaintiffs had carried their burden to show that the painting "was not an authentic work" by Roberts. (*Id.* at 24-25.) Thus, notwithstanding Biro's allegations, the Article's characterization of the proceedings constitutes a fair and true report.

The Article does not at any point state that Biro "knowingly sold fake art, and concealed that fact until the trial court ruled against them." It simply reports the Wises' allegations and quotes from the deposition of Biro and the trial. To the extent that the narrative contains any implication that Biro did, in fact, engage in misconduct, the implication arises from portions that Biro does not challenge. For example, the Article contains an extensive description of Biro's evasiveness in answering how and where he obtained the Roberts painting. The Article also details the colloquy about the fact that Biro appeared to be working on restoring a painting with a

frame containing a name plate that read "John Constable," but which Biro conceded was not an actual painting by Constable. These details, none of which Biro alleges to be false, potentially convey the implication that Biro's behavior during the Wise case was suspicious. For the reasons discussed above, in Section III.C, the extent to which a reader may draw any inference about Biro's culpability in the Wise case is a reflection of the author's opinion based on fully disclosed facts.

On the other hand, Biro's claims regarding the Article's description of the lawsuit with Saul Hendler over the "Renoir" painting that may or may not have been switched with a copy may not be dismissed at this stage. Biro alleges that these passages are false and defamatory in that they imply that he "knowingly sold fake art, a criminal offense"; that Biro "switched one painting for another, or fraudulently sold a painting determined by experts by Renoir as if it were authentic, for a substantial sum of money"; and "that [P]laintiff defrauded the Hendlers." (Comp. ¶¶ 84, 92, 95.) Biro alleges that the Article omits several facts that it does not, in fact, omit.[14] But Biro also alleges that the Article contains several inaccuracies, including that he "did not approach Hendler; it was the other way around"; that Biro and Hendler had an agreement "to jointly acquire a seated nude signed 'Renoir' and explore its potential"; and that when confronted with the fact that a Renoir expert had determined that the painting was fake, "Hendler became belligerent and demanded all of his money back." (Comp. ¶¶ 86-89.) Biro also alleges that "the Hendlers' claim was fully paid," and that "after [P]laintiff purchased the painting back, Marion

---

[14] For example, Biro alleges that "[i]n fact, the painting had undergone the removal of large amounts of aged darkened varnish, and the undoing of prior alterations done to it in a previous restoration. As a result, the restored painting no longer perfectly matched the appearance of its un-restored state." (Comp. ¶ 93.) But the Article quotes Biro's response to the Hendler allegations, including that Biro contended that "the sole difference in the painting was the work which had been performed on the painting by the Defendants in lifting the paint in order to discover the original painting which had appeared on the canvas." (Article at 19.)

Hendler [Saul's wife] also demanded a signed Renoir for free, thrown in as part of the deal."
(Comp. ¶¶ 95-96.)

Defendants argue that the report of this lawsuit is privileged under § 74, but the only
document they submit to show what transpired in the judicial proceedings is an affidavit from
Saul Hendler.  (*See* Grann Dec. Ex. C.)  The Court cannot take judicial notice of the accuracy of
the Article's description of the trial or the court's judgment without any documents of which to
take such judicial notice.  The Article also expressly states that the narrative—which is not
confined to reporting the allegations contained in the affidavit—is based on "court records and
interviews with [Hendler's attorney] and Hendler's wife, Marion."  (Article at 18.)  At this stage
of the case, the Court cannot conclude as a matter of law that this section of the Article
constitutes a fair and true report of a judicial proceeding, and thus, Biro's claim as to the
Article's discussion of the Hendler lawsuit is not dismissed.

> ### E.     Overall Impact of the Article

In sum, most of Biro's claims for defamation based on the express statements contained
in the Article or alleged implications that can be drawn from the Article must be dismissed.
Biro's claims regarding the comments by Elizabeth Lipsz and her attorney, Biro's analysis of the
purported Pollock paintings owned by Teri Horton and Alex Matter, the Provenance venture, and
Saul Hendler's lawsuit are not dismissed.  All other claims for defamation or defamatory
implication are dismissed for failure to state a claim.

Biro also alleges that, "taken as a whole, the Article is a devastating and utterly false
attack on Plaintiff's reputation."  (Comp. at 31.)  However, as the Second Circuit has held, the
"overall impact" of an article "does not in itself constitute a cause of action," because "the
defamatory 'impact' of the publication is the same as the defamatory implication conveyed by

each of the individual statements." *Herbert*, 781 F.2d at 307.  In other words, Biro may not maintain a claim based on the Article "as a whole" beyond the claims for the individual passages that have not been dismissed.

There is little question that a reader may walk away from the Article with a negative impression of Biro, but that impression would be largely the result of statements of fact that Biro does not allege to be false.  There can be no claim for an overall defamatory impact from the reporting of true statements beyond the specific defamatory implications that may arise from those specific statements.

More fundamentally, the Article as a whole does not make express accusations against Biro, or suggest concrete conclusions about whether or not he is a fraud.  Rather, it lays out evidence that may raise questions, and allows the reader to make up his or her own mind.  In that regard it is similar to the article at issue in the *Chapin* case in the Fourth Circuit.  There, the article raised questions about the legitimacy of a charitable organization that sent gift packages to U.S. soldiers stationed abroad.  The court concluded that the article "is a story constructed around questions, not conclusions."  *Chapin*, 993 F.2d at 1098.  The court continued:

> But the mere raising of questions is, without more, insufficient to sustain a defamation suit in these circumstances.  Questions are not necessarily accusations or affronts.  Nor do they necessarily insinuate derogatory answers.  They may simply be, as they are here, expressions of uncertainty.  The . . . article advances alternative answers to the questions it raises, presenting both favorable and unfavorable views, but does not ultimately adopt any particular answer as correct.  From this, a reasonable reader would not be likely to conclude that one answer is true and the other false.  Language of ambiguity and imprecision permeates the article, significantly coloring its tone.

*Id.*

60

This analysis applies to the Article in this case as well.  At the end of the Article, the reader is left genuinely uncertain what to believe.  Although the Article reports many facts tending to suggest that Biro may not be exactly who he says he is, it also contains extensive interviews with Biro himself, includes Biro's responses to many of the accusations reported in the Article, and quotes many third party sources with complimentary things to say about Biro.  If anything, the Article seeks to draw a parallel between the idea that one can never be wholly certain whether a piece of art is truly "authentic" (whether through connoisseurship or science) with the idea that it is difficult to fully know the truth about who a person is.  This type of inquisitive approach falls short of the "hatchet job" that Biro's counsel described at oral argument.  (*See* Transcript, Dkt. No. 68, at 27.)

At the same time, there can be little doubt that even a publication that, on the whole, merely raises questions has the potential to have serious consequences on a plaintiff's reputation.  Thus, where Biro has alleged an actionable defamatory false statement of fact, or false implication, the Court allows the claim to proceed.

## F.      Injurious Falsehood

Biro also brings a claim for injurious falsehood against Defendants.  The tort of injurious falsehood "consists of the knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relations with others, to its detriment."  *Kasada, Inc. v. Access Capital, Inc.*, No. 01 Civ. 8893, 2004 WL 2903776, at *15 (S.D.N.Y. Dec. 14, 2004) (citing *Waste Distillation Tech., Inc. v. Blasland & Bouck Engineers, P.C.*, 136 A.D.2d 633, 523 N.Y.S.2d 875, 877 (2d Dep't 1988)).  The elements of a claim of injurious are: (i) falsity of the alleged statements; (ii) publication to a third person; (iii) malice; and (iv) special damages.  *Id.* at *16 (citation omitted).

Biro cites pre-*New York Times v. Sullivan* case law for the proposition that a statement need not be defamatory in order to create liability for injurious falsehood. But it is now well settled that "[w]hen additional tort claims are aimed at controlling the same speech that is the basis of a libel claim, courts should not entertain the additional claims under less stringent standards." *Anyanwu v. Columbia Broad. Sys., Inc.*, 887 F. Supp. 690, 693-94 (S.D.N.Y. 1995) (citing *Hustler Magazine v. Falwell*, 485 U.S. 46, 57 (1988)). And where "tort claims essentially restate a defamation claim that has been dismissed on a motion to dismiss, the tort claims must also be dismissed." *Chao v. Mount Sinai Hosp.*, No. 10 Civ. 2869, 2010 WL 5222118, at *11 (S.D.N.Y. Dec. 17, 2010) (citing *O'Brien v. Alexander*, 898 F.Supp. 162, 172 (S.D.N.Y. 1995)).

Here, Biro's claim for injurious falsehood is based upon harm to his reputation from the complained-of statements in the Article. Thus, the claim for injurious falsehood based upon the statements as to which the Court has dismissed his defamation claims are also dismissed. Because Biro has alleged special damages as a result of the Article, the claims for injurious falsehood based upon the statements that have not been dismissed are also not dismissed.

**IV. Conclusion**

For the foregoing reasons, the motion of Defendants David Grann and Condé Nast/Advance to dismiss the Second Amended and Supplemental Complaint is GRANTED in part and DENIED in part.

The Clerk of Court is directed to close this motion (Dkt. No. 20).

SO ORDERED.

Dated: New York, New York
      August 9, 2012

_____
J. PAUL OETKEN
United States District Judge

# APPENDIX

Case 1:11-cv-04442-JPO-KNF   Document 20-1   Filed 03/29/11   Page 65 of 95

# THE NEW YORKER

A REPORTER AT LARGE

## THE MARK OF A MASTERPIECE

*The man who keeps finding famous fingerprints on uncelebrated works of art.*

by David Grann

JULY 12, 2010



Peter Paul Biro with an alleged Jackson Pollock. Photograph by Steve Pyke.

Every few weeks, photographs of old paintings arrive at Martin Kemp's eighteenth-century house, outside Oxford, England. Many of the art works are so decayed that their once luminous colors have become washed out, their shiny coats of varnish darkened by grime and riddled with spidery cracks. Kemp scrutinizes each image with a magnifying glass, attempting to determine whether the owners have discovered what they claim to have found: a lost masterpiece by Leonardo da Vinci.

Kemp, a leading scholar of Leonardo, also authenticates works of art—a rare, mysterious, and often bitterly contested skill. His opinions carry the weight of history; they can help a painting become part of the world's cultural heritage and be exhibited in museums for centuries, or cause it to be tossed into the trash. His judgment can also transform a previously worthless object into something worth tens of millions of dollars. (His imprimatur is so valuable that he must guard against con men forging not only a work of art but also his signature.) To maintain independence,

Kemp refuses to accept payment for his services. "As soon as you get entangled with any financial interest or advantage, there is a taint, like a tobacco company paying an expert to say cigarettes are not dangerous," he says.

Kemp, who is in his sixties, is an emeritus professor of art history at Oxford University, and has spent more than four decades immersed in what he calls "the Leonardo business," publishing articles on nearly every aspect of the artist's life. (He even helped a daredevil design a working parachute, from linen and wooden poles, based on a Leonardo drawing.) Like many connoisseurs, Kemp has a formidable visual memory, and can summon into consciousness any of Leonardo's known works. When vetting a painting, he proceeds methodically, analyzing brushstrokes, composition, iconography, and pigments—those elements which may reveal an artist's hidden identity. But he also relies on a more primal force. "The initial thing is just that immediate reaction, as when we're recognizing the face of a friend in a crowd," he explains. "You can go on later and say, 'I recognize her face because the eyebrows are like this, and that is the right color of her hair,' but, in effect, we don't do that. It's the totality of the thing. It feels instantaneous."

Other authenticators have also struggled to explain their evaluative process, their "eye." Thomas Hoving, the former director of the Metropolitan Museum of Art, who died in December, liked to speak of the "ineffable sense of connoisseurship." The art historian Bernard Berenson described his talent as a "sixth sense." "It is very largely a question of accumulated experience upon which your spirit sets unconsciously," he said. "When I see a picture, in most cases, I recognize it at once as being or not being by the master it is ascribed to; the rest is merely a question of how to fish out the evidence that will make the conviction as plain to others as it is to me." Berenson recalled that once, upon seeing a fake, he had felt an immediate discomfort in his stomach.

In March, 2008, Kemp checked his e-mail and saw another submission—a digital image of a drawing on vellum, or fine parchment. Ever since Dan Brown published "The Da Vinci Code," five years earlier, Kemp had been flooded with works, many of them purportedly embedded with cryptic symbols, and, after a lifetime of dismissing forgeries and copies and junk, he was instinctively wary. About thirteen inches long and nine inches wide, the picture showed the profile of a girl, on the cusp of womanhood, with pale skin and glowing brown hair pulled back in a long ponytail. Her left eye, the only one visible in the profile, had a lifelike translucency. Her upper lip pressed secretively against her lower one, and a red bodice peeked out from underneath a green dress. The artist had meticulously rendered the girl's features with pen and colored chalks ("Her face is subtle to an inexpressible degree," Kemp later wrote), and Kemp felt a shiver of recognition. He enlarged the image on his computer screen until it became a mosaic of pixels. He looked closely at the shading—it seemed to have been drawn with a left hand, just as Leonardo

had done.

Kemp tried to contain his excitement. A major work by Leonardo had not been discovered for more than a century. This drawing had no clear provenance—a trail of invoices, catalogue listings, or other records that can allow a work to be traced back to an artist. Rather, the drawing seemed to have come, as Kemp later put it, "from nowhere." In 1998, Kate Ganz, a prominent dealer, had paid a little less than twenty-two thousand dollars for the drawing, at an auction at Christie's. (The auction house did not disclose the previous owner's identity, saying only that the picture had been the "property of a lady.") At the time, the drawing was thought to have been executed in the nineteenth century, by a member of a German school of artists known for imitating Italian Renaissance painters. If the drawing was by Leonardo, it had slipped past some of the world's most respected connoisseurs and collectors—people whose eyes are honed to look for fortune in addition to beauty. As Hugh Chapman, an assistant keeper in the Department of Prints and Drawings at the British Museum, later told the *Times*, "The market is a fairly efficient place. This would be an amazing miss."

In January, 2007, Ganz sold the drawing at her gallery in Manhattan for roughly what she had paid for it. As is common in the art world, the identity of the new owner was a secret. Officially, the purchasing agent was listed as Downey Holdings, a Panamanian business with an address in Jersey, in the Channel Islands, which is popular as a tax haven. The purchase was made under the guidance of Peter Silverman, a Canadian collector who has a reputation in the business (though he dislikes the term) as a "picker"—someone who scours auction houses for undervalued works. Silverman told me that he had bought the drawing for a collector in Switzerland who is one of "the richest men in Europe." Many people in the art world have speculated that Silverman himself is the owner. He denied this, but added, "Even if it were true, I wouldn't say."

Upon seeing the drawing, Silverman thought that it had to be from the Renaissance, and before long, he said, he began to consider "the 'L'-word"— Leonardo. He submitted the drawing to tests that have become a standard part of the authentication process. Many of the drawing's pigments were analyzed, and it was determined that none of them had been invented after Leonardo's time period. A sample of the parchment was sent to the Swiss Federal Institute of Technology, in Zurich, for radiocarbon dating. The parchment was dated between 1440 and 1650, making it conceivable that the drawing was by Leonardo, who was born in 1452 and died in 1519. After receiving these results, Silverman contacted Kemp and sent him the image.

As Kemp well understood, countless artists could have made the drawing in that two-hundred-and-ten-year span. And many modern forgers come out of the field of restoration, where they learn not only how to copy an artist's style but also how to exploit historically appropriate materials: organic pigments, antique wooden frames infested with beetles, canvases blackened by centuries of smoke. In the nineteen-thirties, the notorious Dutch forger Han van Meegeren, who

produced at least nine fake Vermeers, used a canvas from the seventeenth century that still had its original stretcher. (Like many forgers, Van Meegeren insisted that he was "driven by the psychological effect of disappointment in not being acknowledged by my fellow artists and critics.")

Further pitting the powers of perception against the powers of deception are genuinely old forgeries, which would not be exposed by radiocarbon dating and pigment analysis. In Thomas Hoving's 1996 book, "False Impressions: The Hunt for Big-Time Art Fakes," he warned, "It's the Renaissance works of art faked in the sixteenth and seventeenth centuries that are dangerous. These are nearly impossible to detect." Making matters even trickier, many Renaissance artists operated studios where apprentices contributed to their works. Scholars now generally believe that the "Madonna Litta," which hangs in The Hermitage, in St. Petersburg, and had long been attributed to Leonardo, was painted, at least in part, by an assistant named Giovanni Antonio Boltraffio. (The landscape shown through a windowpane is considered too prosaic to have been executed by Leonardo.)

Martin Kemp made a habit of cataloguing the mistakes of Leonardo's imitators and forgers: an inadvertent right-handed brushstroke; a deadened effect from painting robotically; a failure to layer the paint so that light played subtly off it. The drawing of the girl betrayed none of these failings, and Kemp decided to examine the picture himself. After making arrangements with Silverman, he went to Switzerland. (It's a joke of the trade that all valuable art works end up in Switzerland, Kemp said, but "it's actually true.") The drawing was in a warehouse in Zurich, protected by armed guards and invisible alarm sensors, which was known as the Bunker.

Kemp was escorted into a large, pristine room, where the drawing of the girl was carefully removed from a box and placed, face up, on a table. He circled around it for hours, lighting the work from different angles and staring at it so closely that his nose nearly touched the parchment. Not only had the drawing apparently been done with left-handed strokes; the artist, like Leonardo, had relied on the palm of his hand as a way of softening the shading. (An imprint was visible.) The figure's proportions adhered to geometrical precepts detailed in Leonardo's notebooks; for example, he had written, "The space from the chin to the base of the nose . . . is the third part of the face and equal to the length of the nose and to the forehead." And didn't the girl's radiant iris resemble the eyes in Leonardo's portrait "Lady with an Ermine"? Still, Kemp remained cautious. The reputations of scholars have been ruined after their eye was shown to be fallible. Dr. Abraham Bredius, who in the thirties was considered the greatest authority on the Dutch Old Masters, is now remembered best for having branded a van Meegeren forgery a Vermeer masterpiece.

Kemp returned to England, where for the next year he continued to interrogate the drawing. The hair style and the costume of the girl, he concluded, were similar to those worn in the

Case 1:11-cv-04442-JPO-KNF   Document 70-1   Filed 03/29/21 Page 65 of 93

Milanese court of the fourteen-nineties. The parchment had incisions suggesting that it had been removed from a bound codex; during the Renaissance, volumes of verse, compiled on sheets of vellum, were often dedicated to a princess upon her marriage or death. But, if this was the drawing's origin, who could the princess in the drawing be? Sifting through members of the court, Kemp settled on the most likely suspect: Bianca Sforza, the Duke of Milan's illegitimate daughter. In 1496, at the age of thirteen, she was married to Galeazzo Sanseverino, and died of an abdominal illness only four months later. Sanseverino, as Kemp knew, was a patron of Leonardo. Each new piece of evidence appeared to cohere. Kemp named the portrait "La Bella Principessa"—"The Beautiful Princess"—and, as he looked at the drawing, he could no longer suppress the sensation that had seized him when he first saw the portrait. In the fall of 2009, Kemp announced to colleagues and reporters that it was "the real thing": a Leonardo masterpiece.

Other scholars and connoisseurs examined the drawing and agreed with Kemp. They included Nicholas Turner, the former curator of drawings at the Getty Museum, and Alessandro Vezzosi, the director of the Museo Ideale Leonardo da Vinci, outside Florence, who said that he didn't have "any doubt" that it was authentic. At first, there was little dissent. Generally, connoisseurs are reluctant to repudiate a piece publicly, for fear of being sued by the owners for "product disparagement," or even for defamation. The threat of litigation has often made the authentication industry a clandestine realm, with connoisseurs who refuse to communicate in writing and with confidential agreements that bind authenticators to silence.

Nevertheless, some critics spoke up. Among them was Thomas Hoving, who discussed the drawing with me a few weeks before he died, at the age of seventy-eight. A flamboyant and imperious figure, who once wrote that he needed "great works of art for the uplift of my soul," Hoving became an emblem of the modern connoisseur. He considered himself that "rare breed of cat" who could instantly detect a fake. And he told me he was sure that "La Bella Principessa" was too "sweet" to be a Leonardo. "His subjects are tough as nails," he said.

Carmen Bambach, the curator of drawings at the Met, was also unpersuaded. The greatest scholar of an artist is not necessarily considered the greatest connoisseur, and with a diverse oeuvre there can be different authorities for each medium. When it comes to Leonardo's drawings, Bambach's eye is perhaps the most respected. "Not everyone's opinion carries the same weight," she told me. "It's like in medicine, where a heart specialist looks at the heart and another specialist looks at the kidneys." She added, "With Leonardo, you need the niche specialist." Bambach pointed out that there is no other example of Leonardo having drawn on vellum. (Kemp concurred, but noted finding evidence that Leonardo had questioned Jean Perréal, a painter in the French court, about the technique.) Moreover, according to Bambach, there was a more profound problem: after studying an image of the drawing—the same costume, the same features, the same strokes that Kemp examined—she had her own strong intuition. "It does not

*look* like a Leonardo," she said.

When such a schism emerges among the most respected connoisseurs, a painting is often cast into purgatory. But in January, 2009, Kemp turned to a Canadian forensic art expert named Peter Paul Biro, who, during the past several years, has pioneered a radical new approach to authenticating pictures. He does not merely try to detect the artist's invisible hand; he scours a painting for the artist's fingerprints, impressed in the paint or on the canvas. Treating each painting as a crime scene, in which an artist has left behind traces of evidence, Biro has tried to render objective what has historically been subjective. In the process, he has shaken the priesthood of connoisseurship, raising questions about the nature of art, about the commodification of aesthetic beauty, and about the very legitimacy of the art world. Biro's research seems to confirm what many people have long suspected: that the system of authenticating art works can be arbitrary and, at times, even a fraud.

"Come in, come in," Biro said, opening the door to his elegant three-story brick house, in Montreal. Biro, who is in his mid-fifties, has a fleshy pink face and a gourmand's stomach, and he wore black slacks, a black turtleneck, and black shoes—his habitual raven-like outfit. A pair of glasses dangled from a string around his neck, and he had thick sideburns and whitening black hair that stood on end, as if he had been working late. ("For me, this is not a nine-to-five job," he later said. "I wake up in the middle of the night because something occurred to me. It's basically every waking hour.") In his arms, he cradled a miniature schnauzer. "This is Coco," he said, petting the dog to keep it from barking.

He led me past a room with a piano and shelves crowded with art books, and climbed a long wooden staircase that opened into a living room and dining area. Sunlight poured through tall windows and illuminated, on almost every wall, oil paintings of landscapes rendered with jabs of bold color. The house had once been "a wreck," Biro said, but he and his wife, Joanne, an accomplished mezzo-soprano, had spent the past two decades renovating it—tearing up floorboards, knocking down interior walls, and installing ceramic tiles. With a work of art, Biro liked to say, you want to preserve everything; with a house, you feel compelled to transform it. "Some people call it renovations," he told me, at one point. "Others call it a disease."

Biro speaks English with an accent that seems to combine traces of French and Hungarian—he was born in Budapest—which contributes to an air of unplaceable refinement. One person who knows Biro told me that he had a mystique of "royalty." Though it was still early in the day, Biro reached into a long wooden rack filled with wine bottles and removed one. After examining the label, he poured himself some and offered me a glass. "Every drop is precious," he said, before finishing his glass and refilling it.

Eventually, with Coco and another dog, a Jack Russell terrier, trailing us, he took me outside to a small courtyard that led to his laboratory, which was in a separate building. The courtyard

had a fountain and was filled with plants that camouflaged what was, essentially, a vault. A pair of steel doors were bolted shut and there were two alarm systems, including one with motion sensors.

He unlocked the door to his workshop, revealing a large rectangular table with a movable microscope and a high-powered lamp. Stacks of paintings were propped against a wall. Biro was frequently presented with possible Pollocks and Raphaels and Picassos. When I visited him on another occasion, he had placed under the microscope a faded picture of Venice that was potentially by J. M. W. Turner. "Quite worn, quite damaged, but it has all the hallmarks of what a Turner should be," Biro said. In the lower right corner, pressed into the paint, he had found a fingerprint. "You can actually see it quite clearly," he said. I looked in the microscope and, sure enough, I could make out a smudged fingerprint: loops and whorls, a painting unto itself.

Biro said that he was using a scalpel to scrape away a previous restorer's excessive overpainting, in an attempt to discern more of the fingerprint's characteristics. A lot of money lies in obtaining this kind of information, he explained, which is why he had to suspect everything, and everyone, of deception. (One of Biro's friends called him a "human lie detector.")

To my surprise, Biro showed me another laboratory, in a locked basement. Here, he said, he kept his most revolutionary device: a multispectral-imaging camera, of his own design, which was mounted on a robotic arm and scanned a canvas from above. The device could take photographs of a painting at different wavelengths of light, from infrared to ultraviolet, allowing him to distinguish, without damaging the work, the kind of pigments an artist had used. (Previously, tiny samples of paint had to be extracted and submitted to chemical analysis.) The multispectral camera could also reveal whether an older painting was hidden beneath the surface, or whether a picture had been restored. And if a fingerprint was present the camera could pick up extraordinary levels of detail. Biro once boasted that his invention surpassed "any camera today" and was "the only one of its kind in the world."

As we spoke, I noticed that hanging on the walls were more landscape paintings by the artist whose works were displayed throughout Biro's house. They gave the laboratory the feel of a shrine. Before Biro told me about his research into "La Bella Principessa," and what he described as startling findings, he shared with me the story of how he became the world's first authenticator of art works through fingerprinting—a story that began, curiously enough, with the very paintings I was staring at.

"They were done by my father," Biro said of the paintings. "I'm surrounded by them."

His father, Geza, who died in 2008, at the age of eighty-nine, was a serious painter. According to Biro, he studied at the Royal Academy of Fine Arts in Budapest, and was admired for his sweeping landscapes and allegorical street scenes. During the Second World War, he was drafted by the Hungarian Army, and was eventually captured by the Russians, who placed him in

a prison camp. One day, while being transported in the back of a crowded Soviet truck, he tumbled off the side, and his left arm—like Leonardo, the one he painted with—got caught under the wheel. The bones shattered like icicles. After the war, he was released, and he returned to Budapest, where, despite a series of operations, he remained handicapped. "He had to learn to paint with his right hand," Peter Paul's older brother, Laszlo, told me. "It really battered his self-confidence." Geza's work grew progressively darker. "He was very pessimistic," Laszlo says.

After Geza got married and had two sons, he took a job as an art restorer at the Museum of Fine Arts in Budapest. For all their seeming kinship, a restorer is the antithesis of a painter: he is a conserver, not a creator. Like a mimic, he assumes another person's style, at the expense of his own identity. He must resist any urge to improve, to experiment, to show off; otherwise, he becomes a forger. Yet, unlike a great actor, he receives no glory for his feats of mimicry. If he has succeeded, he has burnished another artist's reputation, and vanished without the world ever knowing who he is, or what he has accomplished. The art historian Max J. Friedländer called the business of the restorer "the most thankless one imaginable."

While Geza became a skilled restorer, specializing in Baroque and Renaissance frescoes, he continued to pursue his own art. Some of his paintings were exhibited in Europe, Peter Paul said, and one hung at the Museum of Fine Arts. Yet Geza refused to conform to the Communists' ideological vision of art, and he found himself increasingly shunned. "The last straw for him was when he submitted his work for a salon," Peter Paul recalls. "The painting was rejected on the basis that it did not reflect Socialist optimism." In 1967, still struggling to manipulate his left arm, he received permission from the state to undergo surgery at a hospital in Vienna. After the operation, he immigrated to Montreal, and a year later his family joined him.

Finally, he was free to be an immortal striver. Geza went to Newfoundland and the Northwest Territories, painting the gorgeous frozen landscapes. In Montreal, he set up a small gallery to show his work. He garnered some critical support and his work occasionally sold at auction, but money was constantly short, and he found himself, for a few dollars, sketching people who wandered in off the street. In the seventies, Geza converted much of the gallery into the Center for Art Restoration, and devoted most of his days to relining other artists' canvases on vacuum hot tables, retouching chipped paint, and removing smudges and dirt with chemical solvents that stung the eyes. Peter Paul and Laszlo, who were then teen-agers, served as his apprentices. Laszlo, who became a skilled painter, said of his father, "He was very demanding. He was trained to adhere to a strict ethical standard, and that was passed on to us."

Peter Paul dropped out of college to work full-time with his father, immersing himself in the technical aspects of restoration. Then, in 1985, an event occurred, he says, that led to his scientific breakthrough. A man walked into their workshop with an unframed picture that was so blackened with dirt that it was hard to make out much more than a faint rural landscape. When

Case 1:11-cv-04442-JPO-KNF   Document 70-1   Filed 03/29/21   Page 73 of 95

Peter Paul told him that it would cost at least two thousand dollars to restore it, the owner went pale, and offered to sell it for a few hundred. "We bought it with the idea that we would clean half of it, and leave the other half dirty and just hang it" in the shop, Peter Paul recalls. It would be the perfect demonstration of their restoration prowess—"a kind of before and after."

Eventually, the Biros started to clean a small portion of it. They had to purge not only the grime but also thick overpaint from a previous restoration, which resembled clotted blood. "As we got into it more and more, and the cleaned area became larger and larger, we realized there was a rainbow on the painting," Laszlo says. Radiant colors emerged: greens and yellows and blues. The picture showed sunlight filtering through a clearing sky, the rays spreading across a river valley with pale grass and delicate trees and a ruined stone church. The picture "reeked of a master's hand," Peter Paul says. The more he and his brother cleaned it, the more they became convinced that they were looking at a work by none other than J. M. W. Turner.

If so, it was worth hundreds of thousands of dollars, and possibly millions. The men spent months researching the painting, trying to make the case that it was consistent with Turner's work. After poring over topographical maps, they visited a valley in Millom, England, which they came to believe was the same setting as in the picture. Incredibly, as he and his brother stood there, Peter Paul recalls, the mist cleared and "we actually saw a rainbow."

In 1987, they took the painting to the Tate Gallery, in London, to show it to the world's leading Turner experts and connoisseurs. The verdict was unanimous—the painting was a tattered imitation. As Laszlo puts it, he and his brother were "very politely shown the door." They had been dismissed by what they perceived as an arrogant art establishment—"an ivory tower," as Laszlo called it. There seemed to be no due process. "They just throw opinions around," Peter Paul said of some connoisseurs.

Before the Biros left the Tate, they say, they walked through a gallery that had several Turner paintings on display. Peter Paul paused in front of Turner's "Chichester Canal," peering at the pale-blue sky reflecting off the waterway, which made it seem as if the earth had been turned upside down. In the foliage of several trees, he says, he noticed tiny swirls in the paint. He looked more closely. They were from a partial fingerprint. He felt a jolt: he had noticed partial fingerprints embedded in the potential Turner painting as well. In both pictures, he says, the ridges were deep enough in the original dried paint that they could not have been left by the hands of an owner or a restorer; rather, they were a by-product of Turner's technique of modelling paint with his fingertips. Indeed, Biro says, he subsequently found fingerprints in hundreds of Turner's works, and wondered: Why not compare the fingerprint in an undisputed Turner painting like "Chichester Canal" with the one in his own painting, and see if they matched?

The desire to transform the authentication process through science—to supplant a subjective eye with objective tools—was not new. During the late nineteenth century, the Italian art critic

Giovanni Morelli, dismissing many traditional connoisseurs as "charlatans," proposed a new "scientific" method based on "indisputable and practical facts." Rather than search a painting for its creator's intangible essence, he argued, connoisseurs should focus on minor details such as fingernails, toes, and earlobes, which an artist tended to render almost unconsciously. "Just as most men, both speakers and writers, make use of habitual modes of expression, favorite words or sayings, that they employ involuntarily, even inappropriately, so too every painter has his own peculiarities that escape him without his being aware," Morelli wrote. He believed that not only did an Old Master expose his identity with these "material trifles"; forgers and imitators were also less likely to pay sufficient attention to them, and thus betray themselves. Morelli became known as the Sherlock Holmes of the art world.

To many connoisseurs, however, the nature of art was antithetical to cold science. Worse, Morelli made his own share of false attributions, prompting one art historian to dismiss him as a "quack doctor."

In the early twentieth century, as J. P. Morgan, Henry Clay Frick, and other wealthy Americans bid up prices of Old Masters, the search for a foolproof system of connoisseurship intensified. At the same time, the flood of money into the art market led to widespread corruption, with dealers often paying off connoisseurs to validate paintings. In 1928, the art dealer René Gimpel complained, "The American collector is prey to the greatest swindle the world has ever seen: the certified swindle."

The public has long been suspicious of connoisseurship. As John Brewer recounts in his recent book "The American Leonardo," about a Kansas City couple's battle, in the nineteen-twenties, to authenticate a potential Leonardo, this distrust had to do with more than the system's reliability; it also had to do with doubts about the authenticity of the art world itself, with its cult of prized artists, its exorbitant trafficking in aesthetic pleasure, and an élite that seemed even more rarefied than most. In 1920, the Kansas couple, Harry and Andrée Hahn, sued the powerful art dealer Joseph Duveen for half a million dollars after he told a reporter that a portrait they owned could not possibly be a Leonardo. The Hahns argued that connoisseurs offered only "air-spun abstractions and nebulous mumbo-jumbos," and that "smart and tricky art dealers" ran a "racket." Even the judge in the case warned jurors to be wary of experts who relied on means "too introspective and subjective." (Though none of the leading connoisseurs considered the painting a Leonardo, and later technical evaluations confirmed their judgment, the trial ended in a hung jury, and Duveen paid the Hahns sixty thousand dollars to settle the case.)

The desire to "scientificize" connoisseurship was therefore as much about the desire to democratize it, to wrest it out of the hands of art experts. Before the Hahn trial, rumors surfaced that there was a thumbprint in the paint. One newspaper asked, "WILL THUMBPRINT MADE 400 YEARS AGO PROVE PAINTING IS LEONARDO DA VINCI'S ORIGINAL?" But identifying the author of a painting

through fingerprints still seemed far beyond the reach of science, and the process of authentication remained largely unchanged until Biro came up with his radical idea.

After returning from London, Biro studied books on fingerprinting and conferred with a retired fingerprint examiner. He learned the difference between a latent print—which is transferred with sweat and often needs to be dusted or processed with chemical agents in order to be detected—and a visible print, which is either impressed in a substance or left by touching a surface with something on one's fingertips, such as ink. He learned fingerprint patterns, including loops, whorls, and tented arches. And he learned how to tell whether two fingerprints had enough overlapping characteristics to be deemed a match. "He basically trained himself," Laszlo recalls. "He read and studied everything."

Biro asked the conservation department at the Tate for images of "Chichester Canal" that were sufficiently high in resolution to show the fingerprint. For days, Biro says, he compared enhanced images of the fingerprint with the one on the rainbow painting; he felt certain that they came from the same person.

Yet the art establishment refused to recognize the painting based on his approach. (As Laszlo puts it, the art world is "very jealous and sinister.") In 1994, after years of frustration, the Biros took the painting to a Turner scholar, David Hill, at the University of Leeds. He thought that the composition and coloring strongly pointed to the hand of Turner, and he enlisted John Manners, a fingerprint examiner with the West Yorkshire Police, to verify Biro's conclusions. "Not my cup of tea, really," Manners said of the painting at the time. "Of course, some Turner canvases are magnificent. Not this one, in my opinion." Still, he said, the fingerprints definitely matched: "It *is* a Turner." Hill called the fingerprints the "clinching piece of evidence."

The story of the fingerprints circulated around the world—"BURIED TREASURE VERIFIED BY SCIENCE," the Toronto *Globe and Mail* declared—and many Turner scholars relented on the question of attribution. "It was the pressure of the media," Biro said. "They were beginning to look foolish." In 1995, the painting, called "Landscape with a Rainbow," was sold as a Turner at the Phillips auction house in London. An undisclosed bidder bought it for more than a hundred and fifty thousand dollars—a sum that would have been even higher had the painting been in better condition. It was the first art work officially authenticated based on fingerprint identification. Biro asserted that he had uncovered the painting's "forensic provenance," telling a reporter, "The science of fingerprint identification is a true science. There are no gray areas." Having developed what he advertised as a "rigorous methodology" that followed "accepted police standards," he began to devote part of the family business to authenticating works of art with fingerprints—or, as he liked to say, to "placing an artist at the scene of the creation of a work."

In 2000, Biro took on an even more spectacular case. A retired truck driver named Teri Horton

hired Biro to examine a large drip canvas, painted in the kinetic style of Jackson Pollock, that she had bought for five dollars at a thrift shop in San Bernardino, California. After inspecting the work, Biro announced that he had found a partial fingerprint on the back of the canvas, and had matched it to a fingerprint on a paint can that is displayed in Pollock's old studio, in East Hampton. André Turcotte, a retired fingerprint examiner with the Royal Canadian Mounted Police, supported the results. But the International Foundation for Art Research, a nonprofit organization that is the primary authenticator of Pollock's works, balked, saying that Biro's method was not yet "universally" accepted. Biro, in a report on Horton's painting, wrote that he had been warned that "science prying into the closed world of connoisseurship is likely to make me many enemies." Horton, meanwhile, became a modern-day Harry and Andrée Hahn, dismissing the method of traditional connoisseurs as "bullshit," and the whole art world as a "fraud."

Biro told me that he maintains a firewall between his research and the sale of a painting, and that he receives the same fee—two thousand dollars a day—regardless of the outcome of his investigation. "If I stopped being disinterested, my credibility will be gone," he said. But he felt "morally obliged" to stand behind his findings.

The effort to authenticate the painting became a crusade. Horton went on "The Tonight Show with Jay Leno," and her struggle was valorized in a 2006 documentary called "Who the #$&% Is Jackson Pollock?" In the film, Biro is depicted as a champion of science and of a woman with an eighth-grade education battling an autocratic establishment. The main antagonist—"the effete, nose-in-the-air art expert," as he later quipped of his role—is Thomas Hoving. He is shown, in a suit and tie, sitting before Horton's picture and declaring, "Dead on arrival." Later, offering a rationale for his response, he noted that Horton's picture featured acrylic paint, which had not previously been documented in Pollock's drip paintings.

Biro, undaunted, visited Pollock's old studio and extracted pigment samples from the floor, where the artist had once spread his canvases and applied paint. In a report, Biro wrote that he had used a "microchemistry test"—a method of mixing a paint sample with other chemicals to analyze its characteristics. "The very first sample of paint I tested," he said, "turned out to be acrylic." He also revealed that gold paint from a matchstick embedded in the floor was the same as gold paint found in Horton's picture. Hoving remained unmoved. He dismissed the fingerprints, and said of Horton, "She knows nothing. . . . I'm an expert, she's not." In reviews of the film, Hoving was denounced as a "pompous fool" and a "villain"; Biro was called a "hero."

Based on Biro's findings, Horton was offered two million dollars for her painting, but she held out for more. Biro assured her that the art world could not continue to resist a forensic method that had been used to convict criminals for more than a century. And though many connoisseurs and collectors opposed his technique, more and more accepted it. He told me that he had

authenticated two Picassos, half a dozen Turners, a Thomas Hart Benton, and close to a dozen other Pollocks. Several of the world's top connoisseurs sought Biro's expertise. Three years ago, two leading Pollock scholars, Claude Cernuschi and Ellen G. Landau, cited Biro's evaluation of a suspected Pollock, saying, "Artists' fingerprints do not show up just anywhere. Their presence cannot be dismissed or simply explained away." Around this time, Biro helped Martin Kemp attribute a painting, partly on the basis of fingerprints, to one of Leonardo's assistants. In an earlier e-mail to a client, Biro wrote, "The world is changing. Not as fast as one would hope but it is changing nevertheless."

In 2009, Biro and Nicholas Eastaugh, a scientist known for his expertise on pigments, formed a company, Art Access and Research, which analyzes and authenticates paintings. Biro is its director of forensic studies. Clients include museums, private galleries, corporations, dealers, and major auction houses such as Sotheby's. Biro was also enlisted by the Pigmentum Project, which is affiliated with Oxford University. His work is published in museum catalogues and in scientific publications, including *Antiquity* and the official journal of the Royal Microscopical Society. In the media, he has become one of the most prominent art experts, featured in documentaries and news reports. (He was once mentioned in this magazine, in The Talk of the Town.) He even has a cameo—as the man who "pioneered the whole technique" of fingerprint authentications—in Peter Robinson's popular detective novel "Playing with Fire"; the story is about a charming, "chameleonlike" con man who runs an art-forgery ring. On his Web site, Biro notes that law enforcement has adopted his approach: "My analytical techniques were presented internally at a training course at the F.B.I. I am not permitted to go beyond that."

Biro told me that the divide between connoisseurs and scientists was finally eroding. The best demonstration of this change, he added, was the fact that he had been commissioned to examine "La Bella Principessa" and, possibly, help make one of the greatest discoveries in the history of art.

During one of the visits I made to Biro's home, he offered to share with me what he had learned about "La Bella Principessa." We were in the living room, and the sweet scent of his wife's French cooking kept wafting in from the kitchen. "You've never tasted anything so good," Biro said. He went over to a varnished desk, where there was a computer, and clicked on an icon. An image of the drawing appeared on the screen. He zoomed in on the upper-left edge of the parchment, and pointed to a small mark on the surface: a fingerprint. It looked like little more than a smudge, and I squinted at the blurry lines.

Even in a high-resolution photograph, the fingerprint was unreadable; Biro called it "complete visual confusion." Many fingerprint examiners, he said, would have been stymied. Then, as if he were lining up a row of mug shots, he called up a series of photographs from a multispectral-imaging camera. Because the images had been made with different wavelengths of light, none of

them looked exactly the same. In some photographs, the texture of the parchment—the background "noise," as Biro put it—was pronounced. In others, the ridge patterns in the fingerprint were accentuated and the parchment all but faded away. From one photograph to the next, Biro said, "the smudge becomes clearer." Still, it was not clear enough. His next step, he said, was "proprietary." Using advanced image-processing software, he subtracted the background noise from each image, until only the clearest parts of the fingerprint remained. Finally, he said, clicking on another icon, "You get *this*."

The smudge had been transformed into a more legible print: now, at least, there were the outlines of ridges and bumps. When I asked Biro if he worried that his method might be flawed, he said that during nearly two decades of fingerprint examinations he had "not made one mistake." He added, "I take a long time and I don't allow myself to be rushed."

Biro showed me another fingerprint, this one taken from Leonardo's "St. Jerome," which hangs in the Vatican. It was the clearest fingerprint from an undisputed work by Leonardo. On the computer screen, Biro moved the image of the "St. Jerome" fingerprint alongside the one from "La Bella Principessa." "See that?" he said, pointing to an elevated ridge, or "island," in each print. The island in "La Bella Principessa," he said, was identical in shape to the island from the "St. Jerome" fingerprint. He added that he had found seven other overlapping characteristics. The results, Biro said, indicated that the paintings had been touched by the same hand more than five hundred years ago, which pointed to one conclusion: "La Bella Principessa" was a genuine Leonardo.

For a moment, Biro stared at the prints in silence, as if still awed by what he had found. The discovery, he said, was a "validation" of his life's work. After he first revealed his findings, last October, a prominent dealer estimated that the drawing could be worth a hundred and fifty million dollars. (The unnamed "lady" who had sold it at Christie's for less than twenty-two thousand dollars came forward and identified herself as Jeanne Marchig, a Swedish animal-rights activist. Citing, among other things, the fingerprint evidence, she sued the auction house for "negligence" and "breach of warranty" for failing to attribute the drawing correctly.)

In the wake of Biro's announcement, Peter Silverman, the Canadian who had helped acquire the drawing, told a reporter, "Thank God, we have the fingerprint, because there will still be those doubting Thomases out there, saying it couldn't possibly be." To object now, he said, would be to "go against science and say the Earth is not round." Biro, meanwhile, was lauded around the world. As an Australian newspaper put it, "ART EXPERT CRACKS DA CODE."

And so, with this final flourish, the glittering portrait of Peter Paul Biro was complete: he was the triumphant scientist who had transformed the art world. Like "La Bella Principessa," the image was romantic, almost idealized—the version of Biro that was most appealing to the eye. But, somewhere along the way, I began to notice small, and then more glaring, imperfections in

this picture.

One of the first cracks appeared when I examined the case of Alex Matter, a filmmaker whose parents had been close to Jackson Pollock. In 2005, Matter announced that he had discovered a cache of art works in his late father's storage space, on Long Island. Ellen Landau, the art historian, said that she was "absolutely convinced" that the paintings were by Pollock. Biro was sent a photograph of a fingerprint impressed on the front of one picture. He identified six characteristics that corresponded with the fingerprint on the paint can in Pollock's studio—strong evidence that the work was by Pollock. But, as more and more connoisseurs weighed in, they noticed patterns that seemed at odds with Pollock's style. Meanwhile, in sixteen of twenty art works submitted for analysis, forensic scientists discovered pigments that were not patented until after Pollock's death, in 1956. At a symposium three years ago, Pollock experts all but ruled out the pictures. Ronald D. Spencer, a lawyer who represents the Pollock-Krasner Foundation, told me, "Biro can find all the fingerprints he wants. But, in terms of the marketplace, the Matter paintings are *done*. They are finished."

When I first talked to Biro about Matter's cache, he had noted that no anachronistic pigments were found on the picture that he had authenticated, and he said that it was possible that Pollock had created only a few of the pictures, or that he had simply touched one of them. After all, Pollock was a friend of Matter's parents.

His explanation seemed plausible, but I kept being troubled by other details relating to Biro's Pollock investigations. For instance, it was peculiar that even though there were no documented cases of acrylic being used in Pollock's pour paintings, Biro had easily found some on the floor of the Long Island studio—indeed, in the very first sample he tested. I contacted a leading forensic scientist in the art world who teaches at the F.B.I. Academy, in Quantico, Virginia, and who has done research in the Pollock studio. The scientist told me that he had spent hours combing the floor and had not found any acrylic. He added that a microchemistry test was not even considered suitable for identifying acrylic. As for the gold paint particles that Biro said he had uncovered on the studio floor and matched to the pigment in Teri Horton's painting, Helen Harrison, an art historian who is the director of the Pollock-Krasner House & Study Center, which oversees Pollock's old studio, told me that she did not know of Pollock's having used gold in any of his pour paintings.

Reporters work, in many ways, like authenticators. We encounter people, form intuitions about them, and then attempt to verify these impressions. I began to review Biro's story; I spoke again with people I had already interviewed, and tracked down other associates. A woman who had once known him well told me, "Look deeper into his past. Look at his family business." As I probed further, I discovered an underpainting that I had never imagined.

One day, I visited the records office at the Palais de Justice, the provincial courthouse in

downtown Montreal. The office was in a windowless, fluorescent-lit room, and, like a remnant of Soviet bureaucracy, it was filled with cardboard boxes and with clerks who were consumed with distinct, but equally dismal, tasks. I asked a clerk if there were any case files connected to anyone with the surname Biro, and after a long wait I was handed a stack of mottled folders. During the eighties and early nineties, more than a dozen civil lawsuits had been filed against Peter Paul Biro, his brother, his father, or their art businesses. Many of them stemmed from unpaid creditors. An owner of a picture-frame company alleged that the Biros had issued checks that bounced and had operated "under the cover" of defunct companies "with the clear aim of confusing their creditors." (The matter was settled out of court.) As I sifted through the files, I found other cases that raised fundamental questions about Peter Paul Biro's work as a restorer and an art dealer.

On February 12, 1981, Sam and Syd Wise, brothers who were art collectors in Montreal, stopped by the Biros' gallery. Peter Paul Biro was present, along with his father, Geza. The restoration business was in the back of the gallery, and the Biros often wore white laboratory coats. Although Peter Paul was the youngest member of the family, people familiar with the company say that he often seemed to be the dominant figure. A lawyer who was involved in cases brought against the Biros said that Peter Paul was "the brains of the operation."

Though the gallery was filled mostly with Geza's landscape paintings, Peter Paul told the Wises that they had for sale an exemplary oil painting by Goodridge Roberts, the Canadian artist. The picture was signed and showed what appeared to be Georgian Bay, in Ontario, which Roberts had often rendered in his paintings. The Wises bought the picture for ninety-five hundred dollars. Soon afterward, Peter Paul informed the Wises that he had another landscape painting by Roberts, and the Wises, who had already sold the first picture to a local gallery, agreed to buy the second one, for seventy-five hundred dollars.

In 1983, Goodridge Roberts's widow, Joan, happened to visit the gallery where the Wises had sold the Georgian Bay painting. She had been intimately involved in her husband's work, keeping a catalogue of his paintings, and she was immediately drawn to the picture. As she subsequently testified, it mimicked her husband's paintings, but the trees were "feeble imitations," the play of the colors was jarring, and the signature appeared oddly slanted. Moreover, she had never catalogued the work. She went up to the dealer and cried, "That's a fake."

The Wises, alerted to the allegation, rushed to see Peter Paul Biro. "I indicated to him that it was very important for us to establish the authenticity," Syd Wise later testified. Biro refused, multiple times, to divulge where he had obtained either of the paintings. According to the Wises, Biro insisted that the person who sold him the paintings was in Europe, and that it was impossible to contact him.

Soon afterward, three of the world's most highly regarded experts on Roberts confirmed that they were fakes. As one of them later testified, usually "a man who makes a forgery makes

Case 1:11-cv-04442-JFK-KNF   Document 27-1   Filed 08/05/11   Page 81 of 95

mistakes," and these had some obvious ones.

Customarily, art dealers are bound to stand behind what they sell, and the Wises refunded the gallery that had bought the Georgian Bay painting. But Peter Paul Biro insisted that the works were genuine—and that, in any case, the Wises had had an opportunity to investigate the paintings before buying them. He refused to reimburse the Wises, who ultimately sued. In an affidavit, the Wises said that Biro and his father had "perpetrated a fraud, in that they knowingly sold . . . a forgery." The Wises were represented by G. George Sand, who handled many civil cases involving art. In 1984, during a sworn deposition, he questioned Peter Paul Biro. For the first time, Biro disclosed the name of the person who had sold him the Roberts paintings. "George Pap," Biro said, adding, "Actually, the proper name is Zsolt Pap. Pap is the family name."

Sand pressed Biro about Pap's identity. Biro said that Pap was of Hungarian descent, and lived in Montreal. Sand seized upon this, asking, "Did you tell Mr. Wise that this person was in Europe?"

"No," Biro said. (Later, at trial, he said that he had told the Wises that it was Pap's *father* who was in Europe.) When Biro was asked why he hadn't revealed Zsolt Pap's name to the Wises, he said, "I didn't want to."

Sand sought proof of a financial transaction—a check or a credit-card payment—between Biro and Pap. Biro, however, said that he had obtained them in exchange for two musical instruments: a Steinway piano and a cello.

Sand was incredulous: "Is Mr. Pap a music dealer or is he an art dealer?" After Biro could not recall where he had originally purchased the cello, Sand suddenly asked him, "You ever been convicted of a criminal offense, sir?"

"No."

"You are certain of that?"

"Yes," Biro said.

Asked whether anybody in his family had done work on the paintings, Biro said that his father had merely cleaned them. (Later, when Geza was asked if he had done anything more, such as retouching, he said, "No, no." They were "intact.")

Sand demanded that Biro provide an address for Pap, and Biro eventually did so. But Sand told me that he twice issued a subpoena to that location—and that no Zsolt Pap ever showed up.

Meanwhile, Sand had obtained a court order to seize various possessions at the Biros' gallery. Several paintings were confiscated, including one whose frame had a plaque engraved with the name John Constable, the English Romantic painter. When the case went to trial, Sand asked Biro if the Constable belonged to him, and Biro said that it was owned by a client and was being restored. Given the value of Constable's work, Sand asked Biro if he had notified the owner that his painting had been seized. "No," Biro said. "The client lived in Florida and he moved, and we

could not locate him."

"A Constable painting, sir, don't you agree with me, is a very expensive painting?" Sand asked.

"Except that this painting was not a Constable."

Biro said that the painting had been bought at an auction, in Montreal, for five hundred dollars.

"You are restoring something that was *not* a John Constable?"

"Sure."

"I see. Even though the name plaque said 'John Constable'?"

"Sure."

Throughout the trial, the Biros and their attorneys maintained that the two paintings sold to the Wises were authentic, but to make their case they presented an art expert who was not a specialist on Roberts, or even on Canadian art. On September 3, 1986, the court found in favor of the Wises, and ordered Peter Paul and Geza Biro to pay them the seventeen thousand dollars they had spent on the pictures, as well as interest.

About two years after the Wises' case, Sand was contacted by another former client of the Biros, an art-and-antique collector named Saul Hendler, who has since died. According to court records and interviews with Sand and Hendler's wife, Marion, the Biros approached Hendler in 1983, saying that they had found a suspected Renoir, signed by the artist, which, if authenticated, was worth millions of dollars. The Biros asked Hendler to front them nine thousand dollars to buy the painting, a portrait of a nude woman; the Biros would then authenticate the work and sell it, sharing the profits. Hendler gave them the money. Not long afterward, Peter Paul Biro consulted a leading Renoir expert, who determined that the painting was a fake and that the signature was forged. The Biros refunded Hendler half his money, and eventually agreed to give him the painting, which still had some value as a decorative piece.

When Hendler picked up the picture, he thought that the composition looked vaguely different. He had previously made a photo transparency of the painting, and at home he compared it with the canvas he had just been handed. "My late husband was furious," Marion Hendler told me. "Then I saw it, and I was horrified. It was clearly not the same painting." Had the Biros sold the original painting without telling Hendler?

Marion and her husband went to the Center for Art Restoration, and confronted Geza Biro. Marion recalls that Geza—who often referred to himself with the honorific "Doctor," though he lacked a Ph.D.—was charming but also arrogant: "It was as if he was the great artiste, and whatever he said was true." One of Geza's sons, she said, inadvertently began to "spill information," revealing that Geza liked to "copy a real artist's work." She added, "The whole thing suddenly came together: *He's* the one who does it. The father did this to our painting."

Hendler, unable to get back what he considered the original painting, sued the Biros for the

rest of the money he had paid. In a written response, the Biros called the allegations "false and untrue and defamatory," adding that "the sole difference in the painting was the work which had been performed on the painting by the Defendants in lifting the paint in order to discover the original painting which had appeared on the canvas." During the trial, which took place in 1992, Sand called to the stand an art expert who testified that the painting was not the same as the one Hendler had bought. The court agreed, awarding Hendler several thousand dollars. But Marion asked me, "What did we win?" She went on, "Where's that piece of art? We never got it back. He probably sold it for a lot of money and we got this piece of junk in return."

Lawsuits had piled up against Peter Paul Biro and his family business. In two instances, there were allegations that art works had vanished under mysterious circumstances while in the care of Peter Paul. In one of the cases, Serge Joyal, who is now a senator in Canada, told me that he left a nineteenth-century drawing with the Biros to be restored. Before he could pick it up, Peter Paul notified him that it had been stolen from his car and that there was no insurance. Biro, however, never filed a police report, and Joyal says that Biro pleaded with him to wait before going to the authorities. During their conversations, Joyal says, Peter Paul acted evasive and suspicious, and Joyal became convinced that Biro was lying about the theft. As Joyal put it, "There was something fishy." Though Peter Paul said that there was nothing "suspect" about his behavior, and that he should not be held liable, the court awarded Joyal seven thousand dollars, plus interest.

Elizabeth Lipsz, a Montreal businesswoman who had once been close to Biro, and who won a lawsuit against him for unpaid loans, described him to me as a "classic con man." Her lawyer told me that Biro "was so convincing. He was very suave, soft-spoken, but after a while you catch him in different lies and you realize that the guy is a phony."

Within Montreal's small art world, there were whispers about Peter Paul Biro and his father. But the lawsuits appear to have attracted virtually no public attention. In 1993, Peter Paul Biro filed for bankruptcy, and he never paid many of the judgments against him, including what he owed the Wises and Joyal. Lipsz's lawyer said of Biro, "He oiled his way out of that whole thing. . . . He got away scot-free."

When I met with Sand at his law office, in Montreal, he told me he was amazed that Biro's history had not tarnished his reputation and that he had reached such an exalted position. He said that, for years, he had read with curiosity about Biro's authenticating paintings using forensic science. He looked at me intently and asked, "What's the deal with all those fingerprints?"

In December, 2004, Ken Parker, a New York private investigator who had no experience with the art world, went to Montreal and showed Peter Paul Biro a drip painting that he and his siblings had received from their father. Parker hoped that the work was a Pollock, and he had read about Biro's celebrated efforts on Teri Horton's behalf. Several weeks after Parker left his painting with Biro, he received an e-mail from him about fingerprints that he had found on the

back of the painting. "You are so lucky," Biro wrote. "I am able to confirm a match to a print that appears on a paint can in the Pollock-Krasner House. It is also the same print as the one on Teri Horton's painting."

According to dozens of e-mails between Parker and Biro, and tape-recorded conversations, Parker was thrilled by Biro's findings, but over time he and his wife, Kathy, grew concerned. As Biro held out the promise of authenticating their painting, and thus making them a fortune, he kept asking them for additional funds for his research. At one point, he requested several thousand dollars for a camera platform, offering, in return, to "produce an image of your Pollock that could not be made any other way." Then he wanted two thousand dollars to get his camera "up to speed." Then came another request: "Can you continue to pitch in smaller amounts? I am now quite certain that with $5,000 I can have the unit up and running." Biro also stressed that in order to improve the painting's value he had to restore it perfectly. "I don't want to see one rusty staple on it," he said, adding, "I would be very happy if you sent me $5,000 as I have seriously underestimated this last phase of the work." Kathy Parker later recalled, "Every time we turned around, he was asking for more money."

Biro soon asked Ken Parker—whose late father and stepmother had won several million dollars from the New York Lotto—to make a much larger investment. Biro was part of an effort to launch a venture named Provenance, which would provide, as he put it, the "clever strategy" necessary to sell "orphaned" paintings for tens of millions of dollars. According to a business prospectus, marked confidential, Provenance would acquire art works that had been forensically validated by Biro and several colleagues, and sell them in a gallery in New York City. The company chose a thumbprint for a logo. The driving force behind the venture was Tod Volpe, an art dealer who had once represented celebrities, including Jack Nicholson and Barbra Streisand. Biro, who had suggested that Volpe might serve as the Parkers' dealer, described him, in an e-mail, as "brilliant, resourceful, and extremely well connected." Biro said that his brother, Laszlo—whose "knowledge was invaluable"—would also be a central part of the company. Once Provenance was established, Biro told the Parkers, "there really is nothing we can no[t] do."

The plan called for raising sixty-five million dollars from investors, part of which would go toward buying J. P. Morgan's old headquarters, on Wall Street, and turning it into a palatial arts complex anchored by a gallery. Surprisingly, at least five million dollars of investors' money would also go to purchasing Teri Horton's painting—even though Biro had authenticated the work and Volpe had tried to sell it. By capitalizing on the media interest surrounding the painting, the plan said, the work could be resold for between forty and sixty million dollars, maybe even a hundred million. Although Biro has always publicly maintained that he had no financial stake in Horton's painting, Horton sent an e-mail to the Parkers saying that after the sale of her painting Biro would "collect" and that it would "set him for life."

Case 1:11-cv-04442-JFK-DKNF   Document 27-1   Filed 08/05/21   Page 85 of 95

The business plan noted that Biro had access to "more than 20" other valuable orphaned paintings, all of which could be sold at Provenance. Among them were paintings by artists with whom Biro and his family had long been closely associated, including three by Turner and a landscape by Constable. The plan estimated that each year Provenance would accept anywhere from twenty to thirty new possible masterpieces for scientific evaluation, of which nearly half would be authenticated, creating staggering profits. (The forensic expert who works with the F.B.I. expressed surprise at this prediction, telling me that, in the overwhelming majority of cases involving disputed art, the work fails to be authenticated.)

Provenance was cleverly tapping into the public's desire to crack open the art world, offering the tantalizing dream that anyone could find a Pollock or a Leonardo or a Turner languishing in a basement or a thrift shop. The company combined the forensic triumphalism of "C.S.I." with the lottery ethos of "Antiques Roadshow." (An associate producer at "Roadshow" had already sent Biro an e-mail about possibly doing a segment on the Parkers' "unbelievable discovery.")

The public's distrust of the cloistered art world helps to explain why a forger, or a swindler, is so often perceived as a romantic avenger, his deceptions exposing the deeper fraudulence of the establishment. When Han van Meegeren was tried for his Vermeer forgeries, in 1947, his lawyer insisted, "The art world is reeling, and experts are beginning to doubt the very basis of artistic attribution. This was precisely what the defendant was trying to achieve." In fact, most art swindlers have no grand intellectual design; rather, they are, as Thomas Hoving once put it, "money-grubbing confidence men, delighted to cobble up something that will get by in the rush for big profits."

According to Parker, Volpe asked him for a "contribution" of five million dollars toward launching Provenance. (In an e-mail, Volpe had assured the Parkers that "when people lie it takes a part of their souls with them.") Even if the Parkers didn't want to help open the gallery, Biro wrote to Ken Parker, he hoped that they would invest "about 1.5 to 2 million" dollars for his research and equipment. "I think you could really do something for art and science if you supported this (not to mention your painting)," Biro said.

Ken Parker estimated that, by this point, he had given Biro between "thirty-five and fifty thousand dollars." Kathy Parker later recalled, "He basically took our money and we thought he was real. He's got a great lab, has a great line. . . . Then what would happen was that he'd be away—'I'm off to Paris with my wife for two weeks'—and he'd give us some reason." She went on, "He came down to New York, he's staying in wonderful hotels, eating, drinking—he loves to eat and drink. . . . And every time he wrote he's, like, 'I haven't gotten to your work because I had the flu.' "

Biro previously had been suspected of creating an investment scheme around a seemingly precious object, with the promise that it would eventually reap huge profits. In the late nineteen-

nineties, he persuaded a Canadian financial adviser, Richard Lafferty, who is now dead, to invest in a venture to authenticate and sell a work purportedly by Raphael's disciple Perino del Vaga. Three of Lafferty's colleagues confirm the story, as do letters, memorandums, and other documents.

Biro claimed that he and his brother had found the circular painting, which looked like Raphael's "Madonna della Sedia," at an antique store in Boston; Biro had purportedly found a fingerprint on it that matched a fingerprint on an undisputed work by Perino. What's more, he said, he and his brother had invented a unique ultrasound instrument—they called it a Perinoscope—and used it to detect a note hidden inside a secret compartment in the picture's frame. The note was written in Italian and was dated April 5, 1520—the day before Raphael died. The Old Master appeared to have dictated a message to Perino, just before his death. The note said, "These are the words of my master as he instructed me to say and to do. If my faithful Perino has finished my last Madonna he has now the greatest treasure of all in his hands." Raphael's signature appeared in partial form, suggesting that he had been too ill to finish writing his name.

According to colleagues, Lafferty, who had once been a combative and astute financial analyst, was nearing the end of his life, and had grown less mentally agile; bored and lonely, he was drawn to Biro. One colleague recalls that the painting, which Lafferty spoke of as the "holy grail," gave Lafferty "something to live for." In a 1999 letter, Lafferty wrote that he had already invested eight hundred thousand dollars in the project. Lafferty's accountant, Luc Desjardins, told me that altogether Lafferty spent well over a million dollars—but the painting never sold. A research team at Harvard analyzed the secret message, and, according to Lafferty's summary of its findings, it had never seen "sixteenth-century ink act as it does on that particular document." Caroline Elam, a leading scholar on the Renaissance, suggested that the work was "a very skilled, elaborate and expert hoax." Lafferty's longtime business partner, Allan Aitken, told me that he believed that "Biro was either a shyster or a con man, and had found in Lafferty an easy mark."

By the fall of 2005, Ken Parker had begun to look into the people behind Provenance. It turned out that Tod Volpe, in the nineties, had defrauded his art clients, including Jack Nicholson, of nearly two million dollars, and had served two years in prison. Parker discovered that one of Volpe's principal partners in Provenance was also an ex-con, who had done time for tax evasion and for running a drug-smuggling operation in the United States. (Volpe told me, "We *all* have skeletons in our past.") Parker confronted Biro, who, in a subsequent e-mail, told Parker that he had "severed all communication with Volpe." To avoid any potential conflict of interest, he said, he was rescinding any request for investment money: "I must maintain absolute neutrality."

Biro told me that his request for millions of dollars from the Parkers came after he had finished his authentication of their painting. But, according to e-mails at the time, the Parkers

Case 1:11-cv-04442-JFK-DKNF   Document 27-1   Filed 08/05/21   Page 87 of 95

were still waiting for his final report. And only months after rescinding his request for money he asked the Parkers to fund another new project: a privately endowed department for him and a colleague at Oxford University. "Naturally it is 100% tax deductible," Biro wrote, in an e-mail. "Those who support the foundation of a bold and new department for us at Oxford will have their name on a plaque or have the department named after them such as 'The Ken Parker Department for Forensic Art History.' Sounds cool?"

Parker, meanwhile, launched an investigation into the provenance of his painting. He learned that his father had obtained the work from a couple named Thelma and Norman Grossman. Parker tracked down the Grossmans. According to Thelma Grossman, she had bought the painting for a few hundred dollars from a young artist in Brooklyn who was skilled at imitating famous artists. As she put it, it is certain that the painting "is *not* a Jackson Pollock." Later, Parker had a forensic scientist examine several paint samples. The test indicated the presence of acrylic emulsion—the kind of paint that has not been documented in a Pollock painting.

In March, 2007, the Parkers' widening inquiry led them to a company called Global Fine Art Registry. One of the main services of the registry, which is based in Phoenix, is to provide art works with a tag, rather like a Vehicle Identification Number, and catalogue them in a database, in order to create a record of their provenance. The founder of the company, Theresa Franks, although not well known in the art world, has cast herself as a crusader against fraud in a realm that she describes as the "last wild frontier." Operating out of her home, she pursues her own investigations, hiring independent experts and posting reports on her Web site. (One of her recent campaigns was against a company named Park West Gallery, which, she alleged, was selling fake prints by Salvador Dali. The gallery's founder, who called her attacks "cyber-terrorism," sued for defamation. In April, a jury ruled unanimously in Franks's favor, and awarded her half a million dollars in a counterclaim.)

Franks became particularly interested in Biro's methods after Frankie Brown, an artist in California, told her that he had seen a photograph of the Teri Horton painting, in *People*, and wondered if it might be his own work. Franks hired as an expert Tom Hanley, the chief of police in Middlebury, Vermont, who had more than two decades of experience as a fingerprint examiner. Hanley told me that he approached Biro, who had previously stated about Horton's painting, "My work is (and has been) available for evaluation to qualified experts." Yet Biro declined to share his evidence, saying that Horton had objected to the idea.

Hanley was thus forced to rely on bits of information that Biro had posted on his Web site, several years earlier. The online report contains a photograph of the partial fingerprint that Biro said he had found on the back of Horton's painting. In Hanley's judgment, the impression lacked the kind of detail—the clear ridges and furrows—that is necessary to make a proper comparison.

After Hanley revealed his findings to Franks, she raised questions on her Web site about the

reliability of Biro's fingerprint methodology. Biro then inserted a clarification to his online report. It said:

> For security reasons, several images in this report are watermarked in a way that is not apparent to the observer. The fingerprint images have also been reduced in resolution so as to render them unusable except for illustration.
>
> I advise against evaluating the fingerprint images illustrated in this report as if they were the actual source material. Any attempt to do so is pointless.

Biro told me that such secrecy protected the privacy of his clients and prevented anyone from misusing the fingerprint. To Hanley, this was baffling: what forensic scientist avoids peer review and even admits to doctoring evidence in order to prevent others from evaluating it? "If what he found are truly fingerprints, why isn't he sharing?" Franks asked me. In any case, Hanley, unable to examine Biro's evidence firsthand, had reached a dead end.

Then Ken Parker told Hanley and Franks about his drama with Biro. Parker said that Hanley was welcome to examine his painting. For the first time, Hanley was able directly to observe Biro's fingerprint evidence. He noted several fingerprints on the back of the picture, including two on the wooden stretcher frame, which were black, as if they had been made with ink. Looking through a magnifying glass, Hanley focussed on the most legible fingerprint, which appeared to be covered with a clear finishing coat, like a varnish. Parker said that before giving the painting to Biro he hadn't noticed a fingerprint on it. "I don't know where it came from," he said. He said that Biro had told him he had used some sort of "resin process" to make it more visible. Hanley had never seen a print developed in this fashion. Based on the clarity of the impression, Hanley thought that the fingerprint had to be relatively new—certainly not from half a century ago, when Pollock was alive.

Parker also retained the services of Lawrence Rooney, a retired detective sergeant and latent-print examiner who had worked in the Suffolk County Police's identification unit, and who had more than two decades of experience as a fingerprint analyst. Rooney agreed that the fingerprint appeared too recent to have come from Pollock. He was also alarmed by the "resin process," and, as he wrote in a report, the use of a "liquid seal" coating was "beyond all acceptable professional methods of latent print preservation and opens the door to many valid questions relating to the latent prints' origin of placement and development."

Hanley kept staring at the way the fingerprints rested on the surface of the wood, without the usual smudging or obliteration. He noticed that they shared an eerily similar shape. And he began to wonder if he was seeing something virtually unheard of: forged fingerprints. In a 1903 Sherlock Holmes story, "The Adventure of the Norwood Builder," the detective discovers that a criminal has made a wax impression of a solicitor's fingerprint and then framed him by stamping the forged fingerprint at an apparent murder scene. "It was a masterpiece of villainy," Holmes says.

The scheme became a common trope in detective fiction, but there are almost no documented cases of a criminal forging another person's fingerprint. In the nineteen-forties, a safe burglar named Nedelkoff set himself up as a fortune-teller in Eastern Europe, and asked clients to press their hands into a soft clay tablet. Later, he poured liquid rubber into the clay impressions, creating soft casts of their fingertips. During his robberies, Nedelkoff pressed his former clients' fingerprints onto safes. (Eventually, his scheme was unravelled by police.)

There were only a few examiners with any expertise in forged and fabricated fingerprints, and Hanley recommended that Theresa Franks hire Pat A. Wertheim. A bespectacled man with gray hair and a thick mustache, Wertheim works in the crime lab of the Arizona Department of Public Safety, and is also a private consultant. He teaches fingerprint analysis to law-enforcement officials around the world and has published numerous articles on the subject. Though forged fingerprints are rare, he says, a person with expertise could produce one with a rubber stamp, or even with an engraving made from a photograph of a fingerprint.

On October 27, 2007, Wertheim went with Hanley to the Parkers' house, on Long Island, to examine their painting. Looking at four fingerprints on the back of the stretcher frame and the canvas, Wertheim was struck by their extremely irregular shape—the bulges and curves along their boundaries. Then he noticed something even more peculiar. Each one of a person's ten fingers leaves a distinct impression, and the elasticity of skin makes it all but impossible to leave precisely the same fingerprint impression twice. Yet the two most visible fingerprints on the Parkers' painting, Wertheim says, were virtually exact overlays of each other: the same shape, the same pressure, the same ridge patterns. What's more, the visible parts of the two other fingerprints also lined up perfectly with these prints. In his more than three decades as an examiner, he had never seen a set of fingerprints like this.

When Wertheim examined one of the prints closely, he could make out several bubble-like voids. Although a person's sweat pores often leave voids in a fingerprint, Wertheim says that these voids were unusually big and elongated.

Wertheim had a hunch about what had caused the voids, and he went with Hanley to Pollock's old studio. Wertheim examined the fingerprint impression on the paint can. It matched the clearest fingerprints on the Parkers' painting, Wertheim says. Hanley then made a silicone cast from the impression on the paint can. Incredibly, Wertheim says, all four fingerprints on the Parkers' painting fit snugly within the boundaries of the cast impression. As Wertheim suspected, the cast also produced similar voids—they were caused from air bubbles that had formed in the rubber.

Altogether, Wertheim says, he tallied eight characteristics that were inconsistent with normal fingerprints. In a final report, he concluded that all of them had been made by a cast from the fingerprint on the paint can. As he told me, the fingerprints "screamed forgery."

When a forgery is exposed, people in the art world generally have the same reaction: how could anyone have ever been fooled by something so obviously phony, so artless? Few connoisseurs still think that Han van Meegeren's paintings look at all like Vermeers, or even have any artistic value. Forgers usually succeed not because they are so talented but, rather, because they provide, at a moment in time, exactly what others desperately want to see. Conjurers as much as copyists, they fulfill a wish or a fantasy. And so the inconsistencies—crooked signatures, uncharacteristic brushstrokes—are ignored or explained away.

If a forgery's success were to depend on fake fingerprints, rather than on the sly imitation of a painter's style, it would represent a radical departure from the methods employed by art forgers over thousands of years. And yet such a forgery would perfectly reflect the contemporary faith in science to conquer every realm, even one where beauty is supposed to be in the eye of the beholder.

Many owners of faked art works are reluctant to bring charges that may demolish the value of their property—one of the reasons that art crimes are often difficult to prosecute. Early on, Parker had told Franks that, if he became convinced that Biro had perpetrated a fraud, "I fully intend to prosecute this guy." In April, 2008, when Franks informed Parker that Wertheim had concluded that the prints were forged, Parker told her that he had his own news about the painting: "We sold it about two weeks ago." He said that he had showed Biro's authentication report to the buyer. Parker recently told me that a group of investors had bought the painting for a "substantial sum," though he still owned a share in it. He suggested that Thelma Grossman's story about buying the painting in Brooklyn might be "mistaken," and he called Theresa Franks a publicity seeker, adding that he did not want to be part of a "witch hunt" against Biro. He told me, "I have no reason to believe it's not a Pollock."

On a recent summer day, I paid a final visit to Biro's home. Biro told me that Laszlo would be joining us, and he soon appeared—a more compact and muscular version of his younger brother. The three of us sat around a table on a balcony overlooking the courtyard. Biro had opened a bottle of a Hungarian white wine ("a fantastic Tokaji"), and he calmly sipped from his glass as I asked him about the allegations that had been made against them.

Peter Paul said that the old lawsuits had involved relatively small amounts, and, as he later wrote in an e-mail, often stemmed from disgruntled "treasure seekers" who "hoped to turn a thousand into ten or even into millions and then turned on us and still make nasty comments because their greed did not turn to gold." He said that although Richard Lafferty, the financial adviser, may have spent more than a million dollars on the purported painting by Raphael's disciple, not all the checks went to the Biros. Laszlo added that Lafferty had "the last word" in what he spent. Peter Paul, who referred to the allegations by Lafferty's colleagues as "hearsay," told me that no scholar had questioned the authenticity of the picture or of the note tucked inside

the frame. When I subsequently uncovered documents indicating otherwise, Peter Paul said, "I don't recall anything of that nature."

At one point, I mentioned that a scientist deemed it incredible that Peter Paul had found acrylic on Pollock's studio floor with his "very first sample of paint." He said that he had been referring simply to his "first visit" to the studio. I asked him why he had performed a microchemistry test, given that it is not an accepted method for detecting acrylic; he said that the test "was just one first step." He assured me that he had no financial stake in Horton's painting. (She had told me that she might "give him a gift," but she could not "let that get out in the media that he has a percentage, when he does not.")

I had heard that Biro had recently gone to New York and met with a Russian who was considering buying the Horton painting, for a few million dollars. It was true, Biro said, but he was no more than a facilitator between interested parties: "I connect them." He acknowledged that he had been involved with Tod Volpe and the plan to create Provenance, but he said, "Eventually, basically, I just turned my back on it, because it became far too commercial in its scope and I didn't see that the integrity of my work would be suitably protected."

Laszlo added, "It would've been just way too racy."

I asked whether their father had forged the fake Goodridge Roberts landscape, or the painting given to Saul Hendler, or any other works of art. Laszlo stood up, circling the table, and for the first time Peter Paul became agitated. "It's upsetting," he said. "It's pure fantasy." He went on, "It's so easy to make this kind of an accusation. Because somebody's a painter, therefore he can forge. It's like saying that if somebody is a surgeon he can kill, because he's got a sharp instrument in his hand."

We discussed "Landscape with a Rainbow," the purported Turner painting that was Peter Paul Biro's first fingerprint-authentication case. There appeared to be notable discrepancies in the various statements that the family had made about the origins of the painting. Peter Paul Biro and Laszlo usually told the press, and had repeated to me, that they were present when the purported owner had taken it to their shop to be restored. They told me that Laszlo had purchased it. Yet, during depositions for Peter Paul Biro's bankruptcy case, Laszlo said that his father had obtained the painting. When Laszlo was asked where Geza had acquired it, he said, "I don't remember." Peter Paul Biro, at the same hearing, said, "I don't specifically recall the circumstances."

After I pointed out such inconsistencies, there was a silence. Laszlo stammered, "What? No."

Peter Paul finally spoke, insisting that he could not have said "such a thing, because we knew where the painting came from." Aware that I don't speak French, he asked, "Are these French documents?"

"No, they're English," I said.

When I asked Biro about the allegedly forged fingerprints on the Parkers' painting, he peered

intently at his glass of wine. I suddenly noticed how blue his eyes were. Calm again, he denied that he had ever forged a fingerprint. The "resin process," he explained, was just a varnish applied to help the prints stand out. And he said of Pat Wertheim, the fingerprint expert, "He's wrong. He's presenting a theory and, in his conclusion, he treats his theory as fact. . . . And the fact that he's producing this work for a do-it-yourself art-authentication Web site—for me, that's quite tainted." In an earlier written statement rebutting the allegations, he noted that without his unparalleled equipment many fingerprint examiners could not attain reliable results: "My laboratory is . . . equipped with an imaging system capable of Gigabit resolution in hyperspectral imaging, surpassing any camera in existence today. The instrument was developed and built here in the lab and it is the only one of its kind in the world." Conventional fingerprint examiners, he told me, lacked the training necessary to evaluate fingerprint impressions on art works: "This is *not* police work." Wertheim and Hanley expressed surprise to me that Biro, who had no formal training as a fingerprint examiner, somehow possessed unique skills. As Wertheim put it, "So Mr. Biro invented the concept, designed the camera, built it, and it is the only one in the world?"

Biro later noted that he had spent only a "few hours" in Pollock's studio, in the "presence of staff," making it impossible for him to have made a rubber stamp. But when I asked Helen Harrison, who oversees the studio, about this, she said, "That's not true." Her records show that he visited four times, once with Tod Volpe, and that he was "there for hours." She said that she did not watch over him all that time; indeed, in her absence he had removed, "without authorization," a match from the floor, which he took to Montreal to analyze for possible paint particles. (When she saw him holding up the match in the documentary "Who the #$&% Is Jackson Pollock?," she demanded that he give it back, and he eventually returned it. Biro claimed to me that an assistant had given him permission to take it.)

He said Wertheim was wrong to think that the fingerprints on the Parkers' painting had to be forgeries simply because they were so similar. Biro took my pen, wrote an "X" on his fingertip, and pressed it three times on my notepad. "Look at this," he said, pointing to the faint "X"s. "All of them identical. It's as simple as that." I noted that Wertheim had told me he welcomed a second opinion from a qualified authority, such as the F.B.I. As I continued to question Biro about whether any fingerprint on the Parkers' painting was a forgery, he suddenly asked, "What if maybe it is?" Though he disagreed with Wertheim's analysis, his conclusion "could be right." Still, Biro had said, this didn't mean that he was the culprit: "Why is everybody after me?"

In the case of "La Bella Principessa," Biro did not handle the drawing, and was sent multispectral images from another laboratory, which he then developed and enhanced. Martin Kemp, the Leonardo scholar, told me, "In terms of what Biro did for us, I have absolutely no problems with any potential ethical issues." He emphasized that his opinion of the drawing did not depend on the fingerprint evidence: "I'm entirely confident that it is by Leonardo."

A final verdict on whether "La Bella Principessa" is genuine may not be reached for years, but more and more connoisseurs have voiced doubts. Skeptics express surprise that there is no apparent historical record for the drawing, given that Leonardo was one of Italy's most famous painters during the Renaissance. They note that vellum lasts for centuries, and that it would be easy for a forger to obtain old sheets. Many of the critics share the view of the Met's Carmen Bambach: it just doesn't look like a Leonardo. *ARTnews*, which has reported on Wertheim's findings, recently interviewed Klaus Albrecht Schröder, the director of the Albertina Museum, in Vienna. "No one is convinced it is a Leonardo," he said. David Ekserdjian, an expert on sixteenth-century Italian drawings, wrote in *The Burlington Magazine* that he "strongly suspects" it is a "counterfeit." Other art critics have suggested that Kemp has succumbed to a fantasy.

In March, "La Bella Principessa" went on display at an exhibit in Gothenburg, Sweden, and Biro saw the drawing for the first time. The crowds were enormous. For several minutes, he stared at the portrait. "It was stunningly beautiful," he said, adding, "I felt that Leonardo definitely had to have had a lot to do with the drawing."

Kemp recently published, with a colleague, a book called "La Bella Principessa: The Story of the New Masterpiece by Leonardo da Vinci," which contains a chapter by Biro, entitled "Fingerprint Examination." In the manner of a law-enforcement officer presenting forensic evidence in court, Biro arranges the images of the "St. Jerome" and the "Principessa" fingerprints side by side, with arrows pinpointing what he identifies as eight overlapping characteristics between them. I asked Charles Parker—a latent-fingerprint examiner with more than thirty years of experience in the field, who has helped to establish guidelines for fingerprint examiners in the United States—to review the chapter. He said that most of the arrows don't point to actual overlapping characteristics, just random details, and that, judging from the images presented, the partial fingerprint on "La Bella Principessa" is too poorly detailed for an identification to be made. "No other examiner I know would sign off on it," he said. "I couldn't even get it past the door." Wertheim agreed with this assessment, and suggested that Biro's approach was the equivalent of trying to identify a man based on seeing his ear poking out from behind a bush for a fraction of a second.

"The fingerprint community can get quite dogmatic," Biro told me in another conversation. "They don't like people who rock the boat, and I could be seen as a loose cannon to some, because I'm questioning a lot of things."

Whereas Biro had once spoken of the absolute objectivity and infallibility of fingerprint analysis, he now sounded more like a connoisseur than like a scientist. "I'm trying to define, for example, what is the point that something becomes a matter of interpretation," he said. "In other words, where is that line? O.K., on the one hand, fingerprint practitioners state that fingerprint identification is a science. I'm more toward the other side, where I'm convinced by my own

personal experience that it is very much like connoisseurship, because of . . . things I see they don't."

In law enforcement, a fingerprint examiner can issue only a positive or a negative identification, and is prohibited from speculating on probabilities. But Biro told me that he was now "pushing into the gray areas." When he first revealed his findings on "La Bella Principessa," Biro did not use the term "match," as is standard among law-enforcement analysts, and as he had done in his reports on the paintings owned by Horton and the Parkers; rather, he said that the fingerprint on "La Bella Principessa" and the print on Leonardo's "St. Jerome" were "highly comparable."

"What does that *mean*?" the forensic scientist who works with the F.B.I. asked me. "*Homo sapiens* and bull mastiff—are they 'highly comparable'? Give me a break."

By the time that Biro took on "La Bella Principessa," his reputation had become so solid, and the public appetite for forensic solutions had become so strong, that he no longer seems to have worried about watermarking his evidence or presenting a perfect match. Many people, not just experts, can look at a painting and argue over what they see, but few individuals, inside or outside the art world, can evaluate fingerprints. In that sense, Biro's authentications were far less democratic than traditional connoisseurship. Though he told me that he did not want to be "judge and jury," he had positioned himself as a singular authority.

Jeanne Marchig's lawsuit against Christie's may finally lead Biro's methods to be subjected to review by top fingerprint examiners. Biro emphasized to me that his findings in the case should not be "overblown," and that he never meant for them to be conclusive: "I see this as the beginning of a process. For me, this is not a closed case."

I asked him whether he might have been wrong in suggesting that Leonardo had ever touched "La Bella Principessa." He looked up at the sky and said, "It's possible. Yes."

During one of my final visits, Biro led me through his lab, where a new stack of orphaned paintings awaited inspection. In an e-mail to me, he had written, "I am busy as a bee, now working on several Michelangelo attributions as well as a new possible Leonardo. I guess when it rains it pours. Fingered another Turner, too." Some of his new research was to be featured in an upcoming documentary on PBS.

I followed Biro into his basement laboratory, where his father's landscape paintings hung. I wondered what had consigned them to this fate—hidden from the public, seen only by an adoring son. They had, I thought, a certain anguished beauty, but they also seemed derivative. Perhaps Biro's father had lacked that divine spark of originality, or perhaps he had sacrificed it while inhabiting the skin of immortal artists. In a corner of the laboratory, propped near Biro's camera contraption, was Teri Horton's canvas, splashed with blue and red and white paint. As I looked at it, I thought of Thomas Hoving and what he had seen in that initial instant. Connoisseurship is rife

with flaws. It is susceptible to error, arrogance, even corruption. And yet there is something about that "strange breed of cat," as Hoving referred to the best connoisseurs, who could truly see with greater depth—who, after decades of training and study and immersion in an artist's work, could experience a picture in a way that most of us can't. Connoisseurship is not merely the ability to discern whether an art work is authentic or fake; it is also the ability to recognize whether a work is a masterpiece. Perhaps the most uncomfortable truth about art is that such knowledge can never be truly democratic.

Biro showed me the back of Horton's canvas and pointed to the fingerprint. With growing excitement, he told me that he was pioneering a forensic method that would further revolutionize the process of authenticating art: DNA analysis. I learned that he had reported collecting several hairs on Horton's painting, which were the same brown color as Pollock's. He said that he had also removed hairs trapped in the dried paint on Pollock's studio floor and on other potential Pollock paintings. In an e-mail to a client, who paid him more than fifteen thousand dollars for DNA testing, Biro wrote, "If this keeps up I'll be reconstructing Pollock's toupee very soon."

Biro was planning to use DNA analysis in a project that he said would rival that of "La Bella Principessa": the discovery, in California, of a cache of more than fifty drip paintings possibly by Jackson Pollock. Biro, who had repeatedly examined the works, said that he had extracted a sample of hair that had been embedded in one of the pictures. With the help of the owners of the paintings, Biro had obtained a DNA sample from a living relative of Pollock.* Matching an artist's DNA on a painting, Biro told me, would finally remove any doubt from the authentication process. It would be, he said, a "holy grail." ♦

*Correction, August 13, 2010: The DNA sample was taken from Pollock's aunt, not from a direct descendant, as originally stated.

To get more of *The New Yorker*'s signature mix of politics, culture and the arts: **Subscribe Now**