UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                              :

PETER PAUL BIRO,                      :

                   Plaintiff,     :

                             :

             -against-       :

                             :

CONDÉ NAST, a division of ADVANCE   :
MAGAZINE PUBLISHERS INC., DAVID   :        11 Civ. 4442 (JPO)
GRANN, LOUISE BLOUIN MEDIA INC.,   :
GLOBAL FINE ART REGISTRY LLC,     :        MEMORANDUM
THERESA FRANKS, BUSINESS INSIDER,  :    OPINION AND ORDER
INC., GAWKER MEDIA LLC,         :
INTERNATIONAL COUNCIL OF MUSEUMS, :
GEORGIA MUSEUM OF ART and PADDY  :
JOHNSON,                     :

                             :

                Defendants.  :

-------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

      This is a diversity action for defamation and injurious falsehood.  Plaintiff Peter Paul

Biro was the subject of an article written by Defendant David Grann that appeared in the July 12-

19, 2010 issue of the *New Yorker* magazine, published by Defendant Condé Nast, a Division of

Advance Magazine Publishers Inc.  (*See* Second Amended and Supplemental Complaint, Dkt.

No. 27, Ex. A (the "Article").)  Biro alleges that the Article was false and defamatory in a variety

of respects.  After the suit was initiated, Biro identified several other individuals and businesses

that had reported or otherwise commented on the content of the allegedly defamatory Article,

and he sought leave to file a supplemental complaint adding those individuals and businesses as

defendants.  The Court granted this request (Dkt. No. 19), and on December 5, 2011, Plaintiff

filed the Second Amended and Supplemental Complaint.  (Dkt. No. 27 (the "Complaint").)

Two of the new defendants, Theresa Franks and Global Fine Art Registry LLC ("FAR") (collectively, for purposes of this motion, "Defendants") have moved to dismiss the complaint against them under Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction. (Dkt. No. 56.) Biro opposes this motion and cross-moves for payment of the costs of service of process. (Dkt. No. 64.)

For the reasons that follow, the motion to dismiss by Defendants Franks and FAR is denied without prejudice to renewal of the motion after the parties have engaged in limited jurisdictional discovery. Biro's motion for payment of costs is denied.

## I.    Background

A more complete factual background of the case and the Article is contained in the Court's opinion on the motion to dismiss filed by Defendants Advance and Grann, issued on August 9, 2012. (*See* Dkt. No. 70.) The parties' familiarity with this background is assumed. Set forth below are facts relevant to this motion.

Biro, the subject of the Article, is a citizen of Canada in the business of art restoration and authentication. He is well known in the art world for having developed scientific approaches to art authentication through the analysis of fingerprints. He brought suit against the author and publisher of the Article.

Defendant Franks is a citizen of the state of Arizona.

Defendant FAR is a limited liability company headquartered in Arizona.

Franks was quoted extensively in the Article, and, based on the Article, appears to have been instrumental in the research and investigation into the reliability of Biro's authentication methods and findings. (*See* Article at 23-26.)

2

The Complaint[1] alleges that on the FAR website, Franks, writing about the Article, states that she is

> grateful to the author David Grann for his fine work and for including some material and videos that were a result of the investigation that Fine Art Registry® conducted in reference to Peter Paul Biro and his amazing ability to discover fingerprints of the Masters on everything he examines. If a fingerprint is needed, he will find it. FAR® began its probe into Biro and his dealings back in 2007 with some amazing results. There are more questions raised here than answered, however there will be more revelations to come!

(Comp. ¶ 152.)

Later, Franks posted several articles to her website discussing the instant lawsuit. The first was posted on June 29, 2011, several days after this action was commenced, and was entitled "Pinhead Peter Paul Biro Awakens Sleeping Giants—Sues New Yorker Magazine and Award-Winning Writer David Grann and Takes Swipe at Fine Art Registry®." (Comp. ¶ 162.) In the posting, she states that "[t]he Complaint contains outrageous and fallacious allegations against David Grann and the New Yorker, and other parties, with no basis whatsoever in fact," and that the complaint "is amusing, in that it is written and crafted by Biro's lawyer in such a way to make Biro appear frightfully shady and quite guilty of wrongdoing." (*Id.*) In the same post, Franks wrote:

> As far as the integrity of David Grann and the *New Yorker* magazine goes, in all the interviews that Fine Art Registry has given over the years to the media, we never had the pleasure of participating in an investigative article in which the fact-checking and legal scrutiny was of such a high caliber and so thorough as it was with the *New Yorker* magazine.
> David Grann is a consummate professional and the *New Yorker* is, and always has been a well-respected magazine since 1925.

---

[1] Citations to the Complaint are styled as "Comp. ¶ __."

(Declaration of Richard A. Altman, Dkt. No. 63 ("Altman Dec."), Ex. A at 30.)[2]

Several weeks later, she posted about the case once again.  The Complaint contains the following excerpt from that post:

> Oh, yes, it's going to get very messy as Fine Art Registry begins to fully expose Biro's participation in what appears to be a cleverly orchestrated sucker game valued at around $360,000,000, give or take a few million here or a few million there. Fine Art Registry believes that to an enormous degree of reasonable probability (according to the overwhelming evidence we have on file), Biro is hoping to deflect possible lawsuits against him for fraud and maybe even eventual criminal implications, by accusing David Grann and the New Yorker magazine of defamation. In other words, Biro doesn't want you to pay any attention to what's going on behind the curtain. Look over here everyone! Perhaps Biro thought no one would notice his sleight of hand, his abracadabra, his hocus pocus. Heck, if he could dodge a bullet or two and quell the fears of a few pissed-off investors and at the same time ring the bell on a nice fat settlement from the New Yorker--well, what could be better?  If he can just keep all the balls in the air--he just might be able to pull it off and then he would be set for life and wouldn't have to worry about all those pesky little Jackson Pollock fingerprints, hairs, and DNA he can't help but to discover on all those canvases and stretcher bars that magically materialize with frequency, using his specially designed super duper fingerprint detection formula that no other latent fingerprint examiner in the world has ever heard of.

(Comp. ¶ 164.)

Plaintiff claims that these postings are false and defamatory.

## II.     Motion to Dismiss

### A.     Motion to Dismiss under 12(b)(2)

When responding to a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), the plaintiff bears the burden of showing that the court has jurisdiction over the

---

[2] The declaration of Mr. Altman, counsel to Biro, includes printouts of various portions of the websites at issue. Defendants do not dispute that these printouts accurately reflect the content posted on the websites.

defendants.  *See Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir.

2005).

"In deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court

has considerable procedural leeway.  It may determine the motion on the basis of affidavits

alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing

on the merits of the motion."  *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.

1981).  "Personal jurisdiction is necessarily a fact-sensitive inquiry dependent on the particulars

of the case before the court."  *Gucci Am., Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d

228, 240-41 (S.D.N.Y. 2010) (citing *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d

Cir. 1997)).  "[P]rior to discovery, a plaintiff challenged by a jurisdiction testing motion may

defeat the motion by pleading in good faith legally sufficient allegations of jurisdiction, i.e., by

making a prima facie showing of jurisdiction."  *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181,

184 (2d Cir. 1998) (internal citations and quotation marks omitted).  "A plaintiff can make this

showing through his own affidavits and supporting materials, containing an averment of facts

that, if credited, would suffice to establish jurisdiction over the defendant."  *Whitaker v. Am.

Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (internal citations, quotation marks and

alterations omitted).  "[W]here the issue is addressed on affidavits, all allegations are construed

in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor." *A.I.

Trade Finance, Inc. v. Petra Bank,* 989 F.2d 76, 79-80 (2d Cir. 1993); *see also Rubinbaum LLP

v. Related Corporate Partners V, L.P.*, 154 F. Supp. 2d 481, 486 (S.D.N.Y. 2001) ("Because

there has not been an evidentiary hearing in this case, the plaintiff need only make a prima facie

showing of personal jurisdiction over the defendant to survive a motion to dismiss, and the

pleadings and any supporting affidavits are to be interpreted in the light most favorable to the

plaintiff.") (citing *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir. 1997)).

"Personal jurisdiction of a federal court over a non-resident defendant is governed by the

law of the state in which the court sits—subject, of course, to certain constitutional limitations of

due process." *Robinson v. Overseas Military Sales Corp*., 21 F.3d 502, 510 (2d Cir. 1994); *see*

*also DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) ("In diversity cases arising

in this Circuit, personal jurisdiction is determined by the law of the state in which the district

court sits, which in this case is New York." (citation omitted). Thus, the Court must engage in a

"two-part analysis." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779,

784 (2d Cir. 1999). First, the court must look to the relevant jurisdictional statute of the forum

state, in this instance New York. *Whitaker*, 261 F.3d at 208 (quoting *Bensusan Rest. Corp. v.*

*King,* 126 F.3d 25, 27 (2d Cir. 1997)). Then, "[i]f the exercise of jurisdiction is appropriate

under that statute, the court must decide whether such exercise comports with the requisites of

due process." *Id.*

### B.    New York Jurisdictional Statutes

New York State provides for both general and specific personal jurisdiction. Under the

general jurisdiction statute, set forth in Section 301 of New York Civil Practice Law and Rules

("CPLR"), a plaintiff need not "establish a connection between the cause of action and the

foreign defendant's business activities within the State, because the authority of the New York

courts is based solely upon the fact" that the defendant is present in New York. *McGowan v.*

*Smith*, 52 N.Y.2d 268, 437 N.Y.S.2d 268, 419 N.E.2d 321, 323 (1981). Under the specific

jurisdiction statute, set forth in CPLR § 302, a plaintiff may rely on a lesser showing of contact

between the defendant and the state, but must establish that the cause of action arose out of the defendant's contacts with the state. *Id.*

Plaintiff asserts that there is personal jurisdiction over FAR under both statutes, and over Franks under the specific jurisdiction statute.

## C.     General Jurisdiction:  Section 301

### 1.     Applicable Law

Section 301 of the CPLR empowers a court to "exercise such jurisdiction over persons, property, or status as might have been exercised heretofore."  CPLR § 301.  Thus, a New York corporation remains subject to the general jurisdiction of New York courts.  The New York Court of Appeals has also held that "[a] foreign corporation is amenable to suit in New York courts under CPLR 301 if it has engaged in such a continuous and systematic course of 'doing business' here that a finding of its 'presence' in this jurisdiction is warranted." *Landoil Res. Corp. v. Alexander & Alexander Services, Inc*., 77 N.Y.2d 28, 563 N.Y.S.2d 739, 565 N.E.2d 488, 490 (1990).  As then Judge Cardozo explained, in order to be amenable to general jurisdiction, a defendant must be present in New York "not occasionally or casually, but with a fair measure of permanence and continuity." *Tauza v. Susquehanna Coal Corp.*, 220 N.Y. 259, 115 N.E. 915, 917 (1917).  The "doing business" standard is "stringent, because a defendant who is found to be doing business in New York in a permanent and continuous manner may be sued in New York on causes of action wholly unrelated to acts done in New York." *Holey Soles Holdings, Ltd. v. Foam Creations, Inc*., No. 05 Civ. 6893, 2006 WL 1147963, at *3 (S.D.N.Y. May 1, 2006) (citing *Overseas Media, Inc. v. Skvortsov*, 407 F. Supp. 2d 563, 567-68 (S.D.N.Y. 2006)).

Courts focus on a traditional set of indicia of doing business in New York, including: (1) whether the company has an office in the state; (2) whether it has any bank accounts or other property in the state; (3) whether it has a phone listing in the state; (4) whether it does public relations work there; (5) and whether it has individuals permanently located in the state to promote its interests. *Wiwa v. Royal Dutch Petroleum Co*., 226 F.3d 88, 98 (2d Cir. 2000) (citing *Hoffritz for Cutlery, Inc. v. Amajac, Ltd*., 763 F.2d 55, 58 (2d Cir. 1985); *Frummer v. Hilton Hotels Int'l, Inc*., 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851, 853 (1967)). "The shipment of goods into New York does not *ipso facto* constitute 'doing business'" here. *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 763 (2d Cir. 1983).

In addition to these traditional indicia, courts also look to whether the defendant solicits business in New York. "It is well settled that the solicitation of business alone, without more, by an out-of-state defendant is insufficient to find a corporate presence within the state." *Aqua Products, Inc. v. Smartpool, Inc.*, No. 04 Civ. 5492, 2005 WL 1994013, at *3 (S.D.N.Y. Aug. 18, 2005) (citing *Landoil Res. Corp. v. Alexander & Alexander Services, Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1991)). However, if "solicitation is substantial and continuous, and defendant engages in other activities of substance in the state, then personal jurisdiction may properly be found." *Landoil*, 918 F.2d at 1043. This has been referred to as the "solicitation-plus" rule. *Holey Soles*, 2006 WL 1147963, at *5 ("The solicitation of business in New York will not justify a finding of general jurisdiction unless the foreign defendant's actions constitute 'solicitation-plus.'").

The internet has somewhat complicated the "doing business" inquiry because it allows any company with a website accessible in a state to do business (at least to some degree) in that state. A company's internet activities are usually examined in the context of specific jurisdiction, but courts have also examined such activity to determine whether a defendant

engages in substantial solicitation of business in New York.  *See Allojet PLC v. Vantgage Assocs.*, No. 04 Civ. 5223, 2005 WL 612848, at \*4-6 (S.D.N.Y. Mar. 15, 2005).  Courts generally place a defendant's web-based activity along a spectrum:  "At the lower end of the spectrum are 'passive' websites, which primarily make information available to viewers but do not permit an exchange of information."  *Hsin Ten Enter. USA, Inc. v. Clark Enterprises*, 138 F. Supp. 2d 449, 456 (S.D.N.Y. 2000).  At the other end are situations where the "defendant clearly does business over the Internet, such as where it repeatedly transmits computer files to customers in other states."  *Id.*  "Occupying the middle ground are 'interactive' websites, which permit the exchange of information between the defendant and website viewers."  *Id.*

Courts have generally held that the fact that a foreign corporation has a website that is accessible within New York is insufficient to confer jurisdiction under CPLR § 301, "unless that website is purposefully directed towards New York."  *Holey Soles*, 2006 WL 1147963, at \*4 (citing *Freeplay Music, Inc. v. Cox Radio, Inc.,* No. 04 Civ. 5238, 2005 WL 1500896, \*4 (S.D.N.Y. June 23, 2005)).  A court in this District noted the dangers of conferring general jurisdiction over a company simply because it has a website that "allows anyone with an Internet connection around the globe" to learn about the company's products, view a listing of authorized retailers, and purchase products online from the company's out-of-state headquarters:

> If such a website gave rise to general jurisdiction, then millions of retailers located throughout the globe could be haled into New York courts for any claim brought against them by any party; such a finding would contravene the purposefully narrow reach and long-standing stringent application of C.P.L.R. § 301.

*Id.* at \*4.

At the same time, if a defendant's website is "purposefully directed towards New York," or the defendant solicits substantial amounts of business from New York on a continuous basis,

then there may be a basis for general jurisdiction.  "Courts will frequently look to the percentage

of a company's revenue attributable to New York business in determining whether solicitation is

substantial and continuous."  *Overseas*, 407 F. Supp. 2d at 569.

 Of course, the solicitation of business through a website, even if substantial, does not

alone satisfy the "solicitation-plus" standard, which also requires that a "defendant engages in

other activities of substance in the state."  *Landoil*, 918 F.2d at 1043.  "[T]he additional activities

sufficient to confer jurisdiction under the solicitation plus doctrine 'have involved either some

financial or commercial dealings in New York . . . or the defendant holding himself out as

operating in New York, either personally or through an agent.'"  *Cicalo v. Harrah's Operating

Co., Inc.*, No. 06 Civ. 221, 2008 WL 1847665, at *4 (S.D.N.Y. Apr. 24, 2008) (quoting *Grill v.

Walt Disney Co.*, 683 F.Supp. 66, 69 (S.D.N.Y. 1988)).  Courts hold that "once solicitation is

found in any substantial degree very little more is necessary to a conclusion of 'doing business.'"

*Id.* at 1044 (quoting *Aquascutum of London, Inc. v. S.S. American Champion,* 426 F.2d 205, 211

(2d Cir. 1970)).

 General jurisdiction may also be had over a foreign corporation based on the presence of

agents in New York.  Thus, a defendant is subject to jurisdiction "when it affiliates itself with a

New York representative entity and that New York representative renders services on behalf of

the foreign corporation that go beyond mere solicitation and are sufficiently important to the

foreign entity that the corporation itself would perform equivalent services if no agent were

available."  *Wiwa*, 226 F.3d at 95.  "To come within the rule, the plaintiff need demonstrate

neither a formal agency agreement, nor that the defendant exercised direct control over its

putative agent"; however, "the agent must be primarily employed by the defendant and not

engaged in similar services for other clients."  *Id.*  Jurisdiction will not lie "when the foreign

defendant merely uses outside sales representatives residing in the forum state to service authorized retail accounts when such representatives are not employed by the defendant and have no authority to bind the defendant to contracts or to open new account locations." *Holey Soles*, 2006 WL 1147963, at *6 (citing *Riviera Trading Corp. v. Oakley, Inc.*, 944 F. Supp. 1150, 1156 (S.D.N.Y. 1996)).

### 2.    Application of Law to Fact

Biro argues that there is jurisdiction over FAR under CPLR § 301 because FAR is doing business here through its website and because it has "agents who transact and solicit business in New York." (Memorandum of Law in Opposition to Motion to Dismiss for Lack of Personal Jurisdiction, and in Support of Cross-Motion for Payment of Costs of Service of Process, Dkt. No. 64 ("Pl. Opp."), at 12.)

The parties do not dispute that FAR does not meet the traditional criteria for "doing business" in New York. FAR does not have an office, bank accounts, a phone listing, or other property here. Defendant Franks submitted an affidavit on behalf of herself and FAR stating that they "do not transact any business within the State of New York"; "have not contracted to supply goods or services in the State of New York"; and "have not solicited business, or engaged in any persisistent course of conduct, or derived substantial revenue from goods used or consumed or services rendered in New York." (Affidavit of Theresa Franks, Dkt. No. 58 ("Franks Aff."), ¶¶ 6, 9.) In that same affidavit, Franks states that "FAR's website is dedicated, in large part, to exposing fraud and deception in the art world." (*Id.* ¶ 4.)

Plaintiff points out that the FAR website, which the parties do not dispute is accessible in New York, appears to contain a direct solicitation of business:

11

> We offer a high-tech patented ID tag that you apply to your art and collectibles, similar to a car's VIN or a book's ISBN.  The archive safe ID tags are registered to you in our database, allowing you to register and store all the information about the piece including title, artist, medium, size, year created, photos, documentation and description.  Using our system you can Tag, Register and Organize your Art and Collectibles in our permanent online database, to ensure the authenticity and provenance of your collection.

(Altman Dec., Ex. A at 1.)  An examination of the website shows that it offers for sale membership plans, packets of Fine Art Registry ID Tags, instructional videos, art and art fraud books and consultation services.  (*Id.*)  The website also contains blog postings, videos, newsletters, and numerous areas where members and potential customers can submit questions to FAR.

In a Reply Affidavit, Franks explains that the Fine Art Registry

> is a patented technology, method and database.  It serves as a permanent registry for artists and collectors, much like a VIN to a motor vehicle.

> Indeed, the ID tags FAR provides are incidental to FAR's primary purpose – providing the service, storage and maintenance of the permanent registry database located in Arizona.  It is [a] service we provide vis-à-vis the registry database that drives the corporation's revenues, as opposed to the tags themselves.

> FAR is not in any way involved in the details or preparation of the artwork that registrants enter into the database.

(Reply Affidavit of Theresa Franks, Dkt. No. 67 ("Franks Reply Aff."), ¶¶ 2-4.)

Franks' testimony does not change the fact that the FAR website fairly clearly falls on the more "interactive" side of the spectrum.  (This is the case whether the revenue is driven by sales of the ID tags and other products, or from the members' use of the database itself.)  Although Franks states that FAR does not "derive[] substantial revenue from goods used or consumed or services rendered in New York," (Franks Aff. ¶ 9), there is no information in the record showing

how much of the company's revenue is derived from the sale of products, services, or database membership to New York customers.  It stands to reason, however, that, given the centrality of New York City to the global art market, a not insignificant amount of FAR's revenue would be derived from business in New York.  Because there has been no jurisdictional discovery, all doubts must be resolved in Plaintiff's favor.  *A.I. Trade Finance*, 989 F.2d at 79-80.  Thus, the Court cannot conclude at this stage that FAR does not solicit substantial amounts of business from New York.

Even if FAR does solicit substantial amounts of business from New York, there would still need to be a showing that it "engages in other activities of substance in the state" to meet the solicitation-plus test.  *Landoil*, 918 F.2d at 1043.  Plaintiff suggests that FAR transacts and solicits business through agents located in the state.  In particular, he points to the section of FAR's website that lists "our partners," including Neglia Services, Inc. ("Neglia"), which (according to FAR's website) has a "Jewelry Registration & Tagging Technology Service" and "has now partnered with the Fine Art Registry."  (Altman Dec., Ex. A at 14.)  The FAR website explains that

> due to this partnership; we have the distributorship, which provides a tagging technology that offers security, authenticity, tracking capabilities, and proof of ownership, which can be passed down to Insurance Industry, policy holders, Retail operations, previous, and new potential customers. [*sic*]

(*Id*.)  FAR also lists as a "partner" CLE 123, Inc., which is a California-approved provider of MCLE credits authorized to issue [Continuing Legal Education ("CLE")] credits in New York and Arizona."  (*Id.*)  The website states that CLE 123, Inc. has "teamed up" with FAR to help provide courses on art and art law for lawyers, including, presumably, to  lawyers licensed in New York.   (*Id.* at 15.)  Plaintiff also contends that FAR has "a relation" [*sic*] with a New York

art supply company called Dick Blick, which has retail locations in Manhattan and on Long

Island, based on the fact that the company sells primed canvases that are already tagged with a

FAR ID tag and registered in the FAR database.  (Pl. Opp. at 13.)

Franks states in her Reply Affidavit that none of the entities has "any authority

whatsoever to bind or act on behalf of FAR"; that none has "permission to make any decisions

for FAR, or accept or promote any business on behalf of FAR"; and that "FAR does not have a

controlling interest in any of these entities nor does it own any of these entities."  (Franks Reply

Aff. ¶¶ 10-12.)

These business relationships would not be sufficient to confer jurisdiction on their own,

as there is no suggestion that these companies are "primarily employed by the defendant and not

engaged in similar services for other clients."  *Wiwa*, 226 F.3d at 95.  It also appears that there is

no formal agency relationship between these entities and FAR.  At the same time, it seems

possible that the relationship between FAR and these entities—which FAR's own websites refer

to as "partners"—could satisfy the "plus" component of the "solicitation-plus" test.

The plaintiff, of course, bears the ultimate burden of proving jurisdiction by a

preponderance of the evidence, and given the "stringent" approach that courts take to the general

jurisdiction power under Section 301, *Allojet*, 2005 WL 612848, at *3, it is possible that Biro

will be unable to demonstrate that FAR is amenable to general jurisdiction in New York.

However, there has been no discovery into the amount of business that FAR solicits in New

York or the portion of FAR's revenue derived from New York business.  There has also been no

discovery into the exact nature of the "partner" relationships with entities that are either located

in New York or themselves solicit substantial business from New York.  Accordingly, the Court

14

cannot hold as a matter of law that Biro has failed to make a "sufficient start toward establishing that there is general jurisdiction" to entitle him to jurisdictional discovery. *Id.* at *7.

### D.       Section 302:  Specific Jurisdiction

#### 1.       Applicable Law

New York's long-arm statute for specific jurisdiction is codified at CPLR § 302.  Section 302 provides that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent" "transacts any business within the state or contracts anywhere to supply goods or services in the state."  CPLR § 302(a)(1).  The statute also provides for jurisdiction for tortious acts committed within the state, and for tortious acts committed outside the state that cause injury within the state, but neither of those provisions is applicable here, as both expressly exempt "a cause of action for defamation of character arising from the act." CPLR § 302(a)(2), (3).

Unlike general jurisdiction, where "doing business" in New York subjects a defendant to jurisdiction regardless of the context in which the claim arises, specific jurisdiction requires that the cause of action arise out of the transaction of business within the state.  Thus, to determine whether a defendant is subject to jurisdiction under 302(a)(1), the court must decide (1) whether the defendant "transacts any business" in New York and, if so, (2) whether this cause of action arises from such a business transaction. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (citation, quotation marks and brackets removed).

In order to satisfy the first prong of the test, "there must have been some 'purposeful activities' within the State that would justify bringing the nondomiciliary defendant before the New York courts." *SPCA of Upstate New York, Inc. v. Am. Working Collie Ass'n*, 18 N.Y.3d 400, 940 N.Y.S.2d 525, 963 N.E.2d 1226, 1128 (2012) (quoting *McGowan*, 52 N.Y.2d 268, 437

N.Y.S.2d 268, 419 N.E.2d at 322).  This activity need not be commercial in nature.  *Best Van Lines*, 490 F.3d at 247 n.10; *Padilla v. Rumsfeld*, 352 F.3d 695, 709 (2d Cir. 2003).  New York courts define purposeful activity as "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *Id.* at 246-47 (quoting *McKee Elec. Co. v. Rauland-Borg Corp.*, 20 N.Y.2d 377, 283 N.Y.S.2d 34, 229 N.E.2d 604, 607 (1967)).  "As for the second part of the test, '[a] suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York.'"  *Id.* at 246 (quoting *Henderson v. INS*, 157 F.3d 106, 123 (2d Cir. 1998)).

Defamation claims create an interesting challenge for the New York long-arm jurisdiction inquiry.  Jurisdiction can be asserted based only upon a defendant's transaction of business (even if not commercial) in New York, but courts are clear that the act of uttering the defamation itself—"no matter how loudly"—does not satisfy this prong.  *Best Van Lines*, 490 F.3d at 248; *see also Pontarelli v. Shapero*, 231 A.D.2d 407, 647 N.Y.S.2d 185, 188 (1st Dep't 1996) (holding that sending two allegedly defamatory letters and one facsimile into New York did not constitute transaction of business).  An alternative rule would provide an easy end-run around the express exemption of defamation claims from jurisdiction based on tortious acts within the state or with in-state effects.  *See Kim v. Dvorak*, 230 A.D.2d 286, 290, 658 N.Y.S.2d 502, 505 (1997) (holding that to deem sending of allegedly defamatory letters into New York as transaction of business would "unjustifiably extend the intendment of the Legislature to allow, in limited circumstances, the reach of this State's jurisdiction beyond its borders").  The Second Circuit recently addressed the issue of long-arm jurisdiction for internet-based defamation in a

16

thorough opinion and concluded that "the posting of defamatory material on a website accessible in New York does not, without more, constitute transacting business in New York for purposes of New York's long-arm statute." *Best Van Lines*, 490 F.3d at 250 (citing *Realuyo v. Villa Abrille*, No. 01 Civ. 10158, 2003 WL 21537754, at *6 (S.D.N.Y. July 8, 2003)). Instead, courts require that the defendant's conduct include "something more"—some other acts that constitute transacting business in New York, and which have a substantial relationship to the defamation claim. *Id.* at 249.

This standard creates some difficulty because the acts that would ordinarily qualify as transactions of business are seldom related to an act of defamation. For example, a website that sells products would undoubtedly be subject to long-arm jurisdiction for claims arising directly out of the sales transactions for those products. But it seems unlikely that those sales would have an articulable nexus to defamation published by the proprietor of that website such that there would be long-arm jurisdiction over the defamation claim. As the Second Circuit explained in *Best Van Lines*, "a website's interactivity may be useful for analyzing personal jurisdiction under section 302(a)(1), but *only* insofar as it helps to decide whether the defendant 'transacts any business' in New York . . . ." 490 F.3d at 252 (emphasis added). That transaction of business must still be substantially related to the defamation claim in order to form the basis of long-arm jurisdiction. *See id.* at 254-55 (holding that website's solicitation of donations may constitute transacting business, but "this nexus—between allegedly tortious conduct and the revenue transactions required to support such conduct—is so attenuated, the relationship between the quest for funds and the lawsuit for which jurisdiction is sought so insubstantial, that the nexus or relationship cannot alone be a sufficient basis upon which to establish jurisdiction over the defendant for purposes of this case.").

17

Courts have typically found long-arm jurisdiction over defamation claims where the defendant engaged in some purposeful activity within New York that was directly related to the creation of the allegedly defamatory work.  For example, in *Legros v. Irving*, 38 A.D.2d 53, 327 N.Y.S.2d 371 (1st Dep't 1971), the alleged defamation was contained in a book.  The court held that there was long-arm jurisdiction over the claim because it was "clear that virtually all the work attendant upon publication of the book occurred in New York."  *Id.* at 373.  The book was in part researched in New York by the author, negotiations with the publisher took place in New York, the contract between the author and publisher was executed in New York and the book was printed in New York.  The court noted that

> [t]here is no requirement that jurisdiction be grounded upon either the final act or the ultimate act causing the injury. . . . Where as here, all the significant actions culminating in the publication of the book occurred in New York, it is quite evident that the cause of action does arise out of those transactions of business.

*Id.*  Similarly, in *Montgomery v. Minarcin*, 263 A.D.2d 665, 693 N.Y.S.2d 293 (3d Dep't 1999), the court held that there was jurisdiction over the creators of an allegedly defamatory television news report because "all of the operative facts giving rise to plaintiff's claims occurred in this State":  the reports were written, produced, and reported in New York, and were broadcast in New York.  *Id.* at 296; *see also Sovik v. Healing Network*, 244 A.D.2d 985, 665 N.Y.S.2d 997, 999 (4th Dep't 1997) (holding that where defendants drafted and either distributed or authorized distribution of allegedly defamatory letter in Buffalo, New York, there was sufficient basis for long-arm jurisdiction).

On the other hand, the New York Court of Appeals has held that "where the contacts are more circumscribed and not directly related to the defamatory statement," or where the relationship between the transaction of business and the defamation is "too diluted," the court

18

will not find jurisdiction. *SPCA*, 18 N.Y.3d 400, 940 N.Y.S.2d 525, 963 N.E.2d at 1229. In

*SPCA*, the plaintiff, a local Society for the Prevention of Cruelty to Animals ("SPCA"), brought

defamation claims based on postings published on the defendant association's website. The

defendant American Working Collie Association ("AWCA") was an Ohio nonprofit organization

dedicated to promoting the welfare and protection of collies. The plaintiff was a nonprofit

organization dedicated to preventing cruelty to animals more broadly. In 2007, 23 mistreated

dogs (including several collies) were rescued from a residence in New York and brought to the

plaintiff's facility. When the president of the AWCA, Jean Levitt, a Vermont resident, learned

this, she telephoned plaintiff to offer the AWCA's assistance, and later the AWCA sent the

SPCA a $1,000 donation. The AWCA also purchased leashes and collars for the dogs. Levitt

visited the SPCA facility on two occasions (spending a total of less than three hours at the

facility), first to deliver the leashes and collars and tour the facility, and then to check on the

collies. Levitt telephoned the plaintiff a total of three times to make arrangements and discuss

the care for the dogs. Volunteers affiliated with the AWCA also assisted in providing care for

the dogs. Later, after her visits, Levitt made several postings to the AWCA website discussing

the condition of the collies and criticizing the treatment being provided by the SPCA. The SPCA

sued for defamation.

     The Court of Appeals affirmed the Appellate Division's ruling that these contacts were

insufficient to support a finding of long-arm jurisdiction over the defendants. The court held that

the "defendants' activities in New York were quite limited," and that the two short visits, three

phone calls, and donation of cash and leashes "do not constitute purposeful activities related to

the asserted cause of action that would justify bringing her before the New York courts." *Id.* at

1229. The court also held that there was no substantial relationship between the defendants'

New York activities and the defamation claim because "Levitt did not visit New York in order to conduct research, gather information or otherwise generate material to publish on the group's Web site.  Instead, defendants engaged in limited activity within the state in order to help provide financial and medical assistance for the dogs."  *Id*.  The court speculated that, had the AWCA placed the dogs with plaintiffs in New York or complained of its volunteers' treatment by the plaintiffs, there may have been a sufficiently substantial relationship between the allegedly defamatory statements and the defendants' New York activities, but as it was, the connection was "too tangential."  *Id.* at 1230.

Previously, the New York Court of Appeals had taken a seemingly even stricter approach to determining the nexus between the New York activity and the alleged defamation.  In *Talbot v. Johnson Newspaper Corp*., 71 N.Y.2d 827, 527 N.Y.S.2d 729, 522 N.E.2d 1027, 1028 (1988), one defendant, a California resident, wrote two letters to officials at St. Lawrence University in New York concerning the conduct of the plaintiff, who was employed as a coach at the school. (One of the letters was also subsequently published in a local newspaper).  The defendant's letters addressed incidents observed by his daughter, also a California resident (and also a defendant), while she was a student at St. Lawrence, two years prior.  In particular, the daughter stated that she observed an individual, whom she believed to be the plaintiff, in a severely intoxicated state at a fraternity party, and that a student who got into a fatal car accident while intoxicated was coming from a party at the plaintiff's home.  The court held that even if the daughter's attendance at a New York university constituted purposeful activity in New York, "there was no showing that—years after termination of that relationship—there was the required nexus between the [defendants'] New York 'business'" and the defamation action.  *Id.* at 1029.

The New York Court of Appeals stated in the *SPCA* case that the state legislature "has manifested its intention to treat the tort of defamation differently from other causes of action" with respect to long-arm jurisdiction, and, "as a result, particular care must be taken to make certain that non-domiciliaries are not haled into court in a manner that potentially chills free speech . . . ." *SPCA*, 18 N.Y.3d 400, 940 N.Y.S.2d 525, 963 N.E.2d at 1230.

### 2.    Application of Law to Facts

There can be little doubt that, through its website, FAR transacts business and contracts to supply goods or services in the State of New York (along with other states).  However, there is no showing that these business transactions—including sales of its products and provision of its database services to New Yorkers—are substantially related to the alleged defamation.  Although Franks' postings about this lawsuit are somewhat related to the apparent broader goals of FAR— indeed, her affidavit states that "FAR's website is dedicated, in large part, to exposing fraud and deception in the art world" (Franks Aff. ¶ 4)—the connection to FAR's *New York* transactions of business is far too tenuous to confer jurisdiction under 302(a)(1).

However, Franks and FAR may have engaged in other "purposeful activity" in New York that is substantially related to the alleged defamatory statements.  Franks stated on the FAR website that the Article in the *New Yorker* included "some material and videos that were a result of the investigation that Fine Art Registry® conducted in reference to Peter Paul Biro . . . ." (Comp. ¶ 152.)   Biro also cites a video posted on the Internet in which Franks discusses the Article and states:  "We did help with some of the evidence for this article"; "Fine Art Registry is just thrilled that we are part of the New Yorker magazine's investigation into this man and we're very proud of the work that we've done so far in uncovering forged fingerprints that Biro said he found on the back of a proposed, or an alleged, Jackson Pollock painting"; and "We were

involved heavily in this Jackson—this proposed, this alleged, Jackson Pollock controversy with Biro."  (Pl. Opp. at 15.)

Biro argues that Franks personally traveled to New York in connection with the allegedly defamatory postings.  He cites a video showing an interview with Ken Parker and his wife, who were owners of a painting on which Biro had claimed to find a fingerprint that matched that of Jackson Pollock.  The analysis of that fingerprint was discussed extensively in the Article, and the Article contained numerous quotations from the fingerprint experts featured in the video (Pat Wertheim and Tom Hanley), who concluded that the fingerprints were likely forged.  (*See* Article at 23-26.)  Franks is also seen in the video, conducting the interview with the Parkers. The interview takes place in the Parkers' home, which is indisputably located in New York. Franks concedes that she did visit New York in 2007 to "meet with the Parkers at their home and to assist in the ongoing criminal investigation taking place with regard to the Plaintiff's scam." (Franks Reply Aff. ¶ 13.)  However, she states that she "never visited New York to meet with David Grann," and has not visited New York for several years.  (*Id.*)

Based on the limited evidence before the Court, it is difficult to say whether Franks' (and FAR's) involvement with the creation of the Article, and with investigating Biro generally, are sufficient to constitute transactions of business in New York that are substantially related to the alleged defamatory statements.  In other words, this case could be somewhat like the *Legros* case, where "all the significant actions culminating in the publication of the [allegedly defamatory] book occurred in New York," 38 A.D.2d 53, 327 N.Y.S.2d at 373, or it could be more like the *SPCA* case, where the site visits, telephone calls, and donations of money and leashes did not constitute transactions of business that were substantially related to the publication of website postings about conditions at the facility that were observed during those

22

site visits.  In *SPCA*, the Court of Appeals suggested that the outcome may have been different if

the defendant had visited New York "in order to conduct research, gather information or

otherwise generate material to publish on the group's Web site."  18 N.Y.3d 400, 940 N.Y.S.2d

525, 963 N.E.2d at 1229.

   It is undisputed that at least some portion of FAR's investigation of Biro took place in

New York (particularly the analysis of the Parkers' painting), and that Franks traveled to New

York at least once in connection with that investigation.  If the facts reveal that Franks'

investigation took place to a significant degree in New York, or that Franks was intimately

involved with the research and investigation behind the Article in New York (which research

also formed the basis for the allegedly defamatory postings), then she and FAR may indeed have

engaged in purposeful activity with an articulable nexus to the alleged defamation.  If, however,

the investigation took place largely outside New York, or Franks and FAR were involved more

peripherally in any research and investigation that did take place here, then there may be no

specific jurisdiction after all.

   Defendants argue that Biro "has grounded his action for defamation against FAR and

Franks solely upon the two articles posted about *this litigation*, not the 2007 inspection."

(Memorandum of Law in Further Support of Theresa Franks and Global Fine Art Registry,

LLC's Motion to Dismiss for Lack of Personal Jurisdiction, and in Opposition to Plaintiff Peter

Paul Biro's Cross-Motion for Payment of Costs of Service of Process, Dkt. No. 66 ("Defs.

Reply"), at 4.)  But the articles are not written by a disinterested observer commenting on a

pending lawsuit.  By Franks' own assertion, she was directly involved in the investigation of

Biro and with the creation of the Article, and the allegedly defamatory postings draw heavily

from those experiences.  For example, she refers to the "overwhelming evidence we have on

23

file" at FAR to support her statements about Biro.  (Comp. ¶ 163.)  If that evidence was gathered and analyzed in New York—in other words, if the content of the allegedly defamatory postings was drawn from New York activity—then her articles may be akin to the television program in *Montgomery v. Minarcin*, 263 A.D.2d 665, 694 N.Y.S.2d 293, which was written, produced, and reported in New York.

The Court could hazard a guess as to the degree of Ms. Franks' involvement in the research for the Article that gave rise to this lawsuit, or how much of the investigation into Biro underlying her postings took place in New York, but it would be just that—a guess.  At this stage of the proceedings, where there has been no jurisdictional discovery, the Court must construe all allegations in the light most favorable to Plaintiff and must resolve all doubts in Plaintiff's favor. *A.I. Trade Finance*, 989 F.2d at 79-80.  Accordingly, the Court concludes that Plaintiff has made the requisite "sufficient start" demonstrating a "reasonable basis," *Allojet*, 2005 WL 612848, at *7, for asserting jurisdiction over Ms. Franks and FAR.  Further jurisdictional discovery may shed light on these issues and allow the Court to resolve the issue with more finality.

### E.   Due Process

Even if jurisdiction over a defendant may be had pursuant to a state's long-arm statute, jurisdiction is appropriate only if it comports with due process.  "[I]n order to exercise personal jurisdiction over out-of-state defendants, the Due Process Clause of the Fourteenth Amendment requires only that the defendants have 'certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Best Van Lines*, 490 F.3d at 242 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  In order to determine whether a defendant has the requisite minimum contacts, the Court must look to the totality of the circumstances to determine whether the defendant has

"purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985)).

As the Second Circuit has observed, the approach of New York courts to determining whether a defendant has transacted business in New York "overlaps significantly" with the constitutional due process standard. *Id.* at 247 (observing that New York courts define "transacting business" as "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws" (quoting *McKee Elec. Co.*, 20 N.Y.2d 377, 283 N.Y.S.2d 34, 229 N.E.2d at 607)). Accordingly, the Court's determination of the due process inquiry is heavily dependent upon its determination of the long-arm statute inquiry.

Because the Court holds that jurisdictional discovery is necessary to determine whether Defendants fall under New York's jurisdictional statutes, the Court reserves judgment on whether the assertion of jurisdiction over Defendants would comport with due process.

## III.   Cross-Motion for Payment Costs of Service of Process

Plaintiff cross-moves for payment of costs for service of process pursuant to Rule 4(d)(2) of the Federal Rules of Civil Procedure.

Rule 4(d) provides that "[a]n individual, corporation, or association that is subject to service under Rule 4(e), (f) or (h) has a duty to avoid unnecessary expenses of serving the summons." Fed. R. Civ. P. 4(d)(1). The Rule provides for service of the summons and complaint by regular mail, provided that the defendant waives service of the summons by signing and returning a form waiver. *Id.* The defendant is not required to return the waiver. However, the Rule provides that

> [i]f a defendant located in the United States fails, without good cause, to sign and return a waiver [of service] requested by a plaintiff located within the United States, the court *must* impose on the defendant:
>
> (A) the expenses later incurred in making service; and
>
> (B) the reasonable expenses, including attorney's fees, of any motion required to collect those service expenses.

Fed. R. Civ. P. 4(d)(2) (emphasis added).

Ignored by both parties in the briefing of this cross-motion is the fact that Biro, the plaintiff, is indisputably not "located within the United States" (although his lawyer is). *Id.* The Court has not located authority regarding the application of the Rule under these circumstances, but under the plain language of the Rule, it would appear that the mandatory cost-shifting provisions do not apply in this case. *See Hoffman-La Roche, Inc. v. Invamed, Inc.*, 183 F.R.D. 157, 159 (D.N.J. 1998) ("It is clear from the language of Rule 4(d) that its application is preconditioned upon both plaintiff and defendant being located in the United States.").

Nevertheless, but for the fact that Biro is located outside the United States, this would be a paradigmatic case for the shifting of costs for failure to waive service. Biro's attorney submitted an affidavit stating that in December 2011, he sent to Defendants by first class mail copies of the complaint, along with requests for a waiver of service, the waivers, and postpaid return envelopes. (Altman Dec. ¶ 3.) Defendants did not return the waivers and Biro ultimately had to resort to the use of a process server to serve them in March 2012. Defendants do not even attempt to show "good cause" for their failure to return the waivers, and pointedly do not deny having received the summons in the mail from Biro's attorney. Instead, in their brief, they quibble with statements concerning service by the process server in a separate affidavit from Biro's counsel (filed in connection with a different motion in the case). (Defs. Reply at 9-10.)

The Court notes that it has the "inherent power" "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630-31 (1962)). Included within this "inherent power" is "the power to assess costs and attorneys' fees against either the client or his attorney where a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *United States v. Int'l Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO,* 948 F.2d 1338, 1345 (2d Cir. 1991) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 258-59 (1975)). However, as the Second Circuit has pointed out, "[t]he Supreme Court has cautioned that because of the 'very potency' of a court's inherent power, it should be exercised with restraint and discretion." *Id.* (quoting *Chambers,* 501 U.S. at 44). Accordingly, the Circuit has "always required a particularized showing of bad faith to justify the use of the court's inherent power," looking for "clear evidence that the challenged actions are entirely without color, and are taken for reasons of harassment or delay or for other improper purposes," based on a "high degree of specificity in the factual findings." *Id.* (citations and quotation marks omitted).

Although Defendants fail to show good cause for their failure to return the waivers, there is not sufficient evidence of bad faith to justify an imposition of sanctions pursuant to the Court's inherent authority.

## IV.   Conclusion

For the foregoing reasons, Defendants' motion to dismiss the Second Amended and Supplemental Complaint for lack of personal jurisdiction (Dkt. No. 56) is DENIED without prejudice to its renewal following completion of limited discovery. Plaintiff's motion for costs of service (Dkt. No. 65) is DENIED.

The parties shall confer on the appropriate scope and schedule for jurisdictional discovery and submit a joint letter to the Court with a proposed schedule no later than August 24, 2012.

SO ORDERED.

Dated: New York, New York
       August 10, 2012

_____
J. PAUL OETKEN
United States District Judge