LAW OFFICE OF RICHARD A. ALTMAN
Attorneys for Plaintiff
285 West Fourth Street
New York, New York 10014
212.633.0123
altmanlaw@earthlink.net
artesq@earthlink.net

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

PETER PAUL BIRO,

        Plaintiff,

  -against-                                  11-cv-4442 (JPO)

CONDÉ NAST, a division of
ADVANCE MAGAZINE PUBLISHERS INC.,
et al.,
        Defendants.

-------------------------------------------------------------x

**MEMORANDUM OF LAW IN OPPOSITION TO MOTION
TO DISMISS OF DEFENDANT PADDY JOHNSON**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

POINT I:

THE STATEMENTS ARE FACTUAL ASSERTIONS, REASONABLY
SUSCEPTIBLE OF A DEFAMATORY CONNOTATION, NOT OPINIONS. . . . . . . . 1

POINT II:

THE CLAIM IS SUFFICIENTLY PLEADED, WHETHER MR. BIRO IS
A PUBLIC FIGURE OR NOT, AND THERE IS IN ANY EVENT
EVIDENCE OF MALICE FROM THE REPUBLICATION AND
REFUSAL TO RETRACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

# **TABLE OF AUTHORITIES**

<u>Federal Cases</u>

*Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163 (2d Cir.2000). . . . . . . . . . . . . . . . . . . . . . 10

*Davis v. Ross*, 754 F.2d 80 (2d Cir.1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Dunlop-McCullen v. Rogers*, 2002 U.S. Dist. LEXIS 3202 (S.D.N.Y. Feb. 21, 2002). . . . . . . . . . 8

*Flowers v. Carville*, 310 F.3d 1118 (9th Cir.2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989). . . . . . . . . . . . . . . . . . 9

*James v. Gannett Co., Inc.*, 40 N.Y.2d 415, 386 N.Y.S.2d 871, 353 N.E.2d 834 (1976). . . . . . . . 2

*Morsette v. Final Call*, 278 A.D.2d 81, 718 N.Y.S.2d 29 (1st Dept.2000). . . . . . . . . . . . . . . . . . . 2

*St. Amant v. Thompson*, 390 U.S. 727 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Herbert v. Lando*, 441 U.S. 153, 99 S. Ct. 1635, 60 L. Ed.2d 115 (1979). . . . . . . . . . . . . . . . . . . 9

*Zerangue v. TSP Newspapers Inc.*, 814 F.2d 1066 (5th Cir.1987). . . . . . . . . . . . . . . . . . . . . . . . 10

<u>Federal Rules</u>

F.R.Civ.P. 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

<u>State Cases</u>

*Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 649 N.E.2d 825,
    625 N.Y.S.2d 477 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Clemente v. Impastato*, 274 A.D.2d 771, 711 N.Y.S.2d 71 (3d Dept.2000). . . . . . . . . . . . . . . . . 2

*Four Star Stage Lighting, Inc. v. Merrick*, 56 A.D.2d 767, 392 N.Y.S.2d 297 (1st Dept.1977). . . 2

*Golub v. Enquirer/Star Group*, Inc., 89 N.Y.2d 1074, 681 N.E.2d 1282,
    659 N.Y.S.2d 836 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*James v. Gannett Co.*, 40 N.Y.2d 415, 386 N.Y.S.2d 871, 353 N.E.2d 834 (1976). . . . . . . . . . . 2

*Nichols v. Item Publishers*, 309 N.Y. 596, 132 N.E.2d 860 (1956).. . . . . . . . . . . . . . . . . . . . . . . *2*

*November v. Time Inc.*, 13 N.Y.2d 175, 194 N.E.2d 126, 244 N.Y.S.2d 309 (1963). . . . . . . . . . 3

*Steinhilber v. Alphonse*, 68 N.Y.2d 283, 501 N.E.2d 550, 508 N.Y.S.2d 901 (1986). . . . . . . . . . 3

*Weaver v. Lancaster Newspapers, Inc.*, 592 Pa. 458, 926 A.2d 899 (Sup.Ct.Pa.2007). . . . . . . . . . . 9

Other Authorities

Restatement (Second) of Torts § 580A, cmt. d (2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Plaintiff's attorneys, Law Office of Richard A. Altman, submit this memorandum of law in opposition to the Rule 12(b)(6) motion by defendant Paddy Johnson to dismiss the Eighth Claim contained in the Third Amended and Supplemental Complaint ("TASC"), asserted against her. The claim arises from a posting which she wrote and published on her blog, which has the tasteless, if not offensive, name of artfagcity.com. The motion should be denied, she should be directed to serve an answer, and discovery should proceed.

Ms. Johnson makes three arguments to support her dismissal motion. First, she says that there are no defamatory implications in the language complained of, that there is no allegation that she adopted or endorsed any defamatory implication from the New Yorker Article, and that the language she used is non-actionable opinion in any event. Second, she says that Mr. Biro is a limited-purpose public figure, and that he must therefore plead and prove malice, *i.e.*, that Ms. Johnson knew that the statements about him were false and that she acted with reckless disregard for the truth. Third, she says that claim does not identify any defamatory portions of the original New Yorker Article which she republished. We address her arguments in turn.

## POINT I

### THE STATEMENTS ARE FACTUAL ASSERTIONS, REASONABLY SUSCEPTIBLE OF A DEFAMATORY CONNOTATION, NOT OPINIONS.

Ms. Johnson's main argument is that the claim against her is based upon libel by implication and that the language is merely opinion. She is incorrect. It is rather based on direct factual assertions of criminality, and the republishing of defamatory language taken at length from the original Article. Notwithstanding her attempts to recast the language she used in its

mildest possible light, a reasonable reader could conclude that Mr. Biro is a forger and a fraud, and that his reputation as a forensic scientist and authenticator of art is therefore undeserved.

As was argued in Mr. Biro's opposition to the New Yorker's motion to dismiss, when the individual is a professional, statements which impute dishonesty or incompetence in the practice of that profession are defamatory *per se*, *i.e.*, damages are presumed without the need for proof of them. *Davis v. Ross*, 754 F.2d 80, 83 (2d Cir.1985); *Nichols v. Item Publishers*, 309 N.Y. 596, 132 N.E.2d 860 (1956); *Four Star Stage Lighting, Inc. v. Merrick*, 56 A.D.2d 767, 768, 392 N.Y.S.2d 297, 298 (1st Dept.1977)("words are libelous if they affect a person in his profession, trade, or business by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof"). "Even on a professional level, a defamatory meaning may attach to derogatory statements that would cause apprehension about a person's ability to conduct business." *Golub v. Enquirer/Star Group*, Inc., 89 N.Y.2d 1074, 681 N.E.2d 1282, 1283, 659 N.Y.S.2d 836 (1997). Moreover, her characterization of Mr. Biro as a forger is an accusation of a crime, and is also defamatory *per se*. *Morsette v. Final Call*, 278 A.D.2d 81, 718 N.Y.S.2d 29 (1st Dept.2000); *Clemente v. Impastato*, 274 A.D.2d 771, 711 N.Y.S.2d 71 (3d Dept.2000).

In any defamation case, the threshold question for the Court on a motion to dismiss is whether the article is "reasonably susceptible of a defamatory connotation," *James v. Gannett Co., Inc.*, 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834, 837 (1976). If so (questions of malice aside), the complained-of words must be submitted to a jury to determine if that connotation was in fact conveyed. The truth or falsity of the words is not in issue on the

motion; it must be presumed at the pleading stage that the words are false, because the complaint so states.

The standards to be followed in examining the language are of long standing in New York. The Court of Appeals has said:

> If every paragraph had to be read separately and off by itself plaintiff would fare pretty well. But such utterances are not so closely parsed by their readers or by the courts and their meaning depends not on isolated or detached statements but on the whole apparent scope and intent. Plaintiff is a professional man. If, on their face, they are susceptible in their ordinary meaning of such a construction as would tend to injure him in that capacity, they are libelous per se and the complaint, even in the absence of allegation of special damage, states a cause of action. The courts will not strain to interpret such writings in their mildest and most inoffensive sense to hold them nonlibelous. The words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed. *The casual reader might not stop to analyze, but could readily conclude that plaintiff is a crook and let it go at that.*
> *November v. Time Inc.*, 13 N.Y.2d 175, 178-79, 194 N.E.2d 126, 128, 244 N.Y.S.2d 309, 311-12 (1963)(citations and quotation marks omitted; emphasis added).

The New York Court of Appeals has repeatedly held that courts "must give the disputed language a fair reading in the context of the publication as a whole." *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 649 N.E.2d 825, 829, 625 N.Y.S.2d 477 (1995). The challenged statements are not to be considered in isolation, but must be read as the average reader would, against the "whole apparent scope and intent" of the writing. *November, supra*, 13 N.Y.2d at 177, 194 N.E.2d 126 at 128.

Moreover, the language here is not opinion. *See Steinhilber v. Alphonse*, 68 N.Y.2d 283, 501 N.E.2d 550, 554, 508 N.Y.S.2d 901 (1986)(distinguishing fact from opinion requires

consideration of "whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous").

There is nothing indefinite or ambiguous about Ms. Johnson's language. Here is the first relevant portion of the blog post:

> Forensic scientist Peter Paul Biro had produced fingerprinting identification and matched paint samples though, and that evidence seemed rather compelling. So I pushed aside a few pesky details, namely that it followed the basic rule of forgery: The less plausible the fake, the more involved the narrative and documentation becomes. This one reached absurd levels, with truck driver Teri Horton's big thrift store find and Peter Paul Biro's research even spinning its own documentary.

A reasonable, unforced and non-legalistic reading of the plain meaning of this passage is that Mr. Biro forged fingerprints and paint samples. Leaving aside the story behind Teri Horton's painting–which is not central to this case, no matter how plausible or implausible it might be–the mere fact that Mr. Biro's research was used in a documentary film[1], in which he showed his work, explained in detail what he did, and showed how the fingerprints matched, is neither evidence that he is a forger, nor is that a plausible interpretation of what the documentary actually says. If anything, a reasonable viewer of the documentary could conclude that the forensic evidence is convincing, but that the art market, for its own reasons, does not accept the painting as a genuine Pollock. However, no one interviewed in the documentary made the slightest suggestion of dishonesty or fraud on Mr. Biro's part. At worst, they only said either that his work was irrelevant to the process of authenticating the painting, or that they just didn't believe it to be a Pollock, regardless of his conclusions.

---

[1] The documentary film was submitted by defendants Condé Nast and Grann as part of their motion seeking public figure status for Mr. Biro (Atcherley decl., Exh. 9, Dkt. #107).

Furthermore, a reasonable person who watches the documentary and reads the New Yorker Article can disagree with what Mr. Biro said, dispute whether the fingerprints or the paint samples truly match, argue that his methods are flawed, criticize the technology which he used to scan and match the fingerprints, challenge his conclusions in any other way, or just claim that he is mistaken and that Horton's painting is not by Pollock, as did some of the art experts in the documentary. All such statements would plainly be protected opinion. But to state or imply that he is a forger of the fingerprints, or that he planted the paint samples, is not to express an opinion, but to accuse him of knowingly committing crimes of deception and fraud, essentially conspiring with Horton to foist off the painting to the public as a genuine Pollock <u>with knowledge that it was not.</u> There is no difference between saying that the evidence "followed the basic rule of forgery," and saying that it in fact is a forgery. Thus it is capable of a defamatory connotation, it is not an opinion, and it survives a motion to dismiss.

Here is the next relevant passage from Ms. Johnson's posting (TASC, ¶ 266 at 42-44). It is largely a verbatim republication of a substantial portion of the Article:

> Now however, David Grann sheds considerable light on some of the forensic scientist's more questionable authentication techniques. From the article:
>
>> [Theresa] Franks [of Global Fine Art Registry, a company crusading against fraud] became particularly interested in Biro's methods after Frankie Brown, an artist in California, told her that he had seen a photograph of the Teri Horton painting, in People, and wondered if it might be his own work. Franks hired as an expert Tom Hanley, the chief of police in Middlebury, Vermont, who had more than two decades of experience as a fingerprint examiner. Hanley told me that he approached Biro, who had previously stated about Horton's painting, "My work is (and has been) available for evaluation to qualified experts." Yet Biro

declined to share his evidence, saying that Horton had objected to the idea.

Hanley was thus forced to rely on bits of information that Biro had posted on his Web site, several years earlier. The online report contains a photograph of the partial fingerprint that Biro said he had found on the back of Horton's painting. In Hanley's judgment, the impression lacked the kind of detail—the clear ridges and furrows—that is necessary to make a proper comparison.

After Hanley revealed his findings to Franks, she raised questions on her Web site about the reliability of Biro's fingerprint methodology. Biro then inserted a clarification to his online report. It said:

For security reasons, several images in this report are watermarked in a way that is not apparent to the observer. The fingerprint images have also been reduced in resolution so as to render them unusable except for illustration. I advise against evaluating the fingerprint images illustrated in this report as if they were the actual source material. Any attempt to do so is pointless.

Biro told me that such secrecy protected the privacy of his clients and prevented anyone from misusing the fingerprint. To Hanley, this was baffling: what forensic scientist avoids peer review and even admits to doctoring evidence in order to prevent others from evaluating it? "If what he found are truly fingerprints, why isn't he sharing?" Franks asked me. In any case, Hanley, unable to examine Biro's evidence firsthand, had reached a dead end.

Then Ken Parker [a man Biro also produced a controversial Pollock authentication for] told Hanley and Franks about his drama with Biro. Parker said that Hanley was welcome to examine his painting. For the first time, Hanley was able directly to observe Biro's fingerprint evidence. He noted several fingerprints on the back of the picture, including two on the wooden stretcher frame, which were black, as if they had been made with ink. Looking through a magnifying glass, Hanley focussed on the most legible fingerprint, which appeared to be covered with a clear finishing coat, like a varnish. Parker said that before giving the painting to Biro he hadn't noticed a fingerprint on it. "I don't know where it

> came from," he said. He said that Biro had told him he had used some sort of "resin process" to make it more visible. Hanley had never seen a print developed in this fashion. Based on the clarity of the impression, Hanley thought that the fingerprint had to be relatively new—certainly not from half a century ago, when Pollock was alive.
>
> Those are pretty damning words. I spoke with Peter Paul Biro on more than one occasion during the promotion of the movie, and while he didn't offer a lot of insight on the movie itself he did go to great lengths to explain that his reputation was his livelihood. "This is not a risk I would take if I were not certain," he told me. Foolishly, I believed him.

The excerpt from the Article tries to make something nefarious out of Mr. Biro's unwillingness to share his work with either Ms. Johnson, Hanley or Franks, and it does so by directly quoting Franks: "'If what he found are truly fingerprints, why isn't he sharing?' Franks asked me." But Mr. Biro had not the slightest obligation to share his work, which was done for a private client, Teri Horton. There was well-known animosity on Franks's part toward Ms. Horton and Mr. Biro, and it was perfectly understandable for Ms. Horton to refuse to consent to the release of his work to someone whom she knew wanted to discredit her and Mr. Biro.

Furthermore, Mr. Biro did not "even admit[ ] to doctoring evidence" as the Article says; he simply refused to disclose it to someone who he knew had an agenda and long-standing hostility toward him. These are not just "pretty damning words," as Ms. Johnson says. They are a verbatim republication of the defamatory words previously published by the New Yorker, and as such, she is as liable for their repetition as if she had written them herself.[2] After all, is

---

[2] In Point I of Mr. Biro's Memorandum in Opposition to defendant Business Insider, Inc.'s motion to dismiss (Dkt. #119), we discuss liability for republication. We incorporate by reference the arguments therein.

there any professional person who would not say that his reputation is his livelihood, and who would have a strong negative reaction, even anger, to anyone who questioned it? There is surely nothing foolish about such a response.

Thus, her Point III, that plaintiff fails to identify the defamatory material which she republished, and her Point I.B., that there is no allegation that she adopted or endorsed the implications of the Article, are plainly refuted by the content of her own blog post, which repeats a large portion of the original Article and characterizes them as "pretty damning words." Indeed they are, and her characterization is thus a clear adoption and endorsement of them.

Taken in its entirety, the blog post is reasonably susceptible of a defamatory connotation, and that is sufficient to result in denial of the motion.

## POINT II

### THE CLAIM IS SUFFICIENTLY PLEADED, WHETHER MR. BIRO IS A PUBLIC FIGURE OR NOT, AND THERE IS IN ANY EVENT EVIDENCE OF MALICE FROM THE REPUBLICATION AND REFUSAL TO RETRACT.

Ms. Johnson argues that because Mr. Biro is a limited-purpose public figure, he is obliged to plead that she made the defamatory statement about him with actual malice, *i.e.*, with knowledge of falsity or reckless disregard of the truth, and that the complaint must contain sufficient factual detail to support that conclusion. Her motion explicitly joins in the same point in the dismissal motion of defendant Business Insider, Inc. (Dkt. #101), and incorporates by reference the arguments therein (Johnson Memo at 18 n. 5). Accordingly, we incorporate herein Point II of our opposition to defendant BI's motion (Biro Memo at 3-9, Dkt. #119), which is *sub judice*.

All of the cases which she cites in support of her motion are already addressed in that our opposition memorandum, with one exception, *Dunlop-McCullen v. Rogers*, 2002 U.S. Dist. LEXIS 3202 (S.D.N.Y. Feb. 21, 2002). However, just as with the *Church of Scientology* case, *Dunlop-McCullen* was also a decision on a summary judgment motion, after a full opportunity for discovery. It is not a pleading case and has no application here.

In any event, there is direct evidence to support the allegation of malice at this point. The New Yorker Article was published in July 2010. Mr. Biro commenced this action on June 29, 2011, and it immediately attracted considerable media attention, and one can assume that Ms. Johnson knew of it. Her blog post was first published on May 18, 2011 (TASC, ¶ 265 at 42), before this action, and thus it was only a response to the original Article. However, after he commenced the action, Mr. Biro demanded a retraction from her, on October 4, 2011. She refused to remove or edit it in any way (*id.*, ¶¶ 273-74), and her refusal was one reason for joining her as a defendant in the latest complaint.

Thus, Ms. Johnson knew that the New Yorker Article was being challenged by its subject's defamation suit. The suit itself was sufficient to raise a doubt as to the veracity of the Article, and placed her on notice that refusing to retract it could raise a question of malice. "In a case such as this involving the reporting of a third party's allegations, 'recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'" *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989), *quoting St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).

> The existence of actual malice may be shown in many ways. As a general rule, any competent evidence, either direct or circumstantial, can be resorted to, and all the

-9-

> relevant circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or *subsequent defamations*, *subsequent statements of the defendant*,...facts tending to show a reckless disregard of the plaintiff's rights, and, in an action against a newspaper, custom and usage with respect to the treatment of news items of the nature of the one under consideration.
> *Herbert v. Lando*, 441 U.S. 153, 164 n. 12, 99 S. Ct. 1635, 60 L. Ed. 2d 115 (1979) (emphasis added).

In other words, republication, or a refusal to retract a defamatory statement can be evidence of malice. *See Weaver v. Lancaster Newspapers, Inc.*, 592 Pa. 458, 469-70, 926 A.2d 899, 905 (Sup.Ct.Pa.2007)(republishing defamatory accusation after lawsuit filed "does inform the jury's inquiry by making it more probable that he either knew the information was false or that he acted recklessly with regard to the truth at the time of the initial publication.").

*See also* Restatement (Second) of Torts § 580A, cmt. d (2006): "Republication of a statement after the defendant has been notified that the plaintiff contends that it is false and defamatory may be treated as evidence of reckless disregard." Filing a lawsuit constitutes such notice, *Weaver, supra.* Furthermore, "[u]nder certain circumstances evidence [of refusal to retract] might be relevant in showing recklessness at the time the statement was published." *Id.*; *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 187 (2d Cir.2000)(same; citing Restatement); *Zerangue v. TSP Newspapers Inc.*, 814 F.2d 1066, 1071 (5th Cir.1987)("Refusal to retract an exposed error tends to support a finding of actual malice.").

*See also Flowers v. Carville*, 310 F.3d 1118, 1130 (9th Cir.2002)("if someone knows that the news story is false, he can't sanitize his republication by purporting to rely on the news source. Nor can he claim immunity if he has conflicting information from another source and recklessly

-10-

disregards it."). Thus, at the least, the pendency of Mr. Biro's suit, the extensive facts alleged in the complaints refuting the Article in detail, and the well-known animosity of Franks toward him, placed Ms. Johnson on notice that her writing might have some factual deficiencies, and that caution and further investigation would have been preferable to her mindless repetition and expansion of the damage to Mr. Biro's reputation. Thus there is already evidence to support the claim of actual malice.

Furthermore, Mr. Biro does not concede for the present motion that he is a public figure. That issue is presently before the Court in the pending motion of the New Yorker defendants, and if the Court determines that he is, then he will have the additional burden of proving malice. But even assuming for the present motion that Mr. Biro is a limited-purpose public figure, the pleading is sufficient, because it alleges the existence of malice: "275. Defendant Paddy Johnson acted with actual malice, in that she knew or should have known that many of the statements of fact in the article were false, and she published the article notwithstanding that knowledge." (TASC at 45). As the cases cited in the BI memorandum hold, a plaintiff need not plead facts to support the existence of actual malice; such facts are usually within the sole control of a media defendant, and development of them is a matter for discovery.

Accordingly, the Court should reject the argument that the complaint should be dismissed for failure to allege facts to support a conclusion of actual malice. It has been sufficiently pleaded at this stage, whether or not Mr. Biro is a limited-purpose public figure.

## **CONCLUSION**

Ms. Johnson's motion to dismiss should be denied, she should be directed to file an answer, and discovery should proceed.

Dated: New York, New York
November 29, 2012

*[signature: Richard A. Altman]*

LAW OFFICE OF RICHARD A. ALTMAN
Attorneys for Plaintiff
285 West Fourth Street
New York, New York 10014
212.633.0123
altmanlaw@earthlink.net
artesq@earthlink.net